UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INDEPENDENCE FEDERAL | ) | |
| SAVINGS BANK, <u>et</u> <u>al</u>., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | C.A. No. 1:08-CV-00963 |
| | ) | |
| 1225 CONNECTICUT CO. L.L.C., | ) | |
| <u>et</u> <u>al</u>., | ) | |
| | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' MOTION TO REMAND
## AND FOR COSTS AND ATTORNEYS FEES

Pursuant to 28 U.S.C. Section 1447(c), Plaintiffs Independence Federal Savings Bank and Stanley W. Parsons, by and through their undersigned counsel, hereby move to remand this case back to the District of Columbia Superior Court, and for an award of their costs and attorneys fees incurred as a result of the removal of the action to this Court.[1]  In support hereof, the Plaintiffs submit the accompanying Memorandum of Points and Authorities.

---

[1] Defendants previously removed this case on November 16, 2007 (Case Number 1:07-CV-001389), and Plaintiffs filed a Motion for Remand.  On January 7, 2008, this Court remanded this case back to the Superior Court for the District of Columbia.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.

_____/s/_____

Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com

***Attorneys for Plaintiffs***
***Independence Federal Savings Bank***
***and Stanley W. Parsons***

## STATEMENT PURSUANT TO RULE 7(M) OF THE RULES OF THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

On June 6, 2008, I conferred with counsel for the Defendants by electronic mail.  On June 9, 2008, Defendants indicated by electronic mail that they believe the removal of this case was legitimate.  On June 20, 2008, I informed counsel for Defendants by electronic mail, of Plaintiffs' intent to file the present Motion.  Defendants' counsel confirmed that Defendants would oppose the Motion.

_____/s/_____

Donna S. Mangold

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **INDEPENDENCE FEDERAL** | ) |
| **SAVINGS BANK, <u>et</u> <u>al.</u>,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | )   **C.A. No. 1:08-CV-00963** |
| | ) |
| **1225 CONNECTICUT CO. L.L.C.,** | ) |
| <u>et</u> <u>al.</u>, | ) |
| | ) |
| | ) |
| **Defendants.** | ) |
| | ) |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PLAINTIFFS' MOTION TO REMAND
<u>AND FOR COSTS AND ATTORNEYS FEES</u>**

Plaintiffs Independence Federal Savings Bank ("IFSB") and Stanley W. Parsons

("Parsons"), by and through their undersigned counsel, hereby submit this Memorandum of

Points and Authorities in support of their Motion to Remand and for Costs and Attorneys Fees

and state as follows:

<u>**INTRODUCTION**</u>

This dispute relates to a construction project ("Repositioning Project") taking place at

1225 Connecticut Avenue in the District of Columbia (the "Building"), and is before this Court

for the third time.  In July 2007, Plaintiff IFSB filed a case with this Court (Case Number 1:07-

CV-001389), seeking to enjoin the Repositioning Project for the remainder of its lease ("First

Federal Case").  After the Court denied its Application for Preliminary Injunctive Relief, IFSB

voluntarily dismissed that case.  On October 23, 2007, Plaintiffs IFSB and Parsons filed a

lawsuit in the Superior Court for the District of Columbia against 1225 Connecticut Co., LLC

("1225") (the landlord) and Davis Construction Services ("DCS"),[1] alleging the following counts

("Superior Court Action"):

|  | Plaintiff(s) | Defendant(s) | Description |
|---|---|---|---|
| Count I | IFSB | 1225 | Breach of Contract |
| Count II | Parsons | 1225 | Breach of Contract (Third-Party Beneficiary) |
| Count III | IFSB Parsons | 1225 DCS | Violation of Implied Covenant of Quiet Enjoyment |
| Count IV | IFSB Parsons | 1225 DCS | Nuisance |
| Count V | IFSB Parsons | 1225 DCS | Negligence |

Plaintiffs seek injunctive relief and compensatory damages.

Because this dispute has gone through several iterations, for ease of reference of the

Court, a chart of the procedural history follows:

---

[1] Plaintiff IFSB is a federally-chartered bank with its principal offices in the District of Columbia. IFSB leases its headquarters office and main bank branch from Defendant 1225 (a District of Columbia entity). Plaintiff Parsons, a Virginia resident, is an officer of IFSB and has his office in the Building. Defendant DCS is a Virginia corporation, and its corporate parent, James G. Davis Construction Corporation ("Davis"), is also a Virginia corporation. Either DCS or Davis is the general contractor on the Repositioning Project. When Plaintiffs filed this case, Plaintiffs sued DCS, believing it to be the general contractor. At the time this case was removed, Plaintiffs had sought to amend the Complaint to add Davis (the parent) as a Defendant. Accordingly, because Defendant DCS and Davis and Plaintiff Parsons are all Virginia residents, this case lacks complete diversity.

| Date | Court | Description |
|------|-------|-------------|

**"FIRST FEDERAL CASE"**

| Date | Court | Description |
|------|-------|-------------|
| 7/31/07 | U.S. District Court | Complaint, Case Number 1:07-CV-001389 ("First Federal Case")[2] |
| 7/31/07 | U.S. District Court | Application for Preliminary Injunctive Relief |
| 9/7/07 | U.S. District Court | Hearing |
| 9/11/07 | U.S. District Court | Order Denying Preliminary Injunctive Relief |
| 9/24/07 | U.S. District Court | Stipulation of Voluntary Dismissal without Prejudice |

**"SUPERIOR COURT ACTION"**

| Date | Court | Description |
|------|-------|-------------|
| 10/23/07 | Superior Court | Complaint, Case Number 2007 C.A. 007075 B (see Chart of Counts, above), attached as Exhibit A |
| 11/16/07 | U.S. District Court | Defendants' Notice of Removal (Case Number 1:07-CV-02090) |
| 11/26/07 | U.S. District Court | Plaintiffs' Motion to Remand and for Costs and Attorneys' Fees (Docket Number 3) |
| 12/6/07 | U.S. District Court | Opposition to Motion to Remand (Docket Number 5) |
| 1/7/08 | U.S. District Court | Memorandum and Order, remanding to Superior Court ("Remand Order")(Docket Number 10), attached as Exhibit B |
| 3/21/08 | Superior Court | Scheduling Order |
| 3/21/08 | Superior Court | Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Dismissal/ Summary Judgment Motion"), attached as Exhibit C |

---

[2] In the First Federal Case, Plaintiff IFSB primarily sought to enjoin the Repositioning Project.

| | | |
|---|---|---|
| 4/14/08 | Superior Court | Initial discovery requests are served by Plaintiffs[3] |
| 4/14/08 | Superior Court | Plaintiffs' Opposition to Motion to Dismiss or, in the Alternative, for Summary Judgment |
| 5/6/08 | Superior Court | Plaintiffs' Motion for Leave to File First Amended and Supplemental Complaint ("Motion for Leave to Amend") |
| 5/19/08 | Superior Court | Defendants' Opposition to Motion for Leave to File First Amended and Supplemental Complaint |
| 6/2/08 | Superior Court | Order Granting, in part, and Denying, in part, Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Dismissal/Summary Judgment Order"),[4] attached as Exhibit D |
| 6/2/08 | Superior Court | Order Denying, with Prejudice, in part, and Denying, without Prejudice, in part, Plaintiffs' Motion for Leave to File First Amended Complaint ("Amended Complaint Order"), attached as Exhibit E |
| 6/5/08 | U.S. District Court | Notice of Removal (Case Number 1:08-CV-00963), attached as Exhibit F |

In its January 7, 2008 Remand Order, remanding the case back to the Superior Court, this Court found that: (1) whether Davis or DCS was the contractor, both were Virginia entities and "plaintiffs may easily amend their complaint to ensure that the proper Virginia party is named,"

---

[3] Prior to removal, the parties had served and begun responding to Interrogatories and Requests for the Production of Documents. The parties had also served deposition notices. Because of the procedural uncertainty, the parties have agreed to stay discovery due dates and depositions, pending a decision on this Motion.

[4] The significance of the Dismissal/Summary Judgment Order to this Motion to Remand is that the Superior Court dismissed claims against Parsons (the non-diverse party). As discussed in detail below, however, the involuntary dismissal of a non-diverse party by a state court does not create removal jurisdiction.

Remand Order at 4; and (2) the decision as to whether Parsons is a proper party or his claims are proper is "appropriately left for the courts of the District of Columbia," id. at 5 (quoting Brown v. Brown & Williamson Tobacco Corp., 26 F. Supp. 2d 74, 77 (D.D.C. 1998)).  This Court found that Parsons was not fraudulently joined, holding:

> Thus, at bottom, defendants have not shown that all of Parsons' claims present "no possibility of a right to relief" and are instead "wholly nonsensical."

Order (1/7/08) at 4-5.  The Court adopted the language in Pulse One Communications, Inc. v. Bell Atlantic Mobile Systems, Inc., 760 F. Supp. 82, 84 (D. Md. 1991), and Brown, which were discussed in Plaintiffs' original Motion for Remand.

Following the remand to the Superior Court, the parties began paper discovery and scheduled depositions (which they have now postponed).  On March 21, 2008, Defendants filed their Dismissal/Summary Judgment Motion with the Superior Court.[5]  On May 6, 2008, Plaintiffs filed their Motion for Leave to Amend, seeking to add Davis (the parent) as a Defendant, and to supplement the factual allegations of the Complaint to reflect the ongoing impact of the Repositioning Project on IFSB and Parsons.

On June 2, 2008, the Superior Court issued several Orders, including the Amended Complaint Order and the Dismissal/Summary Judgment Order.  In the Amended Complaint Order, the Superior Court denied, without prejudice, Plaintiff's Motion for Leave to Amend to

---

[5] In opposition, Plaintiffs cited several District of Columbia cases establishing Parsons' and IFSB's causes of action, some of which were also cited in Plaintiffs' Motion for Remand, filed in Case Number 1:07-CV-02090.  See, e.g., Anderson v. Washington Metropolitan Area Transit Authority, 1991 WL 197024 (D.D.C. 1991) (recognizing claim for nuisance and negligence by person residing across from construction project against contractor performing work), and Bostic v. Henkels and McCoy, Inc., 748 A.3d 421 (D.C. 2000) (contractor owes common law duty of care to those lawfully present near construction site).

add Davis as a Defendant, and directed IFSB to resubmit its Motion for Leave to Amend with an Amended Complaint which added Davis as a Defendant, but excluded Parsons as a Plaintiff. Amended Complaint Order at 1-2.

The Superior Court also granted in part, and denied in part, the Defendants' Dismissal/Summary Judgment Motion, with its Analysis of the arguments set forth at pages 7-11 of the Dismissal/Summary Judgment Order. The Defendants had moved to dismiss all claims against DCS (contained in Counts III, IV and V) on the grounds that DCS was not involved in the Repositioning Project.[6] In Section A of the Analysis, the Superior Court considered this argument, and declined to dismiss the claims against DCS, finding that "there is a genuine issue of material fact in dispute as to whether DCS is a proper party." Dismissal/Summary Judgment Order at 7-8.

The Superior Court's Analysis of the other arguments and the impact of its conclusions on Parsons' claims, however, require further clarification, and mandate the remand of this action. At pages 8-10 of its Analysis (Section B), the Superior Court considered Defendants' argument that Parsons' claim of breach of contract as a third-party beneficiary (Count II) should be dismissed. Defendants argued that Parsons was not an intended beneficiary of the Lease and, therefore, had no enforcement rights. The Superior Court's Analysis of Count II begins with the following caption:

> Plaintiff Parsons is not a third party beneficiary and Count II is dismissed. Plaintiff Parson[s] is no longer a party to the lawsuit.

---

[6] Defendants asserted the same "wrong defendant" argument in response to the Remand Motion previously before this Court. See Remand Order at 4 n.2.

Dismissal/Summary Judgment Order at 8.  The Superior Court concluded that Parsons was only an "incidental beneficiary," and not an intended beneficiary under the Lease, and therefore could not proceed with Count II.[7]  Id. at 9.  Following its discussion of "intended" vs. "incidental" beneficiaries under a contract, the Superior Court states at page 10 of its Analysis that "summary judgment shall be granted as to Count II of the Complaint."  Although the discussion at pages 8-10 is clearly limited to Parsons' claims under Count II of the Complaint (third-party beneficiary under the Lease), the Superior Court's caption contains language not only dismissing "Count II" but also declaring:  "Plaintiff Parson[s] is no longer a party to the lawsuit."  Yet, Counts III-V, which also assert claims by Parsons, are not discussed in Section B of the Analysis.

In its discussion of Counts III-V, there is no basis to find that the Superior Court intended to dismiss Parsons as a Plaintiff, as none of those counts are dependent on either "direct privity of contract [or] third party beneficiary status."  See Dismissal/Summary Judgment Order at page 9 (discussing Count II). In Count III, IFSB and Parsons sued 1225 and DCS for violation of the implied covenant of quiet enjoyment.  Seeking dismissal of Count III, the Defendants argued:

- the express covenant contained in the lease superseded the implied covenant under common law; and

---

[7] In reaching its conclusion that Parsons cannot be a third-party beneficiary under the lease the Superior Court relied on the recent opinion in Fort Lincoln Civic Assoc. v. Fort Lincoln New Town Corp., 944 A.2d 1055, 1064 (D.C. 2008).  The finding of incidental beneficiary in Fort Lincoln, however, was based on the specific factual situation, involving a government contract, and the principle that a member of the public generally cannot sue to enforce a government contract.  In its earlier Remand Order, this Court reached the opposite conclusion: "the District of Columbia recognizes a cause of action for a third party beneficiary under a contract."  Remand Order at 4.  Having two Courts reach conflicting conclusions on Parsons' claims supports the finding that Parsons' third-party beneficiary claims were not "wholly nonsensical."  Remand Order at 5.

    -      any covenant would run only between the landlord and tenant - not in favor of Parsons, and not against DCS.

The Superior Court declined to grant summary judgment on Count III without mentioning Parsons or IFSB one way or the other.[8]  The entirety of the Superior Court's discussion with regard to Count III (Analysis, Section C) is as follows:

> The Court finds that there is a genuine issue of material fact in dispute as to whether there is a breach of the implied covenant of quiet enjoyment.  Therefore, summary judgment shall not be granted as to Count III of the Complaint.

Dismissal/Summary Judgment Order at 10.  There is no indication that Parsons' claim for breach of quiet enjoyment is treated any differently than IFSB's claim.

In Count IV, IFSB and Parsons sued 1225 and DCS for nuisance.  Seeking dismissal of the nuisance claim, Defendants argued:

    -      Parsons has no possessory or property interest in the premises; and

    -      Defendants' interference is allowed under the Lease.

In its Analysis of Count IV (Section D), the Superior Court referred to both "Plaintiffs" and Parsons:

> ***Plaintiffs*** argue "the Defendants have created a nuisance." [Citation omitted].  Specifically, ***Plaintiffs*** state that Defendants have interfered in ***their*** use and enjoyment of the Premises ... disturbing of the safety, health and comfort of the Bank's officers, employees, including ***Parsons***, and customers ... failing to take proper precautions to ensure against risks to the Plaintiff ***Parsons***, as well as the Bank's other employees and customers ... .  Complaint at ¶72.

Dismissal/Summary Judgment Order at 10-11 (emphasis added).  In reaching its decision to deny

---

[8] This Court previously stated that, "... defendants have failed to cite any District of Columbia law that establishes that a plaintiff may not plead a claim for breach of implied covenant of quiet enjoyment if a claim has been made for breach of an express covenant of quiet enjoyment."  Remand Order at 4-5.

8

the motion as to Count IV, the Superior Court concluded:

> there are genuine issues of material fact in dispute as to whether Defendants have created a nuisance and whether this alleged interference in *Plaintiffs'* use and enjoyment of the Premises is substantial and unreasonable.  Therefore Summary Judgment shall not be granted as to Count IV of the Complaint.

Dismissal/Summary Judgment Order at 11 (emphasis added).  There is no indication that Parsons' claim for Nuisance is treated any differently than IFSB's claim.

In Count V, IFSB and Parsons sued 1225 and DCS for negligence.  Seeking dismissal of Count V, the Defendants' only argument was that Plaintiffs named the wrong party - DCS, as opposed to its parent, Davis.  Defendants did not assert any other specific grounds for dismissing the negligence claims as to either or both of Parsons and IFSB.[9]  Consistent with its finding in Section A of the Analysis (pages 7-8) that there were facts in dispute with regard to DCS, the Superior Court denied the Dismissal/Summary Judgment Motion on the negligence claim brought against DCS (Count V).  Dismissal/Summary Judgment Order at 11 (Section E).  Again, the Superior Court did not mention either Parsons or IFSB one way or the other.  Id.

Although the Dismissal/Summary Judgment Order's Analysis of Parsons' claims is solely in the context of the contractual claim alleged in Count II, and the Superior Court never even discusses, let alone finds, that Parsons is not a proper party to Counts III-V, the decretal paragraphs set forth in the "Conclusion" (pages 11-12 of the Dismissal/Summary Judgment Order) state that "the Motion to Dismiss Plaintiff Parsons is GRANTED [f]or the reasons stated

---

[9] This Court previously recognized the limited scope of Defendants' argument, noting that, "[Other than the 'wrong defendant' argument] Defendants make no further argument regarding Count V ... ."  Remand Order at 4 n. 2 (Case Number 1:07-CV-02090, Docket Number 10).

9

above."  Consistent with the Analysis discussion however, the Superior Court denied the Dismissal/Summary Judgment Motion as to DCS, and denied the Motion as to Counts III (breach of covenant of quiet enjoyment), IV (nuisance), and V (negligence), without differentiating between IFSB and Parsons.[10]

Significantly, the Superior Court's Dismissal/Summary Judgment Order did not explicitly state that it was a final order pursuant to Sup. Ct. R. Civ. P. 54(b).  Given the apparent inconsistency between dismissing "Parsons as a Plaintiff," and the Superior Court's denial of the Dismissal/Summary Judgment Motion as to Counts III-V, Plaintiffs immediately began to prepare a Motion for Clarification of the June 2nd Orders, seeking clarification that Parsons' claims under Counts III-V survived.  The Motion could not be filed however, because on June 5, 2008, Defendants filed their Notice of Removal.

## ARGUMENT

Removal of the present case is improper for several reasons.  Without regard to whether Parsons' claims were dismissed in full or in part, removal jurisdiction does not exist.  This Court already found Parsons was not fraudulently joined, and remanded this case on January 7, 2008. The June 2nd Dismissal/Summary Judgment Order, even to the extent that it extinguished all of Parsons' claims, would be subject to the voluntary-involuntary rule, and subject to reversal by the District of Columbia Court of Appeals.  Accordingly, this Court does not have diversity jurisdiction over this case.

---

[10] The Superior Court did not find, nor did it even suggest, that there was any requirement under District of Columbia law that Parsons would have to demonstrate direct privity or intended beneficiary status under the lease to pursue his claims under Counts III - V.

I.    **THE SUPERIOR COURT'S INTERLOCUTORY ORDER**
      **IS UNCLEAR AND SUBJECT TO REVISION**

At the time Defendants removed, the Superior Court still had revisory power over the

order under Superior Court Rule 54:[11]

> **(b) Judgment Upon Multiple Claims or Involving Multiple Parties.** When more than
> one claim for relief is presented in an action, whether as a claim, counterclaim, cross-
> claim, or third-party claim, or where multiple parties are involved, *the court may direct*
> *the entry of a final judgment as to one or more but fewer than all of the claims or parties*
> *only upon an express determination that there is no just reason for delay and upon an*
> *express direction for the entry of judgment.* In the absence of such determination and
> direction, any order or other form of decision, however designated, which adjudicates
> fewer than all of the claims or the rights and liabilities of fewer than all the parties shall
> not terminate the action as to any of the claims or parties, and *the order or other form of*
> *decision is subject to revision at any time before the entry of judgment adjudicating all the*
> *claims and the rights and liabilities of all the parties.*

(Italics added).  Even if the Superior Court dismissed all of Parsons' claims in its

Dismissal/Summary Judgment Order,[12] there was no final order issued: the order did not dispose

of the claims by IFSB against 1225 and DCS; and the order did not expressly direct a judgment be

entered against Parsons.  Thus, the Dismissal/Summary Judgment Order was still "subject to

revision" by the Superior Court.  See Cox-Stewart v. Best Buy Stores, L.P., 295 F. Supp. 2d 566,

568 (D. Md. 2003) (finding that the dismissals in state court were not final and that removal was

improper); Grubb v. Donegal Mut. Ins. Co., 935 F.2d 57, 59 (4th Cir. 1991) (although the Court

ultimately found the plaintiff waived remand, the Court held: "... until an order or judgment is

thus formally entered, a judge who has announced an intention or disposition to rule in a certain

---

[11] Superior Court Rule 54(b) is nearly identical to Rule 54(b) of the Federal Rules of
Civil Procedure.

[12] As set forth above, it is unclear which of Parsons' claims the Superior Court actually
dismissed.

11

way might yet change his mind before making the ruling a formal one. [Citation omitted.] This

is also true in the removal context") (citing Estep v. Georgetown Leather Design, 57 A.2d 78, 80

(Md. 1991)).

In Pulse One, 760 F. Supp. 82, previously relied upon by this Court in its prior Remand

Order in Case Number 1:07-CV-02090, the Court confronted a second removal of the same case,

following the dismissal of non-diverse plaintiffs. The defendants argued that the case became

removable when the non-diverse plaintiffs were dismissed from the case, and that their claims

were fraudulent to begin with. Id. at 83. The Court rejected these arguments. Id. First, the Court

dispelled the idea that diversity was created by an interlocutory dismissal:

> The order entered in the Baltimore City court was not a final judgment, in that it did not
> dispose of all claims against all parties, under Md. Rule 2-602(a), which is analogous to
> Fed. R. Civ. P. 54(b). The Court agrees with plaintiffs' contention that the order is thus
> still interlocutory as to them, as the Maryland Rule clearly states, and, thus, they have not
> been terminated from the action with sufficient finality to warrant removal. ... The reason
> for his result is that, on appeal, the involuntary dismissal could be found erroneous, thus
> reinstalling the non-diverse party.

Id. at 83.[13] The Court then affirmed the voluntary-involuntary rule, which is discussed in detail

below. Because there was no final order issued in the present case either, this Court should

remand.

---

[13] Even the presence of a final order against a non-diverse plaintiffs would not have
established a removable action. See Pulse One, 760 F. Supp. at 84.

## II.    __PARSONS HAS NOT BEEN FRAUDULENTLY JOINED__

Courts, including this one, consistently find that, once a claim passes the "wholly nonsensical" barrier, the merits of the case are left for the "state court*s*."[14]  Remand Order at 3, 5 (quoting Brown, 26 F. Supp. 2d at 77; Lyall v. Airtrain Airlines, Inc., 109 F. Sup. 2d 365, 374 (E.D. Pa. 2000)) (emphasis added).  Here, this Court already found Parsons' claims passed this "very low" bar.  Remand Order at 5.  It is anticipated that Defendants will once again argue that Parsons was fraudulently joined, especially now that the Superior Court dismissed Count II.  The test on a motion for remand, however, is whether the claim is "wholly nonsensical," not that the claim would survive a motion to dismiss or motion for summary judgment.[15]

In Leong v. Taco Bell Corp., 991 F. Supp. at 1239 (D. Or. 1998), a former Taco Bell employee, sued Taco Bell (a diverse party) for wrongful discharge and his supervisor (a non-diverse party) for intentional interference with economic relations.  Id. at 1238.  Defendant Taco Bell removed and claimed the supervisor had been fraudulently joined.  Id.  The United States District Court for the District of Oregon found that the supervisor was not fraudulently joined and remanded.  Id.  Following remand, the state trial court dismissed the claims against the supervisor

---

[14] The use of the plural, "courts," informs the voluntary-involuntary rule.  Concerns of judicial economy impel courts to avoid proceedings that could later be considered a nullity.  See Pulse One, 760 F. Supp. 82 ("... all federal proceedings theretofore would have been futile"); Poulos v. Naas Foods, Inc., 959 F.2d 69, 73 (7th Cir. 1992) ("If a state court has come to judgment, is there any reasonable possibility that the judgment will be reversed on appeal?"); Bogan, 55 F. Supp. 2d at 596 ("... a reversal on appeal 'would destroy the diversity of the parties, make any action of the federal court a nullity, and offend, thereby, traditional notions of judicial economy'") (quoting Arthur v. E.I. du Pont, 798 F. Supp. 367, 368 (S.D.W. Va. 1992)).

[15] The argument that different standards exist for fraudulent joinder and dismissal was first presented in this case by Plaintiff's December 17, 2007 Reply to Defendants' Opposition to Motion to Remand (Case Number  1:07-CV-02090).

because plaintiff "could not plead sufficient facts to support his claim." Id. Defendant Taco Bell

removed again. Id. Taco Bell claimed that the supervisor's dismissal "means that defendant

Ertman [the supervisor] was fraudulently joined." Id. at 1239. The Court disagreed, finding:

> [The state trial court judge's] ruling does not compel this court to conclude that there was *no possibility* that the state court would rule otherwise, and defendant Ertman would remain a party in the case.

Id. at 1239. The case was remanded back to the state trial courts. See also Kuperstein v.

Hoffman-LaRoche, Inc., 457 F. Supp. 2d 467, 471 (S.D.N.Y. 2006) (in considering claims under

a fraudulent joinder standard, there is "greater leniency" than under a motion to dismiss standard);

Leong, 991 F. Supp. at 1239 (distinguishing standards); Pulse One, 760 F. Supp. at 84

(distinguishing between summary judgment standard and "wholly nonsensical" standard). This

Court, however, has already determined that Parsons' claims were not "wholly nonsensical."

There is no reason to revisit this issue. Accordingly, this case should be remanded.

## III.   INVOLUNTARY DISMISSALS DO NOT CONFER REMOVAL JURISDICTION

Even assuming, *arguendo*, that the Superior Court dismissed all of Parsons' claims, the

dismissal was involuntary, and removal is not appropriate under the well-established voluntary-

involuntary rule. Riverdale Baptist Church v. Certainteed Corp., 349 F. Supp. 2d 943, 945 (D.

Md. 2004) ("When, however, the dismissal of all non-diverse defendants results from something

other than the voluntary action of the plaintiff, a federal court cannot exercise diversity

jurisdiction under the so-called 'voluntary-involuntary rule,' and removal is not proper") (citing

several cases); Cox-Stewart, 295 F. Supp. 2d at 568 ("'Although complete diversity may

temporarily exist between the parties, suggesting that removal is proper, diversity jurisdiction

may ultimately be destroyed if the state appellate court reverses the dismissal of the non-diverse

14

party'") (quoting <u>Higgins v. E.I. DuPont de Nemours & Co.</u>, 863 F.2d 1162, 1166 (4th Cir. 1988)); <u>Bogan v. Moore</u>, 55 F. Supp. 2d 597 (S.D.Miss 1999) (removal based on dismissal without prejudice of non-diverse parties due to failure of plaintiff to timely serve process was improper under voluntary-involuntary rule); <u>Davis v. Customized Transp., Inc.</u>, 854 F. Supp. 513, 517 (N.D.Ohio 1994) (although plaintiff did not seek remand, the Court, citing <u>Poulos</u>, found that he could have; the non-diverse party was involuntarily dismissed from case and removal was improper); <u>Poulos</u>, 959 F.2d at 72 (7th Cir. 1992) ("Every court of appeals that has addressed the voluntary/involuntary rule has held that it survived the enactment of section 1446(b)"); <u>Burke v. General Motors Corp.</u>, 492 F. Supp. 506, 508 (N.D.Ala. 1980) (remanding case because default judgment was neither a final order, nor was it a voluntary act by the plaintiff); Wright & Miller, <u>Federal Practice and Procedure</u>, §3723 (2008) ("Most cases subsequent to the 1949 amendment have held that the [voluntary-involuntary] distinction has survived the change in the statute").

In <u>Pulse One</u>, 706 F. Supp. 82, also discussed above, the district court (Maryland) confronted a second removal following the grant of summary judgment against non-diverse plaintiffs. The Court found that the plaintiffs' "involuntary termination from the case would remain reviewable on appeal and would continue to defeat removal." <u>Id</u>. at 93. The Court also found:

> Finally, to prevent yet a third attempt at removal (should, on remand, the summary judgment grant against the individual plaintiffs be made final and appealable by the state court), the Court notes that, as in <u>Higgins</u>, their involuntary termination from the case would remain reviewable on appeal and would continue to defeat removal.

<u>Id</u>. at 84. Under these cases, it is clear that removal of the present case was improper, and this case should be remanded.

## IV.  PLAINTIFFS SHOULD BE AWARDED THEIR COSTS AND ATTORNEYS FEES

Under 28 U.S.C. Section 1447(c), "[a]n order remanding the case may require payment of just costs and any actual expenses, including attorney fees, incurred as a result of the removal." To award costs and fees, a court need not find a notice of removal is subject to Rule 11 sanctions or was made in bad faith; the removal need only contravene "well-settled" law, or lack a "reasonable basis."  Martin v. Franklin Capital Corp., 546 U.S. 132, 141 (2005) (when a defendant lacks an "objectively reasonable basis" for removal, attorney's fees and costs may be awarded); Kuperstein, 457 F. Supp. 2d at 472 (finding that an award "does not require a finding of bad faith or frivolity," only the lack of a "reasonable basis" for removal); Yazdani v. Access ATM, 457 F. Supp. 2d 36, 37-38 (D.D.C. 2006) ("Yazdani I") ("well settled" law prevented untimely removal); Simpson v. Union Pacific R. Co., 282 F. Supp. 2d 1151, 1161 (N.D.Cal. 2003) ("The court need not find the motion rises to the level of sanctionable conduct under Rule 11 to assess attorney's fees and costs under section 1447(c)"); Johnson-Brown v. 2200 M Street LLC, 275 F. Supp. 2d 175, 181 (D.D.C. 2003) ("... if non-removability is obvious or contrary to well-settled law, courts regularly impose costs and expenses incurred as a result of removal") (the Court also found that "... defendants fail to point to any lower court decision supporting their argument presumably because every court that has addressed the issue has held that LLCs do not qualify for corporate citizenship"); Leong, 991 F. Supp. at 1239 (after remanding a second time, the court would have considered awarding attorney's fees had plaintiff "provided the court with the expenses incurred"); Pulse One, 760 F. Supp. at 84-85 (awarding costs even though Rule 11 sanctions were not appropriate because "the removal notice was not filed without any arguable basis").  Plaintiffs request reimbursement of their attorney's fees incurred as a result of

Defendants' second removal of the Superior Court Action to this Court.

In this case, given the wealth of precedent establishing the voluntary-involuntary rule, which is discussed above, Defendants lacked of an objectively reasonable basis for removal. This Court has already found that Parsons was not fraudulently joined. Even after Plaintiffs attempted to convince Defendants that removal was improper by alerting Defendants' counsel to the voluntary-involuntary distinction contained in this Motion, Defendants refused to agree to remand.[16]

As a result of this improper removal, Plaintiffs incurred the following attorneys fees:

| Date | Attorney | Description | Hours | Rate | Total |
|------|----------|-------------|-------|------|-------|
| 6/6/08 | Donna Mangold | Review Removal Notice; office conference with Dale Cooter; office conference with Fernando Amarillas and Adam Pignatelli; legal research; draft e-mail to Cassano and Luchs | 1.8 | 490.00 | 882.00 |
| 6/6/08 | Adam Pignatelli | Review Notice of Removal; Office conference with Donna Mangold, Fernando Amarillas | .2 | 260.00 | 52.00 |
| 6/11/08 | Adam Pignatelli | Legal research; draft Motion to Remand | 2.7 | 260.00 | 702.00 |
| 6/13/08 | Adam Pignatelli | Legal research | 1.7 | 260.00 | 442.00 |
| 6/16/08 | Adam Pignatelli | Legal research; draft Motion for Remand | 2.2 | 260.00 | 572.00 |

---

[16] In Johnson-Brown, 275 F. Supp. 2d at 181, the Court found that the removing party failed "to point to any lower court decision supporting their argument presumably because every court that has addressed the issue has held that LLCs do not qualify for corporate citizenship." Although the voluntary-involuntary rule is at issue in this case, it is also well-settled. As discussed above, every court of appeals that has addressed the voluntary-involuntary rule has upheld it. Poulos, 959 F.2d at 72.

| 6/17/08 | Adam Pignatelli | Revise Motion for Remand | 2.5 | 260.00 | 650.00 |
|---|---|---|---|---|---|
| 6/18/08 | Adam Pignatelli | Revise Motion for Remand | 1.5 | 260.00 | 390.00 |
| 6/19/08 | Donna Mangold | Revise Motion to Remand; office conference with Adam Pignatelli | .9 | 490.00 | 441.00 |
| 6/19/08 | Adam Pignatelli | Revise Motion to Remand; office conference with Donna Mangold; legal research | 3.6 | 260.00 | 936.00 |
| 6/20/08 | Donna Mangold | Email correspondence with opposing counsel | .2 | 490.00 | 98.00 |
| 6/20/08 | Adam Pignatelli | Revise Motion for Remand; legal research | 3.0 | 260.00 | 780.00 |
| 6/23/08 | Donna Mangold | Revise Motion for Remand; office conference with Adam Pignatelli | .5 | 490.00 | 245.00 |
| 6/23/08 | Adam Pignatelli | Revise Motion for Remand; office conference with Donna Mangold | 2.5 | 260.00 | 650.00 |
| 6/24/08 | Donna Mangold | Revise Motion for Remand; office conference with Adam Pignatelli | 1.0 | 490.00 | 490.00 |
| 6/24/08 | Adam Pignatelli | Revise Motion for Remand; office conference with Donna Mangold | 3.2 | 260.00 | 832.00 |
| | | **TOTAL** | **27.5** | | **8,162.00** |

The fees charged are those actually charged to Plaintiffs in this case.  Declaration of Donna S. Mangold at ¶12 ("Mangold Decl."), attached as Exhibit G.  See Yazdani v. Access ATM, 474 F. Supp. 2d 134 (D.D.C. 2007) ("Yazdani II") (awarding $10,058.71 in attorneys' fees incurred by plaintiffs in seeking remand, at actual hourly rate charged to the client).  The fees charged are reasonable and necessary under the circumstances.  Mangold Decl. at ¶13.  Accordingly, Plaintiffs respectfully request the Court order Defendants to pay their attorneys fees incurred in seeking remand.

**<u>CONCLUSION</u>**

For the foregoing reasons, the Plaintiffs respectfully request the Court remand this case

back to the District of Columbia Superior Court, and award Plaintiffs their costs and attorneys'

fees incurred as a result of the Defendants' second removal to this Court.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.

_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com

***Attorneys for Plaintiffs***
***Independence Federal Savings Bank***
***and Stanley W. Parsons***

19

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 26th day of June, 2008, a copy of the foregoing

**PLAINTIFFS' MOTION TO REMAND AND FOR COSTS AND ATTORNEYS FEES**,

Memorandum of Points and Authorities in support thereof, and proposed Order was served

through the Court's ECF system on:

> Richard W. Luchs, Esq.
> William C. Casano, Esq.
> Greenstein Delorme & Luchs, PC
> 1620 L Street, N.W.
> Suite 900
> Washington, DC  20036-5605

_____/s/_____
Dale A. Cooter

### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **INDEPENDENCE FEDERAL<br>  SAVINGS BANK, <u>et</u> <u>al</u>.,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **C.A. No. 1:08-CV-00963** |
| | ) | |
| **1225 CONNECTICUT CO. L.L.C.,**<br>  <u>et</u> <u>al</u>., | ) | |
| | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

### <u>ORDER</u>

UPON CONSIDERATION of the Plaintiffs' Motion for Remand and for Costs and

Attorneys Fees, the Memorandum of Points and Authorities in support thereof, any response of

Defendants thereto and any hearing thereon, it is this ____ day of _____, 2008,

hereby

ORDERED that the Plaintiffs' Motion be, and it hereby is, GRANTED and it is further

ORDERED that this case is remanded back to the District of Columbia Superior Court

and it is further

ORDERED that Defendants shall pay Plaintiffs their reasonable costs and attorneys fees

resulting from the removal to this Court in the amount of $_____.


_____
John D. Bates, Judge
United States District Court

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK<br>1229 Connecticut Avenue, N.W.<br>Washington, DC 20036, | ) )<br>)<br>) |
| and | ) ) |
| STANLEY W. PARSONS<br>4814 Castlewood Road<br>Richmond, Virginia, 23234 | )<br>)<br>) ) |
| Plaintiffs, | ) )<br>) |
| v. | ) )<br>) |
| 1225 CONNECTICUT CO. LLC<br>c/o its registered office<br>Corporation Service Company<br>2711 Centerville Road<br>Suite 400<br>Wilmington, DE 19808 | )<br>)<br>)<br>)<br>)<br>) ) |
| and | ) ) |
| DAVIS CONSTRUCTION SERVICES, LLC<br>14325 Willard Road<br>Suite K<br>Chantilly, VA 20151, | )<br>)<br>)<br>) ) |
| Defendants. | )<br>) ) |

C007075-07

C.A. No.: _____
Judge: _____
Calendar: _____

RECEIVED
CIVIL CLERK'S
CO...

## JURY DEMAND

Plaintiffs, Independence Federal Savings Bank and Stan Parsons, by and through their undersigned counsel, here demand trial by jury on all issues.

Respectfully submitted,


COOTER, MANGOLD, TOMPERT
 & KARAS, L.L.P.

_____
Dale A. Cooter, Bar No.227454
Donna S. Mangold, Bar No. 358851
5301 Wisconsin Ave., N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
*Independence Federal Savings Bank*
  *and Stanley W. Parsons*

2

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | | |
|---|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK<br>1229 Connecticut Avenue, N.W.<br>Washington, DC 20036,<br><br>        and<br><br>STANLEY W. PARSONS<br>4814 Castlewood Road<br>Richmond, Virginia, 23234<br><br>        Plaintiffs,<br><br>        v.<br><br>1225 CONNECTICUT CO. LLC<br>c/o its registered office<br>Corporation Service Company<br>2711 Centerville Road<br>Suite 400<br>Wilmington, DE 19808<br><br>        Please Serve:<br><br>        Registered Agent<br>        Prentice-Hall Corporations<br>          System, Inc.<br>        1090 Vermont Avenue, N.W.<br>        Washington, D.C. 20005<br><br>        and<br><br>DAVIS CONSTRUCTION SERVICES, LLC<br>14325 Willard Road<br>Suite K<br>Chantilly, VA 20151<br><br>        Please Serve:<br><br>        Registered Agent<br>        J & C Agency Services, Inc.<br>        1120 20th Street, N.W.<br>        Washington, DC 20036<br><br>        Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | C.A. No.:  _____<br><br>Judge:     _____<br><br>Calendar: _____<br><br><br>JURY TRIAL DEMANDED |

## COMPLAINT AND JURY DEMAND

Plaintiffs, Independence Federal Savings Bank and Stanley W. Parsons, by and through their undersigned counsel, hereby file their Complaint against Defendants and state as follows:

### JURISDICTION

1.  This Court has jurisdiction pursuant to D.C. Code Sections 11-921(a), 13-422, and 13-423(a) (2001 ed.).

### PARTIES

2.  Plaintiff Independence Federal Savings Bank ("IFSB" or the "Bank") is a federally-chartered savings bank, with its principal place of business in the District of Columbia.  It is the oldest historically minority banking institution in the District of Columbia. The Bank operates two branches in the District of Columbia, one branch in Chevy Chase, Maryland, and one branch in Silver Spring, Maryland. The address of the Bank's headquarters is 1229 Connecticut Avenue, N.W., Washington, D.C. (the "Premises"), which is located in the building whose address is 1225 Connecticut Avenue, N.W., Washington, D.C. (the "1225 Building").  On November 4, 2003, the Office of Thrift Supervision (the "OTS") advised the Bank that it had determined that the Bank is both a "problem association" and in "troubled condition."  This designation has not been lifted. IFSB has historically served the minority community, and is working

2

diligently under new management to emerge from the OTS designation as a "troubled" institution.

3.   Plaintiff Stanley W. Parsons ("Parsons") is a resident of the Commonwealth of Virginia.  Parsons is an employee of IFSB, having begun his employment there in June 2001.  Parsons is the Vice-President and Chief Information Officer.  For his entire tenure at the Bank, Parsons' office has been located at the Premises.  Parsons' job duties include being responsible for the Bank's information technology and computer system.

4.   Defendant 1225 Connecticut Co. LLC (formerly known as Trizechan 1225 Connecticut Avenue LLC) ("1225 LLC") is a Delaware limited liability company.

5.   Defendant Davis Construction Services, LLC ("Davis") is a Virginia limited liability Company with its principal executive office located in Chantilly, Virginia.  Davis is authorized to do business in the District of Columbia.

## FACTUAL BACKGROUND

### *The Lease*

6.   On or about December 16, 1988, IFSB, as tenant, and Pool 1225 Associates ("Pool"), as landlord, entered into an Agreement of Lease ("Lease") for the Premises.  A copy of the Lease is attached hereto as Exhibit A.   Section 2.01 of the Lease

3

provided for an initial lease term of twelve years, beginning
January 1, 1989 and ending December 31, 2000.

7. Section 1.01 of the Lease describes the leased premises
as "the portion of the Lobby Space (containing approximately
6,450 square feet in total) as delineated on the plan attached
[hereto] (the "demised premises"), *and as presently constructed* .
. .." (Emphasis added).

8. Section 1.01 of the Lease further provides that "[t]he
lease of the demised premises includes the right, together with
other tenants of the Building and members of the public, to use
the common and public areas of the Land and Building providing
access to the demised premises, but includes no other rights not
specifically set forth herein."

9. On or about December 16, 1988, IFSB and Pool entered
into a Memorandum of Lease ("MOL") which provides, in pertinent
part, that Pool leases to IFSB "the portion of Lobby Space
(containing approximately 6,450 square feet in total) as
described in the said lease *and as presently constructed* . . .."
(Emphasis added).

10. Section 16.02 of the Lease provides as follows:

> Landlord reserves the right, without the same
> constituting an actual or constructive
> eviction and without incurring liability to
> Tenant therefore, to change the arrangement
> and/or location of public entrances,
> passageways, doors, doorways, corridors,
> elevators, stairways, toilets and other
> public parts of the Building; provided,

4

however that the demised premises shall be
visible from the street, public access on the
street level directly into the demised
premises shall not be cut off, access to the
Building shall not be cut off and that there
shall be no unreasonable obstruction of
access to the demised premises or
unreasonable interference with the use or
enjoyment thereof.

11.    Article 20 of the Lease is captioned "Quiet Enjoyment"
and pursuant to Section 20.01 the Defendant "covenants and
agrees" that IFSB's "rights under th[e] Lease shall not be cut
off or ended before the expiration of the Term of th[e] Lease[.]"

12.    BRE/Connecticut L.L.C. ("BRE") (a Delaware limited
liability company) became the successor in interest to Pool under
the Lease.  On or about April 25, 2001, IFSB and BRE entered into
a First Amendment to Lease ("Lease Amendment") which pursuant to
its express terms was effective as of January 1, 2001.  A copy of
the Lease Amendment is attached hereto as Exhibit B.  On
information and belief, BRE subsequently assigned its rights and
obligations under the Lease and Lease Amendment to Trizechahn
1225 Connecticut Avenue LLC, which is now known as 1225
Connecticut Co. LLC, the Defendant.

13.    Section 2 of the Lease Amendment amends the square
footage total of the Premises to reflect that the total square
footage is 6,870 square feet and not 6,450 square feet.

14. Section 3 of the Lease Amendment amended Section 2.01 of the Lease resulting in a new lease term, for ten years, beginning January 1, 2001 and ending December 31, 2010.

15. Section 14 of the Lease Amendment provides that "[e]xcept as expressly set forth in this Amendment, the terms and conditions of the Lease shall continue in full force and effect without any change or modification and shall apply for the balance of the term of the Lease."

16. There have been no other amendments to the Lease.

### The Repositioning Project

17. In or about April 2007, Robert Isard, the Vice Chairman of IFSB, met with Christine V. Olfus-Campos and Robert Fuller, representatives of Defendant 1225 LLC, regarding a renovation project to be undertaken at the 1225 Building. Mr. Isard requested that they provide the Bank with a comprehensive plan of what was to be done with the 1225 Building, a copy of the plans, specifications, general conditions and time-line for the project. Mr. Isard's requests were rejected and he was told that the items for which he asked were not available to IFSB.

18. On or about May 11, 2007, Brookfield Properties (the property manager for the 1225 Building) delivered a letter to IFSB. A copy of the May 11, 2007 letter is attached hereto as Exhibit C. The letter states that on July 1, 2007, work would commence for the 1225 Connecticut Avenue Repositioning Project

6

("Repositioning Project").  The letter further advised that the project is currently scheduled to continue for approximately 18 months.

19. On or about June 12, 2007, representatives of IFSB, including Morton Bender and Mr. Isard, met with representatives of Brookfield Properties regarding the proposed Repositioning Project. A representative of the project architect and of the Defendant Davis (as the contractor) were also in attendance. IFSB expressed its concern at that meeting about the substantial business disruptions and safety hazards that the Repositioning Project would cause.  At that meeting, Mr. Bender requested a copy of the plans for the contemplated work and inquired as to the steps to be taken to ensure that there would be no interruption of the Bank's operations.  Mr. Bender expressed specific concerns about the potential for water leaks, debris, dust, noise and interruption of access, as well as the potential for mechanical and electrical failures.  The representatives of Brookfield Properties refused to provide a copy of the plans or any information regarding how 1225 LLC intended to protect IFSB's business, employees and customers.  Many issues, such as hours of construction, noise, staging, dust, air quality and lighting, were not even discussed by the Defendants' representatives.  The meeting lasted approximately one hour.

20.  On July 2, 2007, Mr. Bender met with Paul Schulman of Brookfield Properties in an attempt to resolve the concerns that

IFSB had about the Repositioning Project. Mr. Bender reiterated his request for a copy of the plans, and repeated his concerns about access, leaks, debris, noise, and electrical and mechanical interruptions.  Mr. Schulman repeated the earlier refusal to produce the plans, and provided no concrete response with regard to Mr. Bender's concerns.  No resolution was reached.

21.  The unwillingness of the Defendants to provide Plaintiff with the details of the Repositioning Project has prevented the Bank from planning an appropriate recourse.

22.  On or about July 20, 2007, Brookfield Properties delivered a Memo to the tenants of the 1225 Building, including IFSB, setting forth a tentative schedule for the Repositioning Project and identifying Defendant Davis as the general contractor for the Project.  A copy of the July 20, 2007 Memo is attached hereto as Exhibit D.  Other than IFSB, a branch of CitiBank located at the corner opposite from the Premises, and Central Parking (the operator of the parking garage that serves the 1225 Building), IFSB does not know of any other tenants still remaining in the 1225 Building.

23.  According to the July 20, 2007 Memo, "Initial Construction Set-Up" was scheduled to take place from July 23 through August 3, 2007.  The Initial Construction Set-Up was to include: adding partitions in the lobby area to separate construction crews, offices and entrances from the rest of the main lobby and the tenants' areas (to occur July 23 through July

8

27, 2007); the demolition and removal of the sidewalk tree planters (to occur July 28, 2007); the placement of a crane on the N Street side of the building to install trash chutes for interior demolition (to occur July 28, 2007); the blocking off of the metered parking and one lane of traffic on N Street to allow for the construction staging area (to occur July 30 through August 3, 2007); the placement of scaffolding in the form of a covered walkway on 18th Street in front of the retail spaces (to occur August 4, 2007); and the installation of temporary signage for the retail spaces (to occur August 4, 2007). The July 20, 2007 Memo also provides that the interior demolition will occur August 2007 through April 2008 and that the exterior demolition April 2008 through June 2008.

24. Attached hereto as Exhibit E is the site layout plan illustrating the foregoing construction.

25. On July 25, 2007, Brookfield Properties sent a letter to IFSB regarding "Asbestos Containing Materials Abatement Notice," a copy of which is attached hereto as Exhibit F. Pursuant to this Notice, IFSB was informed that "abatement of certain Asbestos Containing Materials will be taking place within the building soon[.]" The letter further states that the abatement work would begin within thirty days of July 25, 2007 (i.e., by August 24, 2007).

### CONSTRUCTION

26. Beginning on or about July 9, 2007, the Bank and its employees began to be adversely affected by the Repositioning Project when the air conditioning at the Premises was being turned off at 6:00 p.m. even though not all Bank employees have left by that time and are still working. Although interior demolition was not to begin until August 2007, and asbestos abatement work was not to begin until August 24, 2007, the interior demolition began earlier, as demonstrated by the garbage dumpsters which appeared outside of the 1225 Building in approximately late July 2007 and which were filled with debris, including dry wall.  A copy of pictures of the dumpsters taken by Mr. Isard on the afternoon of July 30, 2007 is attached hereto as Exhibit G.

27.  The work on the Repositioning Project continues, while the Bank attempts to continue to operate its business.  The adverse impact of the Repositioning Project on the Premises and its occupants is constant. For example, contrary to the July 20th memo's statement that emergency exits would be maintained, the 1225 Building was immediately isolated and the Bank's two fire exits opening onto N Street were blocked; access to the trash dumpster was cut off; IFSB's space is obscured from the street, including scaffolding at the front door; the sidewalk in front of the Bank has been transformed into a parking area where plywood,

10

construction materials and large trucks block the view of the
Bank and further restrict access to the Bank.

### The Building is Partially Exposed to the Exterior

28.   The outer material of the 1225 Building has been
partially removed and the openings in the exterior of the
building created by that removal have not been sealed or covered
with plywood and are covered only by a hanging piece of plastic
material. The Premises will be exposed to the risk of leaks and
water damage, which would cause serious damage to the Bank's
records and equipment, as well as discomfort to the employees and
customers of the Bank.

29.   All of the Bank's Information Technology equipment is
based at its headquarters at the Premises along with the
executive offices and the Accounting and Finance offices.  As of
approximately October 19, 2007, water began leaking through the
ceiling of the accounting department of the Bank, apparently from
the second floor of the 1225 Building.  The leaks were
approximately ten feet from the computer room.  Water leaking
into the computer room puts the entire computer system of IFSB at
risk and could result in a disruption of the flow of information
to the Bank's tellers and branches throughout the Bank's network.
The potential for interruption of the Bank's electricity is
equally as devastating.  The potential for the interruption of
the HVAC could also cause the computer systems to crash as well
as cause the eventual evacuation of the Premises on any given

11

day.  Due to the numerous hazards, key staff must now be alert

for the potential for a disaster recovery event at all times.

30.  Because the Bank operations are federally regulated, it

has government-mandated levels of security which will be

difficult if not impossible to comply with when the physical

building in which the Bank operates is literally open and exposed

to the exterior.

### Reduced Physical Visibility of the Bank

31.  On August 21, 2007, construction workers began

attaching sheets of plywood to the scaffolding that is in front

of the Bank, further obstructing visibility from the street and

reducing visible light.   In addition, a six foot high fence with

an opaque mesh has been installed, cutting off visibility of the

Bank.

32.  The N Street side of the property is a long glass wall

broken up by structural units.  Prior to the beginning of the

Repositioning Project, the Bank offices and its employees were

visible from the street and the sidewalk.  Prior to the erection

of the scaffolding, the Connecticut Avenue/18th Street side was a

convenient loading zone for customers and vendors making

deliveries.

33.  Half of the Bank's deposit activity and 95% of the

Bank's loan activity is generated at its headquarters location.

Moreover, because the Bank's other branches at E Street, Eastern

Avenue and Wisconsin Avenue are all in locations with inferior

visibility from the street or are located on comparably low
traffic corridors, 90% of the Bank's image and reputation
emanates from its headquarters.

34.    The reduced physical visibility of the Bank has not
been ameliorated by the temporary signage installed by the
Defendants.  The temporary signage with IFSB's name which has
been installed has come loose on several occasions, and has been
installed so as to be obstructed and/or were mounted in such
fashion as to leave off the Bank's logo.  The style of the
signage, about which the Bank was never consulted, is not
appropriate for the headquarters of a historic financial
institution and is not sufficient to convey to the public that
the Bank is continuing to operate.

### Parking and Access to the Bank

35. The entire length of the building on N Street had
metered parking that was important for IFSB's customers who could
stop briefly to transact business without having to enter a
garage.  Those spaces are now occupied by construction fencing
covered with green mesh, surrounded by barricades.  This fence
has blown over during wind gusts.  In addition, although the
metered parking on the opposite side of N Street has not been
formerly cordoned off, some of those spaces are being used by the
construction crew for their trucks, further depleting the parking
availability for Bank customers.

36.  Entry and exit points are only maintained and cleared
when IFSB has complained, and it appears that the demolition
crews have not been instructed to accommodate the continued
operation of the Bank.  The Bank's N Street fire doors were
obstructed until construction personnel saw IFSB photographing
the doors.  Even now, the emergency exit in the accounting
department, which borders N Street, opens to an area that passes
directly beneath the chutes, through the scaffolding.  At the
end, the passage way is cordoned off with yellow plastic tape.

37.  The Bank's handicapped access was obstructed until IFSB
was seen photographing the "handicapped access" sign.  Even now
the "handicapped access" does not provide effective access.
Handicapped persons must pass underneath yellow plastic tape that
is strung between two poles of the scaffolding, and maneuver
between the rails of the scaffolding while going over sidewalk
grates.  There is no sign at the street end of this passageway
designating it as the pathway to the handicap entrance to the
Bank.

38.  No pedestrian walkway has been maintained on the N
Street side of the 1225 Building under the "covered arcade area."
Customers and pedestrians are forced to walk across the street,
or in the street to get from the Bank's offices to the garage.

### Noise and Vibrations

39.  The demolition is causing significant noise and
vibrations which interrupt and distract the Bank's employees,

14

including Plaintiff Parsons and negatively impact their ability to serve IFSB's customers. Currently, the noise and vibrations are the greatest near the area of the Bank where the accounting, loan and technology departments are located. These offices are near the area of the Building where the exterior windows have been removed and where the trash chutes are located. The noise and vibrations can be heard and felt through the floor and ceilings and sometimes make the desks shake. The noise and vibration are being caused by: the bulldozer which is being used on the upper floors to push the demolished interior scrap and debris across the length of the building to the trash chutes; by the debris coming down the chute; and by the switching of the large dumpsters which are located just outside the large glass windows of the accounting department. The dumpsters are switched a few times a day during the Bank's operating hours. A truck comes to pick up the loaded dumpster and then one or two bobcats are used to push an empty dumpster across the sidewalk to a position under the chutes to take the place of the loaded dumpster. The dumpsters are located just a few yards away from the accounting department's windows and the windows of the board room. The vibrations are so significant within the accounting department that there is a risk the glass partitions in the office could break.

40. Some days the noise and vibrations escalate in severity. For example, on October 22, 2007, the noise and

vibrations from the bobcats on the upper floors were extremely bad and caused the entire accounting department to "rumble" and the walls and desks to shake.

41.    Currently, only the interior of the upper floors of the 1225 Building are being demolished, yet the noise and vibrations can be heard and felt on the first floor of the 1225 Building, at the Premises.   Once the demolition crew moves down the building closer to the first floor, the noise and vibrations heard and felt in the Premises will be significantly worse.

### Disorderly Condition of Site, Debris and Mice

42.    The demolition site has been disorderly and poorly maintained since the arrival of the contractors, especially at the beginning.    Demolition is progressing as though no tenants are in the building.    As a result of the ongoing demolition, the Bank needs to be constantly vigilant with regard to debris and access.    Debris is sometimes piled in a haphazard fashion and the "secure" area is sometimes left wide open with no supervision and unauthorized persons inside.    Some improvements have been made in response to complaints by the Bank, but the situation sometimes changes from day to day.

43.    Since the demolition has begun, mice have been found at the Bank Premises, and, until August 20, 2007, there has been a failure to maintain a coordinated vermin abatement program as promised.    Mice were first observed in mid-July and have been seen as recently as mid-September.    Beginning August 20, 2007,

16

after complaints from the Bank, an exterminator visits the
Premises every other Friday.  In addition, access to the trash
dumpster in the alley has been interrupted.  The dumpster was put
behind a construction fence, and eventually under lock and key.
IFSB was provided with a copy of the key, but then told it could
no longer have access to the dumpster through the Building, as
the Bank had had in the past.  For a time, trash removal
consisted of having the trash carried out the front of the 1225
Building, across N Street, down the block, across the street
again and down the alley to the dumpster.  Shortly after the
Bank's access to the dumpster was cut off, the Bank was told to
leave the trash in a container in the lobby or give it to the day
porter.  Although the Bank had been told that a rolling bin would
be available for the Bank each evening in the lobby, the bin for
a time was not consistently available.  There have been incidents
when the security access control has already been cut off,
without proper notice or explanation for the Bank's cleaning
people.

### *Health Risks*

44.  It is unknown what is or will happen with the outside
air filters, or what will occur with regard to the asbestos
abatement.  Although the Defendants assert that they have plans
for a monitoring program to test the air within the building for
airborne asbestos once asbestos abatement begins, if there is any
deviation in the implementation of the plan as proposed, the

17

health of the Bank's customers and employees would be at risk.
There is no indication that the air monitoring system will also
insure that no other airborne pollutants, such as lead, PCB's,
dust, bacteria from vermin, or mold spores can get into the Bank,
as they are disrupted during the Repositioning Project.

45.   Staff morale at the headquarters, where 30 employees
now work, is being devastated by the fear of asbestos poisoning.
Some staff believe they must come to work in dangerous
circumstances and this creates an atmosphere in which it is
impossible to establish a positive sales mentality among staff
when the concern distorts the bonus structure and impedes the
potential to create an incentive plan.

### Impediment to Bank's Turn-Around Strategy and Success

46. The adverse affects of the Repositioning Project create
an impediment to the efforts being made by the Bank to make a
rebound.   The physical effects of the Repositioning Project are
having and will continue to have a substantial negative impact on
the business of IFSB. The efforts to turn the Bank around and
extract it from its "troubled and problem" designation cannot be
successfully executed during the proposed construction.   The
current Repositioning Project will make a financial turnaround to
profitability impossible within the Bank's proposed nine-month
period, will delay the turnaround until after the Repositioning
Project, and will ultimately lead to the failure of the Bank and
its takeover by the regulators due to seven years of continuous

18

losses and serious undercapitalization unless the Bank can
attract new investors to replenish the losses created by the
Repositioning Project.  Such a takeover would result in a
complete loss of shareholder equity.

47.  In seeking to restore financial stability to the Bank,
the Bank has focused on securing new loans and deposits, both of
which require creating a new confidence in the Bank.  It is not
sufficient for IFSB customers to simply be able to access the
Bank and that it "merely be visible" from the street.  In fact,
in order to improve its profitability, IFSB needs to dramatically
improve its image, customer access to the Bank, and its
visibility throughout the community, not just from the street.
The Repositioning Project makes it impossible to create a
positive image of the Bank as the Bank's management no longer
controls the appearance of the Bank.  The Repositioning Project
obstructs the Bank's right to improve its own image and it is a
devastating marketing setback when dramatic improvement is
required.  The effort new management had planned to devote to
improvement must now be devoted to preventing further losses or
even holding on to the *status quo* which is defined by
unacceptable annual operating losses.

48.  The ATM is located within the front glass doors at the
entrance to the Premises.  Due to the scaffolding that has been
erected around the 1225 Building, the ATM is no longer visible
from the street. An analysis of the usage of the ATM located at

19

the Premises has revealed a dramatic reduction in transactions since the Repositioning Project began compared against the same period for 2006.  For example, in the last 14 days of July 2006, there were 599 ATM transactions.  For the same two week time period in July 2007 - after the scaffolding had been erected - total transactions decreased to 416, a decrease of approximately 30%.  In August 2006, there were a total of 1151 ATM transactions; for August 2007, with demolition having begun, the ATM transactions for the month fell to 812, a decrease of 29.6%. In September 2006, there were a total of 1065 ATM transactions; for September 2007, the number fell to 763, reflecting a decrease of 28.5%.

49.  The unbecoming exterior is creating inhibitions in customers who would normally transact at the Bank and there have been decreases in the number of in-person bank transactions.  For the three month period of July, August and September 2006, there were 7386 such transactions; for the same period in 2007, there were only 6525 such transactions, reflecting a decrease of 11.66%. Only approximately 200 of the more than 7,500 IFSB account holders use the Bank's internet banking services.  Over 95% of IFSB customers conduct their business in one of IFSB's banking locations and 50% of all of the customers bank at the headquarters branch located at the Premises, as opposed to "on-line" via internet banking.  In addition, using "on-line" banking is not reasonably practicable for many of the Bank's customers,

who are often elderly members of the minority community, and who
have traditionally (and continue to) conduct their banking
transactions in person at the Premises.

50. Real estate is unique and the headquarters location has
irreplaceable history tied to it from over a decade of Thursday
Luncheons held by its founder.  These Luncheons cannot be held in
the same location at the Premises, with the same level of class
and professionalism once established, while the planned
construction takes place within five feet of the luncheon.  IFSB
cannot merely be satisfied to maintain its existing image and
expect to create a turnaround but must instead dramatically
reinvent its image in order to survive.

### Other Concerns

51. Although the Streets Permit for the Project specifies
"water filled barricades," those barricades lining N Street are
actually just empty plastic containers, and thus provide no
substantive protection or security for the fence that is put up
at the end of the day to secure the demolition site.

52. The emergency standpipe connection that allows the fire
department to pump water into the building in the event of a fire
was for a time not visible or accessible from the street, placing
the Bank and its employees and customers at risk of significant
loss and injury should a fire occur.  The situation was remedied
only after the Bank complained.

21

53. The Bank has not been provided with an Emergency Safety Plan; the Bank staff has not been provided an orientation; and the communication between the Defendants and the Bank has not been focused on providing information, but rather hiding information.

54. With regard to "service interruptions," since the end of July 2007 there has been a consistent reduction in cooling capacity, which is provided to the Premises in the form of chilled water. In the past the Building's cooling towers produced enough chilled water to satisfy the needs of eight floors of occupancy. Now the system is insufficient to maintain less than 85 degrees on hot days.

**COUNT I**

**(BREACH OF CONTRACT - Plaintiff IFSB
and Defendant 1225, LLC)**

55. Plaintiffs incorporate herein by reference paragraphs 1- 54 as if fully set forth herein.

56. The Lease and the Lease Amendment constitute a valid contract between Plaintiff IFSB and Defendant 1225 LLC.

57. Plaintiff IFSB has fully and adequately performed its obligations under the Lease and the Lease Amendment.

58. Defendant 1225 LLC's Repositioning Project constitutes a material breach of the Lease and the Lease Amendment. The specific provisions of the Lease and the Lease Amendment which

are breached by the Repositioning Project include but may not be
limited to, the following:

(A) Section 1.01 is breached in that as a result of the
Repositioning Project the Premises will no longer exist
as they were constructed at the time the Lease was
entered into; and IFSB and its customers will no longer
have the right to use all the common and public areas
of the Land and Building (as those terms are defined in
the Lease) providing access to the demised premises;

(B) Section 16.02 is breached in that the Repositioning
Project does not comport with the limited rights of
1225 LLC as Landlord to change the arrangement and/or
location of public entrances, passageways, doors,
doorways, corridors, elevators, stairways, toilets and
other public parts of the 1225 Building.  Section 16.02
is further breached in that during the Repositioning
Project, the Premises are no longer fully visible from
the street; public access on the street level directly
into the Premises has been cut off; direct access to
the 1225 Building has been cut off; there is
unreasonable obstruction of access to the Premises; and
there is unreasonable interference with the use or
enjoyment of the Premises;

(C) Section 21.02 is breached in that 1225 LLC is
failing to furnish air conditioning after 6:00 pm.;

(D) Section 20.01 of the Lease is breached in that the
Repositioning Project has terminated IFSB's quiet
enjoyment of the Premises;

(E) IFSB is not a bank with hundreds of conveniently
located branches. It is a small bank with only 4
branches, including its headquarters location in the
1225 Building.  If customers, both new and current, are
unable to easily access the Bank (or fear for their
physical safety if they do access the bank), the Bank
risks losing those customers to nearby more easily
accessible banks.  Indeed, a branch of Wachovia Bank is
located across the street.

59. As a result of the foregoing breaches, Plaintiff IFSB is
suffering injury from a loss of business due to restricted access
to, and visibility of, the Bank.  Continued losses over the 18

23

month time period that the Repositioning Project is expected to take would constitute a destruction of the Bank's business.

60.    In addition to the foregoing losses, IFSB's employees and customers will suffer harm and injury as a result of the asbestos abatement.


## COUNT II

### (BREACH OF CONTRACT – THIRD PARTY BENEFICIARY – Plaintiff Parsons and Defendant 1225, LLC)

61.    Plaintiffs incorporate herein by reference paragraphs 1- 60 as if fully set forth herein.

62.    At the time the Lease and Lease Amendment were entered into, the parties thereto knew that a Bank would be operated at the Premises and that the Bank would have employees and customers and intended that those employees and customers would benefit from the covenants of quiet enjoyment set forth in, *inter alia*, Sections 16.02 and 20.01 of the Lease.  As one of those employees, Plaintiff Parsons is an intended third party beneficiary of the quiet enjoyment covenants of the Lease and Lease Amendment.

63.    As alleged above, Defendant 1225, LLC has breached the Lease and Lease Amendment by undertaking the Repositioning Project while the Bank still occupies the Premises and while its employees, including Parsons, are working at the Premises.

24

64.   Due to the ongoing Repositioning Project, Plaintiff Parsons' use and quiet enjoyment of his workplace is being disturbed by noise, vibrations, and risk of health concerns such as asbestos and vermin infestation.   Further, due to the fact that Plaintiff Parsons' office is located in the only elevated area of the Bank, his office is closest to the ceiling and therefore to the noise and vibrations being caused by the bobcat/bulldozer being used on the upper floors to drag the debris from one side of the Building across to the exterior trash chutes.   Moreover, because some of the walls of Parsons' office are made of glass, his office is particularly subject to vibrations.

65.   Defendant 1225 LLC's breach of the quiet enjoyment covenants of the Lease and Lease Amendment is a breach of an obligation owed to Plaintiff Parsons as an intended third-party beneficiary of the covenants contained in the Lease and Lease Agreement and Parsons has been damaged as a result of that breach.

## COUNT III

### (VIOLATION OF IMPLIED COVENANT OF QUIET ENJOYMENT - Plaintiffs IFSB and Parsons and Defendants 1225, LLC and Davis)

66.   Plaintiffs incorporate herein by reference paragraphs 1-65 as if fully set forth herein.

67.  There is a covenant of quiet enjoyment implied in the Lease and Lease Amendment which inures to the benefit of Plaintiff IFSB in its capacity as a tenant and to Parsons as an occupant of the Premises.  Because Parsons is an employee of the Bank, it is reasonably foreseeable that he will be present at the Premises on a daily basis.   Plaintiff Parsons is owed a covenant of quiet enjoyment of his workplace both directly and as a third party beneficiary of the Lease and Lease Amendment.

68.  On information and belief, 1225 LLC and Davis have entered into a contract pursuant to which Davis is acting as the general contractor for the Repositioning Project.  In undertaking the Repositioning Project, 1225 LLC and Davis, its general contractor, are jointly interfering with the Plaintiffs IFSB and Parsons' implied covenant of quiet enjoyment in that the Project is actually disturbing Plaintiffs' possession, use and enjoyment of the Premises in the following ways: (a) the interference with the physical condition of the Premises; (b) the disturbance of the safety, health and comfort of the Bank's officers, employees, including Parsons, and customers; (c) significant noise and vibration from the demolition work; (d) the presence of significant dirt, debris and dust in and around the areas just outside the Premises; (e) the threat of future disturbance to the Premises; and (f) exposure to asbestos, lead, PCB's, dust, bacteria from vermin, or mold spores.

69.  As a result of Davis and 1225 LLC's interference, the Plaintiffs are suffering and will continue to suffer harm.

## COUNT IV

### (NUISANCE – Plaintiffs IFSB and Parsons and Defendants 1225 LLC and Davis)

70.  Plaintiffs incorporate herein by reference paragraphs 1-69 as if fully set forth herein.

71.  Plaintiff IFSB lawfully occupies the Premises pursuant to the Lease and Lease Amendment.  Plaintiff Parsons lawfully is present at the Premises as an employee of the Plaintiff IFSB and his presence at the Premises on a daily basis is reasonably foreseeable.

72. Defendants' intentional acts in undertaking and implementing the Repositioning Project have invaded and continue to invade Plaintiffs' right to be free of interference in their use and enjoyment of the Premises, in at least the following ways:  (a) interfering with the physical condition of the Premises; (b) disturbing of the safety, health and comfort of the Bank's officers, employees, including Parsons, and customers; (c) creating significant noise and vibration; (d) creating and causing dirt, debris and dust outside the Premises; (e) causing the presence of vermin; (f) failing to take proper precautions to ensure against risks to the Plaintiff Parsons, as well as the

27

Bank's other employees and its customers of exposure to asbestos, lead, PCB's, dust, bacteria from vermin, or mold spores; (g) causing water damage in the Bank and subjecting the computer and other technical operations of the Bank to be at risk of malfunctioning; and (h) interfering with the visibility of the Bank from the street and sidewalk. Plaintiff Parsons' private use and enjoyment of the premises is particularly adversely affected by the noise and vibrations due to the elevated location of his office, and its being constructed, in part, of glass.

73. Alternatively, Defendants are carrying out and undertaking the Repositioning Project in a negligent manner causing an interference with the Plaintiffs' use and enjoyment of the Premises as described in Paragraph 72.

74. The actions described in Paragraph 72 constitute a substantial and unreasonable interference with Plaintiff IFSB and Parsons' private use and enjoyment of the Premises.

75. The foregoing actions are ongoing and continuous and constitute a nuisance.

76. As a proximate result of the Defendants' actions, Plaintiffs have suffered and continue to suffer injury.

**COUNT V**

**(NEGLIGENCE – Plaintiffs IFSB and Parsons and Defendant Davis)**

77. Plaintiffs incorporate herein by reference paragraphs 1- 76 as if fully set forth herein.

78.   Defendant Davis, as the general contractor for the
Repositioning Project, owes a common law duty to IFSB, a tenant
lawfully using the Premises and the area surrounding the 1225
Building.   Defendant Davis, as the general contractor also owes a
common law duty to Parsons, an employee of the Bank lawfully
using the Premises and the area surrounding the 1225 Building.
The duty that is owed by Defendant Davis to each of the
Plaintiffs is to use reasonable care under the circumstances to
protect them against the hazards and risks associated with the
Repositioning Project, as well as the interference with their
enjoyment and use of the Premises.

79.   Defendant has breached its duty to Plaintiffs in
various ways, including, but not limited to, the following: (a)
the interference from time to time with the emergency exit,
sometimes placing yellow tape across the exterior exit point from
the emergency pathway; (b) failure to take appropriate caution so
that water does not leak into the Premises; (c) failure to take
proper precautions to ensure against risks to Parsons and the
Bank's other employees and customers of exposure to asbestos,
lead, PCB's, dust, bacteria from vermin, or mold spores.

80.   As a direct and proximate cause of Defendant's
negligent acts, and without any negligence on the part of
Plaintiffs contributing thereto, the Plaintiffs have suffered and
continue to suffer injury.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests that the Court enter an appropriate order granting equitable and monetary relief, and specifically, that the Court:

(A)  grant preliminary and permanent injunctive relief enjoining Defendants from undertaking the Repositioning Project until after December 31, 2010,the end of the current term of the Lease;

(B) grant preliminary and permanent injunctive relief enjoining Defendants from commencing asbestos abatement until after December 31, 2010, the end of the current term of the Lease;

(C) grant preliminary and permanent injunctive relief abating the nuisance caused by the Defendants until afer December 31, 2010, the end of the current term of the Lease;

(D) enter judgment in favor of Plaintiffs and against Defendants for compensatory damages in an amount not less than five million dollars, plus pre-judgment interest;

(E)  award Plaintiffs their attorneys' fees and costs of this action; and

(F)  grant such other and further relief as may be appropriate.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
  & KARAS, L.L.P.

_____
Dale A. Cooter, Bar No.227454
Donna S. Mangold, Bar No. 358851
5301 Wisconsin Ave., N.W.
Suite 500
Washington, D.C. 20015
(202)537-0700
efiling@cootermangold.com
*Attorneys for Plaintiffs*
*Independence Federal Savings Bank*
*  and Stanley W. Parsons*

# EXHIBIT A

12_ original

# FRIED, FRANK, HARRIS, SHRIVER & JACOBSON

SUITE 800

1001 PENNSYLVANIA AVENUE, N. W.

WASHINGTON, D. C. 20004-2505

(202) 639-7000

FELIX S. COHEN (1932-1953)

RICHARD B. BERRYMAN*
DAVID E. BIRENBAUM
JOHN T. BOESE
MILTON EISENBERG*
JOEL R. FEIDELMAN*
JUNE MUNFORD GERTIG
KENNETH W. GIDEON
JACK B. GORDON
HENRY A. HUBSCHMAN
WILLIAM JOSEPHSON
ALAN S. KADEN
JAY R. KRAEMER
KENNETH S. KRAMER*
ARTHUR LAZARUS, JR.*
JAMES J. McCULLOUGH

DAVID M. MILES
ROBERT P. MOLLEN
FRANCIS J. O'TOOLE
HARVEY L. PITT
P. DAVID RICHARDSON
MELVIN RISHE*
MARCUS A. ROWDEN
RICHARD A. SAUBER
JAMES H. SCHROPP
RICHARD A. STEINWURTZEL
THOMAS P. VARTANIAN
W. RICHARD WEST, JR.
ERIC J. ZAHLER
LEONARD A. ZAX

CABLE "STERIC WASHINGTON"

TELEX 892406

DEX 6200 (202) 639-7008
DEX 6200 (202) 639-7003
DEX 3500 (202) 639-7004
DEX 4200 (202) 639-7005

ONE NEW YORK PLAZA

NEW YORK, NEW YORK 10004-1980

(212) 820-8000

TELEX: 620223

725 S. FIGUEROA

LOS ANGELES, CALIFORNIA 90017-5438

(213) 689-5800

3 KING'S ARMS YARD

LONDON, EC2R 7AD, ENGLAND

(01) 600-1541

TELEX: 887606

MARTIN D. GINSBURG*
STUART R. REICHART
PAUL SHNITZER
SARGENT SHRIVER
DANIEL M. SINGER
COUNSEL

*PROFESSIONAL CORPORATION

WRITER'S DIRECT LINE

639-7172

December 9, 1988

BY HAND

Edmund S. Spivack, Esq.
12000 Old Georgetown Road
Suite N-409
Rockville, Maryland  20852

    Re:  1225 Connecticut Avenue

Dear Mr. Spivack:

    Enclosed are four execution counterparts of the Memorandum
of Lease for Independence Federal Savings Bank.

    Please arrange for execution of each counterpart by your
client, have each acknowledged and deliver all four counterparts
to Neil Newman for execution and acknowledgement by Landlord.

    If you have any questions or comments, please call me or
Kerry L. Iris.

                              Sincerely,

                              Eileen P. Ragen
                              Legal Assistant

Enclosures

cc: Neil Newman w/ enclosure
    Marjorie Smith w/enclosure

− 2 −

demised premises includes the right, together with other
tenants of the Building and members of the public, to use the
common and public areas of the Land and Building providing
access to the demised premises, but includes no other rights
not specifically set forth herein.

## ARTICLE II

### TERM AND DELIVERY

2.01.  The term of this Lease shall be a period of
twelve (12) years (the "Term") commencing on January 1, 1989
(the "Commencement Date"), and expiring at 5:00 p.m. on
December 31, 2000 the "Expiration Date"), unless such Term
shall sooner cease and expire as hereinafter provided.

2.02.  Tenant occupies the demised premises pursuant
to the Prior Leases and will continue to occupy the demised
premises on a month to month basis pursuant to the Prior Leases
until the Commencement Date hereof.

## ARTICLE III

### RENT

3.01.  Tenant agrees to pay to Landlord a fixed annual
rent (the "fixed annual rent") equal to the product of the
number of square feet, which shall for the purposes of this
Lease be deemed to be 6,450, attributable to the demised
premises, multiplied by the annual rate as follows:

| During the Period | Per Square Foot Per Annum |
|---|---|
| 1/1/89 − 12/31/89 | $20.00 and additional rent, if any, as set forth in this Lease. |
| 1/1/90 − 12/31/91 | $39.90, plus the CPI Increase computed as set forth in Article IV hereof. |
| 1/1/92 − 12/31/94 | $44.90, plus the CPI *(3) 289,605* Increase computed as set forth in Article IV hereof. |
| 1/1/95 − Expiration Date | $48.90, plus the CPI *(6) 315,405* Increase computed as set forth in Article IV hereof. |

AGREEMENT OF LEASE, made this *16th* day of December, 1988, by and between POOL 1225 ASSOCIATES, a District of Columbia limited partnership, having an office c/o Jones Lang Wootton, Five Hanover Square, New York, New York 10004 ("Landlord") and INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, having an office at 1225 Connecticut Avenue, N.W., Washington, D.C. ("Tenant").

## RECITALS

A.  Landlord is currently leasing to Tenant approximately 6,450 square feet of the first or main lobby floor (the "Lobby Space") and 610 square feet of the first basement level (the "Basement Space") of the Building (as defined in Section 1.01 hereof) pursuant to separate leases. Tenant is occupying 1,252 square feet of the Lobby Space pursuant to a lease dated December 27, 1983, between 1225 Connecticut Avenue Associates (the "Landlord's predecessor in interest") and Tenant, commencing December 1, 1983 and terminating on April 30, 1988.  Tenant is occupying 5,198 square feet of the Lobby Space and the Basement Space pursuant to a lease dated February 15, 1982 between Landlord's predecessor in interest and Tenant, commencing May 1, 1983 and terminating April 30, 1988 (collectively, the "Prior Leases").

B.  Pursuant to this Lease, Landlord and Tenant agree that as of the Commencement Date (as defined in Section 2.01 hereof), Tenant shall surrender the Basement Space and the provisions of the Prior Leases shall be terminated and superceded in their entirety by the terms, provisions and conditions set forth herein, except, however, for those terms, provisions and conditions which survive the expiration of the Prior Leases.

## AGREEMENT

## ARTICLE I

## PREMISES

1.01.  Subject to and upon the terms, provisions and conditions set forth herein, Landlord hereby leases to Tenant, and Tenant hereby leases and hires from Landlord the portion of the Lobby Space (containing approximately 6,450 square feet in total), as delineated on the plan attached hereto as Exhibit A (the "demised premises"), and as presently constructed, in the building known as 1225 Connecticut Avenue, N.W., Washington, D.C. (the "Building").  The Building is situated on the land (the "Land") more fully described in Exhibit B attached hereto and made a part hereof.  (The Land and Building are hereinafter collectively referred to as the "Property".) The lease of the

– 3 –

Fixed annual rent shall be payable in advance on the first day
of each calendar month during the Term from and after the
Commencement Date at the office of Landlord set forth above or
such other place as Landlord may designate, without any set-off
or deduction whatsoever.

      3.02.  Tenant shall pay the fixed annual rent and all
additional rent payable hereunder in lawful money of the United
States by check (subject to collection) drawn to Landlord's
order on a local branch of a bank (including Tenant) doing
business in the Washington, D.C. metropolitan area.  All sums,
other than fixed annual rent, payable by Tenant hereunder shall
be deemed additional rent and shall be payable on demand unless
other payment dates are hereinafter provided.  Landlord shall
have the same rights and remedies for a default in the payment
of additional rent as for a default in the payment of fixed
annual rent, notwithstanding that Tenant may not then also be
in default in the payment of fixed annual rent.

      3.03.  If Tenant shall fail to pay when due any
installment of fixed annual rent or any payment of additional
rent for a period of 5 days after such installment or payment
shall have become due, Tenant shall pay interest thereon at the
Interest Rate (as such term is defined in Article XXII hereof),
from the date when such installment or payment shall have
become due to the date of the payment thereof, and such
interest shall be deemed additional rent.  Notwithstanding the
foregoing, upon presentment by Tenant to Landlord of evidence
satisfactory to Landlord that such fixed annual rent or
additional rent was paid in full by Tenant when due and such
payment was not received by Landlord on a timely basis through
no fault on the part of the Tenant, then in such event Tenant
shall pay interest thereon at the Interest Rate from the date
Landlord notifies Tenant of Landlord's failure to receive
payment to the date of payment thereof.  The provisions of this
Section 3.03 are in addition to all other remedies available to
Landlord for nonpayment of fixed annual rent or additional rent.

      3.04.  If any of the fixed annual rent or additional
rent payable under this Lease shall be or become uncollectible,
reduced or required to be refunded because of any Legal
Requirement (as such term is defined in Article XXII hereof),
Tenant shall enter into such agreements and take such other
legally permissible steps as Landlord may request to permit
Landlord to collect the maximum rents which from time to time
during the continuance of such Legal Requirement may be legally
permissible and not in excess of the amounts reserved therefor
under this Lease.  Upon the termination of such Legal

– 4 –

Requirement, (a) the rents hereunder shall be payable in the amounts reserved herein for the periods following such termination, and (b) Tenant shall pay to Landlord, to the maximum extent legally permissible, an amount equal to (i) the rents which would have been paid pursuant to this Lease but for such Legal Requirement less (ii) the rents paid by Tenant during the period such Legal Requirement was in effect.

ARTICLE IV

COST OF LIVING ADJUSTMENT

4.01.  For purposes of Section 3.01, the CPI Increase shall equal the product obtained by multiplying "x" by the CPI Percentage Change.  The "CPI Percentage Change" shall equal 30% of a fraction:

(a)  the numerator of which shall be the Price Index for the month immediately preceding the Annual Review Date minus the Base Price Index; and

(b)  the denominator of which shall be the Base Price Index.

For purposes of determining the CPI Increase, "x" (in dollars per square foot) shall be:

(1)  For the lease year January 1, 1989 through December 31, 1989:  not applicable;

(2)  For the lease years commencing January 1, 1990 through December 31, 1992:  $39.90;

(3)  For the lease years commencing January 1, 1993 through December 31, 1995:  $44.90; and

(4)  For the lease year January 1, 1996 through December 31, 1996 and for each lease year thereafter through the Expiration Date:  $48.90.

(c)  For the purposes of calculating the CPI Increase, the CPI Percentage Change shall be deemed not to exceed four percent (4.0%).  To the extent that the CPI Percentage Change is actually greater than four percent, then for the purposes of calculating the CPI Increase in succeeding lease years of the Term, such difference will be carried forward and added (to the extent of such difference) to the actual CPI Percentage Change computed for one or more succeeding lease years.

– 5 –

4.02.  If on any Annual Review Date the Price Index has not been issued for the immediately preceding month, then any increase hereunder shall be based upon the last Price Index issued prior to such Annual Review Date.  Upon the issuance of the Price Index for the immediately preceding month, the fixed annual rent shall be recomputed based upon such Price Index. If any such recomputation indicates that the fixed annual rent paid by Tenant from the Annual Review Date until such recomputation was less than the amount due and payable based upon such recomputation, Tenant shall pay to Landlord, within 30 days after being furnished with such recomputation, the amount of any underpayment; and if the fixed annual rent paid by Tenant from the Annual Review Date until such recomputation was more than the amount due and payable based upon such recomputation, Tenant shall be entitled to a credit in the amount of such overpayment against subsequent payments of fixed annual rent.

4.03.  For purposes of this Article IV the following terms shall have the following meanings:

(a)  "Annual Review Date" shall mean each anniversary date of the Commencement Date;

(b)  "Bureau" means the Federal Bureau of Labor Statistics or any successor agency that shall issue indices or data referred to in this Article IV;

(c)  "Price Index" shall mean the Revised Consumer Price Index for all Urban Consumers for Washington, D.C. – Maryland – Virginia (All Items, 1982-1984 = 100) issued by the Bureau, or any other measure hereafter employed by the Bureau in lieu of such Consumer Price Index that measures cost of living in the Washington, D.C. area (adjusted to make such Index comparable to the Base Price Index);

(d)  "Base Price Index" shall mean the last Price Index issued by the Bureau prior to the execution of this Lease; and

(e)  "issue" shall mean the release to the public of any such Price Index, and the date of issue shall be the date on which such Index is released, whether or not the Index released is for the month in which it is released or any preceding period.

4.04.  Notwithstanding the foregoing, in no event shall the fixed annual rent ever be reduced by operation of the provisions of this Article IV.  The obligation of Tenant with

– 6 –

respect to the payment of fixed annual rent or additional rent shall survive the termination of this Lease.

4.05.   If Tenant shall fail to pay when due any installment of fixed annual rent or any payment of additional rent for a period of 5 days after such installment or payment shall have become due, Tenant shall pay interest thereon at the Interest Rate (as such term in defined in Article XXII hereof), from the date when such installment or payment shall have become due to the date of the payment thereof, and such interest shall be deemed additional rent.   The provisions of this Section 4.05 are in addition to all other remedies available to Landlord for nonpayment of fixed annual rent or additional rent.

ARTICLE V

RENTAL ADJUSTMENTS FOR INCREASES IN
OPERATING EXPENSES AND TAXES

5.01.   Operating Expenses.   "Operating Expenses" means all expenses (and taxes thereon, if any) incurred by Landlord (computed on an accrual basis) in connection with managing, operating, maintaining, servicing, insuring and repairing the Building and all appurtenances thereto (including without limitation the costs of employee salaries and benefits, water and sewerage, maintenance and service contracts, security systems, management fees, contesting tax levies or assessments or assessed valuations of the Building and the Land, and all other costs of operating and maintaining a first-class commercial building in the Washington, D.C. Central Business District except the costs of elevator maintenance, electric service, HVAC and cleaning).   Operating Expenses shall not include capital improvements, amortization of mortgages, depreciation, ground rent, leasing commissions or legal expenses with respect to the negotiation of leases; provided, however, that Operating Expenses shall include the costs of capital improvements, which are necessary to comply with any legal requirement or which Landlord reasonably estimates would reduce the costs otherwise includable in Operating Expenses, so long as the costs of such capital improvements are included in Operating Expenses only as amortized over the estimated useful life thereof.

5.02.   Taxes.   "Taxes" means all taxes and assessments, general and special, ordinary and extraordinary, foreseen and unforeseen, now or hereafter levied, assessed or imposed on the Building, the Land or appurtenances thereto, including without limitation any tax, excise or fee measured

— 7 —

by, or payable with respect to, any rent, which is levied
against Landlord, the Building or the Land.  Taxes shall not
include income or franchise taxes or other such taxes imposed
or measured by the net income of Landlord from the operation of
the Building, unless such taxes are imposed in lieu of, or as a
supplement to, real estate taxes or assessments.

5.03.  Base Year; Tenant's Share.  For the purpose of
calculating Operating Expense and Tax Adjustments (as defined
in Section 5.04 hereof), the base year shall be the calendar
year 1988 (the "Base Year"), and Tenant's share of Operating
Expenses shall be three and one-half percent (3.50%) and
Tenant's share of Taxes shall be three percent (3.00%).  If the
number of square feet of rentable area of the Building changes,
then Tenant's share of Operating Expenses and Taxes shall be
adjusted effective as of the date of any such change.

5.04.  Operating Expense and Tax Adjustment.
"Operating Expense and Tax Adjustment" means the sum of:
(1) Tenant's share of the increase in Operating Expenses for
the then current calendar year over Operating Expenses for the
Base Year; and (2) Tenant's share of the increase in Taxes for
the then current calendar year over Taxes for the Base Year.

(a)  As soon as practicable after January 1 of
each calendar year which occurs during the Term, Landlord shall
give Tenant a statement setting forth: (1) the actual Operating
Expense and Tax Adjustment, if any, for the immediately
preceding calendar year; (2) the amount of Tenant's overpayment
or underpayment, if any, of additional rent on account of the
estimated Operating Expense and Tax Adjustment for the
immediately preceding calendar year; (3) Landlord's reasonable
estimate of the Operating Expense and Tax Adjustment for the
current calendar year; and (4) the current amount of Tenant's
overpayment or underpayment, if any, of additional rent on
account of the estimated Operating Expense and Tax Adjustment
for the current calendar year ("Landlord's Operating
Statement").  An estimate by Landlord that Operating Expenses
for the current calendar year will be one hundred ten percent
(110%) of Operating Expenses for the immediately preceding
calendar year shall be deemed to be reasonable.  As soon as
practicable at any time that Landlord shall receive notice of
an increase in Taxes, Landlord shall give to Tenant a
Landlord's Operating Statement.

(b)  Pending the giving of Landlord's Operating
Statement to Tenant, Tenant shall pay to Landlord as additional
rent on the first day of each month of the current calendar
year one-twelfth (1/12) of the estimated Operating Expense and

– 8 –

Tax Adjustment for the immediately preceding calendar year.
After the giving of Landlord's Operating Statement to Tenant:
(1) Tenant shall pay to Landlord as additional rent on the
first day of each month of the current calendar year
one-twelfth (1/12) of the estimated Operating Expense and Tax
Adjustment for the current calendar year; and (2) the parties
shall reconcile all overpayments or underpayments of additional
rent on account of Operating Expense and Tax Adjustments;
provided that immediately following the giving of Landlord's
Operating Statement to Tenant, if Tenant owes Landlord such
additional rent, Tenant shall pay such rent to Landlord on the
first day of the next month or, if Landlord owes Tenant a
refund of such additional rent, Tenant shall deduct the same
from one or more monthly installments of rent thereafter due.

(c)  After the end of the Term and as soon as
practicable after Landlord's next customary financial reporting
period, Landlord shall give Tenant Landlord's Operating
Statement for the portion of the calendar year in which the
Term ends.  Landlord and Tenant shall thereupon make the
appropriate adjustment of amounts then owing on account of the
Operating Expense and Tax Adjustment for such year, and the
appropriate payment shall be made promptly by the appropriate
party.

5.05.  The rights and obligations of Landlord and
Tenant under the provisions of this Article V shall survive the
termination of this Lease, and payment shall be made pursuant
to this Article V notwithstanding the fact that an Escalation
Statement is furnished to Tenant after the expiration or other
termination of the Term.

5.06.  Landlord's failure to render a Landlord's
Operating Statement with respect to any Tax Fiscal Year shall
not prejudice Landlord's right to thereafter render a
Landlord's Operating Statement with respect thereto or with
respect to any subsequent Tax Fiscal Year within 180 days of
such Tax Fiscal Year.

ARTICLE VI

ELECTRICITY

6.01. All electricity to the demised premises shall be
furnished directly by the public utility and shall be
separately metered and paid for by Tenant.

6.02. Without limiting the generality of Section 6.01
and Article VIII hereof, Tenant's use of electric current in

- 9 -

the demised premises shall not at any time exceed the capacity of any of the electrical conductors and equipment in or otherwise serving the demised premises. Tenant shall not make or perform or permit the making or performing of any alterations to wiring, installations or other electrical facilities in or serving the demised premises without the prior consent of Landlord in each instance which consent shall not be unreasonably withheld or delayed. Should Landlord grant any such consent, all additional risers or other equipment required therefor shall be installed by Landlord and the cost thereof shall be paid by Tenant upon Landlord's demand.

6.03. Landlord shall not be liable in any way to Tenant for any failure or defect in the supply or character of electric energy furnished to the demised premises by reason of any requirement, act or omission of the public utility providing the Building with electricity or for any other reason whatsoever.

ARTICLE VII

USE

7.01. The demised premises shall be used solely for operating a savings bank or any other federally insured financial institution and for no other purpose.

7.02. Tenant shall not use or permit the use of the demised premises or any part thereof in any way which would violate any of the covenants, agreements, terms, provisions and conditions of this Lease or for any unlawful purposes or in any unlawful manner or in violation of the certificate of occupancy for the demised premises or the Building, and Tenant shall not permit the demised premises or any part thereof to be used in any manner or anything to be done, brought into or kept therein which, in Landlord's reasonable judgment shall, or shall tend to, impair or interfere with (i) the character, reputation or appearance of the Building as a high quality office building, (ii) any of the Building services or the proper and economic heating, cleaning, air conditioning or other servicing of the Building or the demised premises, or (iii) the use of any of the other areas of the Building by, or cause discomfort, inconvenience or annoyance to, any of the other tenants or occupants of the Building. Tenant shall not install any electrical or other equipment of any kind which, in the reasonable judgment of Landlord, might cause any such impairment, interference, discomfort, inconvenience or annoyance or which might overload the risers or feeders servicing the demised premises or other portions of the Building.

- 10 -

## ARTICLE VIII

### PREMISES "AS IS" AND TENANT ALTERATIONS

8.01.   Tenant acknowledges that, as the present occupant of the demised premises, it has inspected and is fully familiar with the condition thereof.  Tenant is taking the Premises "as is" except for structural defects not caused by Tenant and that are not known to Tenant and should not be known to Tenant.

8.02.   (a)   Tenant will not make or permit anyone to make any alterations, installations, additions or improvements (hereinafter referred to collectively as "improvements"), in or to the demised premises, without the prior written consent of Landlord which consent shall not be unreasonably withheld. Tenant will not make or permit anyone to make any structural improvements or improvements to the Building without the prior written consent of Landlord which consent shall be in Landlord's sole discretion.

(b)   When granting its consent pursuant to subparagraph (a) above, Landlord may impose any reasonable conditions, which conditions shall include, but not limited to, reasonable approval of the contractor or other persons who will perform the work, and the obtaining of specified general liability insurance.  All improvements permitted by Landlord must conform to all rules and regulations established from time to time by the Underwriters' Association of the District of Columbia and to all Legal Requirements. As a condition precedent to such written consent of Landlord in all situations involving improvements estimated or contracted to cost at least $20,000 including, but not limited to, the costs of materials, labor, architectural fees, engineering fees and contractor fees, Tenant shall obtain and deliver to Landlord (i) evidence of worker's compensation insurance covering all persons employed for such work and (ii) written, unconditional waivers of mechanics' and materialmen's liens against the Property from all proposed contractors, subcontractors, laborers and material suppliers of all work, labor and services to be performed and materials to be furnished in connection with improvements to the demised premises. If, notwithstanding the foregoing, any mechanic's or materialman's lien is filed against the demised premises and/or the Property, for work claimed to have been done for, or materials claimed to have been furnished to, the demised premises, such lien shall be discharged by Tenant within twenty days after notice thereof, at Tenant's sole cost and expense, by the payment thereof or by the filing of a bond.  If Tenant shall fail to discharge any such lien,

- 11 -

Landlord may, at its option, discharge such lien and treat the
cost thereof (including attorneys' fees incurred in connection
therewith) as additional rent payable with the next monthly
installment of fixed annual rent falling due; it being
expressly agreed that such discharge by Landlord shall not be
deemed to waive or release the default of Tenant in not
discharging such lien.  Any improvements to the demised
premises shall be made on behalf of Tenant and not on behalf of
Landlord, and Tenant shall be deemed to be "owner" (and not the
"agent" of Landlord) for purposes of the application of Section
38-101 of the District of Columbia Code.  In the event Landlord
shall give its written consent to the making of any
improvements to the demised premises, such written consent
shall not be deemed to be an agreement or consent by Landlord
to subject its interest in the demised premises, the Building
or the Land to any mechanic's or materialman's lien which may
be filed in connection therewith.

        (c)  All improvements shall be performed in
accordance with plans and specifications first approved by
Landlord.  Tenant shall reimburse Landlord on demand for any
costs and expenses incurred in connection with Landlord's
review of such plans and specifications.

        (d)  Tenant contemplates making substantial
improvements to the demised premises in accordance with the
provisions of this Article VIII.  Landlord shall contribute
$85,000 toward the cost of such improvements in the form of a
payment to Tenant at any time within four (4) months of the
Commencement Date, which such time of payment shall be decided
by Landlord.  Tenant shall deliver to Landlord, within six (6)
months of the Commencement Date, evidence that such
improvements have been completed and paid for.

        8.03.  Tenant shall indemnify and hold Landlord
harmless from and against any and all expenses, liens, claims,
liabilities and damages based on or arising, directly or
indirectly, by reason of the Tenant's making of any
improvements to the demised premises.  If any improvements are
made without the prior written consent of Landlord, Landlord
shall have the right to remove and correct such improvements
and restore the demised premises to their condition immediately
prior thereto, and Tenant shall be liable for all expenses
incurred by Landlord in connection therewith.

        8.04.  All improvements made and installed by Tenant,
or at Tenant's expense, upon or in the demised premises which
are of a permanent nature and which cannot be removed without
damage to the demised premises or Building shall become and be

- 12 -

the property of Landlord, and shall remain upon and be surrendered with the demised premises as a part thereof at the end of the Term, except that Landlord shall have the right at any time up to six months prior to the expiration of the Term to serve notice upon Tenant that any of such improvements shall be removed, and in the event of service of such notice, Tenant will, at Tenant's own cost and expense, remove the same in accordance with such request, and restore the demised premises to substantially the same condition as delivered on the Commencement Date, ordinary wear and tear and casualty excepted.

8.05.   Where furnished by or at the expense of Tenant, all moveable furniture, furnishings and trade fixtures shall remain the property of Tenant which may at its option remove all or any part thereof at any time prior to the expiration of the Term.   Notwithstanding the foregoing, Tenant may at its option remove any and all trade fixtures and equipment, specialty lighting, art and decorations, whether or not such items are affixed to the demised premises, provided, however, that Tenant shall, at Tenant's own cost and expense, restore the demised premises to the above-stated condition.   In case Tenant shall decide not to remove any part of such property, Tenant shall notify Landlord in writing not less than three months prior to the expiration of the Term, specifying the items of property which it has decided not to remove.   If, within 30 days after the service of such notice, Landlord shall request Tenant to remove any of such property, Tenant shall at its expense remove the same.   As to such property which Landlord does not request Tenant to remove, the same shall be, if left by Tenant, deemed abandoned by Tenant and thereupon the same shall become the property of Landlord.

8.06.   If any improvements or other property which Tenant shall have the right to remove or be requested by Landlord to remove as provided in Sections 8.04 and 8.05 hereof (herein in this Section 8.06 called the "property") are not removed on or prior to the expiration of the Term, Landlord shall have the right to remove the property and to dispose of the same without accountability to Tenant and at the sole cost and expense of Tenant.   In case of any damage to the demised premises or the Building resulting from Tenant's removal of the property, or in case of any unavoidable damage resulting from Landlord's removal, Tenant shall repair such damage or, at Landlord's option, shall reimburse Landlord for Landlord's cost in repairing such damage.   This obligation shall survive any termination of this Lease.

8.07.   Without limiting the generality of the foregoing, Tenant may install or operate in the demised

- 13 -

premises, with the prior written consent of Landlord, which consent shall not be unreasonably withheld, at Tenant's sole cost and expense, any equipment of any kind or nature whatsoever even if such equipment will or may necessitate any changes, replacements or additions to, or require the use of, the water, plumbing, heating, air conditioning or electrical systems in the Building.

8.08.  Landlord shall have the right to prescribe the weight and method of installation and position of safes and other heavy fixtures or equipment.  No freight, furniture or other bulky matter of any description will be received into the Building or carried in the elevators, except as approved by Landlord, which approval shall not be unreasonably withheld. Tenant shall promptly remove from the public areas in or adjacent to the Building any of Tenant's property there delivered or deposited.

## ARTICLE IX

### MAINTENANCE AND REPAIRS

9.01.  (a)  Tenant shall keep the demised premises and the fixtures and equipment therein in clean, safe and sanitary condition, will take good care thereof, and will suffer no waste or injury thereto.  Tenant shall only store trash and garbage in areas designated by Landlord for such storage and accumulation.  Landlord agrees that, at no cost to Tenant, Tenant shall have the right to deposit its trash in the trash room of the Building, provided such trash is placed in plastic containers furnished by Tenant.

(b)  At the expiration or other termination of this Lease, Tenant will surrender the demised premises broom clean and in the same order and condition in which they were on the Commencement Date, ordinary wear and tear and casualty excepted.  The provisions of this Section 9.01(b) shall survive the expiration or earlier termination of this Lease.

9.02.  Without limiting the generality of Section 9.01 Tenant shall, at its sole cost and expense, make such repairs to the demised premises and the fixtures and appurtenances therein as are necessitated by any act, omission, occupancy or negligence of Tenant, or of any agent, employee, subtenant, contractor, customer or invitee of Tenant or by the use of the demised premises in a manner contrary to the purposes for which same are leased to Tenant, as and when needed to preserve them in good working order and condition.  Except as otherwise provided in Article XI hereof, all damage or injury to the

- 14 -

demised premises and to its fixtures, appurtenances and
equipment caused by Tenant moving property in or out of the
Building or by installation or removal of furniture, fixtures
or other property, shall be repaired, restored or replaced
promptly by Tenant at its sole cost and expense, which repairs,
restorations and replacements shall be in quality and class
equal to the original work or installations. If Tenant fails
to make such repairs, restorations or replacements, same may be
made by Landlord at the expense of Tenant and such expense
shall be collectible as additional rent and shall be paid by
Tenant upon demand therefor.

9.03. Business machines and mechanical equipment used
by Tenant which cause vibration, noise, cold or heat that may
be transmitted to the Building structure or to any leased space
to such a degree as to be objectionable to Landlord or to any
other tenant in the Building shall be placed and maintained by
Tenant, at its expense, in settings of cork, rubber or spring
type vibration eliminators sufficient to absorb and prevent
such vibration or noise, or prevent transmission of such cold
or heat. The parties hereto recognize that the operation of
elevators, air conditioning and heating equipment will cause
some vibration, noise, heat or cold which may be transmitted to
other parts of the Building and demised premises. Landlord
shall be under no obligation to endeavor to reduce such
vibration, noise, heat or cold beyond what is customary in
current good building practice for buildings of the same type
as the Building.

9.04. Landlord shall make all structural repairs as
soon as practicable after receipt by Landlord of written notice
from Tenant specifying the nature and extent of the repairs
requested. There shall be no allowance to Tenant for a
diminution of rental value and no liability on the part of
Landlord by reason of inconvenience, annoyance or injury to
business arising from the making of any repairs, alterations,
additions or improvements in or to any portion of the Building
or the demised premises or in or to fixtures, appurtenances or
equipment thereof. Landlord shall exercise reasonable
diligence so as to minimize any interference with Tenant's
business operations, but shall not be required to perform the
same on an overtime or premium pay basis.

ARTICLE X

REQUIREMENTS OF LAW

10.01. Tenant shall comply with all Legal
Requirements which shall impose any violation, order or duty

- 15 -

upon Landlord or Tenant with respect to Tenant's use or occupation of the demised premises, except for structural items which shall be Landlord's responsibility.

10.02. Notwithstanding the provisions of Section 10.01 hereof, Tenant may contest, at its own cost and expense, in its name and/or (whenever necessary) Landlord's name, in any manner permitted by law (including appeals to a court or governmental department or authority having jurisdiction in the matter), the validity or the enforcement of any Legal Requirement with which Tenant is required to comply pursuant to this Lease, and may defer compliance therewith provided that:

(a) such non-compliance shall not subject Landlord to criminal prosecution or subject the Property to lien or sale;

(b) such non-compliance shall not be in violation of any mortgage, or of any ground or underlying lease or any mortgage thereon;

(c) Tenant shall first deliver to Landlord a surety bond issued by a surety company of recognized responsibility, or other security satisfactory to Landlord, indemnifying and protecting Landlord against any loss or injury by reason of such non-compliance; and

(d) Tenant shall promptly, diligently and continuously prosecute such contest.

Landlord, without expense or liability to it, shall cooperate with Tenant and execute any documents or pleadings required for such purpose, provided that Landlord shall reasonably be satisfied that the facts set forth in any such documents or pleadings are accurate.

10.03. Tenant shall be responsible for, and pay before delinquent, all federal and local taxes assessed presently or hereafter during the term of this Lease against any leasehold interest or personal property of any kind, owned by or placed in, upon or about the demised premises by Tenant.

ARTICLE XI

INSURANCE, LOSS, REIMBURSEMENT, LIABILITY

11.01. (a) Landlord shall carry policies of fire and casualty insurance with respect to the Building in an amount equal to the full insurable value of the Building. Landlord

— 16 —

shall not be obligated to carry any fire or casualty insurance
with respect to the Premises, any portion thereof or any
property located therein and, except as provided by law, shall
not be obligated to repair any damage thereto or restore the
same, or any decorations, installations, equipment or fixture
installed by or for Tenant at Tenant's expense. Tenant shall
carry such insurance coverages as Tenant may deem are necessary
or desirable to protect Tenant's property located in or around
the Premises.

(b) Tenant shall not do or permit to be done
any act or thing upon the demised premises which will
invalidate or be in conflict with the fire insurance policies
covering the Building and fixtures and property therein, or
which would increase the rate of fire insurance applicable to
the Building. If by virtue of any act or omission of Tenant or
any person under Tenant's reasonable control (whether or not
such act or omission would otherwise constitute a default
hereunder) any such fire or casualty insurance premium is
increased, Tenant shall promptly pay Landlord the amount of
such increase as additional rent. Tenant shall neither do nor
permit to be done any act or thing upon the demised premises
which shall or might subject Landlord to any liability or
responsibility for injury to any person or persons or to
property by reason of any business or operation being carried
on within the demised premises.

11.02. If, as a result of any act or omission by
Tenant other than an act or omission which is considered
customary in Tenant's permitted use of the demised premises as
provided in Article VII hereof, or violation of this Lease, the
rate of fire insurance applicable to the Building shall be
increased to an amount higher than it otherwise would be,
Tenant shall reimburse Landlord for all increases of Landlord's
fire insurance premiums so caused; such reimbursement to be
additional rent payable within 5 days after demand therefor by
Landlord. In any action or proceeding wherein Landlord and
Tenant are parties, a schedule or "make-up" of rates for the
Building or demised premises issued by the body making fire
insurance rates for the demised premises shall be presumptive
evidence of the facts stated therein, including the items and
charges taken into consideration in fixing the fire insurance
rate then applicable to the demised premises.

11.03. Landlord or its agents shall not be liable for
any injury or damage to persons or property resulting from
fire, explosion, falling plaster, steam, gas, electricity,
water, rain or snow or leaks from any part of the Building, or
from the pipes, appliances or plumbing works or from the roof,

- 17 -

street or subsurface or from any other place or by dampness or
by any other cause of whatsoever nature, unless any of the
foregoing shall be caused by or due to the negligence or
intentional act or omission of Landlord, its agents, servants
or employees.

11.04.   Tenant covenants and agrees to indemnify and
save harmless Landlord against and from all claims, expenses,
damages or fines incurred or suffered by Landlord, by reason of
any breach, violation or non-performance by Tenant, or its
agents, servants or employees, of any covenant or provision of
this Lease, or by reason of damage to persons or property
caused by moving property of or for Tenant in or out of the
Building, or by the installation or removal of furniture or
other property of or for Tenant.

11.05.   Tenant shall give Landlord prompt notice of
any fire or accidents in the demised premises.

11.06.   Tenant agrees to look solely to Landlord's
interest in the Property or the lease of the Building or of the
Property and the demised premises for the satisfaction of any
right or remedy of Tenant for the collection of a judgment (or
other judicial process) requiring the payment of money by
Landlord in the event of any liability by Landlord, and no
other property or assets of Landlord shall be subject to levy,
execution, attachment, or other enforcement procedure for the
satisfaction of Tenant's remedies under or with respect to this
Lease, the relationship of Landlord and Tenant hereunder, or
Tenant's use and occupancy of the demised premises, or any
other liability of Landlord to Tenant.

11.07.   (a)   Tenant and Landlord agree that each will,
at its sole cost and expense, cause its fire insurance policies
to contain appropriate clauses pursuant to which the insurance
companies (i) waive all right of subrogation against the other,
and (ii) agree that such policies shall not be invalidated as a
result of any waiver under this Lease of any or all right of
recovery against any party for losses covered by such policies.

(b)   Provided that Landlord's right of full
recovery under its fire insurance policies is not adversely
affected or prejudiced thereby, Landlord hereby waives any and
all right of recovery which it might otherwise have against
Tenant, its servants, agents and employees, for loss or damage
occurring to the Building and the fixtures, appurtenances and
equipment therein, to the extent the same is covered by
Landlord's insurance, notwithstanding that such loss or damage
may result from the negligence or fault of Tenant, its

- 18 -

servants, agents or employees.  Provided Tenant's rights of
full recovery are not affected or prejudiced thereby, Tenant
hereby waives any and all right of recovery which it might
otherwise have against Landlord, its servants, and employees,
and against every other tenant in the Building who shall have
executed a similar waiver as set forth in this Section 11.07(b)
for loss or damage to Tenant's furniture, furnishings, fixtures
and other property removable by Tenant under the provisions
hereof to the extent that the same is covered by Tenant's
insurance, notwithstanding that such loss or damage may result
from the negligence or fault of Landlord, its servants, agents
or employees, or such other tenant and the servants, agents or
employees thereof.

11.08.  Tenant shall provide on or before the
Commencement Date and keep in force during the Term a
comprehensive general liability insurance policy protecting
Landlord and Tenant against any liability whatsoever,
occasioned by any occurrence on or about the demised premises
or any appurtenances thereto and naming Landlord, its servants
and employees, and Tenant as insured parties.  In addition, if
requested by the holder of any mortgage or deed of trust
against the Building and/or the Land, such insurance shall also
contain a standard mortgagee loss payable endorsement for the
benefit of such holder.  Such policy shall be written by good
and solvent insurance companies licensed to do business in the
District of Columbia satisfactory to Landlord, and shall be in
such limits as Landlord may from time to time require.  As of
the date hereof, Landlord reasonably requires limits of
liability thereunder of not less than $3,000,000 per occurrence
for bodily or personal injury (including death) and in the
amount of $1,000,000 per occurrence in respect of property
damage.  Such insurance may be carried under a blanket policy
covering the demised premises and other locations of Tenant, if
any, provided that each such policy shall in all respects
comply with this Article and shall specify that the portion of
the total coverage of such policy that is allocated to the
demised premises is in the amounts required pursuant to this
Section 11.08.  Prior to the time such insurance is first
required to be carried by Tenant and thereafter, at least 15
days prior to the effective date of any such policy, Tenant
shall deliver to Landlord either a duplicate original of the
aforesaid policy or a certificate evidencing such insurance.
Such certificate shall contain an endorsement that such
insurance may not be cancelled except upon 30 days' prior
notice to Landlord:  Such certificate shall also have the
indemnity clause referred to in Article XXXVI hereof typed on
the certificate evidencing that the "hold harmless" clause has
been insured.  Tenant's failure to provide and keep in force

- 19 -

the aforementioned insurance shall be regarded as a material default hereunder entitling Landlord to exercise any or all of the remedies provided in this Lease in the event of Tenant's default.

ARTICLE XII

DAMAGE BY FIRE OR OTHER CAUSE

12.01.  If the Building or the demised premises shall be partially or totally damaged or destroyed by fire or other cause (and if this Lease shall not have been terminated pursuant to this Article XII), Landlord shall repair the damage and restore and rebuild the Building and/or the demised premises, with reasonable dispatch after notice to it of the damage or destruction and allowing for reasonable time required for adjustment and settlement of insurance claims.

12.02.  If the Building or the demised premises shall be partially or totally damaged or destroyed by fire or other cause, the rents payable hereunder shall be abated to the extent that the demised premises shall have been rendered untenantable for the period from the date of such damage or destruction to the date the damage shall be substantially repaired or restored unless such fire or damage shall have resulted from the negligence of Tenant then the rents, payable thereunder shall abate, but only to the extent that Landlord shall collect insurance proceeds covering the loss of rent incurred by Landlord, provided, however, that should Tenant reoccupy a portion of the demised premises during the period the restoration work is taking place and prior to the date that the whole of said demised premises are made tenantable, fixed annual rent and additional rent allocable to such portion shall be payable by Tenant from the date of such occupancy.

12.03.  (a)  If the Building shall be so damaged or destroyed by fire or other cause (whether or not the demised premises are damaged or destroyed) as to require a reasonably estimated expenditure made by Landlord or a reputable contractor designated by Landlord of more than 30% of the full insurable value of the Building immediately prior to the casualty, and the Landlord elects not to repair, restore or rebuild the Building and the demised premises, if damaged or destroyed, then Landlord may terminate this Lease by giving Tenant notice to such effect within 120 days after the date of the casualty and, upon such notice, this Lease and the estate hereby granted shall terminate as if the date of such notice were the Expiration Date.

- 20 -

(b)  If more than 30% of the demised premises
shall be damaged or destroyed by fire or other cause and if a
reputable contractor would reasonably require more than 180
days to restore the demised premises to their condition
immediately prior to the casualty, then Landlord or Tenant may
terminate this Lease by giving notice to such effect within 120
days after the date of casualty and, upon such notice, this
Lease and the estate hereby granted shall terminate fifteen
(15) days after the date of such notice, whereupon Tenant shall
wholly vacate the demised premises.

12.04.  No damages, compensation or claim shall be
payable by Landlord for inconvenience, loss of business or
annoyance arising from any repair or restoration of any portion
of the demised premises or of the Building pursuant to this
Article XII.

12.05.  Notwithstanding any of the foregoing
provisions of this Article XII, if Landlord or the lessor of
any superior lease or the holder of any superior mortgage shall
be unable to collect all of the insurance proceeds (including
rent insurance proceeds) applicable to damage or destruction of
the demised premises or the Building by fire or other cause, by
reason of some action or inaction on the part of Tenant or any
of its employees or agents or contractors, then, without
prejudice to any other remedies which may be available against
Tenant, there shall be no abatement of Tenant's rents, but the
total amount of such rents not abated (which would otherwise
have been abated) shall not exceed the amount of uncollected
insurance proceeds.

12.06.  To the extent permitted by law, Tenant hereby
expressly waives the provisions of any law or statute now or
hereafter in force giving Tenant the right to terminate this
Lease because of fire or other casualty.

ARTICLE XIII

ASSIGNMENT, MORTGAGING, SUBLETTING, ETC.

13.01.  Except as otherwise expressly provided in this
Article XIII, Tenant shall not, without, in each instance,
obtaining the prior consent of Landlord (which consent shall
not be unreasonably withheld or delayed), (a) assign or
otherwise transfer this Lease or the estate hereby granted,
(b) sublet all or part of the demised premises, (c) permit
others to use or occupy the demised premises (including without
limitation by the granting of a concession or license),
(d) mortgage, pledge or encumber this Lease or all or part of

- 21 -

the demised premises in any manner, or (e) advertise for a
subtenant or for an assignee of this Lease.  For purposes of
this Article XIII, (i) the transfer of a majority of the issued
and outstanding capital stock of any corporate tenant or
subtenant, or the transfer of a majority of the total interest
in any other entity (partnership or otherwise) which is a
tenant or subtenant, however accomplished, whether in one or
more transactions, shall be deemed an assignment of this Lease,
or of such sublease, as the case may be, (ii) any person or
legal representative of Tenant to whom Tenant's interest under
this Lease passes by operation of law, or otherwise, shall be
bound by the provisions of this Article XIII, and (iii) a
modification, amendment or extension without Landlord's prior
written consent of a sublease previously consented to by
Landlord shall be deemed a new sublease.  Tenant agrees to
furnish to Landlord upon demand from time to time such
information and assurances as Landlord may reasonably request
that neither Tenant, nor any subtenant, shall have violated the
provisions of this Section 13.01.

     13.02.  (a)  The provisions of clauses (a), (b) and
(c) of Section 13.01 hereof shall not apply to transactions
entered into by Tenant with (i) an "affiliated corporation" (as
hereinafter defined) or (ii) a corporation into or with which
Tenant is merged or consolidated or with an entity to which
substantially all of Tenant's assets are transferred, provided
(a) such merger, consolidation or transfer of assets is for a
good business purpose and not principally for the purpose of
transferring the leasehold estate created hereby, and (b) the
assignee or successor entity has a net worth at least equal to
or in excess of the net worth of Tenant either (i) immediately
prior to such merger, consolidation or transfer or (ii) as of
the date hereof, whichever is greater.

          (b)  For purposes of this Article XIII, an
affiliated corporation means (i) a corporation controlled by,
controlling or under common control with Tenant or (ii) a
partnership or joint venture in which Tenant or an affiliated
corporation is either a managing general partner or owns at
least 51% of the interest therein.

     13.03.  No assignment or transfer, whether made with
Landlord's consent as required by Section 13.01 or without
Landlord's consent pursuant to Section 13.02, shall be
effective unless and until (a) the assignee shall execute,
acknowledge and deliver to Landlord a recordable agreement, in
form and substance reasonably satisfactory to Landlord, whereby
the assignee shall (i) assume the obligations and performance
of this Lease and agree to be bound by all of the covenants,

– 22 –

agreements, terms, provisions and conditions hereof on the part
of Tenant to be performed or observed on and after the
effective date of any such assignment and (ii) agree that the
provisions of this Article XIII shall, notwithstanding such
assignment or transfer, continue to be binding upon it in the
future, and (b) in the case of any assignment or transfer
pursuant to Section 13.02, Tenant or its successor shall have
delivered to Landlord financial statements certified by a
reputable firm of certified public accountants evidencing
satisfaction of the net worth requirements referred to in
Section 13.02.  Tenant covenants that, notwithstanding any
assignment or transfer, whether or not in violation of the
provisions of this Lease, and notwithstanding the acceptance of
fixed annual rent by Landlord from an assignee or transferee or
any other party, Tenant shall remain fully and primarily and
jointly and severally liable for the payment of the fixed
annual rent and all additional rent due and to become due under
this Lease and for the performance and observance of all of the
covenants, agreements, terms, provisions and conditions of this
Lease on the part of Tenant to be performed or observed.

13.04.  (a) Should Tenant agree to assign this Lease
or to sublet all or any portion of the demised premises (other
than by an assignment or sublease permitted by Section 13.02
hereof), Tenant shall, as soon as the form of any such
agreement is finalized but no later than 60 days prior to the
effective date thereof (the "Effective Date"), deliver to
Landlord the proposed form of any such agreement and of all
ancillary agreements with the proposed assignee or sublessee,
as applicable, and Landlord shall then have the right to elect
by notice to Tenant given within 30 days after such delivery
(x) to consent or refuse to consent to such assignment or
sublease in accordance with the terms of this Lease or (y) to
elect to:

A.  With respect to a proposed assignment of this
Lease or a proposed subletting of the entire demised
premises, terminate this Lease as of the Effective
Date as if it were the Expiration Date set forth
herein; or

B.  With respect to a proposed subletting of less than
the entire demised premises, terminate this Lease as
to the portion of the demised premises affected by
such subletting as of the Effective Date, in which
case Tenant shall promptly execute and deliver to
Landlord an appropriate modification of this Lease in
form satisfactory to Landlord, effectuating such
termination and providing that the fixed annual rent

- 23 -

payable hereunder and the additional rent payable pursuant to Article V hereof shall be adjusted in proportion to the portion of the demised premises affected by such termination.

(b)  If Landlord shall give its consent to any assignment of this Lease or to any sublease, Tenant shall, in consideration therefor, pay to Landlord as additional rent:

(i) in the case of an assignment, an amount equal to all sums and other consideration paid to Tenant by the assignee for or by reason of such assignment (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of a lease or sale thereof, the then fair market rental or sale value, as the case may be); and

(ii) in the case of a sublease, an amount equal to all rents, additional charges and other consideration payable under the sublease to Tenant by the subtenant which is in excess of the fixed annual rent and additional rent accruing during the term of the sublease in respect of the subleased space (at the rate per square foot payable by Tenant hereunder) pursuant to the terms hereof (including, but not limited to, sums paid for the sale or rental of Tenant's fixtures, leasehold improvements, equipment, furniture, furnishings or other personal property, less, in the case of the lease or sale thereof, the then fair market rental or sale value, as the case may be).

The sums payable under this Section 13.04(b) shall be paid to Landlord as and when paid by the assignee or subtenant to Tenant.

(c)  If Landlord exercises any of its options under Section 13.04(a), Landlord shall be free to, and shall have no liability to Tenant if Landlord shall, lease the demised premises or any portion thereof to Tenant's proposed assignee or subtenant, as the case may be.

ARTICLE XIV

ADJACENT EXCAVATION - SHORING

14.01.  If an excavation or other substructure work shall be made upon land adjacent to the Property, or shall be authorized to be made, Tenant shall afford to the person causing or authorized to cause such excavation, license to

- 24 -

enter upon the demised premises for the purpose of doing such
work as shall be necessary to preserve the wall of the Building
from injury or damage and to support the same by proper
foundations without diminution or abatement of rent.

ARTICLE XV

CONDEMNATION

15.01.   In the event that the whole of the demised
premises shall be lawfully condemned or taken in any manner for
any public or quasi-public use, this Lease and the term and
estate hereby granted shall forthwith cease and terminate as of
the date of vesting of title.   In the event that only a part of
the Building shall be so condemned or taken, then (a) Landlord
(whether or not the demised premises be affected) may, at
Landlord's option, terminate this Lease and the term and estate
hereby granted as of the date of such vesting of title by
notifying Tenant in writing of such termination within 120 days
following the date on which Landlord shall have received notice
of vesting of title, or (b) if such condemnation or taking
shall be of a substantial part of the demised premises or of a
substantial part of the means of access thereto, Tenant may, at
Tenant's option, by delivery of notice in writing to Landlord
within 30 days following the date on which Tenant shall have
received notice of vesting of title, terminate this Lease and
the term and estate hereby granted as of the date of vesting of
title, or (c) if neither Landlord nor Tenant elects to
terminate this Lease, as aforesaid, this Lease shall be and
remain unaffected by such condemnation or taking, except that
(i) the fixed annual rent and the additional rent payable under
Article V hereof shall be abated proportionately according to
the reduction in the rentable area of the demised premises (if
any) resulting from such condemnation or taking, and
(ii) Landlord, at its expense, shall proceed with reasonable
diligence to repair, alter and restore the remaining parts of
the Building and the demised premises to substantially their
former condition to the extent that the same may be feasible
and so as to constitute a complete and tenantable Building and
demised premises.

15.02.   In the event of any condemnation or taking of
all or a part of the Building, Landlord shall be entitled to
receive the entire award in the condemnation proceeding.
Tenant hereby expressly assigns to Landlord any and all right,
title and interest of Tenant now, or hereafter arising in or to
any such award or any part thereof, and agrees that it shall
not be entitled to receive any part of such award.  Nothing
contained herein, however, shall prevent Tenant from pursuing a

– 25 –

separate claim against the condemning authority for the value of furnishings, equipment, and trade fixtures installed in the demised premises at Tenant's expense and for relocation expenses; provided, that such claim does not in any way diminish the award or compensation payable to or recoverable by Landlord in connection with such taking or condemnation.

15.03.    In the event any part of the demised premises be taken to effect compliance with any law or requirement of public authority other than in the manner hereinabove provided in this Article XV, then, (i) if such compliance is the obligation of Tenant under this Lease, Tenant shall not be entitled to any diminution or abatement of rent or other compensation from Landlord therefor, but (ii) if such compliance is the obligation of Landlord under this Lease, the fixed annual rent payable hereunder shall be reduced and additional rents under Article V shall be adjusted in the same manner as is provided in Section 15.01 according to the reduction in rentable area of the demised premises resulting from such taking.

ARTICLE XVI

ACCESS TO DEMISED PREMISES; CHANGES

16.01.    Tenant shall permit Landlord to erect, use and maintain pipes, ducts and conduits in and through the demised premises, provided the same are installed adjacent to or concealed behind walls and ceilings of the demised premises. Tenant shall permit Landlord or its agents or representatives to enter into and upon any part of the demised premises (including security areas accompanied by representatives of Tenant) at all reasonable hours without incurring any liability to Tenant (i) to inspect the same, clean or make repairs and other alterations or additions as Landlord may deem necessary or appropriate for the proper operation of the Building and in connection therewith Landlord may keep and store in the demised premises necessary tools, materials and equipment, (ii) to show the demised premises to prospective purchasers, or to any prospective or existing underlying landlord or mortgagee, (iii) to comply with the demand of any receiver, trustee, or assignee for the benefit of creditors, sheriff, marshal or court officer entitled to or reasonably purporting to be entitled to such access for the purpose of taking possession of or removing Tenant's property or for any other lawful purpose (but this provision and any action by Landlord hereunder shall not be deemed a recognition by Landlord that the person or official making such demand has any right or interest whatsoever), (iv) to comply with the demand of any

– 26 –

representative of the fire, police, building, sanitation or
other department of the District of Columbia or federal
government, and (v) within the last twelve months of the Term
to show the demised premises to prospective tenants.  The
exercise of any such rights shall not give rise to any
liability by Landlord to Tenant and shall not constitute an
eviction of Tenant in whole or in part and the rent shall not
be abated by reason thereof or by reason of loss or
interruption of Tenant's business, or otherwise.

16.02.  Landlord reserves the right, without the same
constituting an actual or constructive eviction and without
incurring liability to Tenant therefor, to change the
arrangement and/or location of public entrances, passageways,
doors, doorways, corridors, elevators, stairways, toilets and
other public parts of the Building; provided, however, that the
demised premises shall be visible from the street, public
access on the street level directly into the demised premises
shall not be cut off, access to the Building shall not be cut
off and that there shall be no unreasonable obstruction of
access to the demised premises or unreasonable interference
with the use or enjoyment thereof.

16.03.  In the event of any emergency, Landlord or
Landlord's agents may forcibly enter the demised premises
without notice and without liability therefor (if during such
entry Landlord or Landlord's agents shall accord reasonable
care to Tenant's property) and without in any manner affecting
the obligations and covenants of this Lease.

ARTICLE XVII

DEFAULT BY TENANT

17.01.  This Lease and the term and estate hereby
granted are subject to the limitation that whenever Tenant
shall make an assignment of the property of Tenant for the
benefit of creditors, or if a petition shall be filed by or
against Tenant under any provisions of the United States
Bankruptcy Code or under the provisions of any other bankruptcy
or insolvency law or any law of like import, or whenever a
permanent receiver of Tenant or of or for the property of
Tenant shall be appointed, then, Landlord may (a) at any time
after receipt of notice of the occurrence of any such event, or
(b) if such event occurs without the acquiescence of Tenant, at
any time after the event continues for thirty (30) days, give
Tenant a notice of intention to end the Term of this Lease at
the expiration of five days from the date of service of such
notice of intention, and upon the expiration of said five-day

- 27 -

period, this Lease and the term and estate hereby granted shall
terminate with the same effect as if such day were the
Expiration Date, but Tenant shall remain liable for damages as
provided in Article XVIII.

17.02.  This Lease and the term and estate hereby
granted are subject to further limitation as follows:

(a)  whenever Tenant shall fail to pay any
installment of fixed annual rent or any additional rent or any
other charge payable by Tenant to Landlord on the day the same
is due and payable pursuant to the terms hereof, and such
default shall continue for seven days after Landlord shall have
given Tenant a notice specifying such default, or

(b)  whenever Tenant shall do or permit anything
to be done, whether by action or inaction, contrary to any of
Tenant's obligations hereunder (except as provided in clauses
(a), (c), (d), (e), (f), (g) or (h) of this Section 17.02) and
if such situation shall continue and shall not be remedied by
Tenant within 15 days after Landlord shall have given to Tenant
a notice specifying the same, or, in the case of a happening or
default which cannot with due diligence be cured within a
period of 15 days and the continuation of the period required
for cure will not subject Landlord to the risk of criminal
liability or termination of any superior lease or foreclosure
of any superior mortgage, if Tenant shall not, (i) within said
15-day period advise Landlord of Tenant's intention to duly
institute all steps necessary to remedy such situation and
(ii) duly institute within said 15-day period, and thereafter
diligently and continuously prosecute to completion, all steps
necessary to remedy the same, or

(c)  whenever this Lease or the estate hereby
granted or the unexpired balance of the Term hereof would, by
operation of law or otherwise, devolve upon or pass to any
person, firm or corporation other than Tenant, except as
expressly permitted by Article XIII, or

(d)  whenever Tenant shall abandon the demised
premises for a continuous period of at least 30 days (unless as
a result of a casualty), or

(e)  whenever in case any other lease held by
Tenant from Landlord shall expire and terminate as a result of
the default of Tenant thereunder, or

(f)  whenever Tenant shall default in complying
with the provisions of Section 8.02 with respect to the

– 28 –

discharge or bonding of mechanic's liens within the time period therein provided, or

(g)  whenever Tenant shall default in the due keeping, observing or performance of any covenant, agreement, provision or condition of Article VII hereof on the part of Tenant and if such default shall continue and shall not be remedied by Tenant within ten business days after Landlord shall have given to Tenant a notice specifying the same, or

(h)  whenever Tenant shall default pursuant to clauses (a)–(d), (f) or (g) above and Landlord shall give Tenant notice of three such defaults in any twelve-month period, regardless of whether Tenant remedies the same within any period of time specified in such clauses, then Landlord may give to Tenant a notice of intention to end  the Term at the expiration of three days from the date of the service of such notice of intention, and upon the expiration of such three-day period this Lease and the term and estate hereby granted shall terminate with the same effect as if such day were the Expiration Date, but Tenant shall remain liable for damages as provided in Article XVIII.

17.03.  In the event of the occurrence of any of the events specified in Section 17.01 or 17.02 with or without terminating this Lease, Landlord or Landlord's agents and employees may immediately or at any time thereafter re-enter the demised premises, or any part thereof, by summary dispossess proceedings or by any suitable action or proceeding at law or in equity, without being liable to indictment, prosecution or damages therefrom.  The word re-enter, as herein used, is not restricted to its technical legal meaning.

17.04.  In the event of a breach or threatened breach by Tenant of any of its obligations under this Lease, Landlord shall also have the right of injunction.  The special remedies to which Landlord may resort hereunder are cumulative and are not intended to be exclusive of any other remedies or means of redress to which Landlord may lawfully be entitled at any time and Landlord may invoke any remedy allowed at law or in equity as if specific remedies were not provided for herein.

17.05.  If this Lease shall terminate under the provisions of Section 17.01 or 17.02 or if Landlord shall re-enter the demised premises in accordance with Section 17.03, then (a) Tenant shall thereupon pay to Landlord the fixed annual rent and additional rent payable by Tenant to Landlord up to the time of such termination of this Lease, or of such recovery of possession of the demised premises by Landlord, as the case

- 29 -

may be, and shall also pay to Landlord damages as provided in Article XVIII, and (b) Landlord shall be entitled to retain any monies paid by Tenant to Landlord, whether as advance rent or otherwise, but such monies shall be credited by Landlord against any fixed annual rent or additional rent due from Tenant at the time of such termination or re-entry or, at Landlord's option, against any damages payable by Tenant under Article XVIII or pursuant to law.

17.06. Tenant hereby expressly waives any and all rights of redemption granted by or under any present or future laws in the event Tenant is evicted or dispossessed for any violation of this Lease by Tenant, or in the event Landlord obtains possession of the demised premises, by reason of the violation by Tenant of any of the covenants and conditions of this Lease or otherwise.

ARTICLE XVIII

DAMAGES

18.01. If this Lease is terminated under the provisions of Article 17.01 or 17.02, or if Landlord shall re-enter the demised premises under the provisions of Article 17.03, Tenant shall pay to Landlord as damages, at the election of Landlord, either:

(a) a sum which at the time of such termination of this Lease or at the time of any such re-entry by Landlord, as the case may be, represents the then value of the excess, if any, of

(1) the aggregate of the fixed annual rent and the additional rent payable hereunder which would have been payable by Tenant for the period commencing with such earlier termination of this Lease or the date of any such re-entry, as the case may be, and ending with the Expiration Date, had this Lease not so terminated or had Landlord not so re-entered the demised premises, over

(2) the aggregate rental value of the demised premises for the same period, or

(b) sums equal to the fixed annual rent and the additional rent payable hereunder which would have been payable by Tenant had this Lease not so terminated, or had Landlord not so re-entered the demised premises, payable upon the due dates therefor specified herein following such termination or such reentry and until the Expiration Date, provided, however, that

— 30 —

if Landlord shall re-let the demised premises during said
period, Landlord shall credit Tenant with the net rents
received by Landlord from such re-letting, such net rents to be
determined by first deducting from the gross rents as and when
received by Landlord from such re-letting, the expenses
incurred or paid by Landlord in terminating this Lease or in
re-entering the demised premises and in securing possession
thereof, as well as the expenses of re-letting, including
altering and preparing the demised premises for new tenants,
brokers' commissions, legal fees, and all other expenses
properly chargeable against the demised premises and the rental
thereof; it being understood that any such re-letting may be
for a period shorter or longer than the remaining term of this
Lease.   In no event shall Tenant be entitled to receive any
excess of such net rents over the sums payable by Tenant to
Landlord hereunder for the period of such re-letting, nor shall
Tenant be entitled in any suit for the collection of damages
pursuant to this subsection to a credit in respect of any net
rents from a re-letting, except to the extent that such net
rents are actually received by Landlord.   If the demised
premises or any part thereof should be re-let in combination
with other space, then proper apportionment on a square foot
basis shall be made of the rent received from such re-letting
and of the expenses of re-letting.

        If the demised premises or any part thereof be
re-let by Landlord for the unexpired portion of the term of
this Lease, or any part thereof, before presentation of proof
of such damages to any court, commission or tribunal, the
amount of rent payable pursuant to such re-letting shall, prima
facie, be the fair and reasonable rental value for the demised
premises, or part thereof, so re-let during the term of the
re-letting.

        18.02.   Suit or suits for the recovery of such
damages, or any installments thereof, may be brought by
Landlord from time to time at its election, and nothing
contained herein shall be deemed to require Landlord to
postpone suit until the date when the Term would have expired
if it had not been so terminated under the provision of Article
17.01 or 17.02 or under any provision of law, or had Landlord
not re-entered the demised premises.  Nothing herein contained
shall be construed to limit or preclude recovery by Landlord
against Tenant of any sums or damages to which, in addition to
the damages particularly provided above, Landlord may lawfully
be entitled by reason of any default hereunder on the part of
Tenant.  Nothing herein contained shall be construed to limit
or prejudice the right of Landlord to provide for and obtain as
liquidated damages by reason of the termination of this Lease

- 31 -

or re-entry of the demised premises for the default of Tenant
under this Lease, an amount equal to the maximum allowed by any
statute or rule of law in effect at the time when, and
governing the proceedings in which, such damages are to be
proved whether or not such amount be greater, equal to, or less
than any of the sums referred to in Section 18.01.

ARTICLE XIX

LANDLORD'S RIGHT TO PERFORM TENANT'S OBLIGATIONS

19.01.  If Tenant shall default in the observance or
performance of any term or covenant on Tenant's part to be
observed or performed under any of the terms or provisions of
this Lease, (a) Landlord may remedy such default for the
account of Tenant, immediately and without notice in case of
emergency, or in any other case if Tenant shall fail to remedy
such default with all reasonable dispatch after Landlord shall
have notified Tenant in writing of such default and the
applicable grace period for curing such default shall have
expired; and (b) if Landlord makes any expenditures or incurs
any obligations for the payment of money in connection with
such default including, but not limited to, reasonable
attorneys' fees in instituting, prosecuting or defending any
action or proceeding, such sums paid or obligations incurred,
with interest at the Interest Rate, shall be deemed to be
additional rent hereunder and shall be paid by Tenant to Land-
lord upon demand.  The provisions of this Article XIX shall
survive the expiration or other termination of this Lease.

ARTICLE XX

QUIET ENJOYMENT

20.01.  Landlord covenants and agrees that, subject to
the terms and provisions of this Lease, if, and so long as,
Tenant keeps and performs each and every covenant, agreement,
term, provision and condition herein contained on the part of
or on behalf of Tenant to be kept or performed, then Tenant's
rights under this Lease shall not be cut off or ended before
the expiration of the Term of this Lease, subject however, to
the terms of this Lease including, without limitation, the
provisions of Article XXV hereof.

ARTICLE XXI

SERVICES AND EQUIPMENT

21.01.  So long as Tenant is not in default under any
of the covenants of this Lease, Landlord shall furnish water

– 32 –

for lavatory and drinking and office cleaning purposes and hot and chilled water for heating and cooling.  If Tenant requires, uses or consumes water for any other purpose, Landlord may install a meter or meters or other means to measure Tenant's water consumption, and Tenant shall reimburse Landlord for the cost of the meter or meters and the installation thereof, and pay for the maintenance of said meter equipment and/or pay Landlord's cost of other means of measuring such water consumption by Tenant.  Tenant shall reimburse Landlord for the cost of all water consumed in excess of that estimated to be consumed for lavatory, drinking and office cleaning purposes, and for hot and chilled water, as measured by said meter or meters or as otherwise measured, including sewer rents.

21.02.  So long as Tenant is not in default under any of the covenants of this Lease, Landlord shall maintain electric systems, conduits and connections which are necessary to maintain electric service in the demised premises.  The Landlord agrees to furnish hot water for heating and chilled water for cooling to the demised premises during the seasons of the year and during the hours of the day when the same is generally furnished to other tenants in the building.  Landlord reserves the right without any liability whatsoever, or abatement of fixed annual rent, or additional rent, to stop the heating, air conditioning, elevator, plumbing, electric and other systems when necessary by reason of accident or emergency or for repairs, alterations, replacements or improvements, provided that except in case of emergency, Landlord will notify Tenant in advance, if possible, of any such stoppage and, if ascertainable, its estimated duration, and will proceed diligently with the work necessary to resume such service as promptly as possible and in a manner so as to minimize interference with Tenant's use and enjoyment of the demised premises, but Landlord shall not be obligated to employ overtime or premium labor therefor.

21.03.  Except as otherwise provided in this Lease, Landlord will not be required to furnish any other services, including without limitation electricity, janitorial services or repairs and maintenance within the demised premises, all of which services shall be provided by Tenant at Tenant's sole cost.

ARTICLE XXII

DEFINITIONS

22.01.  The term "Landlord" as used in this Lease means only the owner, or the mortgagee in possession, for the

- 33 -

time being of the Building (or the owner of a lease of the Building), so that in the event of any transfer of title to Building, upon notification to Tenant of such transfer or lease the transferor Landlord shall be and hereby is entirely freed and relieved of all existing or future covenants, obligations and liabilities of Landlord hereunder, and it shall be deemed and construed as a covenant running with the land without further agreement between the parties or their successors in interest, or between the parties and the transferee of title to the Building or said lease, that the transferee or the lessee, as applicable, has assumed and agreed to carry out any and all such covenants, obligations and liabilities of Landlord hereunder.

22.02. The term "Business Days" as used in this Lease shall exclude Saturdays, Sundays and all days observed as legal holidays by the United States Government.

22.03. "Interest Rate" shall mean a rate per annum equal to the lesser of (a) three percent (3%) above the prime commercial lending rate of The Riggs National Bank of Washington, D.C., or (b) the maximum rate of interest, if any, which Tenant may legally contract to pay.

22.04. "Legal Requirements" shall mean laws, statutes and ordinances including building codes and zoning regulations and ordinances and the orders, rules, regulations, directives and requirements of all federal, state, county, city and borough departments, bureaus, boards, agencies, offices, commissions and other subdivisions thereof, or of any official thereof, or of any other governmental, public or quasi-public authority, whether now or hereafter in force, which may be applicable to the Land or Building or the demised premises or any part thereof, or the sidewalks, curbs or areas adjacent thereto and all requirements, obligations and conditions of all instruments of record on the date of this Lease.

ARTICLE XXIII

INVALIDITY OF ANY PROVISION

23.01. If any term, covenant, condition or provision of this Lease or the application thereof to any circumstance or to any person, firm or corporation shall be invalid or unenforceable to any extent, the remaining terms, covenants, conditions and provisions of this Lease shall not be affected thereby and each remaining term, covenant, condition and provision of this Lease shall be valid and shall be enforceable to the fullest extent permitted by law.

- 34 -

ARTICLE XXIV

BROKERAGE

24.01.   Landlord and Tenant each covenant, represent and warrant to one another that each party has had no dealings or negotiations with any broker or agent other than Jones Lang Wootton in connection with the consummation of this Lease, and Tenant covenants and agrees to pay, hold harmless and indemnify Landlord, and Landlord agrees to pay, hold harmless and indemnify Tenant, from and against any and all cost, expense (including reasonable attorneys' fees and court costs), loss and liability for any compensation, commissions or charges claimed by any broker or agent, other than the brokers named in this Section 24.01, with respect to this Lease or the negotiation thereof if such claim or claims by any such other broker or agent are based in whole or in part on dealing with Tenant or its representatives, or Landlord and its representatives, respectively.   Landlord agrees to pay to the brokers specified in this Section 24.01 such compensation, commission or charges to which they are entitled pursuant to the separate agreements between such brokers and Landlord.

ARTICLE XXV

SUBORDINATION

25.01.   This Lease is and shall be subject and subordinate to all ground or underlying leases which may now or hereafter affect the Land or the Building and to all mortgages which may now or hereafter affect such leases, the Land or the Building, and to all renewals, refinancings, modifications, replacements and extensions thereof (hereinafter called "Superior Instruments") provided that the holder thereof agrees, so long as Tenant is not in default hereunder, not to disturb Tenant's possession hereunder.   This Lease shall remain in full force and effect upon any sale or assignment of, or foreclosure upon, the Building or the Land pursuant to a Superior Instrument, and thereupon Tenant shall not be entitled to terminate this Lease.   The provisions of this Section 25.01 shall be self-operative and no further instrument of subordination shall be required.   In confirmation of such subordination, Tenant shall promptly execute and deliver any instrument, in recordable form if required, that Landlord, the holder of any Superior Instrument or any of their respective successors in interest may request to evidence such subordination, within 7 days after such request.   Tenant hereby constitutes and appoints Landlord or its successors in interest to be Tenant's attorney-in-fact, irrevocably and coupled with

- 35 -

an interest, to execute and deliver such instrument for and on
behalf of Tenant, upon the failure of Tenant to execute and
deliver such instrument within such 7-day period.  Landlord
shall use reasonable efforts to obtain non-disturbance and
attornment agreements from any future holder of a Superior
Instrument.

25.02.  In the event of a termination of any ground or
underlying lease, or if the interests of Landlord under this
Lease are transferred by reason of, or assigned in lieu of,
foreclosure or other proceeding for enforcement of any
mortgage, or if the holder of any mortgage acquires a lease in
substitution therefor, then Tenant under this Lease will, at
the option to be exercised in writing by the holder of any such
Superior Instrument or any purchaser, assignee or lessee, as
the case may be, either (i) attorn to it and agree to perform
for its benefit all the terms, covenants and conditions of this
Lease on Tenant's part to be performed with the same force and
effect as if it were the landlord originally named in this
Lease, if such holder, purchaser, assignee or lessee shall
agree to perform all of Landlord's obligations hereunder and
recognize Tenant as its tenant hereunder and agree not to
disturb Tenant's possession under this Lease so long as Tenant
shall not be in default hereunder, or (ii) enter into a new
lease with it for the remaining term of this Lease and
otherwise on the same terms and conditions and with the same
options, if any, then remaining.  The provisions of this
Section 25.02 shall inure to the benefit of such holder of a
Superior Instrument, purchaser, assignee or lessee, and shall
be self-operative upon the exercise of such option, and no
further instrument shall be required to give effect to such
option.  Tenant, however, upon demand of any such holder of a
Superior Instrument, purchaser, assignee or lessee agrees to
execute, from time to time, within 7 days after a request
therefor, instruments in confirmation of the foregoing
provision of this Section 25.02, satisfactory to any such
holder of a Superior Instrument, purchaser, assignee or lessee,
acknowledging such attornment and setting forth the terms and
conditions of its tenancy.  Tenant hereby constitutes and
appoints Landlord or its successors in interest to be Tenant's
attorney-in-fact, irrevocably and coupled with an interest, to
execute and deliver such instrument of attornment, or such new
lease, upon the failure of Tenant to execute such instrument
within such 7-day period.

25.03.  Notwithstanding anything contained herein to
the contrary, under no circumstances shall any such holder of a
Superior Instrument, purchaser, assignee or lessee, as the case
may be, whether or not it shall have succeeded to the interests
of the Landlord under this Lease, be

- 36 -

(a)   liable for any act, omission or default of any prior landlord; or

(b)   subject to any offsets, claims or defenses which Tenant might have against any prior landlord; or

(c)   bound by any rent or additional rent which Tenant might have paid to any prior landlord for more than one month in advance or for more than three months in advance where such rent payments are payable at intervals of more than one month; or

(d) . bound by any modification, amendment or abridgment of the Lease, or any cancellation or surrender of the same, made without its prior written approval.

25.04.   In the event of any act or omission by Landlord which would give Tenant the right to terminate this Lease, Tenant will not exercise such right until Tenant shall have first given written notice of such act or omission to the holder of any Superior Instrument who shall have furnished such holder's last address to Tenant, and until a reasonable period for remedying such act or omission shall have elapsed following the giving of such notices, during which time such holder shall have the right, but shall not be obligated, to remedy or cause to be remedied such act or omission.   Tenant further agrees not to exercise any such right if the holder of any such Superior Instrument commences to cure such act or omission within a reasonable time after having received notice thereof and diligently prosecutes such cure thereafter.

25.05.   If, in connection with the financing of the Building, the holder of any mortgage shall request reasonable modifications in this Lease as a condition of approval thereof, Tenant will not unreasonably withhold, delay or defer making such modifications provided the same are not material modifications of this Lease and do not (i) increase the fixed annual rent or additional rents payable by Tenant, (ii) reduce the Term hereof or (iii) extend the Term hereof.

ARTICLE XXVI

CERTIFICATE OF TENANT

26.01.   (a)     Tenant shall, without charge, at any time and from time to time, within 10 days after request by Landlord, execute, acknowledge and deliver to Landlord, the holder of a Superior Instrument or any other person, firm or corporation specified by Landlord, a written instrument in the

- 37 -

form attached hereto as Exhibit C or such other form as may be required by the holder of any Superior Instrument.

(b)    Landlord shall without charge, upon reasonable request by Tenant, execute, acknowledge and deliver to a proposed assignee or subleasee, permitted in accordance with the provisions of Article XIII of this Lease which such assignee or subleasee has signed an agreement pursuant to Section 13.03 of this Lease, a written instrument stating, if true as of the date thereof that Landlord has no actual knowledge, without performing any inquiry, of any default of the terms and provisions of this Lease by Tenant or any pending claim by Landlord against Tenant and based on these statements, this Lease is in full force and effect.

## ARTICLE XXVII

### LEGAL PROCEEDINGS, WAIVER OF JURY TRIAL

27.01.    Landlord and Tenant hereby waive trial by jury in any action, proceeding or counterclaim brought by either of the parties hereto against the other on any matters whatsoever arising out of or in any way in connection with this Lease, the relationship of Landlord and Tenant, Tenant's use or occupancy of the demised premises, and/or any other claims.

## ARTICLE XXVIII

### RULES AND REGULATIONS

28.01.    Tenant and Tenant's servants, employees and agents shall observe faithfully and comply strictly with such reasonable rules and regulations as Landlord or Landlord's agents may from time to time adopt; provided, however, that in case of any conflict or inconsistency between the provisions of this Lease and of any of such rules and regulations, the provisions of this Lease shall control and that such rules and regulations are universally applied to and enforced against the tenants of the Building.  Reasonable written notice of any additional rules and regulations shall be given to Tenant prior to Landlord's enforcement of such rules and regulations.  The present rules and regulations are attached on Exhibit D.

28.02.    Nothing in this Lease contained shall be construed to impose upon Landlord any duty or obligation to enforce the rules and regulations or the terms, covenants or conditions in any other lease, against any other tenant of the Building, and Landlord shall not be liable to Tenant for violation of the same by any other tenant, its servants, employees, agents, visitors or licensees.

— 38 —

## ARTICLE XXIX

### CONSENTS AND APPROVALS

29.01.  (a)  Whenever Landlord's consent or approval is required in this Lease, Landlord shall not unreasonably delay notifying Tenant whether its approval shall be granted or withheld.

(b)  Whenever Landlord's consent or approval is required in this Lease and this Lease does not provide that such approval or consent shall not be unreasonably withheld, Landlord may determine in its sole discretion whether to grant such consent or approval, regardless of whether such refusal to consent or approve may be deemed arbitrary.

## ARTICLE XXX

### NOTICES

30.01.  Any notice or demand, consent, approval or disapproval, or statement (collectively called "Notices") required or permitted to be given by the terms and provisions of this Lease, or by any law or governmental regulation, either by Landlord to Tenant or by Tenant to Landlord, shall be in writing and unless otherwise required by such law or regulation, shall be personally delivered or sent by United States mail postage prepaid as registered or certified mail, return receipt requested.  Any Notice shall be addressed to Landlord or Tenant, as applicable, at its address set forth on page 1 of this Lease as such address may be changed from time to time as hereinafter provided and as to Tenant such Notice shall be addressed to Mr. William Fitzgerald, Sr. and shall be delivered to him if such Notice is personally delivered.  After Tenant shall occupy the demised premises, the address of Tenant for Notices shall be at the Building.  By giving the other party at least ten (10) days prior written notice, either party may, by Notice given as above provided, designate a different address or addresses for Notices.

30.02.  Any Notice shall be deemed given as of the date of delivery as indicated by affidavit in case of personal delivery or by the return receipt in the case of mailing; and in the event of failure to deliver by reason of changed address of which no Notice was given or refusal to accept delivery, as of the date of such failure as indicated by affidavit or on the return receipt or by notice of the postal service, as the case may be.

— 39 —

30.03. In addition to the foregoing, either Landlord or Tenant may, from time to time, request in writing that the other party serve a copy of any Notice on one other person or entity designated in such request, such service to be effected as provided in Section 30.01 hereof.

ARTICLE XXXI

NO WAIVER

31.01. No agreement to accept a surrender of this Lease shall be valid unless such agreement is in writing and signed by Landlord. No employee of Landlord or of Landlord's agents shall have any power to accept the keys of the demised premises prior to the termination of this Lease. The delivery of keys to any employee of Landlord or of Landlord's agent shall not operate as a termination of this Lease or a surrender of the demised premises. In the event Tenant at any time desires to have Landlord sublet the premises for Tenant's account, Landlord or Landlord's agents are authorized to receive said keys for such purpose without releasing Tenant from any of the obligations under this Lease. The failure of Landlord or Tenant to seek redress for violation of, or to insist upon the strict performance of, any covenant or condition of this Lease or any of the Rules and Regulations set forth herein, or hereafter adopted by Landlord, shall not prevent a subsequent act, which would have originally constituted a violation, from having all the force and effect of an original violation. The receipt by Landlord, or the payment by Tenant, of rent with knowledge of the breach of any covenant of this Lease shall not be deemed a waiver of such breach. The failure of Landlord to enforce any of the Rules and Regulations set forth herein, or hereafter adopted, against Tenant and/or any other tenant in the Building shall not be deemed a waiver of any such Rules and Regulations. No provision of this Lease shall be deemed to have been waived by Landlord or Tenant unless such waiver be in writing signed by such party. No payment by Tenant or receipt by Landlord of a lesser amount than the monthly rent herein stipulated shall be deemed to be other than on the account of the earliest stipulated rent, nor shall any endorsement or statement on any check or any letter accompanying any check or payment of rent be deemed an accord and satisfaction, and Landlord may accept such check or payment without prejudice to Landlord's right to recover the balance of such rent or pursue any other remedy in this Lease provided.

31.02. This Lease contains the entire agreement between the parties, and any executory agreement hereafter made

- 40 -

shall be ineffective to change, modify, discharge or effect an abandonment of this Lease in whole or in part unless such executory agreement is in writing and signed by the party against whom enforcement of such change, modification, discharge or abandonment is sought.

## ARTICLE XXXII

## INABILITY TO PERFORM

32.01.  (a)    If, by reason of (1) strike, (2) labor troubles, (3) governmental preemption in connection with a national emergency, (4) any rule, order or regulation of any governmental agency, (5) conditions of supply or demand which are caused by war or other national, district or municipal emergency, or (6) any cause beyond Landlord's reasonable control, Landlord shall be unable to fulfill its obligations under this Lease except Tenant's obligation to pay rent, additional rent, fees, and all other charges whatsoever required hereunder, or shall be unable to supply any service which Landlord is obligated to supply, this Lease and Tenant's obligation to pay rent hereunder shall in no way be affected, impaired or excused except in the event of a constructive eviction.

(b)    If, by reason of (1) strike, (2) labor troubles, (3) governmental preemption in connection with a national emergency, (4) any rule, order or regulation of any governmental agency, (5) conditions of supply or demand which are caused by war or other national, district or municipal emergency, or (6) any cause beyond Tenant's reasonable control, Tenant shall be unable to fulfill its obligations under this Lease or shall be unable to supply any service which Tenant is obligated to supply, this Lease shall in no way be affected, impaired or excused except in the event of a constructive eviction.

## ARTICLE XXXIII

## NO REPRESENTATIONS BY LANDLORD

33.01.  Landlord or Landlord's agents have made no representations or promises with respect to the Building or demised premises except as herein expressly set forth.

- 41 -

ARTICLE XXXIV

NAME OF BUILDING

34.01.  The name of the Building shall be 1225 Connecticut Avenue, N.W.  Landlord shall have the full right at any time to name and change the name of the Building and to change the designated address of the Building.

ARTICLE XXXV

ARBITRATION

35.01.  In each case specified in this Lease in which resort to arbitration shall be required, such arbitration (unless otherwise specifically provided in other sections of this Lease) shall be in the District of Columbia in accordance with the Commercial Arbitration Rules of the American Arbitration Association and the provisions of this Lease.  The decision and award of the arbitrators shall be in writing, shall be final and conclusive on the parties, and counterpart copies thereof shall be delivered to each of the parties.  In rendering such decision and awards, the arbitrators shall not add to, subtract from or otherwise modify the provisions of this Lease.  Judgment may be had on the decision and award of the arbitrators so rendered in any court of competent jurisdiction.

ARTICLE XXXVI

INDEMNITY

36.01.  Except for any loss or damage caused by the wilful misconduct or gross negligence of Landlord, its agents, servants or employees, Tenant hereby indemnifies and agrees to defend and save Landlord harmless from and against any loss, liability, cost and expense (including reasonable attorneys' fees) arising from the use or occupation of the demised premises by Tenant, its agents, servants or employees, and/or from any breach of this Lease by Tenant.

ARTICLE XXXVII

MEMORANDUM OF LEASE

37.01.  Either party shall, at the request of the other, execute and deliver a statutory form of memorandum of this Lease for the purpose of recording; provided, however (i) such memorandum of this Lease shall not in any circumstances be

– 42 –

deemed to modify or to change any of the provisions of this Lease, (ii) the costs of the preparation and recordation of such memorandum shall be the responsibility of the party requesting the execution of same, and (iii) neither party shall record this Lease.

## ARTICLE XXXVIII

[Intentionally omitted.]

## ARTICLE XXXIX

### HOLDOVER

39.01.  In the event that Tenant shall not immediately surrender the demised premises on the Expiration Date, Tenant shall become a month-to-month tenant at a monthly rental equal to the greater of:  (i) one and one-half times the fixed annual rent due during the last full calendar month of the Term plus all additional rent due for such periods (prorated on a monthly basis) or (ii) the then current market rental for space in the Building.  Said monthly tenancy shall commence on the first day following the expiration of the Term.  As a monthly tenant, Tenant shall be subject to all terms, conditions, covenants and agreements of this Lease.  Tenant shall give to Landlord at least 30 days' written notice of any intention to quit the demised premises, and Tenant shall be entitled to 30 days' written notice to quit the demised premises, unless Tenant is in default hereunder, in which event Tenant shall not be entitled to any notice to quit, any right of Tenant in such event to a notice to quit is hereby expressly waived. Notwithstanding the foregoing provision of this Section 39.01, in the event that Tenant shall holdover after the expiration of the Term, and if Landlord shall desire to regain possession of the demised premises promptly at the expiration of the Term, then at any time prior to Landlord's acceptance of rent from Tenant as a monthly tenant hereunder, Landlord, at its option, may forthwith re-enter and take possession of the demised premises without process, or by any legal process in force in the District of Columbia.  If the demised premises are not surrendered after the expiration or sooner termination of this Lease, Tenant hereby indemnifies Landlord against liability resulting from delay by Tenant in so surrendering the demised premises, including any claims made by any succeeding tenant or prospective tenant founded upon such delay and from any loss of rent with respect to such prospective tenant.

- 43 -

ARTICLE XL

[intentionally omitted]

ARTICLE XLI

MISCELLANEOUS

41.01.  This Lease shall be governed by and construed in accordance with the laws of the District of Columbia.

41.02.  This Lease shall be construed without regard to any presumption or other rule requiring construction against the party causing this Lease to be drafted.

41.03.  Except as otherwise expressly provided in this Lease, each covenant, agreement, obligation or other provision of this Lease on Tenant's part to be performed shall be deemed and construed as a separate and independent covenant of Tenant, not dependent on any other provision of this Lease.

41.04.  All terms and words used in this Lease, regardless of the number or gender in which they are used, shall be deemed to include any other number and any other gender as the context may require.

41.05.  Except as otherwise provided herein, whenever payment of interest is required by the terms hereof it shall be at the Interest Rate.

41.06.  The captions are inserted only as a matter of convenience and for reference, and in no way define, limit or describe the scope of this Lease nor the intent of any provision thereof.

41.07.  In the event that Tenant is in arrears in payment of fixed annual rent or additional rent hereunder, Tenant waives Tenant's right, if any, to designate the items against which any payments made by Tenant are to be credited, and Tenant agrees that Landlord may apply any payments made by Tenant to any items it sees fit irrespective of and notwithstanding any designation or request by Tenant as to the items against which any such payments shall be credited.

41.08.  Tenant hereby acknowledges that in order to avoid delay this Lease has been prepared and submitted to Tenant for signature with the understanding that it shall not be deemed an offer by Landlord or bind Landlord unless and until it is executed and delivered by Landlord.

- 44 -

41.09.  All Exhibits referred to in this Lease are hereby incorporated in this Lease by reference.

41.10.  The covenants, conditions and agreements contained in this Lease shall bind and inure to the benefit of Landlord and Tenant and their respective heirs, distributees, executors, administrators, successors, and except as otherwise provided in this Lease, their assigns.

41.11.  The parties agree that the introductory Recitals are intended to be made a part of the provisions of this Lease and are hereby incorporated in this Lease by reference.

41.12.  This Lease represents the entire agreement between the parties as of the date hereof and the provisions hereof supercede any and all prior agreements between the parties.

ARTICLE XLII

PARKING

42.01.  Landlord shall use reasonable efforts to cause the parking garage operator to provide to Tenant, at the prevailing market rate, two (2) parking spaces in the parking garage located beneath the Building.

- 45 -

IN WITNESS WHEREOF, Landlord and Tenant have respectively executed this Lease under seal as of the day and year first above written.

POOL 1225 ASSOCIATES,
Landlord

By:

Name: *A. Fogerty*

Title: *V.P.*                    [SEAL]


INDEPENDENCE FEDERAL SAVINGS BANK,
Tenant

By:

Name:

Title:                    [SEAL]

- 46 -

<u>EXHIBIT A</u>

[The Demised Premises]

MEMORANDUM OF LEASE

This agreement made the _11oth_ day of December, 1988, between POOL 1225 ASSOCIATES, a District of Columbia Limited Partnership, having an office c/o Jones Lang Wootton, Five Hanover Square, New York, New York 10004, Landlord, and INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, having an office at 1225 Connecticut Avenue, N.W., Washington, D.C., Tenant.

### Witnesseth:

That Landlord, in consideration of the rents reserved and on the terms, covenants, agreements and conditions contained in a certain lease between the same parties dated the _11oth_ day of December, 1988, hereby leases to Tenant and Tenant hereby leases and hires from Landlord the portion of Lobby Space (containing approximately 6,450 square feet in total) as described in the said lease and as presently constructed, in the building known as 1225 Connecticut Avenue, N.W., Washington, D.C., on the Land described on Exhibit A annexed hereto, for the term commencing on the first day of January, 1989 and ending at 5:00 p.m. on December 31, 2000.

In witness whereof the parties hereto have executed this Memorandum of Lease the _11oth_ day of December, 1988.

POOL 1225 ASSOCIATES,
Landlord

By: _____

Name: A. EDGLEY.                    [SEAL]

Title: V.P.


INDEPENDENCE FEDERAL SAVINGS BANK,
Tenant

By: _____

Name: _____

                                    [SEAL]

Title: _____

## EXHIBIT A

### [The Land]

Lot numbered Eighty-two (82) in Square numbered One Hundred Fifty-nine (159) in the subdivision made by 1225 Connecticut Avenue Associates, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 150 at folio 197.

EPR7172/78

DISTRICT OF COLUMBIA, to-wit:

I, _Dorothy J. Rindie_, a notary public in and for the District of Columbia, do hereby certify that _William B. Fitzgerald_, party to a certain Memorandum of Lease bearing date on the _19th_ day of December, 1988, and hereto annexed, personally appeared before me in said District, the said _William B. Fitzgerald_ being personally well-known to me as the _President_ of INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, and the person who executed the said Memorandum of Lease and by virtue and in pursuance of the authority conferred upon him/her by the Board of Directors of INDEPENDENCE FEDERAL SAVINGS BANK, acknowledged the same to be the corporate act and deed of INDEPENDENCE FEDERAL SAVINGS BANK and that he/she executed said instrument in the name of INDEPENDENCE FEDERAL SAVINGS BANK as its _President_.

Given under my hand and seal this _19th_ day of _December_, 19_88_.

_Dorothy J. Rindie_
Notary Public

My Commission Expires: MY COMMISSION EXPIRES JULY 31, 1990

DISTRICT OF COLUMBIA, to-wit:

I, _Patricia Scott Hanges_, a notary public in and
for the State of New Jersey do hereby certify
that _Anthony P.D. Edgley_, _Vice President_
of _Pool 1225 Associates_, General Partner of POOL
1225 ASSOCIATES, a District of Columbia Limited Partnership,
which limited partnership is a party to a certain Memorandum of
Lease bearing date on the _16th_ day of December, 1988, and
hereto annexed, personally appeared before me in said District,
the said _Anthony P.D. Edgley_, being personally
well-known to me as the _Vice President_
of _Pool 1225 Associates_, General Partner of
POOL 1225 ASSOCIATES, and the person who executed the said
Memorandum of Lease and, by virtue and in pursuance of the
authority conferred upon him by _the Board of Directors_
of _Pool 1225 Associates_,
acknowledged the same to be the act and deed
of _Pool 1225 Associates_, General Partner of
POOL 1225 ASSOCIATES and that he executed said instrument in the
name of POOL 1225 ASSOCIATES.

Given under my hand and seal this _9TH_ day
of _January_, 19_89_.

_Patricia Scott Hanges_
Notary Public

My Commission Expires:

PATRICIA SCOTT HANGES
Notary Public, State of New Jersey
No. 2039522
Qualified in Bergen County
Commission Expires January 19, 19_93_

**POOL 1225 ASSOCIATES**
c/o Jones Lang Wootton
**Five Hanover Square**
New York, New York 10004

Independence Federal Savings Bank
1225 Connecticut Avenue, N.W.
Washington, D.C.

Re:    Lease of Premises at 1225 Connecticut
Avenue, N.W., Washington, D.C. dated
January 9, 1989

Ladies and Gentlemen:

In connection with the execution of the referenced lease, you have asked us for certain information regarding the current status of your tenancy. As of January 1, 1989, the undersigned has no actual knowledge, having made no independent investigation or special inquiry, of any default by Tenant (as defined in the referenced lease) of th terms and provisions of the Prior Leases (as defined in the referenced lease) pursuant to such Prior Leases and all rents and charges have been paid through December 31, 1988.

Very truly yours,

POOL 1125 ASSOCIATES

By :

Name:  *Anthony P. D. Edgley*
Title:  *V. P.*

– 47 –

## EXHIBIT B

[The Land]

Lot numbered Eighty-two (82) in Square numbered One Hundred Fifty-nine (159) in the subdivision made by 1225 Connecticut Avenue Associates, as per plat recorded in the Office of the Surveyor for the District of Columbia in Liber 150 at folio 197.

0502i

# EXHIBIT B

## FIRST AMENDMENT TO LEASE

THIS FIRST AMENDMENT TO LEASE (this "**Amendment**") is made this 25 day of April, 2001, but effective for all purposes as of January 1, 2001, by and between INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation, having an address at 1225 Connecticut Avenue, N.W., Washington, D.C. 20036 ("**Tenant**"), and BRE/CONNECTICUT L.L.C., a Delaware limited liability company, successor in interest to Pool 1225 Associates, having an address at c/o The Blackstone Group, 345 Park Avenue, New York, New York 10154 ("**Landlord**").

## W I T N E S S E T H:

WHEREAS, pursuant to that certain Agreement of Lease made December 16, 1988 between Landlord and Tenant (the "**Lease**"), Tenant leases from Landlord a certain portion of the first or main lobby floor (the "**Demised Premises**") in the building known as 1225 Connecticut Avenue, N.W., Washington, D.C. 20036 (the "**Building**"); and

WHEREAS, Landlord and Tenant desire to amend the Lease to, among other things, extend the Lease term, reflect the re-measurement of the Demised Premises and the Building and make certain other modifications as more fully set forth herein.

NOW THEREFORE, in consideration of the premises and mutual promises herein contained and other good and valuable consideration the receipt and sufficiency of which is hereby acknowledged, the parties hereto agree as follows:

1. Capitalized Terms. All capitalized terms used in this Amendment shall have the meanings ascribed to such terms in the Lease unless expressly provided otherwise herein. The following definition is added to Article XXII of the Lease in the correct alphabetical order:

"**Lease Year**" shall mean the period commencing January 1, 2001 and ending on the last day of the month which completes twelve (12) full calendar months thereafter, and each 12-month period thereafter commencing on the first day after the end of the immediately preceding Lease Year, except that the last Lease Year shall end on the last day of the Term.

2. Re-Measurement of Demised Premises/Building. Landlord has re-measured the Demised Premises in accordance with the Modified GWCAR standard and the rentable square footage of the Demised Premises as so re-measured is 6,870. Accordingly, the number "**6,450**" is hereby replaced with the number "**6,870**" wherever it appears in the Lease. Landlord has re-measured the Building in accordance with the Modified GWCAR standard and the rentable square footage of the Building (excluding retail areas) as so re-measured is 204,854.

3.    _Term_. Section 2.01 of the Lease is hereby deleted in its entirety and replaced with the following:

"2.01    The term of this Lease shall be a period of ten years (the "**Term**") commencing on January 1, 2001 (the "**Commencement Date**"), and expiring at 11:59 p.m. on December 31, 2010 (the "**Expiration Date**") unless such Term shall sooner cease and expire as hereinafter provided."

4.    _Extension Option_. The following is hereby inserted in the Lease immediately after current Section 2.02 as Section 2.03 of the Lease:

"2.03    _Tenant's Option to Extend Term_.

(a)    _Extension Option_. Subject to the limitations of Section 2.03(c), Tenant shall have the option (the "**Extension Option**") to extend the Term for one (1) additional period of five (5) years (such additional period being hereinafter referred to as the "**Extension Period**"). The Extension Period shall begin on the day after the end of the Term and shall end on the day which completes five years thereafter. If Tenant timely exercises the Extension Option in accordance with this Section, the Term and the Expiration Date shall be extended accordingly. Except as otherwise expressly provided in this Section, the Extension Period shall be upon the same terms, covenants and conditions set forth in this Lease with respect to the Term; except that there shall be no extension option after the Extension Period; and, Landlord shall have no obligation to pay Tenant the Allowance or to make (or pay for) improvements to the demised premises.

(b)    _Manner of Exercise_. The Extension Option shall be exercisable by Tenant by giving notice of the exercise of the Extension Option to Landlord at least one hundred eighty (180) days before the end of the last Lease Year in the Term. Time shall be of the essence in connection with Tenant's exercise of the Extension Option.

(c)    _Limitations on Exercise of Extension Option_. Tenant may not exercise the Extension Option if, at the time of a purported exercise of the Extension Option an Event of Default has occurred and is continuing.

(d)    _Rent per Square Foot During Extension Period_. If Tenant timely exercises the Extension Option, the Rent per Square Foot for each Lease Year in the Extension Period shall be an amount equal to the Fair Rental Value of the Premises for the Extension Period as determined by mutual agreement between Landlord and Tenant or by appraisal by one or more commercial real estate brokers in the manner provided in Section 2.03(f). The "**Fair Rental Value of the Premises**" shall be (i) in the case of the first Lease Year in the applicable Extension Period, an amount equal to the fair rental value (per square foot) of the demised premises as of the

first day of such Lease Year, and (ii) in the case of each Lease Year thereafter in the Extension Period, an amount equal to the fair rental value (per square foot) of the demised premises for such Lease Year which shall be expressed either as (x) a fixed amount per square foot, or (y) a specified percentage increase, or an increase based on a formula that measures inflation or changes in the cost of living, in the fair rental value of the demised premises for the immediately preceding Lease Year in the Extension Period.

(e)    Base Year During Extension Period. The Base Year for purposes of calculating Operating Expenses and Tax Adjustments in accordance with Section 5.04 of the Lease, will be the first Lease Year of the Extension Period.

(f)    Method of Determining Rent per Square Foot. If Tenant exercises the Extension Option, and if Landlord and Tenant are unable mutually to agree on the Rent per Square Foot for the first Lease Year in the Extension Period at least one hundred fifty (150) days before the end of the last Lease Year in the Term, either party (the "**Initiating Party**") shall have the right to notify the other party (the "**Responding Party**") of its desire to determine the Fair Rental Value by appraisal pursuant to this Section 2.03(f) and in such notice the Initiating Party shall designate the broker appointed by it. Within twenty (20) days after receipt of the Initiating Party's notice, the Responding Party shall, by notice to the Initiating Party, designate a second broker. If the Responding Party does not so designate a second broker within the 20-day period, the first broker appointed by the Initiating Party shall proceed to make his/her valuation, in which case the Fair Rental Value of the Premises for the Extension Period shall be the amounts (including, if applicable, the formula for calculating the amounts) determined by the first broker. Each broker shall make an independent determination of the Fair Rental Value of the Premises for the Extension Period. If the two brokers so appointed agree on the Fair Rental Value of the Premises for the Extension Period within fifteen (15) days after the appointment of the second broker, the Fair Rental Value of the Premises for the Extension Period shall be the amounts (including, if applicable, the formula for calculating the amounts) determined by them. If the two brokers so appointed do not agree on the Fair Rental Value of the Premises within fifteen (15) days after the appointment of the second broker, the Landlord and Tenant shall each make a separate determination of the applicable Fair Rental Value of the Premises. If the two determinations differ by less than ten percent (10%), the Fair Market Rental Value shall be the average of the two (2) determinations. If Landlord's and Tenant's determinations differ by ten percent (10%) or more, then, either Landlord or Tenant may terminate the process of determining Fair Rental Value of the Premises by giving written notice to the other within ten (10) business days following receipt of the

other party's determination of the Fair Rental Value of the Premises. In such event, the Term shall expire on the last day of the initial Term. If neither party terminates the process of determining Fair Rental Value of the Premises within such ten (10) business day period, then the Fair Rental Value of the Premises shall be the average of the two (2) determinations.

(g)    Qualifications of Brokers and Method of Valuation. Each broker appointed pursuant to Section 2.03(f) shall be an individual of recognized competence who (i) has had a minimum of 10 years' experience in the leasing of commercial office space in Washington, D.C.; (ii) is not compensated on a contingent fee basis; and (iii) is not affiliated with or, except in this limited case, otherwise employed by the Landlord or Tenant. All valuations of the Fair Rental Value of the Premises shall be in writing and, in the case of the valuation for the first Lease Year in the Extension Period, shall be expressed in terms of an annual rent per square foot of Rentable Area. Each broker shall determine the Fair Rental Value of the Premises, as a whole, for the Extension Period on the basis of the criteria set forth in Section 2.03(i). The party appointing each broker shall be obligated, promptly after receipt of the valuation report prepared by the broker appointed by such party, to deliver a copy of such valuation report to the other party in the manner provided elsewhere in this Lease for the giving of notices.

(h)    Expenses of Brokers. The expenses of each of the first two brokers appointed pursuant to Section 2.03(f) shall be borne by the party appointing such broker.

(i)    Criteria for Determining Fair Rental Value. Each broker appointed pursuant to Section 2.03(f) shall determine the Fair Rental Value of the Premises in accordance with the following criteria:

(1)    The Extension Period shall be on the same terms and conditions as set forth in this Lease, with the only changes being the change in the fixed annual rent, the change of the Base Year to the first Lease Year of the Extension Period, and the fact that there is no additional Extension Option; and

(2)    All relevant factors affecting the fair rental value, including the rent being charged for the renewal or extension of the terms of leases for comparable space in comparable office buildings located in the sub-markets of Washington, DC, occupied by tenants on floors corresponding in size to the Floors occupied by Tenant, the size of the demised premises and the length of the term, but such rent shall be adjusted to determine a net effective market rent by accounting for (a) the extent, if any, to which rent comparables include (i) landlord payment of renewal tenant

improvements, (ii) rent abatement periods, (iii) other rent concessions, (iv) brokerage fees, (v) tenant payment of operating expenses and real estate taxes; and (vi) the availability of, and charges for, parking ; and (b) the fact that Tenant will be taking the demised premises in its "as is" condition, with no abatement in its obligation to pay rent.

(j)    Documentation. At any time after Tenant exercises the Extension Option has expired Landlord or Tenant shall, within fifteen (15) days after request by the other party, join with the requesting party in executing and delivering an amendment to this Lease which sets forth the Rent per Square Foot and the Basic Rent for the first Lease Year in the Extension Period and confirms the extension of the initial Term for the Extension Period."

5.    Rent. Sections 3.01 and 3.02 of the Lease is hereby deleted in its entirety and replaced with the following:



$340,065

"3.01. (a)    Fixed Rent. Tenant agrees to pay to Landlord a fixed annual rent (the "**fixed annual rent**") equal to the product of the number of square feet, which shall for the purposes of this Lease be deemed to be 6,870, attributable to the demised premises (the "**Rentable Area**"), multiplied by an annual rate ("**Rent per Square Foot**") of $49.50 during the first Lease Year, and for each Lease Year (or part of a Lease Year) thereafter during the Term, an amount equal to 103% of the Rent per Square Foot for the immediately preceding Lease Year and for each Lease Year during the Option Period, the amount determined pursuant to Section 2.03. Tenant shall pay the fixed annual rent for each Lease Year in equal monthly installments in advance on January 1, 2001 and thereafter on the first day of each month (or part of a month) during the Term.

(b)    Storage Rent. Throughout the Term, Landlord shall lease to Tenant, and Tenant shall lease from Landlord, storage space on the Basement Level of the Building (the "**Storage Space**"), for use as storage space. For the first Lease Year, Tenant shall pay, as additional rent for the storage space, an amount equal to One Hundred Forty Four and 58/100 Dollars ($144.58) per calendar month. For each Lease Year after the first Lease Year, Tenant shall pay, as additional rent for the Storage Space, an amount equal to 103% of the additional rent for the Storage Space payable for the immediately preceding Lease Year. All other provisions of the Lease shall apply to the Storage Space to the same extent, and with the same effect, as if it were a part of the demised premises.

(c)    Rent Payment. Fixed annual rent and all additional rent due under the Lease (including, without limitation, the additional rent payable for the Storage Space) shall be payable in advance on the first day of each calendar month during the Term at the office of Landlord or such other place as Landlord may designate, and Tenant shall not have the right to setoff, recoup or deduct any

amount allegedly owed by Landlord to Tenant under this Lease from any of the fixed annual rent of additional rent payable by Tenant under this Lease, except as otherwise expressly permitted by this Lease. Tenant's sole remedy with respect to any claim against Landlord (other than a setoff or credit expressly permitted by this Lease) shall be to commence an independent legal action against Landlord or file a counterclaim or third party claim (impleader) in a legal action commenced by Landlord.

3.02    The fixed annual rent, additional rent and Storage Rent shall be paid promptly when due, in lawful money of the United States, without notice or demand and without deduction, diminution, abatement, counterclaim or setoff of any amount for any reason whatsoever, except as otherwise provided in this Lease, to Landlord at Landlord's notice address or at such other address or to such other Person (including a successor to Landlord's interest in the Building) as Landlord may from time to time designate. The rent reserved under this Lease shall be the total of all fixed annual rent, additional rent and Storage Rent, increased and adjusted as elsewhere herein provided, payable during the entire Term and, accordingly, the methods of payment provided for herein, namely, annual and monthly rental payments, are for convenience only and are made on account of the total rent reserved hereunder."

6.    The provisions of Article IV of the Lease are hereby deleted in their entirety.

7.    <u>Operating Expense Definition</u>. The last sentence of Section 5.01 of the Lease is hereby deleted and the following is inserted in lieu thereof:

The following shall be excluded from the definition of Operating Expenses: (i) repairs or other work occasioned by a casualty, the costs of which are reimbursed to Landlord by insurers or any other person (or which would have been reimbursed if Landlord had carried the insurance required to be carried by it under this Lease or had otherwise enforced its right to collect such costs from such other person) or by governmental authorities in eminent domain proceedings; (ii) the cost of repairs or other work occasioned by an eminent domain, taking or condemnation; (iii) any amount paid to affiliates of Landlord (other than management fees at a rate not to exceed three percent (3%) of Landlord's gross revenue from the Building) for services or goods relating to the Property, to the extent that the cost of such services or goods exceeds competitive costs for such services rendered by unaffiliated persons with similar or reasonably equivalent skill, competence and experience or the competitive costs of such goods provided by unaffiliated persons; (iv) interest, fines or penalties due to late payment of Taxes or Operating Expenses due to Landlord's negligence; (v) financing or mortgage costs, including payment of the interest on or principal of borrowed money; depreciation expense; advertising for vacant space in the Building; leasing commissions; the cost of constructing improvements for space in the Building leased to other tenants; (vi) the cost of any specific work or service performed in

connection with the Building which, in accordance with the terms of this Lease, is to be paid for directly by Tenant or other tenants of the Building; (vii) ground rent; (viii) any costs or expenses incurred in the solicitation or execution of leases for space in the Building (including legal fees, advertising, moving expenses, design fees, rental concessions, rental credits, and lease assumptions); (ix) the cost of electricity and other utility charges for heating, ventilating and air-conditioning which are separately metered to, and payable by, other tenants of the Building; (x) expenses directly resulting from the breach of this Lease by Landlord, or the gross negligence of Landlord, its agents, contractors or employees; (xi) any repairs, alterations, additions, changes, replacements, renovations, or other expenditures which, under generally accepted accounting principles, are properly classified as capital expenditures, however, there shall be included each Lease Year in the Operating Expenses an amount equal to the amortized cost of the same determined on a straight-line basis over a period equal to the useful life of the same, and in accordance with generally accepted accounting principles applied on a consistent basis; (xii) bad debt loss, rent loss, or legal fees incurred in collecting rent or other obligations from Building tenants; (xiii) Landlord's general entity-level overhead and general and administrative expenses and other costs associated with maintaining Landlord's existence or the operation of the business of the entity that constitutes Landlord (as distinguished from the costs of operation of the Building), including accounting and legal matters (except for accountings costs specifically included in Operating Expenses); (xiv) rent associated with any management or leasing office in the Building; (xv) the wages and benefits of any employee of Landlord or Landlord's management agent who does not devote substantially all of his or her time to the Building, except to the extent such wages and benefits are reasonably, properly and equitably allocable to time spent by such employee in directly servicing the Building; (xvi) Taxes, other than sales and use taxes on items the cost of which is properly included in Operating Expenses; (xvii) salaries and other compensation paid to executive employees above the grade of building manager (including profit sharing, bonuses and other employee benefit plans) and any payroll taxes attributable to such employees; (xviii) general overhead and administrative and accounting expenses, except to the extent reasonably and properly directly allocable to the operation of the Building; (xix) legal fees or other costs of enforcing leases for space in the Building; (xx) acquisition costs of any sculpture, paintings or other art work in the Building; (xxi) costs of selling, syndicating, financing, mortgaging or hypothecating any part of or interest in the Property; (xxii) costs incurred to remove or remediate hazardous materials now or hereinafter existing in the Property; (xxiii) increased insurance premiums caused by hazardous materials brought onto, stored, used or disposed of in the Building by Landlord or any other tenant in the Building; (xxiv) the cost of settling disputes with agents which are not directly related to the management, maintenance or operation of the Building; (xxv) the cost of settling disputes with employees which relate to compensation and benefits, work rules and working conditions and other disputes related to the employees' services in managing, maintaining and operating the Building; and (xxvi) the costs incurred

in operating, managing, maintaining, repairing, resurfacing, cleaning or securing the Parking Facility.

8.    Operating Expenses and Tax Adjustments.  Section 5.03 of the Lease is hereby deleted in its entirety and replaced with the following:

"5.03    Base Year; Tenant's Share.  For the purpose of calculating Operating Expense and Tax Adjustments (as defined in Section 5.04 hereof), the base year shall be the calendar year 2001 (the "**Base Year**"), and Tenant's share of Operating Expenses shall be 3.27% and Tenant's share of Taxes shall be 3.13%.  If the number of square feet of rentable area of the Building changes, then Tenant's share of Operating Expenses and Taxes shall be adjusted effective as of the date of any such change."

9.    Tenant's Right to Review.  Section 5.04 of the Lease is hereby amended to add the following:

(d)    Initial Review.  Tenant shall have the right to review the Landlord records related to Operating Expenses and Taxes for any calendar year, at any time within ninety (90) days after Tenant receives such Landlord's Operating Statement for such calendar, for the purpose of determining whether the statement correctly reflects the Operating Expenses and Real Estate Taxes for such calendar year and the Tenant's share of the same.  If Tenant exercises its foregoing right, Tenant shall retain a national accounting firm or a reputable local accounting firm whose fee for its review services is not contingent, in whole or in part, on the amount of an overstatement.  If Tenant fails to exercise its foregoing right of review within the 90-day period, the amount of the Tenant's share of the Operating Expenses and Taxes set forth in the Landlord's  Operating Statement for the calendar year in question shall be conclusively established as the amount set forth in the Landlord's Operating Statement for such calendar year delivered by Landlord to Tenant pursuant to Section 5.04(a), except as otherwise provided in Section 5.04(f).

(e)    Limited Review.  If Tenant's review of the Operating Expenses Statement and Taxes for a particular calendar year (the "**first calendar year**") pursuant to Section 5.04(d) discloses that the Tenant's share of Operating Expenses or Taxes for the first calendar year were overstated by more than five percent (5%), Tenant shall have the additional right, within thirty (30) days after Tenant receives the Landlord's Operating Statement  for the first calendar year, to review Landlord's records for Operating Expenses and Taxes for the two calendar years immediately preceding the first calendar year, subject to the limitations that Tenant's review shall be limited solely to determining whether the Operating Expenses or Taxes for the two earlier calendar

years were overstated for the same reasons that the Operating Expenses or Taxes for the first calendar year were overstated.

(f)     Expense of Review.  The costs incurred by Tenant to review the Landlord's records pursuant to Section 5.04(d) shall be paid by Tenant, except that, if it is determined on the basis of such review (or if, in accordance with the following provisions, it is otherwise ultimately determined) that the Tenant's share of the Operating Expenses and Taxes for such calendar year was overstated by more than five percent (5%) then the reasonable third party cost of the review (not to exceed $5,000) shall be paid by Landlord.  Landlord shall pay to Tenant any overpayment of the Operating Expenses and Taxes for the calendar year in question within thirty (30) days after the amount of the overpayment has been established by the review as provided in this Section.

(g)     Effect of Review.  If (i) Tenant timely exercises its right to review the Landlord's records pertaining Operating Expenses and Taxes for a calendar year, and (ii) Tenant gives notice to Landlord, together with a copy of the report of its review prepared by its accountants, that Tenant's review discloses an overstatement of Operating Expenses or Taxes for such calendar year, the amount of the Operating Expense and Tax Adjustment for such calendar year shall be conclusively established as the amount determined as a result of such review unless, within ninety (90) days after receipt of Tenant's notice, Landlord, at its expense, shall contest the amount thereof, in which event the amount of the Operating Expenses or Real Estate Taxes (and the amount of the Operating Expense and Tax Adjustment) for such calendar year shall be conclusively established by an arbitration conducted pursuant to Article XXXV of the Lease.  Tenant's exercise of its right to review the Landlord's records pertaining Operating Expenses and Taxes for a particular calendar year pursuant to this Section shall not suspend or defer Tenant's obligation to pay the amount shown to be due by such Annual Operating Expense and Tax Statement pursuant to Section 5.04(a).

10.     Tenant Improvement Allowance.  Tenant contemplates making improvements to the demised premises in accordance with the provisions of this Article VIII (the "**Tenant Improvements**").  Within five (5) business days following execution and delivery this Amendment, Landlord shall give Tenant an allowance for the demised premises (the "**Allowance**") in an amount equal to the product obtained by multiplying (i) $12.50, by (ii) the Rentable Area of the demised premises, which shall be used to pay or reimburse Tenant for any costs paid or incurred by Tenant to third parties in designing, preparing and completing the Tenant Improvements.  The entire amount of the Tenant Allowance shall be disbursed by Landlord to Tenant concurrently with the execution of this Amendment. Upon request, the Tenant will supply the Landlord with lien waivers from the person or entity performing the work or providing the materials for such Tenant Improvements upon the completion of the same.

11.    Parking.  Section 42.01 of the Lease is hereby deleted in its entirety and replaced with the following:

"Throughout the Term, Landlord agrees to provide to Tenant, at Landlord's expense, two (2) parking spaces (the "**Parking Spaces**") in the below grade paring structure on the Land (the "**Parking Facility**").  The Parking Spaces shall be made available to Tenant on a self-park but, reserved or assigned basis within the Parking Facility.  Tenant acknowledges that the Parking Facility is operated, managed and maintained by a tenant of Landlord (the "**Parking Facility Operator**"), that Landlord has no responsibility for the management, operation and maintenance of the Parking Facility and that Landlord's sole obligation with respect to the Parking Spaces is to obtain the Parking Spaces from the Parking Facility Operator (or its successor) and provide the Parking Spaces to Tenant at Landlord's expense.  Tenant agrees that the Parking Spaces will be used solely by Tenant and Tenant's agents, employees, contractors, licensees, customers, clients and guests for the parking of passenger automobiles and other motor vehicles and for no other purpose, and that none of the Parking Spaces will be used by Persons other than the foregoing.  The Parking Spaces will be available during the normal operating hours of the Parking Facility as operated by the Parking Facility Operator.  If Landlord shall be unable to provide or shall be delayed in providing the parking spaces required by this Section, and if such inability or delay shall result from Landlord's inability to perform as set forth in Article XXXII, such inability or delay shall not constitute an actual or constructive eviction, in whole or in part, or relieve Tenant from any of its obligations under this Lease, or impose any liability upon Landlord or its agents by reason of inconvenience to Tenant, or injury to, or interruption of, Tenant's business, or otherwise, or entitle Tenant to any abatement or diminution of rent unless Landlord shall fail to use reasonable diligence to correct the event or circumstances causing such inability to perform."

12.    Landlord's Work.  Landlord, at its sole cost and expense, shall install, or cause to be installed, a fire suppression sprinkler system in the demised premises in conformance with applicable Legal Requirements.  Landlord, at its sole cost and expense, shall renovate the area surrounding the existing Automatic Teller Machine ("**ATM**") to match the appearance of the Building lobby in the location and in accordance with the specifications to be mutually agreed upon by Landlord and Tenant within seven (7) business days following execution and delivery of this Amendment.  Landlord shall commence such work promptly after the date Landlord and Tenant agree upon the plans and specifications for Landlord's work, and subject to Landlord's inability to perform as set forth in Article XXXII of the Lease, Landlord shall complete such work in accordance with a mutually agreed upon construction schedule.

13.    Brokers.  Landlord and Tenant each represents and warrants to the other that neither of them has employed or dealt with any broker or finder in carrying on the negotiations relative to this Amendment.  Landlord and Tenant shall each indemnify and hold harmless the other from and against any claim or claims for brokerage or other

commission arising from or out of any breach of its foregoing representation and warranty.

14.     <u>Ratification of Lease</u>.  Except as expressly set forth in this Amendment, the terms and conditions of the Lease shall continue in full force and effect without any change or modification and shall apply for the balance of the term of the Lease.  In the event of a conflict between the terms of the Lease and the terms of this Amendment, the terms of this Amendment shall govern.

15.     <u>No Amendments</u>.  This Amendment shall not be altered, amended, changed, waived, terminated or otherwise modified in any respect or particular, and no consent or approval required pursuant to this Amendment shall be effective, unless the same shall be in writing and signed by or on behalf of the party to be charged.

16.     <u>Successors</u>.  This Amendment shall be binding upon and shall inure to the benefit of the parties hereto and to their respective heirs, executors, administrators, successors and permitted assigns.

17.     <u>Counterparts</u>.  This Amendment may be executed in any number of counterparts.  It is not necessary that all parties sign all or any one of the counterparts, but each party must sign at least one counterpart for this Amendment to be effective.

**[SIGNATURE PAGE FOLLOWS]**

WITNESS the following signatures and seals as of the date first above written.

WITNESS/ATTEST:

LANDLORD:

BRE/CONNECTICUT L.L.C., a Delaware limited liability company

_____

By:_____
Name:_____
Title:_____

TENANT:

INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation

By: _Donna A. Shuler_
Name: _Donna F. Shuler_
Title: _President + CEO_

# EXHIBIT C

**Brookfield** Properties

Brookfield Properties Management LLC
U.S. Commercial Operations
1250 Connecticut Avenue, N.W., Suite 500
Washington, D.C. 20036

Tel  (202) 659-8349
Fax (202) 467-5520
www.brookfieldproperties.com

*Via Hand Delivery & Mail*

May 11, 2007

Mr. Robert B. Isard, President & CEO
Independence Federal Savings Bank
1229 Connecticut Avenue, N.W.
Washington, DC 20036

Dear Mr. Isard:

We are excited to announce that on July 1, 2007, work will commence for the 1225
Connecticut Avenue Repositioning Project. This project which is currently scheduled to
continue for approximately 18 months, will bring a completely "new" look to the entire
building. Detailed drawings of the completed project are not yet available, however a
rendering is attached.

Realizing that Independence Federal Savings Bank will be a tenant of the building during
the length of this project, it would be beneficial to meet to discuss any concerns you may
have with regard to its impact on your operations. At your convenience, we would like to
schedule this meeting within a few weeks. Please provide a date that best fits your
schedule. If you have any questions or concerns, I can be reached at 202-659-8349.

Looking forward to meeting with you.

Sincerely,

Christine V. Olfus-Campos
Assistant Property Manager

cc:    Jackie Duke, General Manager – Brookfield Properties



# EXHIBIT D

**Brookfield** Properties

ENTERED JUL 2 4 2007

# Memo

| To: | Tenants of 1225 Connecticut Avenue |
|---|---|
| From: | Karen Hunt, Property Manager |
| Re: | 1225 Renovation – Scheduling/Notification |

Date/Time:   July 20, 2007

As you know, Brookfield Properties will soon begin the renovation of 1225 Connecticut Avenue. To give you an understanding of the scope and timing of the work, we are providing a tentative schedule from our general contractor, Davis Construction. As with any construction project, these dates will be subject to change. Also, updated schedules and notices detailing the various project phases and any service interruptions will be provided in advance and coordinated directly with each affected tenant.

The parking garage will remain open during these renovations; however, some spaces will be impacted due to shoring during certain phases. We will continue to provide elevator service from the garage to the building's main lobby. Emergency egress exits will be maintained for the duration of the project for both retail spaces and they shall be clearly marked at all times.

The current schedule for construction is as follows:

A.  **INITIAL CONSTRUCTION SET-UP: July 23 – August 3, 2007**
- **Monday, July 23 – Friday, July 27, 2007** – Davis Construction will be adding partitions in the lobby area to separate constructions crews, offices and entrances from the rest of the main lobby and the tenants' areas.
- **Saturday, July 28, 2007** – The sidewalk tree planters will be demolished and completely removed. A crane will be placed on the N Street side of the building in order to install trash chutes for interior demolition.
- **Monday, July 30 – Friday August 3, 2007** – The metered parking and one lane of traffic will be blocked off on N Street to allow for the construction staging area.
- **Saturday, August 4, 2007** Scaffolding in the form of a covered walkway will be erected on 18th Street in front of the retail spaces and temporary signage will be installed so that the retail spaces remain clearly visible during construction. Entrances will remain unobstructed.

B.  **INTERIOR DEMOLITION: August 2007 – April 2008**
The first phase of construction will consist of interior demolition. Demolition will initially take place on the upper floors and then progress down the building.

C.  **EXTERIOR DEMOLITION: April 2008 – June 2008**

We will provide regular updates as construction progresses. For any questions throughout this process, please do not hesitate to call the management office at (202) 659-8349. Thank you.



# EXHIBIT E



**Legend:**

Construction Fence

Scaffolding System for Structural Modifications

Temporary Toilets

Temporary Signage, through Construction for Bank Tenants

Trash Chute / Dumpsters

Brookfield Properties

1225 CONNECTICUT AVENUE, NW

SITE LAYOUT PLAN

CONNECTICUT AVENUE, N.W.

18th STREET, N.W.

Covered Walkway

Low Roof

Main Lobby

Occupied at 1st Floor

Elevator Access

Occupied at 1st Floor

Elevator Access

DAVIS Field Office

Demo Crane

Curb Lane – 9 Parking Meters

N STREET, N.W.

Existing Garage A Remain Open

Boring Construction

10' PUBLIC ALLEY

Temporary Alley Closure
for Weekend Hours

11 June 2007

# EXHIBIT F

**Brookfield** Properties  |  Brookfield Properties Management LLC  |  Tel  (202) 659-8349
U.S. Commercial Operations  |  Fax (202) 467-5520
1225 Connecticut Avenue, N.W. Suite 100  |  www.brookfieldproperties.com
Washington, D.C. 20036

*Via Overnight Delivery*

**July 25, 2007**

Mr. Robert B. Isard, President & CEO
Independence Federal Savings Bank
1229 Connecticut Avenue, N.W.
Washington, DC 20036

**RE:    Asbestos Containing Materials Abatement Notice**

Dear Mr. Isard:

Per the requirements of the 1987 Superfund Amendments and Reauthorization Act/Community Right-to-Know Requirements, the Landlord is required to inform tenants when any abatement of Asbestos Containing Materials (ACM) is to take place in an office building. This letter is being sent to inform all tenants that abatement of certain Asbestos Containing Materials will be taking place within the building soon and to address any concerns that this information might cause to tenants.

Background
Historically, asbestos, a naturally occurring mineral fiber, was widely used as a building material in both commercial and residential structures. Its unique wear and heat resistant properties made it suitable for use in vinyl flooring, adhesive, roofing, siding, insulation and fireproofing materials. The term "Asbestos Containing Materials" is considered by the government to be any material containing more than one (1) percent of asbestos by weight. Most buildings older then 1981 (when use of ACM in construction was prohibited) typically have some form of ACM in them. While it is now banned as a construction material, it may stay in place as long as it is maintained in good condition, not disturbed or broken up, and inspected regularly.

Potential Health Concerns
Although asbestos is hazardous, the risk of asbestos-related disease depends upon exposure to airborne asbestos fibers. As long as ACM is not disturbed and remains intact, it presents very little risk to the occupants and visitors of 1225 Connecticut Avenue. ACM can become a concern if damaged during remodeling or demolition, or if allowed to deteriorate over the course of time. When crumbled or crushed, ACM can be reduced to very fine airborne mineral fibers that may be harmful if inhaled or swallowed. These fibers cannot be seen or otherwise detected without specialized instruments.



Page 2 – July 25, 2007
Abatement Notification Letter
Independence FSB

Abatement Information
This letter serves as official notice to all tenants of 1225 Connecticut Avenue, NW that scheduled abatement of identified ACM will be conducted within the building by a licensed asbestos abatement contractor, in support of upcoming renovation activities. All abatement activities will be performed in accordance with all applicable Federal, State and Local regulations governing the removal of asbestos. This work will begin 30 days from the date of this letter. The National Emissions Standard for Hazardous Air Pollutants (NESHAP) classifies the materials scheduled for abatement as Category I non friable materials (vinyl asbestos tile, various mastics, etc.), Category 2 non-friable materials (caulking, fire doors, etc) and regulated ACM (RACM) [thermal system insulation, spray-applied duct insulation, etc]. Environmental controls, including the erection of negative pressure enclosures and the use of High Efficiency Particulate (HEPA) air filtration will be employed by the abatement contractor, and the work practices will be monitored by an independent third-party Industrial Hygiene (IH) firm. The IH firm will provide asbestos project monitoring services in support of asbestos abatement activities in accordance with the requirements of OSHA 29 CFR 1926.1101, to include periodic contractor oversight, pre-abatement inspections, final visual inspections, and final air clearance sampling in support of asbestos abatement activities.

Please feel free to call the management office at 202-659-8349 if you have any questions or concerns regarding this matter. Thank you.

Sincerely,

Karen Hunt
Property Manager

cc:    Lease File
       Christine Olfus - Campos, Assistant Property Manager
       Kevin Parks, Lead Engineer
       Jackie Duke, General Manager

**EXHIBIT G**





Prolaw
Atty/E-mail

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK, et al.,

    Plaintiffs,

       v.                               Civil Action No.  07-2090 (JDB)

1225 CONNECTICUT CO. LLC, et al.,

    Defendants.

## MEMORANDUM AND ORDER

    This case, in a slightly altered form, is before the Court for a second time, now pursuant

to removal jurisdiction.  Currently before the Court is plaintiffs' motion to remand the case to the

Superior Court of the District of Columbia ("D.C. Superior Court").  For the reasons stated

below, the Court will grant plaintiffs' motion.

    Plaintiff Independence Federal Savings Bank ("IFSB") is a federally-chartered savings

bank that has four branches in the D.C. metropolitan area: two in the District, one in Chevy

Chase, MD, and another in Silver Spring, MD.  Its headquarters are in an office building located

at 1225 Connecticut Avenue, NW.  Plaintiff Stanley W. Parsons ("Parsons"), a Virginia resident,

is the Vice-President and Chief Information Officer of IFSB, and he works in the D.C.

headquarters.  IFSB leases commercial space for its headquarters from defendant 1225

Connecticut Co. LLC ("1225"), a Delaware-chartered limited liability company.  Beginning in

July 2007, 1225 initiated a renovation plan (its "Repositioning Project") that includes large-scale

demolition of interior and exterior portions of the building.  Plaintiffs claim to have identified the

ENTERED JAN 0 7 2008

contractor for the project as defendant Davis Construction Services, LLC ("DCS"), a Virginia

company.

In the complaint filed in the D.C. Superior Court on October 23, 2007, plaintiffs

complain about the impact of the Repositioning Project.[1]  Specifically, plaintiffs assert the

following causes of action in five counts: (I) a breach of contract claim by IFSB against 1225; (II)

a third party beneficiary claim by Parsons against 1225 for breach of contract; (III) a claim in

which both plaintiffs allege a violation of the covenant of quiet enjoyment by both defendants;

(IV) a claim of nuisance by both plaintiffs against both defendants; and (V) a claim of negligence

by both plaintiffs against DCS.  Plaintiffs seek injunctive relief and compensatory damages.

On November 16, 2007, defendants filed a notice of removal of the D.C. Superior Court

action to this Court arguing that plaintiff Parsons and defendant DCS were improperly and/or

fraudulently joined as parties and that without Parsons and DCS diversity jurisdiction would

exist under 28 U.S.C. § 1332(a).  On November 26, 2007, plaintiffs filed a motion asserting that

removal to federal court was improper and requesting that this Court remand the case back to the

D.C. Superior Court.

The party seeking removal of an action bears the burden of proving that jurisdiction exists

in federal court.  See Mulcahey v. Columbia Organic Chems. Co., 29 F.3d 148, 151 (4th Cir.

1994); Bhagwanani v. Howard Univ., 355 F. Supp. 2d 294, 297 (D.D.C. 2005);

---

[1]On July 31, 2007, plaintiff IFSB filed suit against defendant 1225 in this Court and
sought a preliminary injunction to prohibit 1225 from further renovating the building.  See
Independence Fed. Savings Bank v. 1225 Connecticut Co. LLC, Civil Action No. 07-1389.  After
a hearing, the Court denied plaintiff's motion, and plaintiff thereafter filed a stipulation of
voluntary dismissal without prejudice.  See Docket Entry Nos. 22, 23.

In re Tobacco/Gov'tal Health Care Costs Litig., 100 F. Supp. 2d 31, 35 (D.D.C. 2000). Because of the significant federalism concerns involved, this Court strictly construes the scope of its removal jurisdiction. See Shamrock Oil & Gas Corp. v. Sheets, 313 U.S. 100, 107-09 (1941); Bhagwanani, 355 F. Supp. 2d at 297; Johnson-Brown v. 2200 M Street LLC, 257 F. Supp. 2d 175, 177 (D.D.C. 2003). Accordingly, "if federal jurisdiction is doubtful, a remand to state court is necessary." Dixon v. Coburg Dairy, Inc., 369 F.3d 811, 815-16 (4th Cir. 2003) (en banc); see also Bhagwanani, 355 F. Supp. 2d at 297; Johnson-Brown, 257 F. Supp. 2d at 177.

In particular, a defendant claiming fraudulent joinder faces a very heavy burden, and "courts are required to resolve all disputed issues of fact and law in favor of the plaintiff." Brown v. Brown & Williamson Tobacco Corp., 26 F. Supp. 2d 74, 77 (D.D.C. 1998) (citing Marshall v. Manville Sales Corp., 6 F.3d 229, 232-33 (4th Cir. 1993)); see also Johnson-Brown, 257 F. Supp. 2d at 177 ("Where the need to remand is not self-evident, the court must resolve any ambiguities concerning the propriety of removal in favor of remand."). To meet their burden here, defendants must show that plaintiff Parsons has "no possibility of a right to relief." Brown, 26 F. Supp. 2d at 77 (citation omitted). "[I]f there is even a possibility that a state court would find a cause of action stated against any one of the named in-state defendants on the facts alleged by the plaintiff, then the federal court must find that the in-state defendant(s) have been properly joined, and that there is incomplete diversity, and that the case must be remanded to the state courts." Id. (quoting B., Inc. v. Miller Brewing Co., 663 F.2d 545, 550 (5th Cir. 1981)). Remand is appropriate, then, unless Parsons' claims are "wholly nonsensical." Id. (quoting Pulse One Commc'ns, Inc. v. Bell Atl. Mobile Sys., Inc., 760 F. Supp. 82, 84 (D. Md. 1991)).

Defendants first argue that DCS was improperly joined as a defendant because DCS "has

nothing to do with the Repositioning Project." Defs.' Opp. at 7. Instead, according to

defendants, DCS is simply a corporate subsidiary of the real general contractor: James G. Davis

Construction Corporation, a Virginia corporation. See id. In response, plaintiffs assert that they

identified the contractual entity to be "Davis Construction," that the permit is in the name of

"Davis Construction," and that without discovery, it is not clear that there can be no cause of

action against DCS. See Pls.' Reply at 9. Moreover, plaintiffs state their intention to amend the

complaint to join James G. Davis Construction Corporation as a defendant. See id. at 10.

Because defendants concede that a Virginia company is the appropriate general contractor to be

named as a defendant and because plaintiffs may easily amend their complaint to ensure that the

proper Virginia party is named, federal jurisdiction is doubtful. Defendants' first argument

therefore fails to establish that this Court has diversity jurisdiction pursuant to 28 U.S.C. §

1332(a).

      Defendants next argue that Parsons fails to state a cause of action in Counts II, III, and

IV.[2] To be sure, defendants expose some weaknesses in those claims. But because the standard

is very low for plaintiffs, the Court cannot say that Parsons' claims are "wholly nonsensical." For

example, the District of Columbia recognizes a cause of action for a third party beneficiary under

a contract. See Fields v. Tillerson, 726 A.2d 670 (D.C. 1999); A.S. Johnson Co. v. Atl. Masonry

Co., 693 A.2d 1117 (D.C. App. 1997). And defendants have failed to cite any District of

Columbia law that establishes that a plaintiff may not plead a claim for breach of implied

_____

      [2]Defendants make no further argument regarding Count V, where the Virginia plaintiff,
Parsons, brings a negligence claim against the Virginia defendant, the general contractor
(whether that entity is DCS or James G. Davis Construction Corporation). This cause of action,
therefore, involves incomplete diversity of citizenship.

covenant of quiet enjoyment if a claim has been made for breach of an express covenant of quiet enjoyment. Thus, at bottom, defendants have not shown that all of Parsons' claims present "no possibility of a right to relief" and are instead "wholly nonsensical."

In the future, these claims may be dismissed for failure to state a claim upon which relief can be granted, see Fed. R. Civ. P. 12(b)(6), but that determination should be made by the D.C. Superior Court. See Brown, 26 F. Supp. 2d at 77 (holding that "[r]egardless of the strength or weakness of the plaintiffs' . . . argument, it cannot be said to be 'wholly nonsensical.' Its merit, therefore, is appropriately left for the courts of the District of Columbia to determine on remand."); see also Lyall v. Airtran Airlines, Inc., 109 F. Supp. 2d 365, 374 (E.D. Pa. 2000) ("We hasten to repeat that it is possible that these claims will ultimately be dismissed on remand, or that the defendants will prevail on summary judgment, but the important point here is that this is not our decision to make, but instead must be left to the state courts."). Because there remains a possibility that the claims here will survive that challenge, remand is appropriate.

Accordingly, upon consideration of [3] plaintiffs' motion to remand and for costs and attorneys' fees, the parties' memoranda, the applicable law, and the entire record herein, it is hereby

**ORDERED** that the motion is **GRANTED IN PART** and **DENIED IN PART**; it is further

**ORDERED** that this action is **REMANDED** forthwith to the Superior Court of the District of Columbia; it is further

**ORDERED** that plaintiffs' request for costs and attorneys' fees is **DENIED**; and it is further

**ORDERED** that [7] defendants' motion to strike plaintiffs' jury demand is **DENIED**

without prejudice as moot.

**SO ORDERED**.

_____/s/_____
JOHN D. BATES
United States District Judge

Date:   January 7, 2008

*[handwritten: BY AGREEMENT w/ JOUSCA per KBK 3/6/08]*

4/14    Prolaw

AOA    Atty/E-mail

IN THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK, *et al.*

        *Plaintiffs,*

v.

1225 CONNECTICUT CO. LLC, *et al.*

        *Defendants.*

Civil Action No. 2007 CA 007075 B
Judge: Jeanette J. Clark
Next Event: Initial Conference
           March 21, 2008
           10:30 a.m.

## DEFENDANTS' MOTION TO DISMISS
## OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

      Defendants 1225 Connecticut Co., LLC and Davis Construction Services, LLC, through

their undersigned counsel, hereby move for an order:

      1.     Dismissing Defendant DCS as a defendant;.

      2.     Dismissing Plaintiff Stanley W. Parsons as a plaintiff;

      3.     In the alternative, dismissing Count II, which is a claim by Plaintiff Parsons

against Defendant 1225 under a third-party beneficiary breach of contract theory;

      4.     Dismissing Count III for violation of implied covenant of quiet enjoyment;

      5.     Dismissing Count IV concerning nuisance; and

      6.     Dismissing Count V concerning negligence.

      In the alternative, Defendants ask this Court to grant summary judgment in their favor

and against Plaintiff with respect to the above-referenced claims and parties.  In support of the

instant motion, Defendants refer this Court and incorporate by reference their memorandum of

points and authorities and various exhibits attached thereto.

325708v1

**ENTERED** MAR 2 5 2008

WHEREFORE, Defendants request that this Court grant the motion to dismiss or alternatively, grant summary judgment in Defendants' favor.

GREENSTEIN DELORME & LUCHS, P.C.

Dated: March 17, 2008

/S/ William C. Casano
Richard W. Luchs, #243931
William C. Casano, #352492
Joshua M. Greenberg, #489323
1620 L Street, N.W., Suite 900
Washington, DC  20036-5605
Telephone:  (202) 452-1400
E-mail:  rwl@gdllaw.com
E-mail:  wcc@gdllaw.com
E-mail:  jmg@gdllaw.com
*Attorneys for Defendants*
*1225 Connecticut Co. LLC and*
*Davis Construction Services, LLC*

## CERTIFICATION OF COUNSEL

Pursuant to Rule 12-I(a) of the Superior Court Rules of Civil Procedure, the undersigned conferred with counsel for Plaintiffs on Friday, March 14, 2008, and despite diligent efforts, counsel for Plaintiffs confirmed that Plaintiffs do not consent to the instant motion.

/S/ William C. Casano
William C. Casano

CERTIFICATE OF SERVICE

A copy of the foregoing Defendants' Motion to Dismiss Or, In the Alternative, For

Summary Judgment was served electronically through eFiling for courts on Dale A. Cooter, Esq.

and Donna S. Mangold, Esq., counsel for Plaintiffs, March 17, 2008.


/S/  William C. Casano
William C. Casano

IN THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK, *et al.*

        *Plaintiffs,*

v.

1225 CONNECTICUT CO. LLC, *et al.*

        *Defendants.*

Civil Action No. 2007 CA 007075 B
Judge:  Jeanette J. Clark
Next Event:  Initial Conference
              March 21, 2008
              10:30 a.m.

## <u>ORDER</u>

Upon consideration of Defendants' Motion to Dismiss Or, In the Alternative, For Summary Judgment, and Plaintiffs' opposition thereto, it is this _____ day of _____, 2008, hereby

ORDERED that Defendants' motion will be and hereby is GRANTED; and it is further

ORDERED that

    a.      All claims against Defendant Davis Construction Services, LLC are dismissed;

    b.      All claims by Plaintiff Stanley W. Parsons are dismissed; and

    c.      Counts II, III, IV and V of the Complaint are dismissed.


                          _____
                          Jeanette J. Clarke
                          Superior Court Judge

Copies to:

Richard W. Luchs, Esq.
William C. Casano, Esq.
Joshua M. Greenberg, Esq.
1620 L Street, N.W., Suite 900
Washington, DC 20036-5605
Telephone: (202) 452-1400

Dale A. Cooter, Esq.
Donna S. Mangold, Esq.
Cooter, Mangold, Tompert & Karas, LLP
5301 Wisconsin Avenue, N.W., Suite 500
Washington, DC 20015

IN THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK, *et al.*

        *Plaintiffs,*

v.

1225 CONNECTICUT CO. LLC, *et al.*

        *Defendants.*

Civil Action No. 2007 CA 007075 B
Judge: Jeanette J. Clark
Next Event: Initial Conference
           March 21, 2008
           10:30 a.m.

## DEFENDANTS' MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Defendants 1225 Connecticut Co. LLC ("1225") and Davis Construction Services, LLC

("DCS"), by their undersigned counsel, pursuant to Rules 12, 12 I, and 56, hereby submit the

instant memorandum in support of their motion to dismiss or, in the alternative, for summary

judgment.

## FACTS

This is a case involving a dispute over a renovation project ("Repositioning Project") at

an office building owned by 1225 and located at 1225 Connecticut Avenue, N.W. (the

"Property"), and the alleged impact that construction has on the operations of the tenant, Plaintiff

Independence Bank ("IFSB"), and one of its employees, Stanley W. Parsons. Plaintiff IFSB is a

tenant of Defendant 1225 with respect to space (the "Premises") on the ground floor of the

Property, and its lease term extends through December 31, 2010. Complaint at para. 6, 12 and

14 and Exhibit A to Complaint. Stanley W. Parsons is not a tenant, but rather an employee of Plaintiff IFSB. Compl. at para. 3.

The Property originally constructed in 1968 is a Class B office building. See Exhibit A, Duke Affidavit at para. 7. In order to replace certain systems, *e.g.*, HVAC and plumbing, that were approaching the end of their useful life, more successfully positioning the Property in the highly competitive District of Columbia commercial leasing market, and bring the Property to Class A standards, 1225 planned for and is implementing the Repositioning Project.

The Repositioning Project involves the complete interior demolition of each floor of the Property beginning with the 8th floor down to the 2nd floor; lobby improvements; limited removal of asbestos containing materials throughout the building, but not within the Premises or the space occupied by the other ground floor tenant, Citibank; and the updating of selected systems in the Property. *Id.* at para. 8.

Article 16.02 of the Lease (attached to the Complaint as Exhibit A), entitles 1225 to undertake work at the Property provided certain conditions are met and states in its entirety:

> Landlord reserves the right, without the same constituting an actual or constructive eviction and without incurring liability to Tenant therefor, to change the arrangement and/or location of public entrances, passageways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the Building; provided, however, that the demised premises shall be visible from the street, public access on the street level directly into the demised premises shall not be cut off, access to the Building shall not be cut off and that there shall be no unreasonable obstruction of access to the demised premises or unreasonable interference with the use or enjoyment thereof.

## LITIGATION HISTORY

On July 31, 2007, Plaintiff IFSB filed a complaint in the United States District Court for the District of Columbia, Civil Action No. 07-1389 ("Federal Suit"). In its complaint, which was amended on August 10, 2007, IFSB complained about the Repositioning Project being performed at the site of its home office, namely the Property, and the impact such work allegedly was having on IFSB's operations. Specifically, IFSB alleged that there were seven ways in which the Repositioning Project violated the terms of the Lease and/or the covenant of quiet enjoyment: 1) destruction of all but the floors and supporting beams of the building; 2) removal of asbestos while tenants remain in the building; 3) dust-debris, noise and vibration from construction; 4) failure to provide air conditioning; 5) the site is an ongoing eyesore not suitable for a professional business; 6) the temporary replacement of IFSB's windows with plastic sheets will prevent IFSB from implementing basic security measures; and 7) IFSB is constructively evicted from the lobby for the duration of the project.

At the time the Federal Suit was filed, IFSB also filed a motion for preliminary injunction, which motion was also thereafter amended. The motion sought an order prohibiting 1225, until December 31, 2010, from further renovating the building even though seven of eight floors were vacant and some of those floors had been partially demolished. After a hearing, the District Court denied the motion for preliminary injunction on September 11, 2007. See Transcript of Oral Ruling attached as Exhibit B. In making that ruling, Judge John D. Bates found that: (a) evidence established that the planned asbestos removal will be properly and safely conducted with minimal risk to IFSB employees and customers. *Id. at 14*; (b) IFSB's concerns regarding hazardous conditions, bank security, fire code violations, fire hazards, and safety code violations were without support (*Id.*); (c) the scaffolding installation is consistent

with the construction permit and will not prevent access to IFSB's premises, *Id.*; (d) 1225 has

provided clear and adequate temporary signs and is making reasonable efforts to address IFSB's

trash concerns and to avoid any unnecessary or overly disruptive closure of entrances, *Id.*; (e) no

likely carbon monoxide from interior equipment is likely to penetrate IFSB's premises, *Id.*; (f)

the record did not establish any serious rodent infestation, *Id. at 14-15*; (g) the record established

1225 provided adequate chilled water for air conditioning as required by the Lease, *Id. at 16*; and

(h) that 1225 has made reasonable efforts to avoid and minimize the disruption and

inconvenience the Repositioning Project will cause to IFSB. *Id. at 19*. Thereafter, on September

24, 2007, IFSB filed a stipulation of voluntary dismissal without prejudice.

On or about October 23, 2007, IFSB filed the instant suit ("Superior Court Suit")

concerning the same renovation work at the Property. The Superior Court Suit complaint is

largely a reiteration of the federal complaint. However, IFSB added parties and claims, no doubt

in an effort to thwart removal to federal court.[1]  With respect to the parties, the complaint in the

Superior Court Suit names as a new plaintiff Stanley W. Parsons, who is described in the

complaint as an IFSB employee since 2001 at the 1225 Connecticut Avenue location, and the

current Vice-President and Chief Information Officer. Complaint at para. 3. The complaint adds

a new defendant, Davis Construction Services, LLC ("DCS"), whom the complaint mistakenly

identifies as the construction contractor of the Repositioning Project. Compl. at paras. 68, 78.

However, DCS has absolutely nothing to do with the Repositioning Project. See Exhibit C,

Affidavit of Neil Moodhe at para. 4; Exhibit D, Affidavit of Simon Carney at para. 5; and

---

[1]    Defendants did remove the instant case to federal court, only to have the case remanded back to this Court by
Order dated January 7, 2008.

Exhibit E, Affidavit of Edward Green, III, at para. 6.[2]  IFSB has littered its complaint with parties improperly joined and with claims that simply fail to state a cause of action upon which relief can be granted.  Those parties and claims should be dismissed from the case.

## STANDARD FOR DISMISSAL OF COMPLAINT

Dismissal of the parties and claims is proper where there is little doubt that Plaintiff can prove no set of facts in support of a claim which would entitle him or her to relief.  *Duncan v. Children's National Medical Center, 702 A.2d 207 (1997), cert. denied, 525 U.S. 912 (1998).*  In this exercise, the Court must treat the complaint's well pled factual allegations as true and draw all reasonable inferences therefrom in the plaintiff's favor.  *Macharia v. United States, 357 U.S. App. D.C. 223, 334 F.3d 61, 64 (D.C. Cir. 2003); Holyland Foundation for Relief and Development v. Ashcroft, 357 U.S. App. D.C. 35, 333 F.3d 156, 165 (D.C. Cir. 2003); Mancuso v. Santucci, 69 A.2d 274 (D.C. Mun. App. 1947).*  However, the Court need not accept as true inferences unsupported by facts set out in the complaint or legal conclusions as factual allegations.  *Browning v. Clifton, 35 U.S. App. D.C. 4, 292 F.3 235, 242 (D.C. Cir. 2002); Warren v. District of Columbia, 359 U.S. App. D.C. 179, 353 F.3d 36, 39 (D.C. Cir. 2004); Donald v. Orfila, 618 F.Supp. 645 (D.D.C. 1985), aff'd, 788 F.2d 36 (D.C. Cir. 1986).*  The Court of Appeals has repeatedly held that dismissal with prejudice is appropriate where plaintiff can prove no set of facts in support of its claims which would entitle plaintiff to relief.  *See, e.g., Schiff v. American Association of Retired Persons, 687 A.2d 1193 (D.C. 1997); Thigpen v. Greenpeace, Inc., 657 A.2d 770 (D.C. 1995).*

---

[2]    Defendants have attached hereto affidavits that have been used in conjunction with the proceedings conducted in federal court.  In some instances, the same individual (*e.g.*, Edward Green, III) executed more than one affidavit.

<u>ARGUMENT</u>

I.    <u>DEFENDANT DCS SHOULD BE DISMISSED AS A DEFENDANT AS TO COUNTS III, IV AND V
      BECAUSE IT HAS ABSOLUTELY NOTHING TO DO WITH THE REPOSITIONING PROJECT.</u>

The Complaint, Para. 68, alleges "On information and belief, 1225 LLC and Davis have

entered into a contract pursuant to which Davis is acting as the general contractor for the

Repositioning Project[.]" (Emphasis added). All of the various claims against DCS stem from

the premise that DCS is the general contractor. See, *e.g.*, Complaint at paras. 32, 68, 78. In

reality, DCS has nothing to do with the Repositioning Project. See Exhibit C, Affidavit of Neil

D. Moodhe at para. 4; Exhibit D, Affidavit of Simon Carney at para. 5; and Exhibit E, Affidavit

of Edward Green III, at para. 6.

Plaintiffs' counter to this fact in proceedings before the United States District Court was

that they had a reasonable basis to conclude that it was DCS, rather than any other entity, that

was the general contractor. In this regard, Plaintiffs cited that construction signs at the site all

read "Davis Construction," and the construction permit was issued to "Davis Construction," and

1225's referral to the contractor as "Davis Construction." Plaintiffs, however, have been unable

to cite any instance in which the contractor was ever referred to as "Davis Construction Services,

LLC." In the past, Plaintiffs also relied on the results of their search of District of Columbia

corporate records using the search term "Davis Construction."

In point of fact, the general contractor is James G. Davis Construction Corporation and

such fact had been clearly provided to IFSB as part of the original federal litigation. In this

regard, as part of 1225's Response to Plaintiff IFSB's Reply Concerning Amended Application

for Preliminary Injunctive Relief (08/31/07), 1225 submitted as an exhibit thereto the Affidavit

of Edward Green, III who, *inter alia*, stated as follows:

> I am Senior Project Manager for James G. Davis
> Construction Corporation ("Davis"), working out of Davis'
> office located at 1430 Spring Hill Road, McLean, Virginia.
> Davis is the general contractor hired by Brookfield
> Properties Management LLC ("Brookfield") in connection
> with the renovation project (the "Renovation Project")
> occurring at 1225 Connecticut Avenue, N.W., Washington,
> DC 20036 (the "Property").

*Id*. at para. 2. For the convenience of the Court, a copy of this affidavit is attached hereto as

Exhibit F. Thus, long before Plaintiffs filed their Complaint in Superior Court, IFSB had sworn

evidence from the general contractor itself. James G. Davis Construction Corporation is

frequently referred to by the shorthand name of "Davis Construction" or "Davis." Exhibit E at

para. 5, Exhibit D at para. 4.[3] Defendant Davis Construction Services LLC, while a corporate

subsidiary of James G. Davis Construction Corporation, is a completely different and separate

entity. Exhibit E at para. 6. When Plaintiffs performed their search of District of Columbia

corporate records, had they searched the name that was provided to them as the contractor, they

would have discovered that James G. Davis Construction Corporation is indeed registered to do

business in the District of Columbia. See Exhibit G.

The fact of the matter is that Defendant DCS has absolutely nothing to do with the

Repositioning Project and that IFSB was provided with specific sworn information on the

identity of the general contractor, yet apparently ignored such and instead sued the wrong entity.

There is no ambiguity. Rather, what we have is an error made by Plaintiffs which does not serve

as a basis to maintain any causes of action against DCS. When Plaintiffs ignored the information

given to IFSB concerning the identity of the general contractor, they did so at their folly.

---

[3]   Conversely, DCS is referred to as "Davis Services." Exhibit E at para. 6.

As noted, this Court need not accept as true any allegations of the Complaint which are not well pled or are inferences unsupported by facts. Plaintiffs allegations against DCS based on "information and belief" are examples of such allegations not entitled to an inference of veracity. There is no basis for liability against DCS, and Plaintiffs, as a matter of law, cannot state a cause of action against DCS. Accordingly, Counts III and IV as they apply to DCS and Count V in its entirely since DCS is the only defendant to that Count, must be dismissed with prejudice.

II.    THERE IS NO BASIS IN LAW SUPPORTING PLAINTIFF PARSONS' CLAIM FOR BREACH OF CONTRACT AS A THIRD PARTY BENEFICIARY AND COUNT II SHOULD BE DISMISSED.

In Count II of the Complaint, Plaintiff Parsons alleges that 1225 is liable to him – as a third party beneficiary of the lease between 1225 and IFSB – for breach of contract. Compl. at para. 62. In essence, Parsons is asking this Court to find that every employee is an intended beneficiary of the lease between its employer (the tenant) and the landlord. Not only is such a result unsupported by the governing law, such a result would have a chilling effect on landlord-tenant relations. Under the current law, Plaintiff Parsons is not an intended beneficiary of the lease and this count fails as a matter of law.

The general rule regarding third party beneficiaries, followed in the District of Columbia, is that a third person may, under his or her own name, enforce a promise made for his or her benefit even if said person is a total stranger to both the contract and the consideration. *See, Western Union Telegraph Co. v. Massman Construction Co., 402 A.2d 1275 (D.C. 1979); Aetna Cas. & Sur. Co. v. Kemp Smith Co., 208 A.2d 737 (D.C. 1965); see also, Hall v. Gardiner, 126 F.2d 227 (D.C. Cir. 1942); see also, Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303 (1927).* The determining factor for whether a third party may enforce a contract as a third party-beneficiary is the intent of the parties to the contract, and specifically, whether the parties

intended the third person to benefit from the contract. *See, Fields v. Tillerson, 726 A.2d 670 (D.C. 1999); Johnson v. Atlantic Masonry Co., 693 A.2d 1117, 1122 (D.C. 1997)* (a third party to a contract "may sue to enforce its provisions if the contracting parties **intend** the third party to benefit directly thereunder."(emphasis added)); *Hamilton & Spiegel, Inc. v. Board of Ed. of Montgomery County, 195 A.2d 710 (Md. 1963)* (The contract must have been intended for the benefit of the third person in order to entitle such person to enforce the same.).

Absent such intent for the third party to benefit from the contract, that person is nothing more than an incidental beneficiary with no enforcement rights. *See, Port Chester Elec. Const. Co. v. Atlas, 40 N.Y. 2d 562, 357 N.E. 2d 983 (N.Y. 1976).*[4] The question of whether a contract was intended to benefit a third party is an issue of contract construction. A court will examine the contract as a whole to determine whether the third party beneficiary was intended or incidental. *Western Union Telegraph Co. v. Massman Construction Co., supra, 402 A.2d at 1277.*

An examination of the Lease demonstrates that neither Parsons, nor any employee of IFSB, was an intended beneficiary of the lease. First, there is no mention of the term "employee(s)" or the name Parsons in the Lease. While this is not dispositive on the issue of intended third party beneficiaries, it does require Parsons to point to specific language in the Lease that demonstrates that same was made for his benefit. Second, the Lease defines the Tenant as "Independence Federal Savings Bank" and not "IFSB and any and all of its employees." See, Exhibit A to Complaint, Lease at p. 1 (Defining "Tenant" as

---

[4]     An incidental beneficiary benefits from the contract of another but such benefit was **not the intent** of the contracting parties. *Schwartz v. Brown, 64 A.2d 298 (D.C. 1949); Implement Service, Inc. v. Tecumseh Products Co., 726 F.Supp. 1171 (Ind. 1989).*

"INDEPENDENCE FEDERAL SAVINGS BANK, a District of Columbia corporation…."").

Clearly, the parties to the Lease, 1225's predecessor in interest and IFSB, were negotiating the

obligations that each had to each other, and not to IFSB's employees.  Finally, an examination of

Paragraph 41.10 of the Lease further supports the contention that Parsons is nothing more than

an incidental beneficiary of the Lease.  Paragraph 41.10 provides:

> The covenants, conditions and agreements contained in this
> Lease shall bind and inure to the benefit of the Landlord
> and Tenant and their respective heirs, distributes, executors,
> administrators, successors, and except as otherwise
> provided in this Lease, their assigns.

See, Exhibit A to Complaint, Lease at p. 44, para. 41.10.  This paragraph clearly defines the

intended beneficiaries of the Lease – namely 1225 and IFSB.  Had it been the parties' intention

to have the Lease provisions "inure to the benefit" of IFSB's employees, the same would have

been so specifically provided in this provision.  Moreover, according to the Complaint (para. 3),

Plaintiff Parsons did not even begin his employment with IFSB until June 2001, so he could not

possibly have been an intended beneficiary of a Lease that was entered into on December 16,

1988, and amended on April 25, 2001.  Complaint at paras. 6 and 12.

In the case of _Castelvetro v. Mills_, _1994 Conn. Super. LEXIS 270 (Ct. Super. Ct. 1994)_[5], a

Connecticut court dismissed counts pertaining to the alleged third party beneficiaries.  In

_Castelvetro_, the plaintiffs alleged that their position as employees of the tenant was enough to

confer third party beneficiary status upon them, and they asserted the same.  _Id. at 5._  The

_Castelvetro_ complaint - as does the Complaint in the instant matter - failed to provide factual

support for this conclusion, and furthermore, the plaintiffs failed to allege the lease put forth the

---

[5]     A copy of _Castelvetro v. Mills_ is attached for the Court's convenience as Exhibit H.

requisite intent to benefit the employees. On this basis, the _Castelvetro_ Court found that the plaintiffs were not third party beneficiaries to the lease between their employer and the landlord. See also, _Anderson v. Fox Hill Village Homeowners Corporation,_ _424 Mass. 365, 676 N.E. 2d 821 (Mass. 1997)_ (Employee of tenant was not an intended third-party beneficiary of lease.); _Wood v. Centermark Properties, Inc.,_ _984 S.W. 2d 517 (Mo. App. 1998)_ (Tenant's employee was not a donee beneficiary or a creditor beneficiary of the lease and thus his estate could not sue for breach of lease under a third-party beneficiary theory.).

In the instant matter, Parsons is nothing more than an incidental beneficiary who is not permitted to sue to enforce the Lease. Parsons has failed to carry his burden of demonstrating that the landlord's primary objective in entering the Lease with IFSB was for the benefit of IFSB's employees. There is no support in the complaint that Parsons, or any other IFSB employee for that matter, was the real promisee under the Lease. Accordingly, Count II fails to state a claim upon which relief may be granted.

III.  COUNT III ALLEGING A BREACH OF THE IMPLIED COVENANT OF QUIET ENJOYMENT SHOULD BE DISMISSED BECAUSE THERE IS NO IMPLIED COVENANT WHEN AN EXPRESS COVENANT IS PRESENT AND ANY SUCH COVENANT, EXPRESS OR IMPLIED, DOES NOT RUN IN FAVOR OF NON-TENANTS NOR AGAINST NON-LANDLORDS.

In Count III of the Complaint, both Plaintiffs allege a violation of the implied covenant of quiet enjoyment against both Defendants. There are several grounds upon which this Count fails to state a cause of action upon which relief can be granted.

A.  THERE IS NO IMPLIED COVENANT OF QUIET ENJOYMENT WHERE THE LEASE IN QUESTION PROVIDES AN EXPRESS COVENANT OF QUIET ENJOYMENT.

The Lease, specifically Section 20.01, has an express provision regarding quiet enjoyment. That section of the Lease provides as follows:

QUIET ENJOYMENT

> 20.01  Landlord covenants and agrees that, subject to the
> terms and provisions of this Lease, if, and for so long as,
> Tenant keeps and performs every covenant, agreement,
> term, provision and condition herein contained on behalf of
> Tenant to be kept or performed, then Tenants' rights under
> this Lease shall not be cut off or ended before the
> expiration of the term of this Lease, subject however, to the
> terms of this Lease including, without limitation, the
> provision of Article XXV hereof.

When there is an express covenant of quiet enjoyment, such governs and abrogates any implied warranty of quiet enjoyment.  See *Myers v. Kayhoe*, *892 A.2d 520, 527 (Md. 2006)* (An express term negates any implied inconsistent term relating to the same aspect of the contracts); *IGEN Intern, Inc. v. Roche Diagnostic GmbH*, *335 F.3d 303, 314 (4th Cir. 2003)*; *District Realty Title Ins. Corp. v. Jack Spencer Real Estate, Inc.*, *373 A.2d 952, 955 (Md. 1977)* (Implied terms of a contract are utilized only in order to supply the place of a missing express term); *Goldman v. Alkek*, *1993 Tex. App. LEXIS 465, 5 (Tex. App. 1993)* (Where lease contains an express covenant of quiet enjoyment, the express clause governs and abrogates any implied warranty of quiet enjoyment).

In the instant case, given the fact that there is an express quiet enjoyment provision in the Lease, such controls the issue of quiet enjoyment therefore mandating dismissal of Count III.  Moreover, the remedy of IFSB for any disturbances in its enjoyment is not by way of a separate cause of action for breach of the implied covenant of quiet enjoyment, but rather is part of a claim for breach of the Lease.  IFSB already alleges in Count I, a breach of the express provision regarding quiet enjoyment.  Complaint at para. 58.

B.  THERE IS NO COVENANT OF QUIET ENJOYMENT THAT RUNS AGAINST DEFENDANT DCS OR IN FAVOR OF PLAINTIFF STANLEY PARSONS. ANY COVENANT OF QUIET ENJOYMENT RUNS ONLY BETWEEN THE TENANT AND THE LANDLORD.

As noted, Count III of the Complaint purports to state a claim by both Plaintiffs, *i.e.*, both IFSB and Parsons, against both Defendants, *i.e.*, Defendant 1225 and Defendant DCS. Parsons, however, is not the tenant, but rather is an employee of tenant IFSB. The covenant of quiet enjoyment does not run in favor of invitees of the tenant, nor does it run against any agents of the landlord. Instead, the covenant of quiet enjoyment runs strictly between the tenant and the landlord or those claiming paramount title through the landlord.

The District of Columbia Court of Appeals has made it clear that the covenant of quiet enjoyment goes only to possession, does not extend to invitees, and is not broken unless there is an eviction from, or some actual disturbance in, the possession by the landlord or by some third person under paramount title. *See, e.g., Hyde v. Brandler, 118 A.2d 398, 399-400 (D.C. 1955)*; See also *Young v. District of Columbia, 752 A.2d 138, 142 (D.C. 2000)* ("A tenant has a right not to have his or her possession interfered with except by lawful process[.]")[6] (Emphasis added); *Hawkins v. Greenfield, 797 F. Supp. 30, 34 n.9 (D.D.C. 1992)* ("A claim for breach of the covenant of quiet enjoyment can only lie against a landlord for acts by the landlord which interfere with the tenant's use and possession.") (Emphasis added).

As applied to this case, neither Plaintiff has a cause of action for violation of the implied covenant of quiet enjoyment against Defendant DCS. DCS is simply not the landlord and therefore owes no covenant of quiet enjoyment to anyone. Furthermore, Plaintiff Parsons is

---

[6]  The Court of Appeals also noted that a landlord-tenant relationship does not arise by mere occupancy of the premises and that an expressed or implied contractual agreement with both privity of estate and privity of contract is needed. *Id.* at 143.

not owed any covenant of quiet enjoyment -- any such covenant runs solely in favor of the tenant -- not any invitees of the tenant.

Given that the Lease at issue contains an expressed provision concerning quiet enjoyment, Count III must be dismissed in its entirety because, in the presence of an express covenant of quiet enjoyment, any implied covenant is abrogated. To the extent the instant court does not adopt that rule, then Count III should still be dismissed as it applies to DCS and also as it applies to Plaintiff Parsons since neither is a tenant or a landlord and the covenant strictly applies between landlords and tenants.

IV.    COUNT IV FAILS TO STATE A CAUSE OF ACTION FOR NUISANCE.

In Count IV of the Complaint, Plaintiffs IFSB and Parsons allege a cause of action of nuisance against Defendants 1225 and Davis. In that Count, Plaintiffs maintain that they lawfully occupy the Premises and that Defendants' act in implementing the Repositioning Project has "invaded and continue to invade Plaintiffs' right to be free from interference in their use and enjoyment of the Premises[.]") Complaint at para. 72. Plaintiffs claim an interference with the physical condition of the Premises, a disturbance of the safety, health and comfort of the occupants of the Premises, noise and vibration, dirt, debris and dust outside the Premises, presence of vermin, water damage, and interference with visibility of the bank. *Id.* Plaintiff Parsons maintains that his private use and enjoyment of the Premises is particularly adversely affected by noise and vibrations. Plaintiffs claim no physical injury to persons. Plaintiffs have failed to state a cause of action in nuisance and Count IV of the Complaint should therefore be dismissed.

An action for private nuisance may be maintained only by those whose property rights have been invaded. *Holloway v. Bristol-Meyers Corp.*, 327 F. Supp. 17, 21 (D.D.C. 1971), *aff'd,*

*158 U.S. App. D.C. 207, 485 F.2d 986 (D.C. Cir. 1973).*  Accord, *Carrigan v. Purkhiser, 466 A.2d 1243 (D.C. 1983)* (A claim of nuisance requires proof of an interference with the interest in the private use and enjoyment of one's land.)  As previously noted, Plaintiff Parsons has no possessory interest or property interest in the Premises and he, therefore, cannot state a claim for nuisance against anyone relating to the Repositioning Project.  Accordingly, his claim for nuisance should be dismissed.

With respect to the cause of action for nuisance by Plaintiff IFSB, it should be noted that not every interference with the use and enjoyment of land constitutes an actionable private nuisance, in as much as the interference must be both substantial and unreasonable.  *See, e.g., Echard v. Kraft, 159 Md. App. 110, 585 A.2d 1018 (Md. App. 2004).*  In the instant case, Defendant 1225 is doing nothing other than what it is permitted to do under the Lease -- *i.e.,* the right "to change the arrangement and/or location of public entrances, passage ways, doors, doorways, corridors, elevators, stairways, toilets and other public parts of the building; provided, however, that the demised premises shall be visible from the street, public access on the street level directly into the demised premises shall not be cut off, access to the building shall not be cut off and that there shall be no unreasonable obstruction of the access to the demised premises or unreasonable interference with the use or enjoyment thereof."  Given this fact, IFSB has no cause of action in nuisance.  Any cause that it does have, is for breach of contract which it has already asserted in Count I.  Accordingly, Defendants request that Count IV of the Complaint be dismissed.

CONCLUSION

Based upon the foregoing, Defendants request that this Court grant their motion to dismiss, or, in the alternative, for summary judgment, and in doing so dismiss Counts II through V of the Complaint, dismiss DCS as a defendant and also dismiss all claims of Stanley Parsons thereby eliminating him as a plaintiff.

GREENSTEIN DELORME & LUCHS, P.C.

Dated: March 17, 2008

/S/  William C. Casano
_____
Richard W. Luchs, #243931
William C. Casano, #352492
Joshua M. Greenberg, #489323
1620 L Street, N.W., Suite 900
Washington, DC  20036-5605
Telephone:  (202) 452-1400
E-mail:  rwl@gdllaw.com
E-mail:  wcc@gdllaw.com
E-mail:  jmg@gdllaw.com
*Attorneys for Defendants*
*1225 Connecticut Co. LLC and*
*Davis Construction Services, LLC*

IN THE SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK, *et al.*

        *Plaintiffs,*

v.

1225 CONNECTICUT CO. LLC, *et al.*

        *Defendants.*

Civil Action No. 2007 CA 007075 B
Judge:  Jeanette J. Clark
Next Event:  Initial Conference
           March 21, 2008
           10:30 a.m.

## DEFENDANTS' STATEMENT OF MATERIAL FACTS AS TO WHICH THERE IS NO DISPUTE

Defendants 1225 Connecticut Co., LLC ("1225") and Davis Construction Services, LLC ("DCS"), by their undersigned counsel, pursuant to Superior Court Rule of Civil Procedure 56, submit the following Statement of Material Facts not in dispute.

1.      This case involves a dispute over a renovation project ("Repositioning Project") at an office building located at 1225 Connecticut Avenue, N.W., and the alleged impact that construction has on the operations of the tenant, Plaintiff Independence Federal Savings Bank ("IFSB"). Complaint

2.      IFSB is a tenant of Defendant 1225 with respect to space on the ground floor of 1225 Connecticut Avenue, Washington, DC (the "Property") and its lease extends through December 31, 2010. Complaint at para. 6, 12 and 14, and Exhibit A to Complaint.

3.      Plaintiff Stanley W. Parsons is not a tenant, but rather an employee of Plaintiff IFSB. Complaint at para. 3.

6338/10/333473/1

4.      The Property originally constructed in 1968 is a Class B office building.  See Exhibit A, Affidavit of Jackie Duke at para. 7.

5.      In order to replace certain systems, *e.g.,*, HVAC and plumbing, that were approaching the end of their useful life, more successfully positioning the Property in the highly competitive District of Columbia commercial leasing market, and bring the Property to Class A standards, 1225, owner of the building, planned for and is implementing the Repositioning Project which involves extensive renovations and rehabilitation of the Property, including the exterior shell and mechanical systems (specifically the HVAC system). *Id.*

6.      The Repositioning Project involves the complete interior demolition of each floor of the Property beginning with the 8th floor down to the 2nd floor; lobby improvements; limited removal of asbestos containing materials throughout the building, but not within the Premises, and the updating of selected systems in the Property. *Id.* at para. 8.

7.      Plaintiff IFSB filed a complaint in the United States District Court for the District of Columbia, Civil Action No. 07-1389 ("Federal Suit"), complained therein about the Repositioning Project, and sought a preliminary injunction which motion was denied.  In making his ruling, Judge John D. Bates found that:  (a) evidence established that the planned asbestos removal will be properly and safely conducted with minimal risk to IFSB employees and customers; (b) IFSB's concerns regarding hazardous conditions, bank security, fire code violations, fire hazards, and safety code violations were without support; (c) the scaffolding installation is consistent with the construction permit and will not prevent access to IFSB's premises; (d) 1225 has provided clear and adequate temporary signs and is making reasonable efforts to address IFSB's trash concerns and to avoid any unnecessary or overly disruptive closure of entrances; (e) no likely carbon monoxide from interior equipment is likely to penetrate

IFSB's premises; (f) the record did not establish any serious rodent infestation; (g) the record established 1225 provided adequate chilled water for air conditioning as required by the Lease; and (h) 1225 has made reasonable efforts to avoid and minimize the disruption and inconvenience the repositioning project will cause to IFSB. See Exhibit B, transcript of oral ruling at pages 14-16, 19.

8.      On or about October 23, 2007, IFSB filed the instant suit ("Superior Court Suit") concerning the same renovation work at the Property. The complaint adds as a new plaintiff Stanley W. Parsons, who is described in the complaint as an IFSB employee since 2001 at the 1225 Connecticut Avenue location, and the current Vice-President and Chief Information Officer. Complaint at para. 3.

9.      The complaint adds a new defendant, Davis Construction Services, LLC ("DCS"), which the complaint mistakenly identifies as the construction contractor of the Repositioning Project. Complaint at paras. 68, 78.

10.     However, DCS has absolutely nothing to do with the Repositioning Project. See Exhibit C, Affidavit of Neil Moodhe at para. 4; Exhibit D, Affidavit of Simon Carney at para. 5; and Exhibit E, Affidavit of Edward Green, III, at para. 6.

11.     The general contractor of the Repositioning Project is James G. Davis Construction Corporation. Exhibit F at para. 2; Exhibit C at para. 4.

12.     Plaintiff IFSB knew of this fact at least by August 31, 2007 as such information was contained in an affidavit served upon it in conjunction with the federal law suit. Exhibit F.

13.     DCS, while a corporate subsidiary of James G. Davis Construction Corporation, is a completely different and separate entity. Exhibit E at para. 6.

14. James G. Davis Construction Corporation is registered to do business in the District of Columbia.  See Exhibit G.

15. James G. Davis Construction Corporation is frequently referred to by the shorthand name of "Davis Construction" or "Davis."  Exhibit E at para. 5; Exhibit D at para. 4.

16. DCS is not the landlord of the Property.  Complaint at Exhibit A.

17. The lease does not list or identify Plaintiff Parsons as an intended beneficiary. Complaint at Exhibit A.

18. The lease contains an express quiet enjoyment provision.  See Exhibit A to Complaint at para. 20.01.

19. Plaintiffs claim no physical injury to persons.  Complaint.


GREENSTEIN DELORME & LUCHS, P.C.

Dated: March 17, 2008

/S/  William C. Casano

Richard W. Luchs, #243931
William C. Casano, #352492
Joshua M. Greenberg, #489323
1620 L Street, N.W., Suite 900
Washington, DC  20036-5605
Telephone:  (202) 452-1400
E-mail:  rwl@gdllaw.com
E-mail:  wcc@gdllaw.com
E-mail:  jmg@gdllaw.com
*Attorneys for Defendants*
*1225 Connecticut Co. LLC and*
*Davis Construction Services, LLC*

# EXHIBIT A

IN THE SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
Civil Division

INDEPENDENCE FEDERAL SAVINGS
BANK, *et al.*,

      *Plaintiff,*

v.

1225 CONNECTICUT CO. LLC, *et al.*,

      *Defendant.*

Civil Action No.  2007 CA 007075B

## AFFIDAVIT OF JACKIE DUKE

I, JACKIE S. DUKE, under penalty of perjury, state as follows:

1. I am over twenty one (21) years of age and make this Affidavit based on matters within my personal knowledge in support of Defendants' Motion to Dismiss Or, In the Alternative, for Summary Judgment.

2. I am the General Manager for Brookfield Properties Management LLC ("Brookfield") with an office address of 1250 Connecticut Avenue, N.W., Suite 500, Washington, D.C.  20036. Among the real estate Brookfield manages is a commercial property located 1225 Connecticut Avenue, N.W. in Washington, D.C. (the "Property").

3. The current owner of the Property is 1225 Connecticut Co. LLC ("1225").  On or about December 16, 1988, 1225's predecessor as the owner of the Property, namely Pool 1225 Associates ("Pool"), as landlord, and Plaintiff Independence Federal Savings Bank ("IFSB"), as tenant, entered into an Agreement of Lease (the "Lease") for a portion of the Property, specifically, a portion of the main lobby (the "Premises").  A copy of the Lease was attached  to the Complaint at Exhibit A.

6338/10/335424/1

4. The initial term under the Lease was for twelve (12) years, commencing on January 1, 1989 and ending on December 31, 2000.

5. Shortly before 1225 became the owner of the Property, on or about April 25, 2001, BRE/Connecticut L.L.C., a successor to Pool, and IFSB executed a First Amendment to the Lease (the "First Amendment"), effective retroactively to January 1, 2001. A copy of the First Amendment was attached to the Complaint as Exhibit B.

6. The First Amendment, *inter alia*, extended IFSB's right to possession of the Premises by an additional ten (10) years, or through December 31, 2010.

7. The Property, originally constructed in 1968, is a Class B office building. In order to replace certain systems (e.g., HVAC) that were approaching the end of their useful life, more successfully position the Property in the highly competitive District of Columbia commercial leasing market, and bring the Property to Class A standards, 1225 planned for extensive renovations and rehabilitation of the Property, including the exterior shell and mechanical system (specifically, the HVAC system) (the "Repositioning Project").

8. The Repositioning Project includes, *inter alia*, the complete interior demolition of each floor of the Property beginning with the 8th floor down to the 2nd floor; lobby improvements; limited removal of asbestos containing materials throughout the building, but not within the Premises or the space occupied by Citibank; and the updating of selected systems in the Property.

Jackie S. Duke

2

# EXHIBIT B

Page 1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL     .
SAVINGS BANK,            .
                        .
        Plaintiff,      .   CA No. 07-1389 (JDB)
                        .
    v.                  .   Washington, D.C.
                        .   Tuesday, September 11, 2007
1225 CONNECTICUT CO., LLC,  .   10:25 a.m.
                        .
        Defendant.      .
                        .
. . . . . . . . . . . . . ..

TRANSCRIPT OF ORAL RULING
OF THE HONORABLE JOHN D. BATES
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Plaintiff:          DALE A. COOTER, ESQ.
                            DONNA S. MANGOLD, ESQ.
                            Cooter, Mangold, Tompert & Wayson
                            5301 Wisconsin Avenue, NW
                            Suite 500
                            Washington, D.C. 20015
                            202-537-0700

For the Defendant:          RICHARD W. LUCHS, ESQ.
                            WILLIAM C. CASANO, ESQ.
                            Greenstein Delorme & Luchs, P.C.
                            1620 L Street, NW
                            Suite 900
                            Washington, D.C. 20036
                            202-452-1400

Court Reporter:             BRYAN A. WAYNE, RPR, CRR
                            Official Court Reporter
                            U.S. Courthouse, Room 6714
                            333 Constitution Avenue, NW
                            Washington, D.C. 20001
                            202-354-3186

Proceedings reported by machine shorthand, transcript produced
by computer-aided transcription.

                    Bryan A. Wayne, RPR, CRR
                    Official Court Reporter

1            P R O C E E D I N G S

2            THE DEPUTY CLERK:  Your Honor, we have Civil Action

3  07-1389, Independence Federal Savings Bank versus 1225

4  Connecticut Company, LLC.  We have Ms. Donna Mangold

5  representing the plaintiff, and Mr. William Casano representing

6  the defendant.

7            MS. MANGOLD:  Good morning, Your Honor.

8            THE COURT:  Good morning to both of you.  I saw

9  Mr. Luchs here earlier, but he couldn't stay apparently, and I

10  understand that Mr. Cooter might not be able to be here.

11            MS. MANGOLD:  He's still in trial.

12            MR. CASANO:  Yes, Mr. Luchs was here and he had to

13  leave a few minutes ago for a prior commitment.

14            THE COURT:  All right.  As I had indicated to you when

15  we were last together on Friday, I thought I would be prepared

16  to issue a decision today, and that the most efficient way to do

17  it, to get a decision into your hands would be to simply issue

18  an oral decision.  And this oral opinion, if you will, will

19  constitute the Court's findings of fact and conclusions of law

20  regarding plaintiff's motion for a preliminary injunction, as is

21  authorized under Federal Rule of Civil Procedure 52(a).

22        And I'm going to even put some headings in here and so

23  forth for the court reporter so that if and when you want a copy

24  of it, you'll get something that is more easily read.

25            Starting with an overview.  Plaintiff Independence Federal

1  Savings Bank, and I will call it, the plaintiff, IFSB, is a

2  federally chartered savings bank that has historically served

3  Washington, D.C.'s minority community.  IFSB has four branches

4  in the District of Columbia metropolitan area, two in the

5  District, one in Chevy Chase, Maryland, and another in Silver

6  Spring, Maryland.  Its headquarters and principal location is in

7  an office building at 1225 Connecticut Avenue, Northwest.  IFSB

8  leases commercial space on the ground floor of that building

9  from the defendant, 1225 Connecticut Company, LLC, which I will

10  call defendant or 1225.

11      After the building's largest tenant left earlier this

12  summer, 1225 initiated a renovation plan, its repositioning

13  project, that includes large-scale demolition of interior and

14  exterior portions of the building.  IFSB alleges in its amended

15  complaint that the repositioning project violates both its

16  rights under its lease with 1225 and an implied covenant of

17  quiet enjoyment.  IFSB seeks preliminary injunctive relief

18  barring 1225 from continuing the construction project or

19  undertaking planned asbestos abatement until the current lease

20  expires at the end of 2010.

21      Standard for preliminary injunction.  To obtain a

22  preliminary injunction, IFSB must demonstrate, first, a

23  substantial likelihood of success on the merits, 2, that it

24  would suffer irreparable injury if the injunction is not

25  granted, 3, that an injunction would not substantially injure

1    other interested parties, and 4, that the public interest would

2    be furthered by the injunction.  Chaplaincy of Full Gospel

3    Churches v. England 454 F.3d 290, 297 D.C. Circuit 2006.

4    Injunctive relief, the D.C. Circuit has emphasized, "is 'an

5    extraordinary remedy that should be granted only when the

6    parties seeking the relief by a clear showing carries the burden

7    of persuasion.'"  That too is a citation to Chaplaincy of Full

8    Gospel Churches quoting Cobell v. Norton, 391 F.3d 251, 258,

9    D.C. Circuit 2004.

10        The four factors are to be weighed on a sliding scale such

11    that a strong showing as to one factor can compensate for a

12    weaker showing with respect to another.  CityFed Financial Corp.

13    v. Office of Thrift Supervision, 58 F.3d 738, 747, D.C. Circuit

14    1995.  The D.C. Circuit has also consistently affirmed the

15    denial of preliminary injunctive relief where the moving party

16    was unable to show any likelihood of success on the merits.

17    See, e.g., Trudeau v. FTC, 456 F.3d 178, 182, note 2, D.C.

18    Circuit 2006; Apotex Inc. v. Food & Drug Administration, 449

19    F.3d 1249, 1253-54, D.C. Circuit 2006; Katz v. Georgetown

20    University, 246 F.3d 685, 688, D.C. Circuit 2001.

21        In addition, the moving party must demonstrate at least

22    some irreparable injury.  Chaplaincy of Full Gospel Churches,

23    454 F.3d at 297.  While economic injury alone does not normally

24    qualify as irreparable, economic loss may constitute irreparable

25    harm in the commercial context where that loss threatens the

Page 5

1    very existence of the moving party's business.  See Wisconsin

2    Gas Company v. FERC, 758 F.2d 669, 674, D.C. Circuit 1985.

3         Factual background of the case.  The lease agreement.

4         IFSB entered into a 12-year lease agreement with the

5    defendant's predecessor in 1998.  When that lease expired, IFSB

6    signed an amended agreement with another of defendant's

7    predecessors.  The agreement amended the square footage of the

8    space used by IFSB, established a new lease term of 10 years,

9    through December 31, 2010, and modified the landlord's

10   obligations by requiring it to provide two parking spaces at the

11   landlord's expense.

12        Now, I will note that I'm going to give some citations to

13   these things just so they're in the record.  Plaintiff's motion,

14   Exhibit B at paragraphs 2, 11.  In all other relevant respects

15   the amendment ratified the original lease and left it in full

16   effect.  Id. paragraph 14.

17        A few provisions of the original lease are particularly

18   important to this dispute.  Section 1.01 of the lease,

19   plaintiff's motion, Exhibit A, describes IFSB's space as a 6,450

20   square foot portion of the lobby "as delineated" on an attached

21   plan "and as presently constructed" and gives IFSB along "with

22   other tenants of the building and members of the public" a right

23   to use the common and public areas of the land and building

24   providing access to the leased premises."

25        Section 21.01 requires -- that's 21.01 requires the

Page 6

1   landlord to provide hot and chilled water for heating and

2   cooling.  A neighboring section, 20.01, is the quiet enjoyment

3   provision, which bars the landlord from cutting off or ending

4   the tenant's rights under the lease prior to the expiration of

5   the term.

6        Two provisions cited by the parties speak to the landlord's

7   authority and responsibility to make repairs.  Most relevant is

8   section 16.02.  This section reserves to the landlord the right,

9   without the work amounting to an actual or constructive

10  eviction, or incurring liability to the tenant, "to change the

11  arrangement and/or location of public entrances, passageways,

12  doors, doorways, corridors, elevators, stairways, toilets, and

13  other public parts of the building."

14       The landlord can make these changes, however, only if the

15  leased premises remain "visible from the street," public access

16  to the bank from the street level is not "cut off," and there is

17  "no unreasonable obstruction of access to the leased premises or

18  unreasonable interference with the use or enjoyment thereof."

19       Finally, section 9.04 absolves the landlord of liability

20  for any "inconvenience, annoyance, or injury to business arising

21  from the making of any repairs, alterations, additions or

22  improvements in or to any portion of the building or the leased

23  premises," so long as the landlord "exercises reasonable

24  diligence so as to minimize any interference with the tenant's

25  business operations."  This section may, however, apply only

1    where the tenant has requested in writing that the landlord

2    conduct such repairs.

3        Now, the repositioning project.  Brookfield Properties, the

4    property manager for the 1225 building, informed IFSB in a May

5    11, 2007, letter of its intention to undertake a project to

6    bring a new look to the building.  Plaintiff's motion, Exhibit

7    C.  The letter indicated that work would begin on July 1, 2007,

8    and suggested that IFSB's president and CEO, Robert Isard, meet

9    with Brookfield representatives to discuss any concerns he may

10   have with regard to the project's impact on bank operations.

11   Id.

12       Isard already knew of the project, having met with two

13   Brookfield representatives in late April 2007.  Plaintiffs

14   reply, Exhibit B, paragraph 3.  1225 had fairly clear

15   motivations for timing the project as it did.  On June 30, 2007,

16   Ernst & Young, which had occupied 95 percent of the space in the

17   building since 1988, vacated the premises.  Plaintiff's

18   opposition, Exhibit 1, paragraph 10.  Ernst & Young's departure

19   left IFSB and Citibank, both on the ground floor, as the only

20   tenants remaining in the building.  Id. paragraph 11.

21       What does the repositioning project encompass?  In short,

22   it will result in the complete interior demolition of the second

23   through eighth floors of the building, improvements to the

24   lobby, limited removal of asbestos-containing materials

25   throughout the building, but not in the areas occupied by IFSB

1  and Citibank, and the updating of certain systems.   Id.

2  paragraph 8.   The asbestos removal will be performed by a

3  licensed and certified contractor and, as of the date of

4  defendant's last filing, had not yet commenced.   The goal of

5  these reforms is to make the building a class A facility capable

6  of charging significantly more in rent per month.   Concretely,

7  whereas Ernst & Young paid $35 per rentable square foot, 1225

8  expects to charge $65 after the renovations.

9        Following the announcement of the repositioning project,

10  representatives of IFSB and Brookfield Properties spoke on

11  various occasions, either in person or over the phone.   One key

12  meeting -- attended by Isard and Morton Bender on behalf of IFSB

13  on June 12, 2007 -- was designed to give an overview of the

14  project, the scope of the work, and estimated schedule and

15  possible impact on the remaining tenants.   Defendant's

16  opposition, Exhibit 1, paragraph 14.

17        Isard and Bender claim that the meeting didn't accomplish

18  much of what was hoped and that they never received a copy of

19  the agenda that 1225 has now produced.   1225 counters that

20  despite its willingness to accommodate IFSB and to try to

21  address its concerns, IFSB deemed all proposed solutions

22  inadequate.

23        Bender met with another Brookfield representative on July

24  2, and was denied access to the project plans that he had

25  requested.   A follow-up phone call on July 9 likewise failed to

Page 9

1    achieve any agreement.  In the wake of these contacts,

2    Brookfield sent IFSB a memo on July 20, 2007, estimating a time

3    line for the repositioning project.  Brookfield later informed

4    IFSB of the asbestos removal component of the project in a

5    letter dated July 25, 2007.

6         1225 obtained its demolition permit in the middle of July

7    and hired Davis Construction to begin work on the project.

8    Davis built its on-site field office and commenced demolition a

9    few weeks later, in late July 2007.  The repositioning project

10   is scheduled to stretch well into 2008.

11        The condition of IFSB.  Despite changes in leadership, IFSB

12   is still listed by the Office of Thrift Supervision, that's OTS,

13   as a minority institution because a majority of its board and

14   its customers, i.e., the account holders, are minorities.

15   Plaintiff's reply, Exhibit A, paragraph 3.  IFSB has suffered

16   severe operating losses over the last five years, causing OTS to

17   designate it as a problem institution and place it under a cease

18   and desist order.

19        The situation has not improved this year, with IFSB posting

20   losses of over $1 million for the first half of 2007.  Moreover,

21   ATM transactions at IFSB's 1225 Connecticut Avenue headquarters

22   have supposedly decreased by over 25 percent since the

23   repossessing project began.  Id. paragraph 10.  If these trends

24   continue, IFSB may qualify as an underperforming bank, rendering

25   it susceptible for a takeover by the OTS, with the accompanying

Page 10

1    loss of shareholder equity.  To put things bluntly, IFSB is in

2    tenuous condition.

3         IFSB is obviously seeking to reverse this trend.  To that

4    end the new leadership is contemplating renovating its

5    headquarters in the 1225 building, changing the bank's name and

6    logo and implementing a new marketing campaign.  The bank faces

7    an uphill climb, however, in part because its customer base

8    still demands in-person transactions.  Specifically, unlike many

9    national banks, IFSB still serves 95 percent of its customers at

10   its branches (50 percent of those at its headquarters), with

11   only 200 out of more than 7,500 customers utilizing online

12   banking.

13        Nature and effects of construction.  At the heart of the

14   parties' dispute lie the effects of the repositioning project on

15   IFSB.  The bank portrays the circumstances as dire and forecasts

16   its own destruction.  Plaintiff's reply at 16.  Not

17   surprisingly, 1225 has a different view, acknowledging that the

18   construction is disruptive, but insisting that reasonable

19   measures have been taken to ameliorate the adverse effects and

20   abide by the lease agreement.

21        IFSB's most recent filing appears to assert seven ways in

22   which the project violates the terms of the lease and/or the

23   covenant of quiet enjoyment:  1, destruction of all but the

24   floors and supporting beams of the building; 2, removal of

25   asbestos while tenants remain in the building; 3, dust, debris,

Page 11

1    noise and vibration from the construction; 4, failure to provide

2    air conditioning; 5, the site is an ongoing eyesore not suitable

3    for professional business; 6, the temporary replacement of

4    IFSB's windows with plastic sheets will prevent the bank from

5    implementing basic security measures; and 7, IFSB is

6    constructively evicted from the lobby for the duration of the

7    project.  That's set forth at plaintiff's reply at 19.

8         With respect to these allegations and others, the parties

9    have submitted a dizzying array of conflicting affidavits and

10   photographs.  It's hard to know how much weight to give to any

11   of these materials, all of which capture the ever-changing state

12   of affairs at only a moment in time.  But a few things are

13   clear.

14        First, extensive scaffolding has been erected around the

15   building.  Below the scaffolding is a covered walkway with

16   overhead lights that proceeds alongside the outside portion of

17   IFSB and Citibank.  The scaffolding and walkway obscure IFSB's

18   permanent sign.  1225 has responded by attaching to the

19   scaffolding and walkway two temporary signs, one of which

20   features IFSB's name in large purple letters, and the other of

21   which reads "Open During Construction."  The walkways are wide

22   enough for handicapped customers to reach IFSB's one accessible

23   entrance in a wheelchair.

24        This handicap-accessible entrance is on the N Street side

25   of the building where the so-called staging area is also

1   located.  The staging area is marked off with green mesh

2   construction fencing and barricades, and it eliminates the

3   metered parking spaces formerly available along N Street.  It

4   also prevents passersby from looking into IFSB from the street;

5   because the N Street side of the building is largely a glass

6   wall at ground level, customers could previously see directly

7   into the bank.  Plaintiff's reply, Exhibit B, paragraph 16.

8        The staging area has displaced the dumpster into which IFSB

9   deposited its trash.  1225 has sought to alleviate the

10  inconvenience by placing a yellow plastic trash can in the lobby

11  and offering to have its staff empty the can each evening.  Also

12  on the N Street side, Davis Construction has installed large red

13  trash chutes for removal of debris from the higher floors.  The

14  chutes were installed using a crane, which apparently still

15  remains.

16       Among the many other points of contention between the

17  parties, for example, dust and noise, safety and security,

18  rodent control, two appear to be of particular importance.  The

19  first is the air conditioning.  IFSB now contends that there has

20  been a consistent reduction in cooling capacity since work began

21  in July, and that the air conditioning system is now incapable

22  of maintaining the temperature below 85 degrees on a hot day.

23  Id.  In its original motion, IFSB accused 1225 of shutting down

24  the air conditioning early each night before all of the bank's

25  employees had left for the day.  Plaintiff's motion, Exhibit H,

1    paragraph 22.

2        1225 responds that under the lease it is obliged to provide

3    and does provide only chilled water to be used for cooling.  The

4    evening temperatures likely changed because Ernst & Young was

5    paying for extra cooling while it was moving between March and

6    June.  Backed by readings testing the temperature of the chilled

7    water, 1225 further avers that the water was between 41 and 48

8    degrees each day during the first two weeks of August 2007.

9    Defendant's surreply, Exhibit B, paragraph 7.

10        The second major area of contention is the asbestos removal

11    aspect of the repositioning project.  IFSB initially objected to

12    the lack of information about the removal, but now acknowledges

13    that it has acquired such information via this litigation.

14    Plaintiff's reply at 7.  The extensive plans produced by 1225

15    discuss the preparations and precautions being taken and

16    indicate how warning signs will appear around the building.

17    Defendant's opposition, Exhibit C, at 11.  IFSB emphasizes the

18    alarming nature of the signs and points to the devastating fear

19    felt by the 30 employees working at its headquarters.

20    Plaintiff's reply at 7-8 and 10.

21        These employees, IFSB contends, cannot maintain a positive

22    sales mentality when they fear exposure to a toxic substance.

23    Id. at 10 to 11.  In addition, IFSB has submitted photographs of

24    what it believes to be the asbestos-containing floor tiles

25    mentioned by 1225.  Defendant's opposition, Exhibit 1, paragraph

1   9.  But 1225 counters with a sworn declaration, backed again by

2   testing, that the tiles in question do not contain asbestos and

3   were simply dislodged when Ernst & Young moved out.  Defendant's

4   surreply, Exhibit A, paragraphs 9 through 10.

5        In short, 1225 offers convincing testimony that the planned

6   asbestos removal will be properly and safely conducted,

7   including ambient air monitoring and air system control, with

8   minimal risk to IFSB employees and customers.

9        IFSB's other asserted areas of hazardous or unacceptable

10   conditions created by the repositioning project have been

11   largely addressed by evidence offered by 1225.  To begin with,

12   the bank security concerns raised by IFSB have been addressed in

13   1225's responses, and hence appear to have little force.

14   Similarly, the alleged fire code violations, fire hazards and

15   safety code violations do not hold up to scrutiny on the current

16   record, given the measures and efforts undertaken by 1225.

17        The scaffolding installation appears to be consistent with

18   the construction permit and site requirements, and although an

19   inconvenient eyesore, will not prevent access to IFSB's

20   premises.  Moreover, 1225 has provided clear and adequate

21   temporary signs.  1225 is making reasonable efforts to address

22   IFSB's trash removal concerns and to avoid any unnecessary or

23   overly disruptive closure of entrances resulting from work on

24   the facade.  No carbon monoxide from interior demolition

25   equipment is likely to penetrate IFSB's space.  And while rodent

Page 15

1    control issues pose a real concern, the record does not

2    establish that the serious infestation that IFSB alleges and

3    fears, or indeed any infestation at all, has in fact occurred.

4         In the end, IFSB alleges that all of these difficulties

5    will have the effect of causing the bank to close its doors

6    and/or to move elsewhere.  This is an outcome that IFSB believes

7    is consistent with 1225's intent of remaking the building

8    completely.  IFSB points first and repeatedly to the decline in

9    ATM transactions.  It also relies on hearsay statements by some

10   of its customers commenting on the difficulty of gaining access

11   to the building and finding parking.

12        Beyond that, however, much of IFSB's case rests on

13   speculation -- speculation as to how its customers and staff

14   will react, how much business will be lost, and the dangers that

15   both future phases of the construction and the asbestos removal

16   project will pose.  IFSB worries in particular about the

17   potential for fires and leakage, possible damage to its

18   computers and other facilities, and the security risk posed by

19   removal of ceilings, roofing and/or windows.  The comprehensive

20   nature of the repositioning project makes all of these a

21   possibility, but the current record -- outside of the somewhat

22   rambling affidavit filed by IFSB's expert -- does not suggest

23   that any of the feared consequences are likely.

24        Entitlement to injunctive relief.  IFSB is not entitled to

25   the extraordinary remedy of an injunction barring 1225 from

1   continuing its renovation project or undertaking asbestos

2   abatement for the over three years remaining on IFSB's lease.

3   The first factor, likelihood of success on the merits, is close

4   to a wash.   IFSB relies primarily on three provisions of the

5   original lease:  air conditioning, 21.01, quiet enjoyment,

6   20.01, and changes to the premises, 16.02.

7        The first of these provisions is of little help to IFSB.

8   For starters, the plain language of the provision supports

9   1225's view that it is required to provide only chilled water,

10   not air conditioning.  1225 has documented the temperature of

11   the water provided during a two-week period in August, which

12   evidence IFSB contests via the subjective declaration of its

13   president and CEO that the system can't keep the air temperature

14   below 85 degrees on hot days.

15        Moreover, 1225 has explained that any perceived increase in

16   the evening temperature is likely due to the fact that the

17   building has been unusually cool during Ernst & Young's move,

18   IFSB's recent decision to stay open an hour later, and the

19   removal by IFSB of ceiling tiles that would normally keep cool

20   air in the leased premises.

21        The latter two arguments boil down to the same set of

22   fact-intensive questions -- is the repositioning project cutting

23   off or unreasonably obstructing access to the building, or

24   unreasonably interfering with IFSB's use and enjoyment thereof?

25   One threshold contention that must be rejected is 1225's

1    assertion, raised for the first time in its surreply, that

2    section 9.04 of the lease immunizes the landlord from damages

3    arising from repairs to the building or to the leased premises.

4    The location of this provision in the lease and its introductory

5    sentence, which was omitted by defendant 1225, may mean that the

6    limitation on liability applies only where the tenant requests

7    the repairs.  The second sentence of section 9.04 is somewhat

8    ambiguous, as it is not altogether clear whether it refers to

9    repairs, alterations and improvements "in or to any portion of

10   the building" even if not requested by the tenant (the situation

11   we have here).

12       But even if section 9.04 has broader application, it would

13   only insulate 1225 from liability to the extent 1225 was

14   reasonably diligent in minimizing interference with IFSB's

15   operations.  Any greater limitation on liability might leave

16   IFSB without an adequate damages remedy at law, making

17   injunctive relief more appropriate.

18       The parties' remaining arguments are not easily resolved.

19   On the one hand, section 16.02 of the lease contemplates that

20   the landlord will be able to alter public parts of the building

21   without either incurring liability or evicting IFSB, so long as

22   certain conditions are met.  The record evidence suggests that

23   1225 has made a good faith, if not always successful, effort to

24   meet these conditions.  1225 has sought to preserve IFSB's

25   visibility with signage, maintain both regular and handicapped

Page 18

1    access, and prevent its construction company from obscuring the

2    sight lines into and out of the N Street side.

3         On the other hand, the construction is extensive and cannot

4    be described as anything other than disruptive.   IFSB has

5    submitted unrebutted declarations attesting to the noise,

6    vibrations, dust and debris caused by the construction.   While

7    1225 says that these problems are not especially acute, the

8    photographs reveal a building in some disarray, with pedestrian

9    and possibly also automobile access impeded.

10        But what it comes down to then is a question of

11   reasonableness, which in turn balances the landlord's right to

12   make alterations and the tenant's right to use and enjoyment of

13   the leased premises.   Defendant 1225 cites a case arising under

14   Florida law, Stinson, Lyons, Gerlin & Bustamante PA v. Brickell

15   Building 1 Holding Company, 747 F.Supp 1470, Southern District

16   of Florida 1970, which is affirmed at 923 F.2d 810, 11th

17   Circuit, 1991.   That case is cited to support the argument that

18   the balance here tips in favor of the landlord.

19        Although Stinson has somewhat similar facts, a large

20   commercial building being renovated to stay modern, a

21   disgruntled tenant claiming severe hardship, there are key

22   distinctions, most notably the absence in the lease of a quiet

23   enjoyment provision, and the presence of lease provisions giving

24   the landlord far more authority to make any changes it deemed

25   necessary.

1     In the end, although 1225 undoubtedly has the power and

2   discretion to make significant alterations to the building, IFSB

3   has introduced evidence suggesting that the renovations may

4   interfere with the use and enjoyment of the leased premises, and

5   that IFSB therefore has at least some chance to succeed on the

6   merits of its claims.

7     The standard for preliminary injunctive relief, however, is

8   that the movant must show a substantial likelihood of success on

9   the merits.  That, I conclude, IFSB has not done.  1225 has

10   adequately addressed many of IFSB's allegations of breach and

11   overall has made reasonable efforts to avoid or minimize the

12   disruption and inconvenience the repositioning project will

13   cause to IFSB.

14     IFSB must next show that it will suffer irreparable harm

15   absent an injunction.  A showing of some harm is an absolute

16   requirement for issuance of a preliminary injunction.  IFSB has

17   likely cleared this minimum threshold.  What it has not done,

18   however, is demonstrate that any harm it suffers will be

19   irreparable.  IFSB has identified potential economic harm but

20   has not shown why this harm could not be redressed with an award

21   of money damages for breach of the lease after a trial on the

22   merits.

23     As explained above, economic harm will qualify as

24   irreparable only when the loss threatens the very existence of

25   the moving party's business.  See Wisconsin Gas Company v. FERC,

1   758 F.2d 669, 674, D.C. Circuit 1985.

2      IFSB's evidence on this front is inadequate.  The decline

3   in ATM transactions in 2007, from May and June to July and

4   August, is worth very little without evidence of what has

5   happened in prior years, especially since the city's population

6   tends to decrease in the summer months.  Nor do the hearsay

7   statements from customers advance the ball.  Those customers of

8   course made their way to the bank and completed the contemplated

9   transactions.  Although they were unhappy with the conditions,

10  they have not left IFSB.

11     The remainder of IFSB's case for irreparable harm is wholly

12  speculative.  IFSB fears that customers will stop coming to its

13  headquarters branch because of the appearance or the difficulty

14  of finding parking.  Whether the latter fear is justified

15  remains unclear, since 1225 seems to think that Ernst & Young's

16  departure has made parking easier.  There is also nothing in the

17  record beyond IFSB's guesses and intuition to support the fear

18  that the appearance of the facilities will turn customers away.

19     And while it stands to reason that employees will be

20  affected by the constant noise and possible dust, the one

21  declaration supplied by IFSB does not indicate how this will

22  translate into the kind of lost business that would sink the

23  bank forever.  Although it may be understandable that IFSB would

24  have a difficult time under the circumstances producing evidence

25  rather than merely speculation of future severe economic harm or

Page 21

1   risk to the ongoing business, it remains the case that such

2   speculative harm is not enough.  See Wisconsin Gas, 758 F.2d at

3   674.

4        Perhaps IFSB's strongest argument -- certainly one of its

5   most recurring -- is that the harm in this instance need not be

6   great because the bank is already teetering on the edge.  That

7   may well be so, and it may be something to take into account

8   when balancing the equities.  But IFSB has not pointed to any

9   principle of law under which vulnerable parties bear a lesser

10  burden of showing harm than do others.  Hence, the standard

11  remains the same, and under Wisconsin Gas IFSB must demonstrate

12  a real and immediate risk of harm that is certain, great, and

13  irreparable.  Again, IFSB has not done so.

14       The speculative nature of the harm IFSB will suffer weighs

15  heavily against the award of the sweeping injunctive relief that

16  it seeks.  Indeed, it's worth emphasizing that IFSB seeks an

17  injunction that would completely prohibit 1225 from continuing

18  the repositioning project -- that is, both the renovations and

19  the asbestos removal -- until after the end of IFSB's lease on

20  December 31, 2010.  In other words, IFSB would stay at its

21  current location, ostensibly with the construction equipment

22  removed, through the end of its lease term.  IFSB would then

23  presumably move away from the unique location that it claims to

24  treasure, allowing 1225 to resume the project only at that time.

25       This is truly an extraordinary scenario and not one that

1   IFSB's relatively weak showings at the first two steps of the

2   test for preliminary injunctive relief can justify.  At the

3   third step, the Court must of course consider the harm to

4   defendant 1225 if an injunction is entered.  That harm, while

5   also economic, is considerable.  1225 estimates the potential

6   harm from delay while the building is largely unleased as

7   between 600,000 and 1.3 million a month, plus the cost arising

8   from construction expenses.

9        The significant hardship a three-year pause would impose on

10  defendant 1225, arguably just as daunting as the challenges

11  faced by IFSB, certainly weighs against the injunction

12  requested.  Unless and until IFSB produces evidence of some real

13  threat to its continuing existence caused by the repositioning

14  project, the balance of these competing harms does not favor

15  IFSB.

16       Finally, the public interest does not appreciably favor the

17  relief sought.  It is at this point that IFSB's status as a

18  troubled yet historically significant minority-run institution

19  comes into play.  The public surely has an interest in such

20  institutions thriving -- let me repeat that.  The public surely

21  as an interest in seeing such institutions thrive and survive.

22  But that interest is less compelling where, as here, the

23  institution seeks sweeping and invasive judicial intervention to

24  protect it from vulnerabilities of its own making.  In the end,

25  that modest public interest favoring relief cannot compensate

1    for a moderate chance of success on the merits, a speculative

2    claim of irreparable harm, and demonstrable harm to the party

3    whose conduct would be enjoined.

4        Accordingly, applying the well-established four-part test

5    for the extraordinary preliminary injunctive relief sought here,

6    the Court concludes that IFSB has not met its considerable

7    burden.  The motion for a preliminary injunction is therefore

8    denied.  A separate order will be issued today.  The parties

9    should confer to suggest the course of, and schedule for,

10   further proceedings in this matter.  And the order will indicate

11   that.

12       In closing, I want to note, as was done at the hearing last

13   week, that the Court intends to continue to scrutinize the

14   developing situation with the repositioning project and its

15   impact on IFSB.  Should the Court be faced with new evidence of

16   sufficiently concrete and irreparable, as opposed to

17   speculative, harm to IFSB and its very existence, further

18   consideration of the extraordinary remedy of a preliminary

19   injunction may be warranted.  1225 should, therefore, continue

20   to bear in mind its obligations under the lease and the implied

21   covenant of quiet enjoyment, including the obligation to avoid

22   unreasonable interference with IFSB's use and enjoyment of the

23   premises.

24       With that, as I said, I will issue an order today, and that

25   order will deny the motion for preliminary injunction and will

Page 24

1   also govern further proceedings in this matter.  With that, I

2   have finished giving this opinion.

3        Anything the parties need to ask me about now?

4            MS. MANGOLD:  Nothing further, Your Honor.

5            MR. CASANO:  No, Your Honor.  Thank you.

6            THE COURT:  All right.  Thank you.

7        (Proceedings adjourned at 11:05 a.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*   *   *   *   *   *

## CERTIFICATE

I, BRYAN A. WAYNE, Official Court Reporter, certify that the foregoing pages are a correct transcript from the record of proceedings in the above-entitled matter.

_____
BRYAN A. WAYNE

Bryan A. Wayne, RPR, CRR

Official Court Reporter

# EXHIBIT C

## AFFIDAVIT OF NEIL D. MOODHE
## IN SUPPORT OF PETITION FOR REMOVAL

I, NEIL D. MOODHE, under penalty of perjury, state as follows:

1.      I am over twenty one (21) years of age and make this Affidavit based on matters within my personal knowledge in support of the Petition for Removal filed by Defendant 1225 Connecticut Co. LLC ("1225").

2.      I am the President for Davis Construction Services, LLC ("DCS") with an office address of 14325 Willard Road, Suite K, Chantilly, VA 20151.

3.      DCS is a limited liability corporation organized under the laws of the Commonwealth of Virginia.

4.      DCS has not been engaged by 1225, or any of its agents, to conduct any of the construction activity with respect to the real property and improvements located at 1225 Connecticut Avenue, N.W., Washington, D.C.  Moreover, DCS is not performing any construction activity at that property for any other entity and, if fact, has no presence at that site. The allegation "on information and belief" by Plaintiffs to the contrary, as contained in Paragraph 68 of the Complaint is false and without foundation.

_Neil D. Moodhe_    11/14/2007

Neil D. Moodhe

325810v1

EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS
BANK, *et al.*

> *Plaintiffs,*

v.

1225 CONNECTICUT CO. LLC, *et al.*

> *Defendants.*

Civil Action No. 07-2090 (JDB)

## AFFIDAVIT OF SIMON CARNEY
## IN OPPOSITION TO MOTION FOR REMAND

I, SIMON CARNEY, under penalty of perjury, state as follows:

1.      I am over twenty one (21) years of age and make this Affidavit based on matters within my personal knowledge in opposition to Plaintiffs' motion for remand.

2.      I am the Vice President and Regional Counsel for Defendant 1225 Connecticut Co., LLC. ("1225").

3.      As 1225 previously informed this Court and Plaintiff Independence Federal Savings Bank ("IFSB") in Case No. 07-1389 (JDB), James G. Davis Construction Corporation ("Davis") is the general contractor for the Repositioning Project currently underway at 1225 Connecticut Avenue, N.W., in Washington, D.C. (the "Property"). See Civil Action No. 07-1389, 1225's Response to Plaintiff IFSB's Reply Concerning Amended Application for Preliminary Injunctive Relief (08/31/07) and Exhibit D thereto, Affidavit of Edward Green, III.

4.      Both 1225 and James G. Davis Construction Corporation itself refer to the latter entity as "Davis Construction" or "Davis."

32682 lvl

5.     The names "Davis Construction" or "Davis" have not been used by 1225 to refer to any other entity, and certainly have not been used to refer to a separate business entity, Defendant Davis Construction Services, LLC, which has nothing to do with the Repositioning Project.

Simon Carney

EXHIBIT E

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK, et al., | : |
| | : |
| Plaintiffs, | : |
| | : |
| v. | :    Case No. 07-cv-2090 (JDB) |
| | : |
| 1225 CONNECTICUT CO. LLC, et al. | : |
| | : |
| Defendants. | : |

**AFFIDAVIT OF EDWARD GREEN, III
IN OPPOSITION TO PLAINTIFF'S MOTION TO REMAND**

I, EDWARD GREEN, III under penalty of perjury, state as follows:

1.      I am over twenty-one (21) years of age and make this Affidavit based on matters within my personal knowledge in support of Defendants' Opposition to Plaintiff's Motion to Remand.

2.      I am a Senior Project Manager for James G. Davis Construction Corporation ("DAVIS"). DAVIS is a Virginia corporation registered to do business in Washington, D.C.

3.      DAVIS is the general contractor hired by Brookfield Properties Management LLC ("Brookfield") in connection with the repositioning project (the "Repositioning Project") occurring at 1225 Connecticut Avenue, N.W. in Washington, D.C. 20036 (the "Property").

4.      I previously provided an affidavit in connection with an earlier action commenced by Independence Federal Savings Bank seeking to enjoin the Repositioning Project (Civil Action No. 07-1389).

5.      In that affidavit, and again here, I averred that DAVIS is the general contractor for the Repositioning Project. In that capacity, DAVIS has placed signs on the Property identifying

the general contractor as "Davis Construction." DAVIS typically refers to itself either as "DAVIS" or "Davis Construction" when promoting its activities.

6.      Davis Construction Services LLC (typically known as "Davis Services") is a separate company and is a subsidiary of DAVIS. Davis Services is not in any way involved in the Repositioning Project.


_____
Edward Green, III

EXHIBIT F

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | Case No. 07-cv-1389 (JDB) |
| | : | |
| 1225 CONNECTICUT CO. LLC | : | |
| | : | |
| Defendant. | : | |

## AFFIDAVIT OF EDWARD GREEN, III IN OPPOSITION TO APPLICATION FOR PRELIMINARY INJUNCTIVE RELIEF

I, EDWARD GREEN, III under penalty of perjury, state as follows:

1. I am over twenty-one (21) years of age and make this Affidavit based on matters within my personal knowledge in support of the Opposition of Defendant 1225 Connecticut Co. LLC("1225") to Plaintiff's Application for Preliminary Injunctive Relief.

2. I am a Senior Project Manager for James G. Davis Construction Corporation ("Davis"), working out of Davis' office located at 1430 Spring Hill Road, McLean, Virginia. Davis is the general contractor hired by Brookfield Properties Management LLC ("Brookfield") in connection with the renovation project (the "Renovation Project") occurring at 1225 Connecticut Avenue, N.W. in Washington, D.C. 20036 (the "Property").

3. I have been employed by Davis for nine (9) years as a project manager on numerous commercial construction projects in the District of Columbia.

### FIRE CODE COMPLIANCE

4. The emergency exit from Independence Federal Savings Bank ("Independence"), located on the N Street elevation has a covered walkway leading away from the Property towards

the driveway servicing the parking garage. *See, Exhibit 10 to Affidavit of Henry Doyle (the "Doyle Affid."), Photographs of Emergency Exit and Parking Garage.* The exit point for this covered walkway is free of any obstruction or impediments. *Id.*

5.      Access to the emergency standpipes servicing the Property is not impeded or otherwise restricted. *See, Exhibit 9 to Doyle Affid., Photographs of Standpipes.* The scaffolding has been configured to allow for maximum accessibility to the standpipes from the adjacent streets. *Id.* Additionally, signage has been placed identifying each standpipe. *Id.*

6.      Davis has arranged for signage to be installed on the scaffolding clearly and prominently identifying the Property as "1225 Connecticut Avenue." The installation of this signage is scheduled for Friday, August 31, 2007.

### FIRE HAZARD PROTECTIONS / ELECTRICAL SYSTEMS

7.      During the removal of the pre-cast façade on the N Street elevation, no "explosive dust" was revealed.

8.      Davis has taken reasonable precautions to prevent the outbreak of fire during the pre-cast façade removal, interior demolition or any other construction work involving cutting, torching or the use of any open flame. Specifically, Davis has installed temporary hose connections on each floor of the Property. Any work that involves torches, open flame or activities that produce "sparks" (including, but not limited to cutting of pipes or ducts) is done in compliance with a "hot permit." The hot permits require the posting of a fire watch at the location where the work is being performed, as well as a fire extinguisher and dousing water. At the end of each day that work is performed pursuant to a "hot permit," the contractor with the permit is required to wait thirty (30) minutes past the stop work time, conduct a walkthrough inspection to ensure that conditions are satisfactory and then sign out. The interior standpipes

2

will remain operational on each floor. Existing fire sprinkler coverage will remain operational on floors where demoltion is not being performed. As additional precautions against fire, the use of wet blankets is mandated for the cutting of any pipes.

9.       The first stage of the interior demolition is the draindown of the sprinkler system on the impacted floors of the Property. The draindown will have no impact on the 1st floor of the Property. The standpipes and fire closets on each of the floors will remain energized and available in the event of an emergency. The demolition crews will have a fire watch posted, along with the placement of fire extinguishers throughout the Property.

10.     There are no electrical or water outages planned for "on-hours." The Property is equipped with a generator for back-up power in the event of an unforeseen electrical interruption.

### SAFETY CODE COMPLIANCE

11.     Davis has installed overhead lighting on the inside of the covered walkways. *See, Exhibit 7 to Doyle Affid., Photographs of Covered Walkway.*

12.     The covered handicapped walkway along the N Street elevation of the Property has sufficient clearance widthwise to allow for the use of a wheelchair. *See, Exhibits 8 and 8.1 to Doyle Affid., Photograph of Handicapped Accessible Walkway.* The entrance to the covered handicapped walkway, located on the 18th Street/Connecticut Avenue elevation of the Property, is free of any obstruction or impediments. *Id.*

13.     Contrary to the assertions of Independence, the Pepco storage vaults are located within the Staging Area and Pepco's access to the storage vaults is no way impeded or otherwise restricted, either in the case of an emergency or otherwise. Pepco may enter the Staging Area through the 18th Street / N Street non-staging area.

3

14.    To allow for the installation of the demolition chutes on the N Street elevation, an entire tier of pre-cast façade needed to be removed. During the removal of the pre-cast façade it was noted that the pre-cast façade was in a good and sturdy condition with no crumbling observed. Based on this observation, there is a reduced likelihood of significant falling debris during the removal of the pre-cast façade from the Property.

### WATER PENETRATION PRECAUTIONS

15.    In order to protect the remaining two (2) tenants of the Property from leaks or other water infiltration, Davis will be sealing off the 1st floor from the rest of the Property. A temporary waterproofing membrane will be installed over the second floor slab and existing penetration points (e.g., for pipes) will be caulked and waterproofed. A temporary poly covered partition, installed from the floor slab to the ceiling slab above, will enclose the entire perimeter of the second and third floors. This work will commence in September.

### ERECTION OF SCAFFOLDING

16.    The overhead protection installed on the Connecticut Avenue portion of Independence's leased space, which Independence suggests was installed "at least 30 weeks too early" is a requirement pursuant to the Public Space Permit obtained for the Renovation Project. The Public Space Permit is for the entire Renovation Project and is not separated by the different elevations (i.e., N Street side, 18th Street/Connecticut Avenue side), nor can compliance with the Permit be phased in (in other words, all requirements of the Permit must be met at this time).

### DEMOLITION OF PRE-CAST FAÇADE

17.    It will take approximately three (3) weeks to remove the pre-cast façade from the 18th Street/Connecticut Avenue side of the Property. Work will commence above the

4

Independence space and move south down 18th Street/Connecticut Avenue towards the Citibank space.

18.    The removal of the pre-cast façade from the Property will commence in the northeast corner of the Property on the N Street elevation (above the entrance to the parking garage), then move counterclockwise to the 18th Street/Connecticut Avenue elevation and conclude with the alley-way elevation.

19.    The removal of the pre-cast façade is conducted in columns, starting at the top of the Property and moving down to the street level in a piece-by-piece, column by column manner.

20.    With respect to the removal of the pre-cast façade located above the entrance to Independence, Davis will take all reasonable measures to minimize any disruption to the operation of Independence.

21.    During the removal of the pre-cast façade, a debris netting system will be installed to arrest the fall of any debris which may break off. The netting will run from the rooftop down to the street level of the particular section of the Property which is being worked on at that time. The netting will not cover those portions of the front façade not being worked on.

22.    During the removal of the pre-cast façade, the covered walkway currently located on the 18th Street/Connecticut Avenue elevation of the Property will be altered. The side of the walkway closest to the Property will be secured from the sidewalk to the top of the walkway with clear plexi-glass. The plexi-glass will allow for continued visibility of Independence along with the requisite amount of safety precautions for conducting overhead construction. There will be no increase in the height of the plywood which is currently installed on the street side of the walkway.

5

23.    The installation of the new curtainwall façade will be done via a monorail and cable system on the roof of the Property. Specifically, each piece of the new curtainwall façade will be lifted via crane, from the N Street elevation, into the Property on the appropriate floor where it will be installed. The installation of the curtainwall façade is done on a floor by floor basis around the building. There will be multiple crews working on the installation of the new curtainwall façade to have work progress on an expeditious basis.

**DUST AND DEBRIS**

24.    The ceiling panels that Independence claims were removed and which it contends allows dust to enter its leased space were not removed by Davis in preparation for the Renovation Project. Davis is unaware of who removed the panels or why.

**USE OF "BOBCATS" FOR INTERIOR DEMOLITION**

25.    The Bobcats utilized in the interior demolition of the Property are equipped with "scrubbers" designed to reduce the amount of emissions. Davis has used Bobcats in interior demolition of occupied buildings in the past and has not had a problem with carbon monoxide emissions.

26.    The Bobcats will only be employed on floors 3 through 8 at the Property. Any interior demolition on the 2nd floor will be done without the assistance of the Bobcats. The 2nd floor "soft architectural demolition" or removal of the tenant's build-out (i.e., pull up carpeting, removal of the acoustical grid) will be performed by hand.

27.    Independence does not draw its air supply from the office portion of the Property, but rather it is self-contained.

6

### RODENT PRESENCE

28.    During the removal of the pre-cast façade on the N Street elevation, no rodent nests were revealed.

### ASBESTOS

29.    As of the date of this Affidavit, no asbestos abatement has begun, nor have any asbestos containing materials been disturbed.

### SECURITY PRECAUTIONS

30.    Since the commencement of the Renovation Project, Davis is not aware of any instances of crime at the Property.

31.    The removal of the pre-cast façade is for floors 2 through 8.

32.    None of the demolition of pipes, ducts or wiring that will be performed at the Property will require access into the Independence space.

### CONSTRUCTION STAGING AREA

33.    The size of the construction staging area on the N Street side of the Property (the "Staging Area") is mandated by the Public Space Permit.  Davis is not using the full allotment as provided by the Public Space Permit.  Specifically, Davis has carved out an area in front of Independence on the corner of N Street and 18th Street/Connecticut Avenue, and the same remains unused by any construction personnel. *See, Exhibit 6 to Doyle Affid., Photographs of Staging Area.*  This section of the Staging Area remains enclosed by the fence to prevent unauthorized access to the Staging Area and to prevent any vehicles from parking by the Property. *Id.*

7

AUG-30-2007 17:23 From:DAVIS CONSTRUCTION    301 468 3918          To: 202 452 1410        P.10/10

34.    The green mesh fence lining that has been installed on the fence that delineates the Staging Area is for security and aesthetics. This type of fence line helps to obscure the Staging Area from pedestrian and vehicular traffic, maintain the overall appearance of the construction sight and reduce the likelihood of theft and/or vandalism at the construction sight.


Edward Green, NI

320745\1

EXHIBIT G

DCRA: Registered Organization Search

Organization Information

DCRA HOME
SERVICES
INFORMATION
ONLINE SERVICE
REQUESTS

**Registered Organization Search**
STEP [1] [2] [3] Your Search Results

Searched for: James g

We have found the following results for your query. Click on the radio button next to the organization you wish to view, then click the Continue To button below to view the organization's registration information and status.

| Organization Name / State | Status | Date | File No. |
|---|---|---|---|
| JAMES G. ABOUREZK, P.C., DC | DISSOLVED | 5/28/1981 | 812327 |
| JAMES G. BANKS, INC., DC | REVOKED | 2/22/1985 | 850840 |
| JAMES G. CROWLEY, III, INC., DC | REVOKED | 1/13/1984 | 840114 |
| JAMES G. DAVIS CONSTRUCTION CORPORATION, VA | ACTIVE | 3/28/1966 | 660465 |
| JAMES G. ENNIS, P.L.L.C., DC | REVOKED | 3/19/2001 | L08006 |
| JAMES G. HOLT ELECTRICAL CONTRACTORS, INC., MD | REVOKED | 11/23/1976 | 763238 |
| JAMES G. MAURO, JR., P.C., DC | REVOKED | 3/4/1991 | 910735 |
| JAMES G. O'HARRA, P.C., DC | REVOKED | 10/1/1982 | 824460 |
| JAMES G. WATT COMPANY, CA | WITHDRAWAL | 2/4/1985 | 850392 |
| JAMES GEORGE & COMPANY, INC., MD | REVOKED | 12/7/1995 | 953899 |

Page 1 2 ▶ ▶▶

Review Organization Information

For more information, contact the Corporations Division at (202) 442-4432 or Ask the Director .

Telephone Directory by Topic · Agencies · DC Council · Search · Elected Officials · Feedback · Translations · Accessibility · Privacy & Security · Terms & Conditions

DCRA: Registered Organization Search                                    Page 1 of 1



**Organization Information**

DCRA HOME

SERVICES

INFORMATION

ONLINE SERVICE
REQUESTS

### Online Organization Registration
**Search Registered Organizations**

Organization Details - Step 1 2 3

To view another organization from the search, select the **Return to Search Results** button below. You may also **print** the organization details, or start a new search. Use the **Back to Main Page** button to continue the registration process.

| Organization | | Registered Agent |
|---|---|---|
| Organization Name: | JAMES G. DAVIS CONSTRUCTION CORPORATION | C T Corporation System |
| | | 1015 15th Street, N.W. Ste. 1000 |
| | | Washington, DC 20005 |
| State: | VA | |
| Status: | ACTIVE | |
| Initial Date of Registration: | 3/28/1966 | |
| File No.: | 660485 | |
| Organization Type: | FOREIGN BUSINESS CORPORATION | |

For more information, contact the Corporations Division at (202) 442-4432 or Ask the Director .

Government of the District of Columbia
Citywide Call Center : (202) 727-1000
TTY/TDO Directory

Telephone Directory by Topic  |  Agencies  |
DC Council  |  Search  |  Elected Officials  |
Feedback  |  Translation  |  Accessibility  |
Privacy & Security  |  Terms & Conditions

John A. Wilson Building
1350 Pennsylvania Avenue, NW
Washington, DC 20004

EXHIBIT H



Cited
As of: Nov 13, 2007

## CARMEL CASTELVETRO, ET AL v. JOHN M. MILLS, ET AL

### NO. 32 03 96

### SUPERIOR COURT OF CONNECTICUT, JUDICIAL DISTRICT OF NEW HAVEN

### *1994 Conn. Super. LEXIS 270*

### January 31, 1994, Decided
### February 1, 1994, Filed

**NOTICE:** [*1] THIS DECISION IS UNREPORTED AND MAY BE SUBJECT TO FURTHER APPELLATE REVIEW. COUNSEL IS CAUTIONED TO MAKE AN INDEPENDENT DETERMINATION OF THE STATUS OF THIS CASE.

**JUDGES:** GRAY

**OPINION BY:** BY THE COURT; LEANDER C. GRAY

**OPINION**

MEMORANDUM OF DECISION

The named defendants, dba GM Associates ("GM"), moved to strike counts two and five of the complaint on the ground that Connecticut law does not recognize an implied warranty of fitness for intended use ("implied warranty of fitness") in commercial leases. The defendants moved to strike counts three and six which alleged breach of contract, on the ground that the plaintiffs failed to allege that they were third-party beneficiaries to GM's contract with plaintiffs' employer Gravymaster, Inc. ("Gravymaster").

The plaintiffs are former employees of Gravymaster and worked in a building that is alleged to have been constructed or maintained in a manner that caused plaintiffs to become ill. Gravymaster, which did not own the building, executed a lease agreement with GM. Parties involved in the design and construction of the building are also named as defendants; i.e.; ABC Mechanical Engineering and Contracting, Inc.; F & F Mechanical Contractors, Inc.; [*2] D & M Engineers & Land Planners.

Counts one, two and three of the complaint are brought on behalf of the plaintiff Castelvetro. Counts four, five and six are brought on behalf of the plaintiff Fritz. Each plaintiff alleges the same causes of action in her respective set of claims.

"The function of a motion to strike is to challenge the legal sufficiency of the allegations as set forth in the pleadings." *Ferryman v. Groton, 212 Conn. 138, 142, 561 A.2d 432 (1989)*. The motion may also be used to test whether Connecticut is "ready to recognize some newly emerging ground of liability." *Durham Aqueduct Co. v. C. E. Burr & Co.,* 8 Conn. L. Trib. No. 13, pp 11, 12 (Super Ct., November 30, 1981, Higgins, J.). "In deciding on a motion to strike or a demurrer, a trial court must take the facts to be those alleged in the [pleading], and cannot be aided by the assumption of any facts not therein alleged." *Liljedah Bros., Inc. v. Grigsby, 215 Conn. 345, 348, 576 A.2d 149 (1990)*. The court must construe the facts pleaded in the manner most favorable to the nonmoving party. *Rowe v. Godou, 209 Conn. 273, 278, 550 A.2d 1073 (1988)*.

At issue is whether the plaintiffs have asserted [*3] a legally recognized cause of action in claiming that they are entitled to it the benefit of an implied warranty of fitness in a commercial lease to which the plaintiffs were not parties. The easy answer is that such a claim is a question of law rather than a factual allegation and as such, Connecticut does not recognize such a warranty in

1994 Conn. Super. LEXIS 270, *

commercial leases. While some states have expanded the concept to commercial leases *[Davidow v. Inwood N. Professional Group-Phase I, 747 S.W. 2d 373, 375 (Tex. 1988); Meyer v. Parkin, 350 N.W. 2d 435 (Minn. App 1984)]*, the general rule, adopted by the majority of states, is that a right to use commercial premises for a specified purpose does not ordinarily imply a warranty on the landlord's part as to the fitness of the premises for the use. M. Friedman, *Friedman on Leases*, ch. 27, #27, 402, p. 1404.

The general rule rests upon recognition of the great disparity between residential and commercial tenants which does not lend itself to imposing liability in the case of commercial leases. See, *Friedman, supra*, 1407. In this instance, the plaintiffs have failed to state a claim upon which relief can be granted and, accordingly, [*4] the motion to strike counts two and five of the complaint is granted.

The remaining counts addressed by the motion to strike concern the plaintiffs' claim that GM breached its contract with Gravymaster by failing to meet certain express and implied requirements of the lease: it failed to provide quiet enjoyment of the property; failed to maintain and manage the property in a habitable, hazard-free condition; failed to provide a building fit; for human occupancy; and failed to provide premises which met state and local standards regarding air quality. The plaintiffs claim that as employees of Gravymaster, they were third-party beneficiaries to the lease.

A third-party beneficiary may sue to enforce a contract. *Colonial Discount Co. v. Avon Motors, Inc., 137 Conn. 196, 200, 75 A.2d 507 (1950)*. However, a person who is neither a party to a contract nor a contemplated beneficiary cannot sue to enforce the promises of a contract. *Coburn v. Lenox Homes, Inc., 173 Conn. 567, 570, 378 A.2d 599 (1977)*.

A third-party seeking to enforce contractual rights must allege that the contracting parties intended that the promisor should assume a direct obligation to the third-party. [*5] *Stowe v. Smith, 184 Conn. 194, 196, 441 A.2d 81 (1981)*.

> To determine the intent of the parties to a contract is a matter of interpretation of the contract. . . . The ultimate test to be applied is whether the intent of the parties to the contract was that the promisor should assume a direct obligation to the third party and that the intent is to be determined from the terms of the contract read in the light of the circumstances attending its making, including the motives and purposes of the parties.

*Colonial, supra*, 200-01.

Here, the plaintiffs conclude that because they were employed by Gravymaster, they thereby became third-party beneficiaries of the lease between their employer and GM. No factual allegations were cast to support this conclusion. Nor do the plaintiffs allege that the lease reflected any intent by GM to assume a direct obligation to Gravymaster employees. "A motion to strike is properly granted where a plaintiff's complaint alleges legal conclusions unsupported by facts." *Mora v. Aetna Life & Casualty Ins. Co., 13 Conn. App. 208, 211, 535 A.2d 390 (1988)*.

The motion to strike counts three and six of the complaint is granted.

BY THE [*6] COURT

LEANDER C. GRAY, JUDGE





Your Account | Submit a Filing | Review Filings / eService | Jurisdictions | Filing Reports | e

## ➡ Review Filing Status

eService Inbox » **eService Detail**

| eService Detail | |
|---|---|
| **Jurisdiction:** | Civil Actions |
| **Court:** | D.C. Superior Court |
| **Cause/Case Number:** | 2007 CA 007075 B |
| **Case Title / Style:** | Independence Federal Savings Bank, et al. v. 1225 Connecticut Co. LLL, et al. |
| **Filing Submission Date/Time:** | 03/21/2008 12:19 PM Eastern (U.S. and Canada) |
| **Serving Party:** | Greenberg, Joshua M. |
| **Recipient Party:** | Mangold, Donna S. |
| **Status:** | Retrieved |
| **Service Status Date/Time:** | 03/25/2008 9:05 AM Eastern (U.S. and Canada) |
| **Filing Trace Number:** | ED301J020083187 |
| **Lead Document:** | 03-17-08 Defendants' Motion to Dismiss Or, In the Alternative, for Summary Judgment.pdf |
| **Attachments (1):** | 03-17-08 Defendants' Memo of P&A In Support of Motion to Dismiss.pdf |

Prolaw
Atty/E-mail

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
### Civil Division

| | | |
|---|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK, *et al.*, | * * * | |
| Plaintiffs, | * * | Civil Action No. 2007 CA 007075 B Judge Jeanette J. Clark |
| v. | * * | Calendar 12 |
| 1225 CONNECTICUT CO. LLC, *et al.*, | * | Next Event: Discovery Closed |
| Defendants. | * * * | June 28, 2008 |

_____

### ORDER GRANTING, IN PART, AND DENYING, IN PART, DEFENDANTS' MOTION TO DISMISS OR, IN THE ALTERNATIVE, FOR SUMMARY JUDGMENT

Upon consideration of Defendants' Motion to Dismiss or, in the Alternative, for Summary Judgment ("Motion"), Plaintiffs' Opposition ("Opposition") thereto, Defendants' Reply, and the record herein, the Motion is granted, in part, and denied, in part for the reasons stated below.

## I.    FACTUAL AND PROCEDURAL HISTORY

On October 23, 2007, Plaintiffs filed their Complaint alleging the following five Counts: "Count I- Breach of Contract – Plaintiff IFSB and Defendant 1225, LLC" Complaint at 22; "Count II - Breach of Contract - Third Party Beneficiary – Plaintiff Parsons and Defendant 1225, LLC" Complaint at 24; "Count III - Violation of Implied Covenant of Quiet Enjoyment – Plaintiffs IFSB and Parsons and Defendants 1225, LLC and Davis" Complaint at 25, "Count IV – Nuisance – Plaintiffs IFSB and Parsons and Defendants 1225 [sic] LLC and Davis" Complaint at 27; and "Count V – Negligence – Plaintiffs IFSB and Parsons and

1

ENTERED JUN 0 4 2008

Defendant Davis" Complaint at 28.  Approximately one month later, the case was removed to the United States District Court for the District of Columbia.  On February 19, 2008, the case was remanded to the Superior Court of the District of Columbia and the case was reopened.

On March 17, 2008, Defendants filed a Motion to Dismiss, or in the Alternative, for Summary Judgment, which the Court denied pursuant to Court Order docketed on March 26, 2008 because Defendants filed a duplicative Motion to Dismiss, or in the Alternative, for Summary Judgment on March 24, 2008.

With the Court's permission, on April 14, 2008, Plaintiffs filed their Opposition to the Motion to Dismiss, or in the Alternative, for Summary Judgment and their Opposition to the Motion to Strike Jury Demand.  Four days later, Defendants filed their Reply to Plaintiffs' Opposition to the Motion to Dismiss, or in the Alternative, for Summary Judgment.  On April 25, 2008, Defendants filed their Reply to Plaintiffs' Opposition to the Motion to Strike Jury Demand.  On May 6, 2008, Plaintiffs filed a Motion for Leave to File First Amended and Supplemental Complaint.  On May 19, 1008, Defendants filed their Opposition thereto.

The instant Motion was filed on March 24, 2008.  Plaintiffs' Opposition thereto was filed on April 14, 2008.  Defendants' Reply was filed on April 21, 2008.

## II.    STANDARD OF REVIEW

### A.    Motion to Dismiss

On a motion for failure to state a claim, the District of Columbia Court of Appeals has stated that "in granting the motion to dismiss. Our review is *de novo*. In considering the sufficiency of the complaint against[ ], we -- like the trial court -- are obliged to 'accept its factual allegations and construe them in a light most favorable to' the plaintiffs.  If the complaint 'adequately states a claim' when thus viewed, 'it may not be dismissed based on a . . . court's assessment that the plaintiff will fail to find evidentiary support for his allegations or prove his claim to the satisfaction of the factfinder.'  And (with limited exceptions not applicable here) a motion to dismiss for failure to state a claim 'may not rely on any facts that do not appear on the face of the complaint itself.' OLERR:03-0010" Luna v. A.E. Engineering Services, LLC, et al., 2007 D.C. App. LEXIS 688, (D.C. Dec. 20, 2007).

The District of Columbia Court of Appeals explained that "[i]n reviewing the complaint, the court must accept its factual allegations and construe them in a light most favorable to the non-moving party. *Jordan Keys & Jessamy, LLP v. St. Paul Fire & Marine Ins. Co.*, 870 A.2d 58, 62 (D.C. 2005). However,

> [f]actual allegations must be enough to raise a right to relief above the speculative level . . . . '*Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1965, 167 L. Ed. 2d 929 (2007).  Furthermore, dismissal under Rule 12(b)(6) is appropriate where the complaint fails to allege the elements of a legally viable claim. *See Jordan Keys & Jessamy*, 870 A.2d at 62 (affirming dismissal for failure to state a claim; '"We agree with the trial judge that Jordan Keys' amended complaint, viewed in the light most

3

favorable to the pleader, does not allege the elements of an implied-in-fact contract.); *Taylor v. FDIC*, 328 U.S. App. D.C. 52, 60, 132 F.3d 753, 761 (1997) ("'Dismissal under Rule 12(b)(6) is proper when, taking the material allegations of the complaint as admitted, and construing them in plaintiffs' favor, the court finds that the plaintiffs have failed to allege all the material elements of their cause of action.') (citations omitted)). To be sure, 'complaints need not plead law or match facts to every element of a legal theory," *Krieger v. Fadely*, 341 U.S. App. D.C. 163, 165, 211 F.3d 134, 136 (2000) (internal quotation marks and citation omitted), but 'the pleader must set forth sufficient information to outline the legal elements of a viable claim for relief or to permit inferences to be drawn from the complaint that indicate that these elements exist.' 5B CHARLES ALAN WRIGHT & ARTHUR R. MILLER, FEDERAL PRACTICE AND PROCEDURE: CIVIL 3D § 1357, at 683 (2004). *See In re Plywood Antitrust Litigation*, 655 F.2d 627, 641 (5th Cir. 1981) ('Despite the liberality of modern rules of pleading, a complaint still must contain either direct or inferential allegations respecting all the material elements necessary to sustain a recovery under some viable legal theory.').

Chamberlain, et. al. v. American Honda Finance Corp., 931 A.2d 1018, 1023 (D.C. 2007).

However, the Court of Appeals has cautioned that "[a]ny uncertainties or ambiguities involving the sufficiency of the complaint must be resolved in favor of the pleader, and generally, the complaint must not be dismissed because the court doubts that plaintiff will prevail." Atkins v. Industrial Telecommunications Ass'n, Inc., 660 A.2d 885, 887 (D.C. 1995) (citing McBryde v. Amoco Oil Co., 404 A.2d 200, 203 (D.C. 1979)).

Defendants seek a dismissal of Defendant Davis Construction Services, LLC ("DCS"), Counts II, III, IV, and V against them pursuant to Super. Ct. Civ. R. 12(b)(6) on the following grounds that: (1) "Defendant DCS should be dismissed as to Counts III, IV, and V because it has absolutely nothing to with the Repositioning Project" Opposition at 6; (2) "[t]here is no basis in law supporting Plaintiff Parsons' claim for Breach of Contract as a Third Party

4

Beneficiary and Count II should be dismissed" *Id.* at 8; (3) "Count III. . .because there is no implied covenant when an express covenant is present and any such covenant, express or implied, does not run in favor of non-tenants nor against non-landlords" *Id.* at 11; (4) "Count IV fails to state a cause of action for nuisance" *Id.* at 14; and (5) Count V in its entirety should be dismissed since DCS is the only Defendant in that Count. *See Id.* at 8.  In support of their Motion, Defendants attached, <u>inter alia</u>, an Affidavit of Jackie Duke, a Transcript of Oral Ruling of the Honorable John D. Bates United States District Judge, an Affidavit of Neil D. Moodhe in Support of Petition for Removal, an Affidavit of Simon Carney in Opposition to Motion for Remand, an Affidavit of Edward Green, III in Opposition to Plaintiffs' Motion to Remand, an Affidavit of Edward Green, III in Opposition to Application for Preliminary Injunctive Relief, a DCRA: Registered Organization Search document, and a copy of *Castelvetro, et al. v. Mills, et al.,* No. 32 03 96, 1994 Conn. Super. LEXIS 270 (C.T. Feb. 1, 1994).

Indeed, "[a] defendant raising a 12(b)(6) defense cannot assert any facts which do not appear on the face of the complaint itself." <u>Carey v. Edgewood Mgmt. Corp.</u>, 754 A.2d 951, 954 (D.C. 2000).  "When the trial court decides a Rule 12(b)(6) motion by considering factual material outside the complaint, the motion shall be treated as if filed pursuant to Rule 56, which permits the grant of summary judgment if there are no material facts in dispute and the movant is entitled to judgment as a matter of law." <u>Kitt v. Pathmakers, Inc.</u>, 672 A.2d 76, 79 (D.C. 1996); <u>Washkoviak v. Sallie Mae</u>, 900 A.2d 168, 177-78 (D.C. 2006). Accordingly, the Court treats the Motion as one for summary judgment because

of the numerous attachments to the Motion, including, but limited to, an Affidavit

of Jackie Duke, an Affidavit of Neil D. Moodhe in Support of Petition for Removal,

an Affidavit of Simon Carney in Opposition to Motion for Remand, an Affidavit of

Edward Green, III in Opposition to Plaintiffs' Motion to Remand, and an Affidavit

of Edward Green, III in Opposition to Application for Preliminary Injunctive Relief,

B.    **Motion for Summary Judgment**

In deciding a Motion for Summary Judgment "'if the pleadings,

depositions, answers to interrogatories, and admissions on file, together with

affidavits [if any], show that there is no genuine issue as to any material fact the

moving party is entitled to judgment as a matter of law.'" Kibunja, et al. v.

Alturas, 856 A.2d 1120, 1127 (D.C. 2004); Phelan, et al. v. City of Mount Rainier

and its Chief of Police, 805 A.2d 930, 936 (D.C. 2002) (citing Morgan v.

Psychiatric Inst. of Washington, 692 A.2d 417, 420 (D.C. 1997) (citing Nader v.

de Toledano, 408 A.2d 31, 41 (D.C. 1979) (quoting Super. Ct. Civ. R. 56(c)). In

other words, "where genuine issues of material facts are in dispute, summary

judgment can not be granted." Young v. District of Columbia, 752 A.2d 138, 145

(D.C. 2000). However, "[c]onclusory allegations by the nonmoving party are not

sufficient for [the] purpose" of showing that there is "sufficient evidence

supporting the claimed factual dispute . . . to require a jury or judge to resolve the

parties' differing versions of the truth at trial (citations omitted)." Kendrick v. Fox

Television, et al., 659 A.2d 814, 818-19 (D.C. 1995) (summary judgment affirmed

in defamation action against news media, the District, and Deputy Police Chief).

Super. Ct. Civ. 56(e) goes on to state that "[w]hen a motion for summary

judgment is made and supported as provided in this Rule, an adverse party may not rest upon the mere allegations or denials of the adverse party's pleading, but the adverse party's response, by affidavits or as otherwise provided in this Rule, must set forth specific facts showing that there is a genuine issue for trial. If the adverse party does not so respond, summary judgment, if appropriate, shall be entered against the adverse party."

Furthermore, "[i]n considering a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party, who 'is entitled to 'all favorable inferences which may reasonably be drawn from the evidentiary materials.'" Phelan, supra (citing Hendel v. World Plan Executive Council, 705 A.2d 656, 660 (D.C. 1997) (quoting Beard v. Goodyear Tire & Rubber Co., 587 A.2d 195, 198 (D.C. 1991)).

## III.   ANALYSIS

For purposes of ruling on the Motion, the Court views the allegations in the Complaint and the record evidence in the light most favorable to the nonmoving party, i.e., Plaintiffs' allegations that Defendants breached the Lease Agreement, violated the implied covenant of quiet enjoyment, created a nuisance, and were negligent.

### A.   There are genuine issues of material fact in dispute regarding Defendant Davis Construction Services, LLC ("DCS").

Defendants argue that "Defendant DCS has absolutely nothing to do with the Repositioning Project and that IFSB was provided with sworn information on the identity of the general contractor. . . ." Motion at 7. Additionally, Defendants argue that "[t]here is not a basis for liability against

7

DCS, and Plaintiffs, as a matter of law, cannot state a cause of action against DCS." Motion at 8.   Defendants contend that "the general contractor is James G. Davis Construction Corporation and such fact has been clearly provided to IFSB as part of the original federal litigation." Motion at 6. Defendants further contend that "Defendant Davis Construction Services LLC, while a corporate subsidiary of James G. David Construction Corporation, is a completely different and separate entity." Motion at 7.

On the other hand, Plaintiffs argue that "absent discovery [ ] it is not clear that Defendant Davis Construction Services LLC is not a proper party." Opposition at 8.   Plaintiffs further argue that "even if James G. Davis Construction Corporation is the general contractor as Defendants state, Defendant Davis Construction Services LLC, as a corporate subsidiary of James G. Davis Construction Corporation, is not necessarily and absolutely absolved of any connection to this matter and discovery is required before Plaintiffs can make this determination." Opposition at 8-9.

The Court finds that there is a genuine issue of material fact in dispute as to whether DCS is a proper party.   Therefore, summary judgment shall not be granted as to Counts III, IV, and V.

**B.      Plaintiff Parsons is not a third party beneficiary and Count II is dismissed.  Plaintiff Parson is no longer a party to the lawsuit.**

Defendants argue "Plaintiff Parsons is not an intended beneficiary of the lease [sic] and [Count II] fails as a matter of law." Motion at 8. Defendants further argue that "[a]n examination of the Lease demonstrates that neither Parsons, nor any employee of IFSB, was an intended beneficiary of the lease."

8

Motion at 9.    Defendants contend that "Parsons is nothing more than an incidental beneficiary of the Lease." Motion at 10.

On the other hand, Plaintiffs argue that "Parsons, as Vice-President and Chief Information Officer of IFSB, may surely enforce a promise made for his benefit and the benefit of other employees at the Bank even though there is not mention of the term 'employee' or 'Parsons' in the lease." Opposition at 12-13.

The Court agrees with Defendants that Plaintiff Parsons is an incidental beneficiary to the Lease Agreement. See *Fort Lincoln Civic Assoc., et al. v. Fort Lincoln New Town Corp., et al.,* 944 A.2d 1055, 1064 (D.C. 2008) (holding that an incidental beneficiary is a beneficiary who is not an intended beneficiary); Restatement (Second) Contracts, § 302(2) (2008).  "An incidental beneficiary is a person who will be benefited by performance of a promise but who is neither a promisee nor an intended beneficiary." *Id.* Furthermore, "[a]n incidental beneficiary acquires by virtue of the promise no right against the promisor or the promisee.  (citation omitted)." *Id.; R*estatement (Second) Contracts, § 325 (1981).

Eventhough Plaintiff Parsons could benefit from some of the promises made in the Lease Agreement between Pool 1225 Associates and IFSB, such promises do not make him an intended beneficiary because "[i]n order to sue for damages on a contract claim, a plaintiff must have either direct privity or third party beneficiary status." *Id.*    Here, Plaintiff Parsons has neither direct privity of contract nor third-party beneficiary status.  Accordingly, Defendants' Motion to Dismiss Plaintiff Parson's claims against them was granted by Court Order dated

9

June 2, 2008. herefore, summary shall be granted as to Count II of the Complaint.

### C. There are genuine issues of material fact in dispute regarding Count III.

The Court finds that there is a genuine issue of material fact in dispute as to whether there is a breach of implied covenant of quiet enjoyment Therefore, summary judgment shall not be granted as to Count III of the Complaint.

### D. There are genuine issues of material fact in dispute regarding Count IV.

Defendants argue Plaintiff "IFSB has no cause of action in nuisance." Motion at 15. Defendants, citing *Echard v. Kraft*, 585 A.2d 1018 (Md. App. 2005), contend that "not every interference with the use and enjoyment of land constitutes an actionable private nuisance, in as much as [sic] the interference must be both substantial and unreasonable." *Id.*

On the other hand, Plaintiffs argue "the Defendants have created a nuisance." Opposition at 17. Specifically, Plaintiffs state that Defendants have interfered

> in their use and enjoyment of the Premises, in at least the following ways: (a) interfering with the physical condition of the Premises; (b) disturbing of the safety, health and comfort of the Bank's officers, employees, including Parsons, and customers; (c) creating significant noise and vibration; (d) creating and causing dirt, debris and dust outside the Premises; (e) causing the presence of vermin; (f) failing to take proper precautions to ensure against risks to the Plaintiff Parsons, as well as the Bank's other employees and its customers of exposure to asbestos, lead, PCB's, dust, bacteria from vermin, or mold spores; (g) causing water damage in the Bank and subjecting the computer and other technical operation s of the

Bank to be at risk of malfunctioning; and (h) interfering with the visibility of the Bank from the street and sidewalk."

Complaint at ¶ 72.

The Court finds that there are genuine issues of material fact in dispute as to whether Defendants have created a nuisance and whether this alleged interference in Plaintiffs' use and enjoyment of the Premises is substantial and unreasonable. Therefore, summary judgment shall not be granted as to Count IV of the Complaint.

### E.    There are genuine issues of material fact in dispute regarding Count V.

There are genuine issues of material fact in dispute as to whether Defendant Davis was negligent.

## IV.    CONCLUSION

For the reasons stated above, the Court grants, in part, and denies, in part the Motion.

**WHEREFORE**, it is this 2nd day of June 2008, hereby

**ORDERED** that Defendants' Motion to Dismiss, or in the Alternative, for Summary Judgment is **GRANTED, IN PART, DENIED, IN PART** for the reasons stated above; and it is

**FURTHER ORDERED**, that the Motion to Dismiss Count II is **GRANTED** or the reasons stated above; and it is

**FURTHER ORDERED**, that the Motion to Dismiss Plaintiff Parsons is **GRANTED** for the reasons stated above; and it is

11

**FURTHER ORDERED**, that the Motion to Dismiss Defendant Davis

Construction Services, LLC is **DENIED** for the reasons stated above; and it is

**FURTHER ORDERED**, that the Motion for Summary Judgment regarding

Count III is **DENIED** for the reasons stated above; and it is

**FURTHER ORDERED**, that the Motion for Summary Judgment regarding

Count IV is **DENIED** for the reasons stated above; and it is

**FURTHER ORDERED**, that the Motion for Summary Judgment regarding

Count V is **DENIED** for the reasons stated above; and it is

**FURTHER ORDERED**, that for each Motion filed, the parties shall e-mail a

copy of the proposed order in Microsoft Word (.doc) format to the following e-mail

addresses pursuant to this Court's General Order: Clarkjj2@dcsc.gov and

Clarkjj3@dcsc.gov.

**SO ORDERED**.

_Jeanette J. Clark_

_____

Judge Jeanette J. Clark
D.C. Superior Court

Copies e-served to and docketed on this 2nd day of June 2008:

Richard W. Luchs, Esq.
William C. Casano, Esq.
Joshua M. Greenberg, Esq.
1620 L Street, NW
Suite 900
Washington, DC 20036

Dale A. Cooter, Esq.
Donna S. Mangold, Esq.
5301 Wisconsin Avenue, NW
Suite 500
Washington, DC 20015

Support: (877) 433-4533





**CaseFileXpress**
secure legal efiling

Your Account |   Submit a Filing |   Review Filings / eService |   Jurisdictions |   Filing Reports |   eService Profile |   Sign Out

## ➋ Review Filing Status

eService Inbox » eService Detail

| eService Detail | |
|---|---|
| **Jurisdiction:** | Civil Actions |
| **Court:** | D.C. Superior Court |
| **Cause/Case Number:** | 2007 CA 007075 B |
| **Case Title / Style:** | Independence Federal Savings Bank, et al. v. 1225 Connecticut Co. LLC, et al. |
| **Filing Submission Date/Time:** | 06/02/2008 7:41 PM Eastern (U.S. and Canada) |
| **Serving Party:** | Clark, Jeanette |
| **Recipient Party:** | Cooter, Dale A. |
| **Status:** | Retrieved |
| **Service Status Date/Time:** | 06/03/2008 2:35 PM Eastern (U.S. and Canada) |
| **Order Number:** | OD301J020021701 |
| **Documents (1):** | Indep. Fed. Savings Bank et al. v. 1225 Connecticut Co. LLC et al., 07ca7075, Mot to Dismiss or MSJ 6-2-08.pdf |

Proposed Motion for Leave) for FA
Pro/ (Amend complaint)
Atty/E-mail

## SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
## CIVIL DIVISION

INDEPENDENCE FEDERAL          )
SAVINGS BANK, *et al.*,        )
                              )
    Plaintiffs,              )    **Case No.: 2007 CA 007075 B**
                              )    **Judge Jeanette J. Clark**
    v.                        )    **Calendar 12**
                              )
1225 CONNECTICUT CO. LLC,     )    **Next Event: Discovery Closed**
*et al.*,                      )    **June 28, 2008**
                              )
    Defendants.              )
_____)

## ORDER DENYING, WITH PREJUDICE, IN PART,
## AND DENYING, WITHOUT PREJUDICE, IN PART, PLAINTIFFS' MOTION
## FOR LEAVE TO FILE FIRST AMENDED COMPLAINT

Upon consideration of Plaintiffs' Motion for Leave to File First Amended ("Motion"),

Defendants' Opposition ("Opposition"), and the record herein, the Motion is denied, with

prejudice, in part, and denied, without prejudice, in part.

**WHEREFORE**, it is this 2nd day of June 2008, hereby,

**ORDERED**, that the Motion is **DENIED, WITH PREJUDICE, IN PART, AND**

**DENIED, WITHOUT PREJUDICE, IN PART**; and it is

**FURTHER ORDERED**, that the Motion is **DENIED, WITH PREJUDICE**, to the

extent that Defendants' Motion to Dismiss Plaintiff Parsons' claims was granted by Court Order

dated June 2, 2008. Therefore, Plaintiff Parson is no longer a party to the lawsuit; and it is

**FURTHER ORDERED**, the Motion is **DENIED, WITHOUT PREJUDICE**, regarding

Plaintiff IFSB to the extent that it is allowed to refile the instant Motion not later than June 12,

2008 and submit another Motion and a proposed First Amended Complaint consistent with the

**ENTERED** JUN 0 4 2008

Court's Order dated June 2, 2008, granting Defendants' Motion to Dismiss Plaintiff Parsons'
claims against them; and it is

**FURTHER ORDERED**, that for each Motion filed, the parties shall e-mail a copy of the
proposed order in Microsoft Word (.doc) format to the following e-mail addresses pursuant to
this Court's General Order: Clarkjj2@dcsc.gov and Clarkjj3@dcsc.gov.

**SO ORDERED**.

*Jeanette J. Clark*

_____
Judge Jeanette J. Clark
D.C. Superior Court

Copies e-served to and docketed on this 2nd day of June 2008:

Dale A. Cooter, Esq.
COOTER, MANGOLD, TOMPERT
 & KARAS, LLP
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015
efiling@cootermangold.com

Richard W. Luchs, Esq.
William C. Casano, Esq.
Joshua M. Greenberg, Esq.
GREENSTEIN DELORME & LUCHS, P.C.
1620 L. Street, N.W.
Suite 900
Washington, D.C. 20036-5605
rwl@gdllaw.com
wcc@gdllaw.com
jmg@gdllaw.com

2

Support: (877) 433-4533





**CaseFileXpress**
secure legal efiling

Your Account  |  Submit a Filing  |  Review Filings / eService  |  Jurisdictions  |  Filing Reports  |  eService Profile  |  Sign Out

## ➡ Review Filing Status

eService Inbox » eService Detail

| eService Detail | |
|---|---|
| **Jurisdiction:** | Civil Actions |
| **Court:** | D.C. Superior Court |
| **Cause/Case Number:** | 2007 CA 007075 B |
| **Case Title / Style:** | Independence Federal Savings Bank, et al. v. 1225 Connecticut Co. LLC, et al. |
| **Filing Submission Date/Time:** | 06/02/2008 6:43 PM Eastern (U.S. and Canada) |
| **Serving Party:** | Clark, Jeanette |
| **Recipient Party:** | Cooter, Dale A. |
| **Status:** | Retrieved |
| **Service Status Date/Time:** | 06/03/2008 2:40 PM Eastern (U.S. and Canada) |
| **Order Number:** | OD301J020021698 |
| **Documents (1):** | Independence Federal Savings Bank v. 1225 Connecticut Co, 07a7075, Motfor Leave to File First Amended Compl (d) 5-30-08.pdf |

Prolaw
Atty/E-mail

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

INDEPENDENCE FEDERAL SAVINGS BANK
1229 Connecticut Avenue, N.W.
Washington, DC 20036,

    *Plaintiff,*

v.

1225 CONNECTICUT CO. LLC
c/o its registered office
Corporation Service Company
2711 Centerville Road, Suite 400
Wilmington, DE 19808

    and

DAVIS CONSTRUCTION SERVICES, LLC
14325 Willard Road
Suite K
Chantilly, VA 20151,

    *Defendants.*

Case: 1:08-cv-00963
Assigned To : Bates, John D.
Assign. Date : 6/5/2008
Description: General Civil

### NOTICE OF REMOVAL

Defendants 1225 Connecticut Co. LLC ("1225") and Davis Construction Services, LLC

("DCS"), by their undersigned counsel, pursuant to 28 U.S.C. §§ 1441 and 1446, hereby remove

this action from the Superior Court for the District of Columbia to the Untied States District

Court for the District of Columbia. The grounds for removal are:

1.    On July 31, 2007, Plaintiff Independence Federal Saving Bank ("IFSB"), a

District of Columbia bank, filed a complaint in the instant court in Civil Action No. 07-1389

(JDB) ("Federal Suit"). The case was filed against Defendant 1225 (a Delaware chartered

ENTERED JUN 1 0 2008

limited liability company with its principal place of business in New York), a diversity case and was assigned to Judge John D. Bates. In its Complaint, which was amended on August 10, 2007, IFSB complained about substantial renovation work ("Repositioning Project") being performed at the site of its home office, namely 1225 Connecticut Avenue, N.W., Washington, DC, and the impact such work allegedly was having on IFSB's operations.

2.    At the time the Complaint was filed in this Court, IFSB also filed a motion for a preliminary injunction, which motion was also amended. The Motion sought an order prohibiting 1225, until December 31, 2010, from further renovating the building even though seven of eight floors were vacant and some of those floors had been partially demolished.

3.    Judge Bates conducted a hearing on the Motion and on September 11, 2007 issued an order denying the Motion. Exhibit A.

4.    Thereafter, on September 24, 2007, IFSB filed a Stipulation of Voluntary Dismissal Without Prejudice Pursuant to Rule 41(a)(1)(ii). Exhibit B.

5.    On or about October 23, 2007, IFSB filed another lawsuit ("Local Suit") over the same renovation work at 1225 Connecticut Avenue. This suit was filed in District of Columbia Superior Court, Civil Action No. 2007 CA 007075 B and is styled *Independence Federal Saving Bank and Stanley W. Parsons v. 1225 Connecticut Co. LLC and Davis Construction Services, LLC*, a copy of the Local Suit complaint together with summons and Initial Order are attached hereto as Exhibit C.

6.    The Local Suit complaint is largely a reiteration of the complaint in the Federal Suit. However, IFSB added parties and claims in the Local Suit complaint in an obvious effort to thwart removal to federal court.

2

Case 1:08-cv-00963-JDB    Document 1    Filed 06/05/2008    Page 3 of 7

7.      With respect to parties, the complaint in the Local Suit named as a new plaintiff,

Stanley W. Parsons, who is described in the complaint as a Virginia resident, an IFSB employee

since 2001 at the 1225 Connecticut Avenue location, and the current Vice-President and Chief

Information Officer. Exhibit C at para 3. The complaint named as a new defendant Virginia

limited liability company Davis Construction Services, LLC ("DCS"), which the complaint

mistakenly identifies "on information and belief" as the construction contractor of the

Repositioning Project. Exhibit C at para. 68. See also, Affidavit of Neil D. Moodhe In Support

of [November 17, 2007] Petition for Removal which was attached as Exhibit D to November 17,

2007 Notice of Removal in Civil Action No. 07-2090 (JDB).[1]

8.      With respect to claims, the Local Suit attempts to fashion several new causes of

action. These new causes of action include the following:

a.      Count II, a third party beneficiary claim of Plaintiff Parsons against 1225

for breach of contract (to-wit, the Lease between IFSB and 1225);

b.      Count III, a claim in which both plaintiffs allege a violation of the

covenant of quiet enjoyment by both defendants;

c.      Count IV, a claim of nuisance by both plaintiffs against both defendants;

and

d.      Count V, a claim of negligence by plaintiffs against DCS only.

9.      On or about November 16, 2007, Defendants filed a Notice of Removal and the

case was assigned the Civil Action No. 07-2090 (JDB) and again assigned to Judge John D.

Bates.

---

[1]    See Exhibit E to that same filing in Civil Action No. 07-2090 for an affidavit confirming that Defendant 1225 is
a Delaware limited liability company with its principal place of business in New York.

10.    In their November 16, 2007 Notice of Removal, Defendants asserted that
Plaintiffs engaged in fraudulent/improper joinder by, *inter alia*, adding Stanley Parsons as a
Plaintiff, and by alleging the claims in Counts II-V of the Local Suit complaint which, as a
matter of law, fail to state a cause of action and were inserted solely for the purpose of
attempting to thwart removal.  The basis of the fraudulent/improper joinder concerning Plaintiff
Parsons was that the causes of action he alleges in Counts II-V, as a matter of law, fail to state a
cause of action upon which relief can be granted.  Defendants maintained under District of
Columbia law, Plaintiff Parsons, as an employee of tenant IFSB, is not entitled to pursue a claim
for breach of contract or breach of any covenant of quiet enjoyment under a third party
beneficiary theory (Counts II and III).  Moreover, there is no implied covenant of quiet
enjoyment (Count III) in the presence of an express covenant in the Lease and, in any event, any
such covenant (express or implied) is between, tenants and landlords, not invitees of tenants,
such as Plaintiff Parsons.  Furthermore, as a matter of law, Plaintiff Parson has no standing
and/or cause of action against either of the defendants for nuisance (Count IV) since he has no
possessory right.

11.    In the November 16, 2007 Notice of Removal, Defendants asserted that when the
complaint was stripped of those parties fraudulently/improperly joined, *i.e.*, the new Virginia
Plaintiff Parsons and the new Virginia Defendant DCS, and the specious claims, what was left is
what the parties originally started out with in this Court and over which the Court has already
exercised diversity jurisdiction -- namely, a claim by a commercial tenant (IFSB) against its
landlord (1225) concerning the impact of a renovation project over which the Court already
exercised diversity jurisdiction under 28 U.S.C. § 1332(a)(1).

12.    However, on November 26, 2007, Plaintiffs filed a motion to remand the case to

the Superior Court of the District of Columbia, which motion was granted by Judge Bates. See

January 7, 2008 Memorandum and Order, Exhibit D. In so ruling, Judge Bates determined that

the decision of whether Plaintiff Parsons was an appropriate party, and thus improperly joined,

was one to be made by local courts, not by the instant court. Accordingly, Judge Bates

concluded that because Plaintiff Parsons and Defendant DCS were both citizens of Virginia,

there was no diversity of citizenship to permit the exercise of federal jurisdiction.

13.    With respect to Plaintiff Parson's claims, Judge Bates stated as follows:

> In the future, these claims may be dismissed for failure to
> state a claim upon which relief can be granted, see Fed. R. Civ. P.
> 12(b)(6), but that determination should be made by the D.C.
> Superior Court. See *Brown*, 26 F. Supp. 2d at 77 (holding that
> "[r]egardless of the strength or weakness of the plaintiffs' . . .
> argument, it cannot be said to be 'wholly nonsensical.' Its merit,
> therefore, is appropriately left for the courts of the District of
> Columbia to determine on remand."); see also, *Lyall v. Airtran
> Airlines, Inc.*, 109 F. Supp. 2d 365, 374 (E.D. Pa. 2000) ("We
> hasten to repeat that it is possible that these claims will ultimately
> be dismissed on remand, or that the defendants will prevail on
> summary judgment, but the important point here is that this is not
> our decision to make, but instead must be left to the state courts.").
> Because there remains a possibility that the claims here will
> survive that challenge, remand is appropriate.

Exhibit D at p. 5.

14.    Recently, the Superior Court of the District of Columbia has reviewed Plaintiff

Parson's claims and has agreed with Defendants that such claims failed to state a cause of action

upon which relief can be granted under District of Columbia law. In this regard, on June 2,

2008, Judge Jeanette J. Clark issued an Order Granting, In Part, And Denying, In Part,

Defendants' Motion to Dismiss Or, In the Alternative, For Summary Judgment, Exhibit E,

whereby Plaintiff Parson was dismissed as a party. See Exhibit E at pp. 8-11. Accordingly, the

impediments to diversity jurisdiction cited by Judge Bates in his January 7, 2008 Memorandum and Order no longer exist, and removal of this case is now appropriate.

15.    As noted, the Superior Court issued an order dismissing Stanley Parsons as a Plaintiff on June 2, 2008. Thus, in accordance with 28 U.S.C. § 1446 (b), this Notice of Removal is timely since it is being filed within 30 days after receipt of an order from which it may first be ascertained that the case is one which is or has become removable, and since the case is less than one year old.

16.    Removal of this lawsuit in authorized by 28 U.S.C. §1441(a).

17.    Attached hereto as Exhibit F is a copy of the notice to the Clerk of the Superior Court of the District of Columbia of the filing of this Notice of Removal, the original of which is being filed with the Clerk of the Superior Court, as required by 28 U.S.C. § 1446(d).

18.    Attached hereto as Exhibit G is a copy of the Notice to the Adversary Parties of the Filing of the Notice of Removal, the original of which is being served on Plaintiffs' counsel, pursuant to 28 U.S.C. § 1446(a).

Respectfully submitted,

GREENSTEIN DELORME & LUCHS, P.C.

Dated: June 5, 2008

Richard W. Luchs, #243931
William C. Casano, #352492
Joshua M. Greenberg, #489323
1620 L Street, N.W., Suite 900
Washington, DC  20036-5605
Telephone:  (202) 452-1400
E-mail:  wcc@gdllaw.com
E-mail:  rwl@gdllaw.com
E-mail:  jmg@gdllaw.com

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I hereby certify that on this 5th day of June, 2008, a copy of this Notice of Removal was

sent by first-class mail, postage prepaid, to:

> Dale A. Cooter, Esq.
> Donna S. Mangold, Esq.
> COOTER, MANGOLD TOMPERT & KARAS, LLP
> 5301 Wisconsin Avenue, NW, Suite 500
> Washington, DC 20015

William C. Casano

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **INDEPENDENCE FEDERAL** )  SAVINGS BANK, et al., ) | |
| ) | |
| **Plaintiffs,** ) | |
| ) | |
| **v.** ) | **C.A. No. 1:08-CV-00963** |
| ) | |
| **1225 CONNECTICUT CO. L.L.C.,** )  **et al.,** ) | |
| ) | |
| ) | |
| **Defendants.** ) | |

_____ )

<u>**DECLARATION OF DONNA S. MANGOLD**</u>

I, Donna S. Mangold, declare and state as follows:

1. I am over the age of 18 and am competent to testify to the matters contained herein.

2. I am counsel of record for the Plaintiffs Independence Federal Savings Bank and Stanley W. Parsons in this litigation.

3. I graduated from the Georgetown University Law Center in 1981, and am a member in good standing of the following bars:

    a.    District of Columbia Court of Appeals (admitted 12/18/81)

    b.    Maryland Court of Appeals

    c.    Supreme Court of the United States

    d.    United States Court of Appeals for the District of Columbia Circuit

    d.    United States Court of Appeals for the Fourth Circuit

    e.    United States Court of Appeals for the Ninth Circuit

    f.    United States District Court for the District of Columbia

    g.    United States District Court for the District of Maryland

  h.  United States Court of Federal Claims

 4. I have practiced law since 1981, and am a partner at Cooter, Mangold, Tompert & Karas, LLP ("CMTK").

 5. Adam B. Pignatelli graduated from the American University Law School in 2005. Mr. Pignatelli joined CMTK as an associate in 2005, and is a member in good standing of the following bars:

  a.  Massachusetts Supreme Judicial Court (admitted 11/28/05);

  b.  Supreme Court of Virginia

  c.  District of Columbia Court of Appeals

  d.  United States District Court for the Northern District of Florida

 6. As a result of the removal of this action to the United States District Court for the District of Columbia, the Plaintiffs incurred $8,162.00 in fees in seeking remand of this case back to the Superior Court for the District of Columbia. Included in Plaintiffs' Motion to Remand and for Costs and Attorneys Fees is the true and correct billing information related to Plaintiff's efforts to gain remand of this case.

 7. The fees incurred were reasonable and necessary. On June 6, 2006, I contacted counsel for the Defendants to request that Defendants withdraw the Notice of Removal. In that e-mail correspondence, I specifically advised counsel of the voluntary-involuntary rule, and directed them to Note 490 in the annotations related to 28 U.S.C.A. § 1446, and to Headnote 39 in the West Digest [Removal of Cases]. Both of those notes contain numerous cases which discuss the applicable principles. I also alerted counsel to Judge Smalkin's opinion in <u>Pulse One Communications, Inc. v. Bell Atlantic Mobile Systems, Inc.</u>, 760 F. Supp. 82, 84 (D. Md. 1991).

2

8. On June 9, 2008, counsel for Defendants advised that they had reviewed the cited authority, but would not agree to withdraw the Notice of Removal.

9. As a result, we had to prepare the Motion for Remand. In addition to the preliminary research I did on June 6th, Mr. Pignatelli and I performed additional research for fact-specific cases and analyses of the voluntary-involuntary rule and the issue of fraudulent joinder. In drafting the Motion, we also examined and described in detail Defendants' Dismissal/Summary Judgment Motion and the Superior Court's Dismissal/Summary Judgment Order. This was necessary – in anticipation of a potential fraudulent joinder argument by Defendants – to demonstrate the fragile basis of the "dismissal" of Parsons' claims.

10. The hourly rates charged were appropriate based on Mr. Pignatelli's and my experience, and consistent with similar rates charged by attorneys of similar experience, which I have reviewed in other cases, in the context of requests for attorneys fees.

11. In 2003 and in 2007, respectively, the Circuit Courts for Baltimore County and Montgomery County both found the rates charged by CMTK to be reasonable and commensurate with the experience of CMTK's attorneys. In Gimbel v. Estate of Howard L. Chertkof, No. 02-013408 (Circuit Court, Baltimore County, Maryland, Nov. 2003), Judge John F. Fader II commented that while "there is often a difference between what an attorney can charge to the client it represents as opposed to what it is able to fee-shift to another party,""[i]n this case I believe the fee-shift is reasonable and in accord with what attorneys of the competence and experience of Cooter-Mangold would charge." Memorandum and Judgment at 9-10. At the time of Judge Fader's ruling, my hourly rate was $450.

12. More recently, on January 18, 2007, in Farid Ghadry, et al. v. Samar Ghadry, et al.,

3

22314-V (Circuit Court, Montgomery County, Maryland), Judge DeLawrence Beard ruled on a

motion to require the opposing party to pay our attorneys' fees as a result of bad faith litigation.

Citing Rule 1.5 of the Maryland Rules of Professional Conduct (listing eight factors should be

considered in calculating the reasonableness of a fee), Judge Beard was satisfied that the hourly

rates charged by the individuals attorneys of CMTK were reasonable.  Specifically, he found that

my $475.00 hourly rate at the time was reasonable, as well as the $225.00 hourly rate for Mr.

Pignatelli.

13.  The current hourly rates reflected on the CMTK billing statements are as follows: my

rate is $490.00; Mr. Pignatelli's rate is $260.00.

Executed under the penalty of perjury of the District of Columbia on the 26th day of June,

2008.

Donna S. Mangold