### UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INDEPENDENCE FEDERAL<br>  SAVINGS BANK, <u>et</u> <u>al.</u>, | ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | C.A. No. 1:08-CV-00963 |
| 1225 CONNECTICUT CO. L.L.C.,<br>  <u>et</u> <u>al.</u>, | ) ) ) ) | |
| Defendants. | ) ) ) | |

### PLAINTIFFS' REPLY TO DEFENDANTS'
### OPPOSITION TO MOTION FOR REMAND

Plaintiffs Independence Federal Savings Bank ("IFSB") and Stanley W. Parsons

("Parsons"), by and through their undersigned counsel, hereby submit this Reply to Defendants'

Motion for Remand and state as follows:

### INTRODUCTION

Defendants cannot meet their burden to establish federal jurisdiction.  <u>See</u> Order (1/7/08)

at 2-3 ("Remand Order"), and cases cited therein.  Defendants continue to claim fraudulent

joinder of Parsons, which carries a "heavy burden for Defendants because the Court resolves all

issues of fact and law in favor of Plaintiffs."  <u>Lewis v. Armstrong Steel Erectors, Inc.</u>, 992 F.

Supp. 842, 844 (S.D. W.Va. 1998) (cited by Defendants and discussed below).  <u>Accord</u> <u>Poulos v.</u>

<u>Naas Foods, Inc.</u>, 959 F.2d 69, 73 (7th Cir. 1992).  This Court already rejected Defendants'

argument that Plaintiff Parsons was fraudulently joined in its Remand Order, finding that:

"defendants have not shown that all of Parsons' claims present "no possibility of a right to relief"

and are instead "wholly nonsensical."  Nevertheless, Defendants devote nearly their entire

Opposition to rearguing that point.  Under <u>Pulse One Communications, Inc. v. Bell Atlantic Mobile Systems, Inc.</u>, 760 F. Supp. 82, 84 (D. Md. 1991), and the many other cases cited by Plaintiffs in their Motion, and referred to by this Court, it is clear that fraudulent joinder simply does not apply in this case.

In their Opposition to Plaintiffs' Motion for Remand, Defendants now argue that, because they believe that Parsons has been dismissed from this case, this Court should reconsider its previous finding that Parsons was not fraudulently joined.  As explained in Plaintiffs' present Motion, however, the Superior Court's Dismissal/Summary Judgment Order (issued on 6/26/08), requires further clarification.  In addition, the cases cited by Defendants all contain specific procedural and factual circumstances that are distinguishable from this case. They also employ no fewer than three competing standards, which all ask essentially the same question - whether Parsons' claims are "wholly nonsensical" - and all of which Parsons' claims pass.

Regarding Parsons' negligence claim (Count V) - which Defendants have never requested be dismissed - and nuisance claim (Count IV), Defendants also argue, for the first time, that:

> Parsons' other claims of nuisance [Count IV] and negligence [Count V] are merely derivative of his contract and covenant claims and were properly dismissed because each is an "impermissible recharacterization of the breach of contract claim," just as the negligence claim was in <u>Fort Lincoln [Civic Assoc. v. Fort Lincoln New Town Corp.</u>, 944 A.2d 1055, 1064 (D.C. 2008)].

Opposition to Motion for Remand at 14.  Defendants are entirely wrong that Parsons cannot claim injuries caused by the Defendants' nuisance and negligence, independently from the contractual claims.  Most fundamentally, the claims in Counts IV and V *against Davis* are

clearly not contractual. Their discussion of <u>Fort Lincoln</u> overlooks the unique facts in that case

that make its holding inapplicable here. Accordingly, this case should be remanded to the courts

of the District of Columbia.

## I.    THIS COURT SHOULD NOT RECONSIDER ITS FINDING THAT PARSONS WAS NOT FRAUDULENTLY JOINED

As anticipated by Plaintiffs in their present Motion for Remand, Defendants again argue

in their Opposition that Parsons was fraudulently joined.[1]  This Court, however, already found

that Parsons was not fraudulently joined and need not revisit that finding.  The cases cited by

Defendants in support of their continued fraudulent joinder argument contain situations that are

substantively different from the present case.  Even applying the standards in those cases,

however, it is clear that Parsons was not fraudulently joined.

### A.    Under The "Reasonable Possibility Of Reversal" Standard, This Case Should Be Remanded

It is reasonably possible that the Dismissal/Summary Judgment Order will be revised by

the Superior Court or reversed by the District of Columbia Court of Appeals.  It is internally

---

[1] Defendants also attempt to create confusion over whether the voluntary-involuntary rule exists. They cite <u>Higgins v. E.I. DuPont de Nemours</u>, 863 F. 2d 1162 (4th Cir. 1988), because the Court merely acknowledges that there is "disagreement" over whether the rule survived a 1949 amendment to 28 U.S.C. Section 1446.  <u>Higgins</u>, however, also states that "the trend appears to retain the distinction." <u>Id</u>. at 1166.  As presented in Plaintiffs' present Motion at pages 14-15, it is unclear that there is any current disagreement that the distinction survived. It has been consistently employed, including the cases cited by Defendants.  In <u>Platt v. Illinois Centrail Rwy. Co.</u>, 305 F.2d 136 (5th Cir. 1962), which Defendants claim is an example of the disagreement over whether the voluntary-involuntary rule currently exists, the Court did not even mention the rule.  Instead, the Court merely combined the motion to dismiss and fraudulent joinder standards, but *remanded* the case.  As discussed below, the <u>Platt</u> opinion is over forty-five years old and nothing more than anomaly in fraudulent joinder jurisprudence.  Defendants do not point to any cases that expressly reject the voluntary-involuntary rule.

inconsistent in its use of plural references after the statement that Parsons is dismissed as a party. It fails to even discuss Parsons' nuisance or negligence claims at all, and states that summary judgment is *denied* for those counts without mentioning Parsons or IFSB one way or the other. It does not discuss the substantive law that prevents Parsons from moving forward on Counts IV (nuisance) and V (negligence). Importantly, Defendants' Dismissal/Summary Judgment Motion does not even request the dismissal of Count V as to Parsons or IFSB.

Several cases cited by Defendants apply the "reasonable possibility of reversal" standard in considering whether to remand based on the voluntary-involuntary rule. Each of the cases is factually distinguishable because they relate to dismissals based on the defense of sovereign immunity. In Lewis v. Armstrong Steel Erectors, Inc., 992 F. Supp. 842, 846 (S.D. W.Va. 1998), the state court dismissed a state agency defendant on sovereign immunity grounds. The remanding defendants removed, and Plaintiffs moved for remand under the voluntary-involuntary rule. Id. The District Court asked, "'whether there is any reasonable possibility that the judgment of the circuit court ... will be reversed on appeal.'" Id. at 844 (quoting Arthur v. E.I. duPont, 798 F. Supp. 367, 370 (S.D. W.Va. 1992)). The Court first found that reversal was unlikely because reviews of West Virginia state court decisions were conducted by the West Virginia Supreme Court of Appeals by petition only, and that few petitions were even accepted for review in previous years. Id. at 844. The Court then found that the West Virginia state court "specifically addressed each of Plaintiffs' arguments." Id. at 845. In rejecting one of the plaintiffs' arguments, "the state court canvassed West Virginia statutory and case law." Id. The state court also "specifically rejected" plaintiffs' other argument and the District Court found that plaintiffs cited "no statutory or case law." Id. at 846. The District Court found that there

was no reasonable possibility of an appellate reversal.  Id.

In the present case, by contrast, there is an automatic right of review in the District of

Columbia Court of Appeals.  The Superior Court's Dismissal/Summary Judgment Order did not

given specific consideration to Parsons' nuisance and negligence claims.  In fact, the Superior

Court did not differentiate between IFSB and Parsons as to Counts III, IV or V.  See Motion for

Remand (6/26/08) at 8-9 (discussion of the use of plural, "Plaintiffs," in Superior Court's

opinion, and lack of reference to IFSB or Parsons, one way or the other).  Even Defendants, at

page 3 footnote 2 of their Opposition, recognize this lack of specific consideration of Parsons'

Count III-V claims ("... Mr. Parsons was not mentioned by Judge Clark in that portion of her

opinion addressing Counts III-V ... .").[2]  Instead, the Dismissal/Summary Judgment Order

merely stated that Parsons was dismissed as a party, without any findings on Counts III, IV or V.

There was no discussion of District of Columbia case law related to Parsons' claims under

Counts III, IV and V.[3]  Moreover, Defendants did not even request dismissal of Parsons'

---

[2] Footnote 2 of Defendants' Opposition completely misses the point of Lewis.  In Lewis, the thorough discussion by the state court of the factual and legal landscapes underlying the plaintiffs' claims influenced the District Court's finding that there was no reasonable likelihood of reversal.  In this case, the Superior Court's opinion totally lacks discussion of the factual or legal background of Counts III-V.  It denies summary judgment on those claims without mentioning Parsons one way or the other.  There is hardly "at most, a misplaced apostrophe," as Defendants argue.  The Superior Court consistently uses the plural, "Plaintiffs," or makes no reference to any plaintiff, in discussing Counts III-V.  Thus, there was no "specific rejection" of Parsons' theories as there was in Lewis.

[3] The only case cited under the headings addressing Counts III-V is a Maryland case, which the Superior Court found limited nuisance actions to "substantial and unreasonable" interference.  The Superior Court then cited to Paragraph 72 of Plaintiffs' Complaint, which lists, (a) through (h), some of the specific interference caused by the Repositioning Project.  The Superior Court then denied summary judgment as to Count IV of the Complaint, without mentioning IFSB or Parsons specifically.

negligence claim (Count V) in their Dismissal/Summary Judgment Motion.[4]  Accordingly, <u>Lewis</u>

is distinguishable from this case.

In <u>Wiacek v. Equitable Live Assur. Soc. of the U.S.</u>, 795 F. Supp. 223, 224 (E.D. Mich.

1992), a slip-and-fall plaintiff sued the owners of the property on which he fell, as well as the

non-diverse City of Westland, whose paramedics responded to the fall.  The City's motion to

dismiss was granted by the state court on the basis of sovereign immunity.  <u>Id</u>.  Following the

dismissal of the City, the remaining defendants, who were diverse, removed the case.  <u>Id</u>.

Plaintiffs moved to remand based on the voluntary-involuntary rule.  <u>Id</u>. at 225.  The Court

considered the motion for remand under the "reasonable possibility of reversal" standard, and

refused to remand, holding:

> The sore lack of legal foundation for the claim against the City and the virtually non-
> existent factual basis for the claim [footnote omitted] lead the Court to the conclusion
> that the City was frivolously and fraudulently joined to defeat diversity jurisdiction.
> Plaintiff's failure to appeal the state court's order of partial dismissal further supports the
> Court's finding of fraudulent joinder.

<u>Id</u>. at 226-227.  The Court noted that: "Exhibits submitted by defendants indicate that the City of

Westland paramedics arrived on the scene of the accident in approximately four minutes."  <u>Id</u>. at

226 n. 4.

In the present case, Plaintiffs have supplied District of Columbia case law in support of

their claims in their prior Motion to Remand (11/26/07, Docket No. 3) and prior Reply to

---

[4] Defendants argued that Plaintiffs named the wrong party - Davis Construction Services ("DCS") as opposed to James G. Davis Construction ("Davis") - in support of its motion to dismiss each count.  The Superior Court rejected this argument and directed Plaintiffs to resubmit its motion for leave to amend the Complaint, adding Davis as an additional defendant and removing Parsons as a plaintiff.

Defendants' Opposition to Motion to Remand (12/17/07, Docket No. 8) (Case Number 1:07-CV-02090 JDB).  See Wilson v. Hart, 829 A.2d 511 (D.C. 2003) ("In the absence of any clear factual determination as the precise status of appellants' occupancy of the property, we do not address that issue here nor the issue whether a wrongful eviction or breach of quiet enjoyment action may lie even if appellants' occupancy constituted something less than some sort of tenancy"); Souci v. William C. Smith & Co., 763 A.2d 96 (D.C. 2000) (recognizing that, notwithstanding lack of contractual privity, property manager of co-operative building has common law duty of care to tenants and occupants in performance of repairs and also recognizing duty of property manager to exercise due care when "it engages in activities affecting [tenant/occupant's] enjoyment of his tenancy"); Bostic v. Henkels and McCoy, Inc., 748 A.3d 421 (D.C. 2000) (contractor owes common law duty of care to those lawfully present near construction site); Fields v. Tillerson, 726 A.2d 670 (D.C. 1999) (third-party beneficiary causes of action are recognized in the District of Columbia); Merrell Dow Pharmaceuticals, Inc. v. Oxendine, 593 A.2d 1023 (D.C. 1991) (allowing concurrent claims of breach of implied and express covenants); Anderson v. Washington Metropolitan Area Transit Authority, 1991 WL 197024 (D.D.C. 1991) (recognizing claim for nuisance and negligence by person residing across from construction project against contractor performing work); Holloway v. Bristol-Meyers Corp., 327 F. Supp. 17, 24 (D.D.C. 1971), aff'd, 158 U.S. App. D.C. 20, 485 F.2d 986 (D.C. Cir. 1973) (nuisance claim based on false advertising).  Plaintiffs have also supplied facts to support Parsons' claims. Specifically, Parsons is lawfully present at the premises several days per week, the Repositioning Project is causing a large number of effects inside and outside the Bank, and Parsons is incurring losses as a result of the effects of the Repositioning Project.  The effects of the Repositioning

Project and Parsons' losses are more fully described in Parsons' Answers to Interrogatories,

attached as Exhibit A.  Finally, Plaintiffs could not have appealed the Superior Court's

Dismissal/Summary Judgment Order because it did not explicitly state that it was a final order

pursuant to Sup. Ct. R. Civ. P. 54(b).[5]  Accordingly, <u>Wiacek</u> is entirely different from this case.

<u>Hardy v. Ajax Magnathermic Corp.</u>, 122 F. Supp. 2d. 757 (W.D. Ky. 2000), cited by

Defendants, discusses competing tests for fraudulent joinder found in <u>Wiacek</u>, 795 F. Supp. at

224, and <u>Anderson v. Electronic Data Systems</u>, 13 F.3d 940 (6th Cir. 1994)).  In <u>Hardy</u>, a

construction worker sued several diverse companies and a non-diverse general construction

contractor - Clark Construction - for his exposure to asbestos.  <u>Id</u>. at 760.  After the grant of

Clark Construction's *unopposed* motion for summary judgment, and the filing of amended

pleadings, one of the remaining parties removed.  <u>Id</u>.  In considering whether to remand the case,

the District Court discussed <u>Wiacek</u>, but refused to adopt the "reasonable possibility of reversal"

test employed in <u>Wiacek</u> and other cases.  <u>Id</u>.  The Court held that:

> There can be no fraudulent joinder *unless it be clear that there can be no recover under the law of the state on the cause alleged or on the facts in view of the law* ... One or the other at least would be required before it could be said that there was no real intention to get a joint judgment, and that there was no colorable ground for so claiming.

<u>Id</u>. (quoting <u>Alexander</u>,13 F.3d at 949) (emphasis added).  In adopting the "reasonable basis" test

over <u>Wiacek</u>'s "reasonable possibility of reversal" test, the Court, found:

> Plaintiffs frequently file cases with a good faith belief that they have a meritorious claim. After sifting through the facts, however, it sometimes becomes apparent that the facts or law are not in their favor.  This does not, however, mean that the plaintiff necessarily

---

[5] Although Plaintiffs argued in the present Motion that an interlocutory order is not a removable event, as it is still "subject to revision," <u>see</u> Motion for Remand at 11-12, Defendants do not discuss this issue in their Opposition.

fraudulently joined the dismissed party.  Such a holding goes too far.  Instead, this Court
will apply the "reasonable basis" test of <u>Alexander</u>.

<u>Id</u>.  The Court characterized the test as, "whether there is arguably a reasonable basis for

predicting that the state law might impose liability on the facts involved.'"  <u>Id</u>. at 760 (quoting

<u>Alexander</u>, 13 F 3d at 949).  Using this "reasonable basis" standard, the Court determined that

the plaintiffs sought little discovery over a four-year period, failed to respond to a Case

Management Order to identify "when and where and how in the life of Joseph Hardy he was

exposed to asbestos," and did not object to the grant of summary judgment in favor of Clark

Construction.  <u>Id</u>.  The Court found that The Court found that, based on the "case history and

facts," Clark Construction was fraudulently joined.  <u>Id</u>. at 761.  The plaintiffs had no reasonable

basis for their claim against Clark Construction.  <u>Id</u>.  Thus, the District Court refused to remand.

This case is completely different than <u>Hardy</u>.  Discovery was ongoing when the Superior

Court issued its Dismissal/Summary Judgment Order: paper discovery was being answered;

documents were being exchanged; depositions were scheduled.  Parsons had a reasonable basis

to assert negligence and nuisance claims, given the disruptive nature of the Repositioning

Project, as explained in the Parsons' Answers to Interrogatories at 8-26 (describing the effects

inside and outside the Bank, including the server room, for which Parsons is primarily

responsible), 29-30 (detailing effects on Parsons' use and enjoyment of premises) (Exhibit A).

Moreover, Parsons has suffered injuries.  <u>See</u> Parsons' Answer to Interrogatories at 26-29

(calculating overtime hours required because of extra work caused by the effects of the

Repositioning Project; Parsons is a salaried employee).  Accordingly, under <u>Hardy</u>'s "reasonable

basis" standard, this case should be remanded.

In Insinga v. LaBella, 845 F.2d 249 (11th Cir. 1988), also cited by Defendants, the Court again confronted a sovereign immunity case but applied a "reasonable basis" test to the plaintiff's claims in determining whether there was a fraudulent joinder.  The plaintiff, an executor of the estate of his wife, sued several defendants, including the Florida Board of Medical Examiners, the hospital at which his wife was treated, and the doctor who treated his wife but who, as it turned out, was an imposter who assumed the identity of a deceased European doctor and was granted his medical license by the Board and staff privileges by the hospital.  Id. at 250.  The last remaining non-diverse defendant, the Board of Medical Examiners, won summary judgment on grounds of sovereign immunity.  Id. at 251.  The remaining diverse defendant, the hospital, removed the case to the District Court for the Southern District of Florida.  Id.  The plaintiff moved to remand based on the voluntary-involuntary rule, but the District Court denied the motion.  Id.  The Eleventh Circuit affirmed the denial of the motion for remand, holding that the dismissal of the Board on sovereign immunity grounds - which, in Florida, is a jurisdictional defense - established fraudulent joinder.  Id. at 254.  The Court found:

> Fraudulent joinder is a well established exception to the voluntary-involuntary rule.  *In order to sustain a fraudulent joinder, a state court must find either that there was no possibility that the plaintiff could prove a cause of action against the resident defendant* or that the plaintiff fraudulently pled jurisdictional facts in order to subject that resident defendant to the jurisdiction of the state court.  Coker v. Amoco Oil Co., 709 F.2d 1433, 1440 (11th Cir. 1983).  For all intents and purposes, a trial court's finding that it lacks jurisdiction over a resident defendant is akin to a finding of fraudulent joinder of that defendant in that it involves a determination by the court that the resident defendant was never properly before the court, rather than a determination that the court had jurisdiction of that defendant but that the case against him, although not frivolous, was not meritorious.

Id. (emphasis added).  Accordingly, the bar for a plaintiff's case imposed by Insinga is even lower than the "wholly nonsensical" and "reasonable basis" standards.  In the present case, there

10

has been no challenge to any of the parties on jurisdictional grounds.  This Court already

determined that Parsons' claims were not "wholly nonsensical" and that his claims were not

fraudulently joined.  There is no reason to revisit that decision.

**B.    The Other "Fraudulent Joinder" Cases, Cited By Defendants,
Are Distinguishable**

Several cases cited by Defendants contain procedural or factual differences from this case

and do not offer any factual discussion or consideration of the applicable standards.  In Platt v.

Illinois Centrail Rwy. Co., 305 F.2d 136, 139 (5th Cir. 1962), the Fifth Circuit actually ordered

the case be remanded to state court.  The wrongful death action was brought against a diverse

railroad company and its non-diverse engineer.  Id. at 137.  The railroad company removed the

case to District Court on the grounds that the Complaint "does not state a cause of action against

[the engineer] under state law ...".  Id. at 136.  The plaintiff moved for remand and the District

Court denied the motion.  Id.  On appeal, however, the Fifth Circuit remanded to state court for

consideration of whether the pleading against the non-diverse engineer was sufficient.  Id. at

139.  The Platt opinion contains general language about the consideration of the sufficiency of

pleadings:

> The insufficiency of the pleadings in a case filed in the state court constitute[s] no
> grounds for the removal of the case to a federal court.  The sufficiency of the pleadings
> must be tested in the state court where the suit is filed.  If, in this case, that test results in
> a decision of the State Court that the suit should be dismissed as to [the engineer], the
> case then becomes removable to the Federal Court ... .

Id. at 139.  This language, however, does not even consider, let alone analyze the fraudulent

joinder or voluntary-involuntary rule standards.  Platt does not consider whether the order by the

state court is final or interlocutory, or whether the claims pass the "wholly nonsensical,"

11

"reasonable basis" or "reasonable possibility of reversal" tests.  See, e.g., Kuperstein v. Hoffman-LaRoche, Inc., 457 F. Supp. 2d 467, 471 (S.D.N.Y. 2006) (in considering claims under a fraudulent joinder standard, there is "greater leniency" than under a motion to dismiss standard); Leong v. Taco Bell Corp., 991 F. Supp. 1237, 1239 (D. Or. 1998) (distinguishing standards); Pulse One, 760 F. Supp. at 84 (distinguishing between summary judgment standard and "wholly nonsensical" standard)).

The opinion in Ennis v. Queen Ins. Co. of America, 304 F. Supp 964 (W.D. Tenn. 1973), cited by Defendants, contains no discussion of the underlying dispute to allow the reader to determine the basis of the fraudulent joinder finding.  Thus, Ennis merely establishes the fraudulent joinder exception to the voluntary-involuntary rule, which is explained in much more detail in the more recent cases cited in Plaintiffs' Motion for Remand.  It is of little value in this fact-specific situation.

The Defendants also cite Preseau v. Prudential Ins. Co. of America, 591 F.2d 74 (9th Cir. 1979), but do not accurately recite its facts, which are distinguishable.  In Preseau, the plaintiff sued several insurance companies, including Prudential, as well as 10 fictitious "Doe" defendants.  Id. at 75.  By the time of the state court's pretrial conference, the plaintiff had not identified any of the non-diverse "Doe" defendants and had dismissed all the other defendants except Prudential, which was diverse.  Id.  At the pretrial conference, the state court *denied*[6] a request by Prudential that the fictitious defendants be dismissed.  Id.  On the morning of the first day of trial, however, the Court found that, "the fictitious defendants were dismissed."  Id.  The

---

[6] Defendants in this case incorrectly state that the fictitious defendants in Preseau were "involuntarily dismissed by the state court at a pretrial conference."

<u>Preseau</u> opinion does not explicitly state that the dismissal was voluntary but, given the prior denial of Prudential's request to dismiss the "Doe" defendants, it appears that the plaintiff *voluntarily* dismissed the non-diverse Doe defendants.  After the dismissal, Prudential requested a recess, during which it filed a petition for removal to Federal District Court.  <u>Id</u>.  The plaintiff filed a motion for remand, which was denied.  <u>Id</u>. at 76.  The District Court ultimately granted summary judgment in favor of Prudential.  <u>Id</u>.  The plaintiff appealed both the denial of the motion for remand and the grant of summary judgment.  <u>Id</u>.  The Ninth Circuit discussed the timeliness of Prudential's removal, but *not whether the removal was proper under the voluntary-involuntary rule*.  <u>Id</u>. at 76-79.  Accordingly, <u>Preseau</u> is distinguishable from the present case because the voluntary-involuntary rule and the competing fraudulent joinder standards were not even applied.  In addition, the case involved fictitious parties as opposed to this case, in which the non-diverse partes are all named.

In <u>Crockett v. R.J. Reynolds Tobacco Co.</u>, 436 F.3d 529 (5th Cir. 2006), the plaintiff initiated a wrongful death action against the decedent's doctors for malpractice (for failure to diagnose cancer) and against several tobacco companies for product liability.  The tobacco company defendants initially removed the action, claiming fraudulent joinder of the defendant doctors.  <u>Id</u>. at 531.  The District Court rejected the fraudulent joinder argument and remanded.  <u>Id</u>.  On remand, the tobacco company defendants successfully severed the action against the doctors from the action against them.  <u>Id</u>.  The state court found that "'the medical negligence and malpractice claim and the burden of proof to sustain [that] claim is totally different [from] the burden of proof ... necessary to secure judgment for product liability.'"  <u>Id</u>. at 533.  The tobacco defendants again removed their severed action to Federal Court, and filed a motion for

judgment on the pleadings.  Id.  The plaintiff moved for remand on the basis of the voluntary-

involuntary rule.  Id.  The District Court, however, granted judgment on the pleadings for the

tobacco defendants, without considering the motion for remand.  Id.  The Fifth Circuit affirmed,

finding that, "an unappealed severance, by a state court, of claims against improperly joined

defendants is not subject to the voluntary-involuntary rule."  Id. at 533 (footnote omitted).  Thus,

Crockett does not apply to the present case.  Defendants are merely arguing that Parsons' claims

were dismissed by the Superior Court, not severed, and because the Superior Court's Order was

interlocutory, Plaintiffs cannot appeal from it.

## II.    THE SPECIFIC FACTUAL SITUATION IN *FORT LINCOLN*
##        DOES NOT APPLY TO THIS CASE

As argued in Plaintiff's Motion for Remand, Fort Lincoln, 944 A.2d 1055, is

distinguishable.[7]  The finding on the incidental beneficiary issue in Fort Lincoln was based on

the specific factual situation, involving a government contract, and the principle that a member

of the public generally cannot sue to enforce a government contract.  Id. at 1064.

**Parsons' Nuisance And Negligence Claims Are Independent Of His Contractual**

**Claims.**  Despite Defendants' argument that the nuisance and negligence claims are

"impermissible recharacterizations of the breach of contract claim, Parsons and IFSB alleged

distinct claims in Counts III, IV and V.[8]  The breach of contract claim *by IFSB against 1225*,

_____

[7] The Superior Court referred to Fort Lincoln only in dismissing Count II.  The Superior Court did not refer to Fort Lincoln in discussing Counts III-V.  In addition, Defendants have never before argued that Fort Lincoln also bars Counts IV and V.

[8] One need only look to the cases cited by Fort Lincoln, 944 A.2d at 1070, to find a discussion of the limits of multiple claims.  See District of Columbia v. Chinn, 839 A.2d 701, 707 (D.C. 2003) (distinguishing standards for assault and batter versus negligence, in action

requires a showing that a specific contractual provision is being or has been violated by 1225's actions or the actions of an agent. Specifically, the various violations of the visibility, access and use and enjoyment requirements *of the Lease* are being contested in the breach of contract count. The nuisance claim *by IFSB and Parsons against Davis and 1225*, and negligence claim, *by IFSB and Parsons against Davis*, have entirely different legal standards and underlying facts. By way of example only, the leaks, dust, dirt, debris, and air quality issues are being asserted as breaches of the applicable duties owed to IFSB and Parsons. Moreover, there is no breach of contract claim against Davis, nor could there be. Davis is not a party to the lease. Accordingly, the tort claims against Davis and 1225 are not "recharacterizations of the breach of contract claim[s]" against 1225.

In addition, the Superior Court did not consider Counts III-V, nor did it distinguish between IFSB and Parsons in denying summary judgment on those claims. Parsons has alleged the required elements for these claims, <u>see</u> <u>generally</u> Complaint at 27-29 (Paras. 70-80); Parsons' Answers to Interrogatories (Exhibit A), and, thus, there is a reasonable possibility that any dismissal of Parsons' claims will be reversed.

In <u>Fort Lincoln</u>, summary judgment was initially denied prior to the close of discovery. <u>Id</u>. at 1069. Only after discovery closed was the Court able to find that "'plaintiffs have failed to demonstrate that their multiple claims are independent of the dismissed breach of contract claim.'" <u>Id</u>. (quoting Superior Court, no citation provided). The Court held:

---

relating to alleged police brutality during arrest) ("'In other words, a plaintiff cannot seek to recover by 'dressing up the substance of one claim,' here assault, in the 'garments' of another, here negligence'" (quoting <u>Sabir v. District of Columbia</u>, 755 A.2d 449, 452 (D.C. 2000)).

> Here, the record shows that appellants' breach of trust (count 2), conversion/
> misappropriation (count 3), breach of fiduciary duty/fraud/non-disclosure (count 4), and
> negligence (alternative count 7) claims all are based on Article VII of the LDA, and
> specifically §§ 7.5(b) and 7.8, as was their breach of contract claim.  In addition, the
> negligence claim is dependent upon the breach of fiduciary duty claim.

Id. at 1070.  In this case, by contrast, Parsons did not refer to any Lease provisions in alleging his

tort claims of nuisance (Count IV) and negligence (Count V).  See Complaint at 27-29.  They are

based on the independent actions by Davis and the effects inside the premises.  Accordingly,

Fort Lincoln does not apply to this case.

**No Government Contract Is At Issue.**  The Fort Lincoln Court considered the specific

circumstance of members of the public suing to enforce a government contract.  In this case,

however, Parsons' claim of breach of contract as a third-party beneficiary (Count II) is a private

contract.  The presumptions associated with government contracts as opposed to private are

wholly different.  The Fort Lincoln Court discussed those presumptions, finding "third party

beneficiaries of a Government contract are generally assumed to be merely *incidental*

beneficiaries ... ."  Id. at 1065 (quoting Moore v. Gaither, 767 A.2d 278 (D.C. 2001) (internal

quotes removed) (italics in original).  The Court also found this presumption in the Restatement

(Second) of Contracts Section 313, comment (a).  Defendants have cited no case law to apply

this presumption in this private contract case.  As described below, the Lease contains several

provisions that were intended to benefit IFSB's customers and employees, as opposed to the

Bank itself.

**The Lease Provisions Grant Benefits To Parsons.**  A corporate tenant can only enjoy

the benefits of its lease through its employees.  In Count II, the only count explicitly dismissed

by the Superior Court, Parsons claims breach of contract as a third-party beneficiary.

16

Defendants argue at length about the intent of the parties in negotiating and drafting the lease

agreements at issue in this case, and about the timing of Parsons' employment.  As

acknowledged by <u>Fort Lincoln</u>, "intent may be 'adduced' if it 'is not expressly stated in the

contract ... .'"  944 A.2d at 1066-1067.  The Complaint, however, alleged that: "the parties

thereto knew that a Bank would be operated at the Premises and that the Bank would have

employees and customers and intended that those employees and customers would benefit from

the covenants of quiet enjoyment set forth in, *inter alia*, Sections 16.02 and 20.01 of the Lease."

Complaint at ¶62.  The provisions violated by the Repositioning Project include:

- reference to the use of the premises to "operat[e] a savings bank;"

- "water for lavatory and drinking and office cleaning purposes;"

- "hot and chilled water for heating and cooling;"

- rules and regulations that are "universally applied to and enforced against the tenants of the Building;" and

- indemnity for the tenant for the landlord's "wilful misconduct or gross negligence."

<u>See</u> Parsons' Answers to Interrogatories at 34.  The Superior Court's Dismissal/Summary

Judgment Order, however, does not specifically discuss any of these provisions, or <u>Fort Lincoln</u>

in the context of determining intent.  Accordingly, even though Count II was dismissed, there

remains a "reasonable possibility of reversal."

Defendants also note that this Court did not previously make any findings regarding

whether, in the District of Columbia, "employees of commercial tenants have a cause of action

as a third party beneficiary."  The inquiries about the lease provisions and the rights of

commercial tenants as third-party beneficiaries are inherently factual, and are clearly left for the

*courts* of the District of Columbia.  <u>See</u> Motion for Remand at page 13 note 14.

## III.   <u>FEES AND COSTS SHOULD BE AWARDED</u>

Because it is readily apparent that this case is not removable under any of the standards

supplied by Defendants, costs and fees incurred by Plaintiffs in seeking remand should be

imposed.  The present removal contravenes the "well-settled" voluntary-involuntary rule and

lacks a "reasonable basis" because of the unclear and interlocutory nature of the Superior Court's

Dismissal/Summary Judgment Order, as well as the valid legal and factual bases for the claims

asserted.  <u>Martin v. Franklin Capital Corp.</u>, 546 U.S. 132, 141 (2005) (when a defendant lacks an

"objectively reasonable basis" for removal, attorney's fees and costs may be awarded);

<u>Kuperstein</u>, 457 F. Supp. 2d at 472 (finding that an award "does not require a finding of bad faith

or frivolity," only the lack of a "reasonable basis" for removal); <u>Yazdani v. Access ATM</u>, 457 F.

Supp. 2d 36, 37-38 (D.D.C. 2006) ("Yazdani I") ("well settled" law prevented untimely

removal); <u>Simpson v. Union Pacific R. Co.</u>, 282 F. Supp. 2d 1151, 1161 (N.D.Cal. 2003) ("The

court need not find the motion rises to the level of sanctionable conduct under Rule 11 to assess

attorney's fees and costs under section 1447(c)"); <u>Johnson-Brown v. 2200 M Street LLC</u>, 275 F.

Supp. 2d 175, 181 (D.D.C. 2003) ("... if non-removability is obvious or contrary to well-settled

law, courts regularly impose costs and expenses incurred as a result of removal") (the Court also

found that "... defendants fail to point to any lower court decision supporting their argument

presumably because every court that has addressed the issue has held that LLCs do not qualify

for corporate citizenship"); <u>Leong</u>, 991 F. Supp. at 1239 (after remanding a second time, the

court would have considered awarding attorney's fees had plaintiff "provided the court with the

expenses incurred"); <u>Pulse One</u>, 760 F. Supp. at 84-85 (awarding costs even though Rule 11

sanctions were not appropriate because "the removal notice was not filed without any arguable basis").

In this case, given this Court's previous rejection of Defendants' fraudulent joinder argument, in addition to the wealth of precedent establishing the voluntary-involuntary rule, and the strength of Plaintiffs' case (both factually and legally) for remand, it is clear that Defendants lacked of an objectively reasonable basis for removal.  Plaintiffs already incurred $8,162.00 due to the drafting and filing of the Motion for Remand and, now, an additional $6,412.00 in legal fees due to the drafting and filing of this Reply:

| Date | Attorney | Description | Hours | Rate | Total |
|------|----------|-------------|-------|------|-------|
| 7/16/08 | Adam Pignatelli | Draft Reply to Opposition to Motion for Remand | 2.2 | 260.00 | 572.00 |
| 7/17/08 | Adam Pignatelli | Legal research; draft Reply | 6.5 | 260.00 | 1,690.00 |
| 7/18/08 | Adam Pignatelli | Legal research; draft Reply | 6.0 | 260.00 | 1,560.00 |
| 7/21/08 | Adam Pignatelli | Legal research; draft Reply; office conference with Donna Mangold | 7.7 | 260.00 | 2,002.00 |
| 7/21/08 | Donna Mangold | Revise Reply; office conference with Adam Pignatelli | 1.2 | 490.00 | 588.00 |
| | | **TOTAL** | **23.6** | | **6,412.00** |

The fees charged are those actually charged to Plaintiffs in this case.  Supplemental Declaration of Donna S. Mangold at ¶6 ("Supp. Mangold Decl."), attached as Exhibit B.  See Yazdani v. Access ATM, 474 F. Supp. 2d 134 (D.D.C. 2007) ("Yazdani II") (awarding attorneys' fees at actual hourly rate charged to the client).  The fees charged are reasonable and necessary under the circumstances.  Supp. Mangold Decl. at ¶6.  Thus, Plaintiffs request reimbursement of $14,574.00 in legal fees.

## CONCLUSION

For the foregoing reasons, the Plaintiffs respectfully request the Court remand this case back to the District of Columbia Superior Court, and award Plaintiffs their costs and attorneys' fees incurred as a result of the Defendants' second removal to this Court.

Respectfully submitted,

COOTER, MANGOLD, TOMPERT
& KARAS, L.L.P.

_____/s/_____
Dale A. Cooter, Bar #227454
Donna S. Mangold, Bar #358851
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C.  20015
(202) 537-0700
efiling@cootermangold.com

**_Attorneys for Plaintiffs_**
**_Independence Federal Savings Bank_**
**_and Stanley W. Parsons_**

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 21th day of July, 2008, a copy of the foregoing

**PLAINTIFFS' REPLY TO DEFENDANTS' OPPOSITION TO MOTION FOR REMAND**

was served through the Court's ECF system on:


Richard W. Luchs, Esq.
William C. Casano, Esq.
Greenstein Delorme & Luchs, PC
1620 L Street, N.W.
Suite 900
Washington, DC  20036-5605



_____/s/_____
Dale A. Cooter

**EXHIBIT A**

SUPERIOR COURT OF THE DISTRICT OF COLUMBIA
CIVIL DIVISION

| | |
|---|---|
| INDEPENDENCE FEDERAL SAVINGS BANK, )<br> *et al.,*                                    )<br>                                          )<br>         **Plaintiffs,**                  )<br>                                          )<br>         **v.**                           )<br>                                          )<br> 1225 CONNECTICUT CO., LLC,               )<br> *et al.,*                                )<br>                                          )<br>         **Defendants.**                  )<br>  ─────────────────────────────────────── ) | C.A. No.: 0007075-07<br>Judge: Jeanette J. Clark<br>Next Event:<br>    Proponent's Rule<br>    26(b)(4) Statement<br>    June 13, 2008 |

**PLAINTIFF STANLEY W. PARSONS'S ANSWERS
TO DEFENDANTS 1225 CONNECTICUT CO., LLCS'
<u>FIRST SET OF INTERROGATORIES</u>**

Plaintiff Stanley W. Parsons ("Parsons"), by and through undersigned counsel, hereby answers Defendants' First Set of Interrogatories as follows:

<u>GENERAL OBJECTIONS</u>

A.  Plaintiff objects to the Interrogatories to the extent that they seek to impose obligations greater than or in conflict with those established by the Rule of the Superior Court of the District of Columbia.

B.  Plaintiff objects to each definition, instruction and request to the extent that it seeks confidential bank or customer information protected by Federal laws and regulations, including but not limited to the Right to Financial Privacy Act, 35 U.S.C. § 3401, <u>et</u> <u>seq</u>.

C.  Plaintiff objects to the Interrogatories to the extent

that they seek information outside the scope of the knowledge of Plaintiff.

D.  Plaintiff objects to the Interrogatories to the extent that they seek information protected by the attorney-client privilege, the attorney work product doctrine, or any other applicable privilege or immunity, including but not limited to the Privacy Act of 1974, 5 U.S.C. §552a.

E.  Plaintiff objects to the Interrogatories to the extent that the answers may be ascertained from documents to be produced in discovery.

F.  Plaintiff objects to the Interrogatories to the extent that the answers contain no temporal restriction.

G.  Plaintiff's objections stated above are hereby incorporated by reference to each Interrogatory, instruction and definition, and are not necessarily repeated as objections to each definition, instruction, and request to which they are applicable.  In addition to these general objections, Plaintiff asserts the specific objections set forth below.  By stating specific objections, Plaintiff does not waive any of the objections stated above.

## **INTERROGATORIES**

**INTERROGATORY NO. 1:**  Identify each person who has personal knowledge of any fact, allegation, and/or claim asserted by you in the Complaint, and for each such person, state the facts and subject matter which each person identified possesses.

**ANSWER TO INTERROGATORY NO. 1:**

3

| | |
|---|---|
| Morton A. Bender<br>Director, Board of<br>Directors<br>IFSB | Mr. Bender has knowledge of all aspects of this case, including the ongoing repositioning project, the effects on the Bank and the damages to the Bank. |
| Stanley Parsons<br>Vice-President and<br>Chief Information<br>Officer<br>IFSB | Mr. Parsons has knowledge of all aspects of this case, including the ongoing repositioning project, the effects inside the Bank, including but not limited to the rodents, dust, dirt, leaks, noise and vibrations, and the damages to the Bank.  Mr. Parsons has specific knowledge about leaks that damaged some of IFSB's computers, the effects on the computers and the required replacements. |
| John A. Hall<br>President and Chief<br>Executive Officer<br>IFSB | Mr. Hall has knowledge of all aspects of this case, including the ongoing repositioning project, the effects inside the Bank, including but not limited to the rodents, dust, dirt, leaks, noise and vibrations, and the damages to the Bank. |
| Robert B. Isard<br>Vice-Chairman of Board<br>of Directors<br>IFSB | Mr. Isard has knowledge of all aspects of this case, including the ongoing repositioning project, the effects inside the Bank, including but not limited to the rodents, dust, dirt, leaks, noise and vibrations, and the damages to the Bank.<br><br>In addition, Mr. Isard has also suffered from coughing and congestion, which improved after a new air filter was installed. |
| Larry C. Alexander, Jr.<br>Security Officer/<br>Facilities Manager<br>IFSB | Mr. Alexander has knowledge of all aspects of this case, including the ongoing repositioning project, the effects inside the Bank, including but not limited to the rodents, dust, dirt, leaks, noise and vibrations, and the damages to the Bank. |

| | |
|---|---|
| Andrea Couttenye<br>IFSB | Ms. Couttenye has general knowledge about the construction and the impacts to IFSB's office space, including but not limited to the rodents, dust, dirt, leaks, noise and vibrations.<br><br>In addition, she has knowledge of the damage caused to her car by falling rocks in the garage, the estimate resulting from the damages, and her communications with defendants about the damage. |
| Sharon Chatman<br>IFSB | Ms. Chatman has general knowledge about the construction and the impacts to IFSB's office space, including but not limited to the rodents, dust, dirt, leaks, noise and vibrations. Specifically, she has knowledge of the rodents present in IFSB's offices and the irritating smell from the use of a blow torch outside the building. |
| Brenda W. Noel<br>Chief Financial Officer<br>IFSB | Ms. Noel has general knowledge about the construction and the impacts to IFSB's office space, including but not limited to the rodents, dust, dirt, leaks, noise and vibrations, and to IFSB's finances.  Specifically, has knowledge of the various leaks in the IFSB offices and her need to relocate meetings because of the leaks. |
| Nikki Christian<br>IT Security & User<br>Administrator<br>IFSB | Ms. Christian has general knowledge about the construction and the impacts to IFSB's office space, including but not limited to the rodents, dust, dirt, leaks, noise and vibrations. Specifically, she has knowledge of debris falling on her workstation and, at times, on her. |
| Wilhelma Christian<br>IFSB | Ms. Christian has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |

| Dannelle Grayson IFSB | Ms. Grayson has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |
|---|---|
| Tamiko Green IFSB | Ms. Green has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |
| Jocelyn Hart IFSB | Ms. Hart has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |
| Bethseine Hedgman IFSB | Ms. Hedgman has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |
| Darrell Holloman IFSB | Mr. Holloman has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |
| Patricia Hubbard IFSB | Ms. Hubbard has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project.  Ms. Hubbard has also suffered from coughing and congestion, which improved after a new air filter was installed. |
| Dora Ceballos Johns IFSB | Ms. Johns has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project.  In addition, Ms. Johns has knowledge of her sickness and hospital visit related to the inhalation of fumes on May 14th, as well as her absence from work for two days, as a result of her symptoms. |
| John Kelly IFSB | Mr. Kelly has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |

| Phillip Losco<br>IFSB | Mr. Losco has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |
|---|---|
| Leonora Malcolm<br>IFSB | Ms. Malcolm has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project.  In addition, Ms. Malcolm has knowledge of her sickness related to the inhalation of fumes on May 14th, which resulted in severe headaches and burning eyes, as well as her absence from work for two days, as a result of these symptoms. |
| Kevin Merrick<br>IFSB | Mr. Merrick has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project.  Mr. Merrick has suffered from headaches as a result of the effects of the construction project in the bank. |
| Maria Velazquez<br>IFSB | Ms. Velasquez has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project.  Ms. Velasquez has suffered from headaches as a result of the effects of the construction project in the bank. |
| Henry Wilson<br>IFSB | Mr. Wilson has knowledge of the rodents, dust, dirt, leaks, noise and vibrations caused by the ongoing repositioning project. |
| Leila Batties | Ms. Batties saw a mouse or mice in IFSB's conference room several times on September 13, 2007. |
| Employees of Brookfield | Employees of Brookfield have knowledge of the construction and the various complaints from IFSB about the conditions inside and outside of the IFSB offices at 1229 Connecticut Avenue. |

| Employees of 1225 Connecticut Co., LLC | Employees of 1225 Connecticut Co., LLC have knowledge of the construction and the various complaints from IFSB about the conditions inside and outside of the IFSB offices at 1229 Connecticut Avenue. |
|---|---|
| Employees of James G Davis Construction Company and/or Davis Construction Services, LLC and their subcontractors | Employees of Davis Construction and/or its subcontractors have knowledge of the construction and the various complaints from IFSB about the conditions inside and outside of the IFSB offices at 1229 Connecticut Avenue. |
| Anthony Cason Building Engineer Brookfield Properties | Mr. Cason has general knowledge of the construction and some of the impacts to IFSB's office space. |
| Kevin Park Building Engineer Brookfield Properties | Mr. Park has general knowledge of the construction and some of the impacts to IFSB's office space. |
| Karen Hunt Brookfield Properties | Ms. Hunt has knowledge of the construction and the various complaints from IFSB about the conditions inside and outside of the IFSB offices at 1229 Connecticut Avenue. |
| Mark Johnson Vice President of Operations Davis Construction (301) 881-2990 | Mr. Johnson has knowledge of various claims for reimbursement due to damage caused by falling rocks. |

**INTERROGATORY NO. 2:**  Identify all witnesses and documents supporting or related to your claims that you are a third party beneficiary under the Lease.

**ANSWER TO INTERROGATORY NO. 2:**

Pursuant to Rule 33(d) of the Superior Court Rules of Civil

Procedure, to the extent that non-privileged, responsive

documents exist and are in Parsons' possession, custody or

control, they will be produced at a mutually agreeable time and place.  Please see Answer to Interrogatory Number 1 for further information.

**INTERROGATORY NO. 3:**  Identify all documents you have referencing or discussing the Repositioning Project.

**ANSWER TO INTERROGATORY NO. 3:**

Pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, to the extent that non-privileged, non-confidential (pursuant to OTS or FDIC authority, or any federal law or regulation), responsive documents exist and are in Parsons' possession, custody or control, they will be produced at a mutually agreeable time and place.

**INTERROGATORY NO. 4:**  State all facts and identify all documents and witnesses supporting your statement in paragraph 27 of the Complaint that the adverse impact of the Repositioning Project on the Premises and its occupants is constant.

**ANSWER TO INTERROGATORY NO. 4:**

Parsons objects to Interrogatory Number 8 on the basis that it is unduly burdensome to list every specific instance relating to the adverse impacts experienced by the Bank because of the Repositioning Project.  Despite this objection, Parsons offers the following explanation of the ongoing impacts and, pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, to the extent that non-privileged, responsive documents in Parsons'

possession, custody or control, they will be produced at a mutually agreeable time and place.

Since nearly the beginning of the Repositioning Project, the Bank has been constantly surrounded by fencing, scaffolding, plywood, temporary windows and piles of debris. The Bank has been constantly disturbed by loud machinery and construction noise and vibrations. The Bank has been constantly surrounded by dirt and dust from the construction site, including dirt and dust inside its Premises and outside the building. The Bank has experienced several instances of leaking water, which has damaged Bank computers and other Bank property, and has caused mold inside IFSB's Premises. Outside the Bank, use of cutting torches on the construction site causes flying sparks and noise. The Bank has also noticed evidence of a lack of security on the construction site. Moreover, the Bank has experienced disturbances of safety, health and comfort of customers and employees. The disturbances and problems created by the Repositioning Project include, but are not limited to, the following:

(1) Lobby doors and exit doors have been locked with no after-hours access.

(2) Severe water damage at the Premises, including unsightly growths in the garage.

(3) Water leaks in the restrooms.

(4) Elevator service disruptions.

(5)  Strong gas smells in the accounting area of the Bank and through the vents.

(6)  Small rocks and debris falling from the ceiling in the garage which caused damage to the hood and windshield of an employee's car.

(7)  Small rocks and other particles have also fallen from the ceiling outside the ladies restroom and in the Accounting Department due to the ongoing hammering in the area which causes significant debris.

(8)  Large water leaks in the garage and an accumulation of construction dust from the lobby to the Bank.

(9)  Steady decline in ATM transactions coupled with street and ATM closures.

(10) Lack of hot water and low water pressure in the restroom sinks.

(11) Nail gun cartridges, with live ammunition, found in walkway into front entrance.

(12) Doors from the garage to the building left open which poses a security problem.

(13) Blocked off parking spaces, including reserved spaces.

(14) Falling wet ceiling tiles.

(15) Emergency Fire/Handicapped Exits blocked by plywood sheets at the Mortgage Department emergency door.

(16) Thick construction dust at the front doors of the Bank and the 1225 Building lobby.

(17) Faulty heating and poorly adjusted thermostats.

(18) Vibrations and dirt resulting from transfer beam work at the Bank and ongoing vibrations from machinery, loud drilling, hammering and sawing on the second floor (directly above the Bank) during normal business hours despite assurances that it would not occur during business hours.

11

(19) Rodent (mice) infestation in the Bank.

(20) Water leaks in the IFSB vestibule and lobby which have created significant safety hazards.

(21) Flooding in the main computer server room caused by overhead water flow occurred twice. This is an otherwise climate controlled space. Systems had to be shut down and essential computer equipment had to be replaced due to water damage. There is no way of determining which other equipment will fail prematurely from the same cause. The total cost of the damaged equipment and repairs already expended is over $ 30,000.00 and the costs of future damages and repairs may exceed several hundred thousand dollars.

(22) No running water whatsoever for periods of time in the restrooms at IFSB.

(23) Rear emergency exit has been blocked by plexiglass and plywood wall.

(24) Concrete, glass, dirt and other debris falling from the upper levels into the Bank's side of the plexiglass barrier.

(25) Handicapped access regularly taped off.

(26) The required evacuation of the premises due to the presence of fumes.

(27) Flooding in the Bank's vault.

(28) Staining of the Bank's carpeting in the main lobby area.

These and other disturbances are described in the Amended Complaint at paragraphs 27 through 60, whose allegations are incorporated as if fully set forth herein, and are verified. The physical conditions disrupt the Bank's professional environment and standing among its customers and potential customers.

12

Some specific examples of disturbances are set forth below:

| September 10, 2007 | Mr. Isard observed what appeared to be some form of bodily waste between the construction site's border and the Bank window, outside the first side door on N Street. |
|---|---|
| September 13, 2007 | A mouse or mice were spotted in the conference room.  Mr. Isard was meeting with Ms. Leila Batties at the time, when she said, "there's a mouse."  She pointed to a space in the corner where the exterior wall (window) and door meet under the curtains.  She saw it three or four times. |
| October 19, 2007 | A leak outside the men's restroom.  Tony (Brookfield's engineer) viewed the leak and inspected the second floor for the water source.  When he returned, he was with two Davis Construction employees.  They explained that the cause was a loose hose on a sink.<br><br>In addition, the day porter vacuumed footprints from the construction employees that were left in the Bank lobby. |
| October 25, 2007 | Ms. Christian notices debris on her workstation.  She also reports to Mr. Alexander that she has had debris fall directly on her. |
| October 27, 2007 | Continued damage to ceiling tiles. |
| October 29, 2007 | Water leaks into the IFSB server room, severely damaging computer equipment.  The leak occurred at about 7:00 a.m. and at least partially resulted because employees of R&R Mechanical, working in the building, did not have a shopvac read while working on a water line.<br><br>Mr. Parsons informs Mr. Hall of the damage done to IFSB's computers and short-term and long-term effects on the computers. |

| November 1, 2007 | At about 9:30 a.m., IFSB employees begin to notice a large amount of hammering taking place against IFSB's windows.  Ms. Hunt responded to Mr. Alexander's email and explained that it related to the plexiglass protection against the windows.  It was to be completed by early afternoon. |
|---|---|
| November 9, 2007 | Concrete, glass, dirt and other debris were falling between IFSB's windows and the plexiglass barrier.  The netting and plexiglass framing, however, were erected to prevent debris from striking and possibly breaking IFSB's windows. |
| November 14, 2007 | IFSB received a notification that on Saturday, November 17th, Saturday, December 1st and Saturday, December 8th, the 18th Street/Connecticut Avenue sidewalk would be shut to pedestrian traffic and that there would be no access to IFSB's ATM during this time.  This was a unilateral action by Brookfield and was not negotiable. |
| November 15, 2007 | IFSB received an email notice that the water would be shut down in the building and that the sidewalk would be closed, preventing access to IFSB's ATM on Saturday, November 18th. |
| November 17, 2007 | The sidewalk in front of IFSB was completely shut off and access to the ATM was blocked.  Plywood blocked off the entire entranceway to the Bank. |
| November 26, 2007 | A loud, continuous buzzing or drilling sound in the front lobby. |

| November 27, 2007 | Water streamed out of the ceiling in the Accounting Department, near the men's restroom.  Mr. Alexander placed a trash basket under the leak, but eventually added three more trash baskets to catch all the leaking water.  Because of a leak near her office, Ms. Noel needed to use Mr. Hall's office for a meeting. |
| --- | --- |
| | In addition, the construction noise was making it difficult to converse on the telephone, and for co-workers to speak to each other in the lobby. |
| November 29, 2007 | Mr. Alexander requests the construction and demolition noise - drilling and hammering - be lowered so that the Board of Directors' meeting could take place. About 30 minutes into the meeting, the noise subsided. |
| | In addition, Ms. Chatman observed construction workers using a blow torch in front of the Mortgage Department to loosen granite from the building.  She could smell smoke and another odor, and the smell irritated her nose and throat.  The sparks from the blow torch appeared to present a fire hazard and made Ms. Chatman and loan department staff nervous. |
| November 30, 2007 | The emergency exit near Mr. Alexander's desk was blocked by a plexiglass and plywood wall. Mr. Alexander immediately notified Ms. Hunt by email. |
| | The burning odor detected by Ms. Chapman on November 29th returned on November 30th.  Tony and Kevin (Brookfield's engineers) came to IFSB's offices on both the 29th and 30th.  On the 30th, Tony was able to smell the odor and Kevin committed via "walkie talkie" that he would make some calls to determine how the odor was getting into IFSB's space. |

15

| December 3, 2007 | On December 3rd, and on many other occasions throughout construction, the disabled access entrance to the bank was blocked off with "Caution" tape.<br><br>In addition, the lobby windows were completely blocked off by plywood barriers and the N Street sign was taken down. |
|---|---|
| December 5, 2007 | The emergency exit from the Accounting Department was entirely blocked by plywood barriers. |

| | |
|---|---|
| December 6, 2007 | In the morning, Mr. Alexander noticed debris on his desk, which sits abutting the glass wall on N Street.  He looked up and saw that the ceiling was apparently no longer connected to anything at the window edge and was drooping precariously.  He immediately notified the building people, Mr. Hall and Mr. Isard.  Messrs. Hall and Isard also looked in the adjoining Board Room space and observed a clear space and sky visible above the top of the glass wall.  Workmen were busily continuing demolition on scaffolding outside these spaces, hammering, cutting with saws and cutting with open torches.<br><br>Shortly after 9:00 a.m., Brookfield's engineer, "Tony," came to investigate.  Mr. Hall and Mr. Alexander accompanied Tony to the area.  Tony commented that the brace that the ceiling tiles sit on had shifted away from the ceiling and towards the glass wall.  He said that this caused that section of ceiling to drop down.  Since it was not known what caused the shift, Mr. Hall asked Tony to notify the construction crew immediately.<br><br>The property manager and other representatives from Brookfield also inspected the situation.  They stated that these occurrences were normal and that they were in the process of reattaching the ceiling and rebuilding the missing wall.  Mr. Hall inquired whether the area was safe for employees or whether he should evacuate the premises of all customers and employees immediately.  The response was that, although there appeared to be a danger that the ceiling would fall, the structural integrity of the ceiling was presumably secure.  They also explained that they did not know that their demolition would eliminate the supports for IFSB's ceiling or that there was no wall continuing above the glass partition up to the underside of the second floor slab.  They determined that the brace that holds that ceiling in place did move.  The construction company said it would reattached the brace from outside of the building and add something |

| December 7, 2007 | The drilling noise in the front lobby was extremely loud past 9:00 a.m. |
| --- | --- |
| December 8, 2007 | The entire building – including ATM, was blocked from the sidewalk on the 18th Street/Connecticut Avenue side of the building. |
| December 11, 2007 | A loud drilling sound during business hours was heard above the Board Room and Mortgage Areas.  Mr. Alexander exchanges several emails about the noise with Ms. Hunt.  Although the drilling on the lower floors and Bobcat activity was not supposed to be performed during business hours, the noise level was unbearable for a professional banking office. Mr. Hall feared that the Bobcat could fall through the floor into the bank premises and was assured that that would not happen.<br><br>The noise continued until at least 10:00 a.m. that morning. |

| December 14, 2007 | At about 1:30 p.m., the water detection in the server room sounded. Mr. Parsons and several other employees quickly attended to a leak of liquids from the second floor, putting trash cans to catch the liquids, placing plastic over exposed cabinets, removing boxes and mopping liquids on the floor. More liquid was entering the adjacent copier room and splashing on the floor. The volume of water entering the Premises was about what one would expect from a couple of garden hoses on full force, for about 15 minutes. After Brookfield contained the source - around 1:45 p.m. - dripping continued for another 30 minutes. |
|---|---|
| | When Brookfield sent people to clean up and assess the situation, Mr. Parsons asked one of them how it happened. The Brookfield employee stated that the demolition caused something to collapse or fall onto a hot water pipe and break it. |
| | After this incident, IFSB Premises lacked heat for about four hours. At least 12-15 man hours were lost while IFSB responded to this emergency. |
| | In addition, at some point in the early afternoon, there was no water in either the men's or women's restroom in IFSB's Premises. Toilets and urinals were not flushing and the sinks only trickled. |
| December 17, 2007 | At about 4:45 p.m., Ms. Couttenye observes a mouse around the ATM closet. At about 5:30 p.m., Ms. Couttenye observed the mouse come out of the closet and move towards the receptionist desk. |
| | After informing Brookfield Properties, a Steritech appointment was made for the following morning, but no employee showed up. |

| December 19, 2007 | Mr. Alexander waits for a Steritech employee from about 6:30 a.m. to about 8:00 a.m. Steritech had an appointment to show up at 7:00 a.m., but did not.<br><br>At about 2:00 p.m., Mr. Isard observed a mouse run through the Accounting Department and disappear under Mr. Alexander's desk. |
|---|---|
| January 3, 2008 | Mr. Isard observed openings from the board room, above the windows, to the outside. |
| January 4, 2008 | IFSB discovers that the drive part of the tape backup machine for the servers is broken and needs to be replaced at a cost of over $4,410. |
| January 8, 2008 | At about 4:00 p.m., Sharon Chatman saw a mouse under her desk in the Mortgage Department. |
| January 9, 2008 | At about 11:40 a.m., a fire alarm sounded in the building and IFSB evacuated for 20 minutes. The alarm was caused by a broken sprinkler head on the P-3 level due to construction work.<br><br>At about 5:15 p.m., Mr. Isard saw a small black mouse on his desk. |
| January 10, 2008 | Am employee of Steritech arrived at the Premises. He was not aware of emails about the recent rodent sightings, but inspected the Premises and laid extra glue boards and traps. He filled several small holes as well. |
| January 11, 2008 | For several days before January 11th a sign at the entrance of the garage read "Garage is Full. Monthly Parking Only." Because the construction eliminated metered street parking on N Street for a projected 18 months, IFSB needed a minimum of 10-15 spaces each day for customers and staff without monthly passes. Garage parking accommodations to IFSB were never made for its customers or its non-monthly employees. |
| January 15, 2008 | A mouse or mice are seen in the Accounting Department, near the emergency exit door. |

| January 15, 2008 | At about 8:30 a.m., Mr. Alexander discovered a water leak coming into the ATM vestibule and lobby. A previous leak in the same area occurred on January 8th. |
|---|---|
| January 16, 2008 | Increased level of construction noise. It appeared that several Bobcats and/or drilling machines were being used on the floor directly above the Premises. |
| January 24, 2008 | IFSB is informed by email that transfer beam work would be performed on January 26th and cause vibrations that may impact the Premises. Brookfield Properties requested IFSB reschedule its cleaning crew until after Saturday at 3:00 p.m., in case the vibrations caused any debris in the Premises. |
| January 24-25, 2008 | The temperature in the Premises was hot in some places in the office (about 90 degrees) and cold in other places. The thermostats were set somewhere between 75 and 80 degrees. |
| February 4, 2008 | The plywood walkway leading from the Mortgage Department emergency exit door was discovered to be positioned so as to prevent the door from opening. Another emergency exit door, from the Accounting Department, was discovered to scrape against a plexiglass barrier above the door. |
| February 5, 2008 | A large amount of thick construction dust accumulated in front of IFSB's front doors. Employees going in and out of the Premises tracked in a lot of dust into the side entrance and the hallway. The carpet looked as if it was never cleaned. Customers were also tracking the dust through the front doors. |
| February 15, 2008 | A big leak in the ceiling of the garage at approximately 11:00 a.m. |
| February 19, 2008 | Mr. Alexander discovers wet ceiling tile on his desk. |
| February 25, 2008 | Several rocks fell from the garage ceiling in the afternoon, shortly after 1:00 p.m. The rocks fell on the hood and windshield of an IFSB employee's car (Ms. Couttenye). |

| March 3, 2008 | Two of IFSB's reserved parking spaces were blocked off with cones, a large barrel covered with plastic going up to the ceiling and yellow caution tape the previous week and on March 3rd.  During this time period, there was intermittent blocking of spaces and, at times, the blocking-in of cars. |
|---|---|
| March 7, 2008 | No hot water in the restroom sinks.  The water pressure also appeared to be low. |
| March 10, 2008 | Dirt, dust and grime from the ceiling had fallen on several desks and the floor of the Accounting Department.  As the Bank's cleaners worked Friday night, the dirt accumulated over the weekend.<br><br>There were also small rocks and other particles coming down outside the ladies' restroom. |
| March 10-14, 2008 | Several times during the week, the doors from the garage into the building were left propped open, increasing the security risk to the Bank's premises and employees. |
| March 11, 2008 | The elevators servicing the Lobby and B levels were not working and access could only be gained by using stairwells and the garage ramp. |
| March 13, 2008 | A strong gas smell in the accounting department.  Mr. Alexander notified Ms. Hunt and the security guard. |
| March 17, 2008 | When entering the Premises in the morning, an IFSB employee discovered a nail gun cartridge. |
| March 25, 2008 | A large amount of dust and dirt from the construction tracked into IFSB's lobby. |
| March 26, 2008 | The elevators servicing the Lobby and B levels were not working and access could only be gained by using stairwells and the garage ramp. |

| March 27, 2008 | Ms. Couttenye was stuck in the elevator for 45 minutes, after traveling from the garage to the street level.  The doors were jammed and would not open more than 2 or 3 inches, the elevator shook each time the doors attempted to open.  A construction worker notified the landlord, and the landlord called the elevator company, who arrived.  Ms. Couttenye called Mr. Hall using her cell phone.  Messrs. Parsons and Alexander came to the lobby and observed the situation. |
|---|---|
| April 2, 2008 | Mr. Alexander attempted to leave IFSB's offices at approximately 6:30 p.m.  The new exit door, however, was locked and there was no way to get out of the building.  Mr. Alexander was informed that he had to exit via the P-1 level and through the garage exit. Many Bank employees work outside the hours of 9:00 a.m. to 5:00 p.m. and this limited access creates a problem. |
| April 15, 2008 | At approximately 1:30 p.m., a window panel fell from three or four floors above and crashed to the sidewalk outside the window on the corner of 18th and N streets. |
| May 14, 2008 | IFSB employees and customers were forced to evacuate the premises because of fumes.  One employee went by ambulance to the hospital and another employee went to the doctor with a severe headache. |
| May 28, 2008 | At 11:42 a.m., IFSB received an email from Karen Hunt that the door from the Bank that leads directly into the building lobby should not be used for the remainder of the day. |

| May 29, 2008 | A leak in the garage fell on top of Mr. Hall's vehicle.  Mr. Velasquez from the parking company notified IFSB that this was clean water and that they were working on stopping it.<br><br>In addition, as Mr. Hall returned to the office, at about 11:30 a.m., there was a mobile scaffolding unit blocking the elevator doors in the lobby, on which a construction worker was standing and performing work above. Mr. Hall was forced to duck under the scaffolding to exit the elevator but was not provided with a hard hat. |
|---|---|
| May 30, 2008 | The construction dust and dirt was being tracked into the Bank and a trail of footprints was developing in the Bank's hallway. |
| May 30, 2008 | At 3:29 p.m., IFSB received a memorandum dated May 23rd, stating that chilled water to the retail tenants would not be provided, starting at 6 p.m. on May 30th until 6 a.m. on May 31st. |
| June 5, 2008 | Water discovered in the women's restroom, including a huge water stain on the ceiling tiles.<br><br>In addition, IFSB discovered water on the floor of the walk-in vault, as well as lines of dampness along the ceiling, east wall and around the light switch.  The vault, however, was constructed to be fireproof.<br><br>Messrs. Parsons and Isard went to the basement level in the morning, to check on the IFSB storage area.  While on that level, they saw standing water on the floor under IFSB's lobby and in the area under the vault.  An apparent water stain in front of the vault was discovered but appeared to be benign. |
| June 9, 2008 | After the water stain in front of the vault dried, a large, white discoloration appeared on the carpeting of the lobby, in view of customers. |

24

For further information, please see Answer to Interrogatory Number 1.

**INTERROGATORY NO. 5:** State all facts and identify all witnesses knowledgeable of, and any document evidencing, any water leaks occurring in the Premises during the Repositioning Project and any damages resulting therefrom.

**ANSWER TO INTERROGATORY NO. 5:**

The Repositioning Project has caused severe damage to the Bank's computer room. On Monday, October 29, 2007, Parsons became aware of flooding in the computer room which had begun over the weekend. He arrived at 7:30 a.m. and, at approximately 7:50 a.m., a building engineer, Kevin Park, requested access to the server room because there had been a water problem on October 27, 2007, the previous Saturday morning. Upon entering the computer room, Messrs. Parsons and Park found puddles surrounding, under, in and on one of the three server racks and the top server in that rack. Water had also splashed onto and into the other racks which were farther from the point where the water entered. Later that day, IFSB learned that the motherboard of the top server had been destroyed. Most of the water damage was in the server room, although there was also an accumulation of water in the Accounting Department as well.

On December 14, 2007, there was additional water leakage in the computer room. On that day, Parsons heard the water alert

25

system, responded immediately, and used plastic covering, mops and other tools to divert the torrent from the computer equipment.  The amount and velocity of the water appeared as if there were a couple of garden hoses running full above the ceiling, and this continued for five to ten minutes.

As a result of the Repositioning Project, the tape drive was completely destroyed as were two servers and the flash card memory in the internet router.  The tape drive unit creates daily backup tapes of the Bank's network and the inability to back up the Bank's data is an unacceptable risk that required immediate attention.  The tape drive failed within just 22 months of service even though the expected life span is 3 to 4 years. Parsons believes that the conditions in the Bank's server room - including exposure to water, humidity, dust, vibrations, and mud from ceiling tiles that have became soaked with water and have fallen to the floor as a result of the demolition - have led to this damage.  The costs incurred to remedy this situation have already exceeded $30,000.00, and the exact damage caused by the humidity, dust, and vibrations may become evident much later in the intricate circuits and components of the Bank's network equipment.  For example, if the humidity is too high, erratic behavior or malfunction of dampened circuits may not become evident for months.

Recently, on April 9, 2008, mold was identified in the

wallpaper in the server room.  The ongoing risk of damage from flooding in this room is incalculable because it can disrupt the flow of information to IFSB's tellers and branches throughout its network.

In addition, pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, to the extent that non-privileged, responsive documents exist and are in Parsons' possession, custody or control, they will be produced at a mutually agreeable time and place.

For further information, please see Answers to Interrogatory Numbers 1, 4.


**INTERROGATORY NO. 6:**  Detail all damages you seek from Defendants and in doing so state: all facts supporting each element of your damages, how the damages were calculated, all persons with knowledge of your damages, and all documents relating to or evidencing your damages.

**ANSWER TO INTERROGATORY NO. 6:**

Parsons spent 36 extra hours at work (unreimbursed overtime) because of tasks required as a result of the Repositioning Project.  This amounts to two-thirds of the total number of hours Parsons spent on tasks he performed as a result of the Repositioning Project, which are described below:


| Date | Incident | Hours | Activity |
|------|----------|-------|----------|
| 10/29/07 | 1st flood | 5.00 | Cleanup. Check equipment |

```
10/30/07  1st flood  3.00   Work with NetEx on server with fried
                            mother board

10/31/07  1st flood  2.50   Work with NetEx on bringing up
                            repaired server

11/20/07  GL server  1.00   React to crash;  cold starts

11/21/07  GL server  0.50   Reboot server after crash

11/23/07  GL server  0.50   Reboot server after crash

11/27/07  GL server  1.00   React to crash;  cold starts

11/29/07  GL server  0.50   Reboot server after crash

12/3/07   GL server  0.75   Work with NetEx to diagnose/solve GL
                            server crashes

12/3/07   GL server  0.50   Reboot server after crash

12/3/07   GL server  0.50   Reboot server after crash

12/4/07   GL server  0.50   Reboot server after crash

12/4/07   GL server  0.50   Reboot server after crash

12/6/07   GL server  0.75   Work with NetEx to diagnose/solve GL
                            server crashes

12/7/07   GL server  0.75   Work with NetEx to diagnose/ solve GL
                            server crashes

12/7/07   BU server  0.50   Reboot server after crash

12/7/07   GL server  0.75   Install replacement memory in attempt
                            to solve crashes

12/10/07  GL server  0.50   Reboot server after crash

12/11/07  GL server  0.50   Reboot server after crash

12/11/07  GL server  0.50   Reboot server after crash

12/12/07  GL server  1.50   Ghost with NetEx to move GL to a
                            virtual server

12/14/07  2nd flood  5.00   Fight water, cleanup, test equipment
```

```
12/17/07  BU server  0.50    Reboot server after crash

12/17/07  BU server  0.75    Reboot server after crash

12/18/07  BU server  0.50    Reboot server after crash

12/19/07  BU server  0.50    Reboot server after crash

12/21/07  BU server  0.50    Reboot server after crash

12/21/07  BU server  0.50    Reboot server after crash

12/24/07  BU server  0.50    Reboot server after crash

12/24/07  BU server  0.50    Reboot server after crash

12/24/07  BU server  1.25    Scope moving BU to another server;
                             order SCSI

12/27/07  BU server  0.75    3 times Reboot server after crash

12/27/07  BU server  1.75    Ghost with NetEx to move bu to
                             another server

12/30/07  BU server  1.50    With NetEx diagnose/solve backup
                             problems on new server

12/31/07  BU server  0.50    With NetEx diagnose/solve backup
                             problems on new server

1/2/08    Tape unit  2.50    Tape drive fails. Borrow, hook up
                             NetEx loaner with NetEx

1/8/08    Tape unit  3.00    Hook up new Tape Drive with NetEx,
                             configure, test, fails

1/10/08   Tape unit  3.00    Retry hook up new Tape Drive:
                             succeeds

1/10/08   Tape unit  6.00    Cumulative hours several days
                             reconfiguring backups

2/12/08   Switch     1.00    Switch fails: diagnose: plug critical
                             units to different switch

2/19/08   Switch     1.00    Got replacement switch. Hooked up
                             with NetEx. Tested.
```

Based on Mr. Parsons' annual salary, his hourly rate (over 2,080 working hours) is $32.21 per hour.  Accordingly, his damages for 36 overtime hours (at time and a half) are $1,739.34.

In addition, damages for nuisance and breach of quiet enjoyment will be an amount to be determined at trial.

**INTERROGATORY NO. 7:**  Detail each and every incident in which you claim that your use and quiet enjoyment of your workplace was disturbed and in doing so identify all documents and witnesses supporting your claim.

**ANSWER TO INTERROGATORY NO. 7:**

Please see Answers to Interrogatory Numbers 1, 3-6.

**INTERROGATORY NO. 8:**  With respect to your claim for nuisance, do you maintain that a property right of yours has been impaired and, if so, identify or otherwise specify said property right or interest.

**ANSWER TO INTERROGATORY NO. 8:**

Parsons' private use and enjoyment of the premises has been adversely affected by the following:

a.   the physical condition of the Premises;

b.   disruption of Parsons' safety, health and comfort;

c.   creation of significant noise and vibration;

d.   creation of dirt, debris and dust inside and outside the Premises;

e.   causing the presence of vermin;

f.  failure to take proper precautions to ensure against risks to Parsons from exposure to asbestos, lead, PCB's, dust, bacteria from vermin, or mold spores;

g.  causing water damage in the Bank and subjecting the computer and other technical operations of the Bank to be at risk of malfunctioning; and

h.  interfering with the visibility of the Bank from the street and sidewalk.

The noise and vibrations have particularly affected Parsons because of the elevated location of his office, and its partial construction of glass.  The various leaks have particularly affected Parsons because several of them affected IFSB's computers and servers and Parsons is IFSB's Chief Information Officer, responsible for IFSB's computers and servers.  Pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, to the extent that non-privileged, responsive documents exist and are in Parsons' possession, custody or control, they will be produced at a mutually agreeable time and place.

**INTERROGATORY NO. 9:**  Identify each person whom you expect to call as an expert witness at trial, state the subject matter on which he is expected to testify, state the substance of the findings and opinions to which the expert is expected to testify, and a summary of the grounds for each opinion, and attach to your answers any written report made by the expert concerning those findings and opinions.

**ANSWER TO INTERROGATORY NO. 9:**

Parsons will identify expert witnesses pursuant to the Superior Court Rules, the Scheduling Order in this case and any

agreement between counsel.

**INTERROGATORY NO. 10:**  Detail all steps you have taken to lessen any impact the Repositioning Project may have had on you and identify all documents that reference such steps and all persons with knowledge of such efforts.

**ANSWER TO INTERROGATORY NO. 10:**

Parsons has promptly reported problems caused by the construction to his superiors at IFSB, and/or Brookfield.  For further information, please see Answers to Interrogatory Numbers 1, 3-8, 12.

In addition, pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, to the extent that non-privileged, responsive documents exist and are in Parsons' possession, custody or control, they will be produced at a mutually agreeable time and place.

**INTERROGATORY NO. 11:**  State all facts and identify all witnesses and documents supporting your allegation in paragraph 42 of the Complaint that the site has been disorderly and poorly maintained.

**ANSWER TO INTERROGATORY NO. 11:**

Please see Answers to Interrogatory Numbers 1, 3-8, 12.  In addition, pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, non-privileged, responsive documents in Parsons' possession, custody or control will be produced at a mutually agreeable time and place.

**INTERROGATORY NO. 12:** Detail all health risks to which you were exposed and any incidents of injuries or illnesses experienced by you as a result of the Repositioning Project, and identify all persons with knowledge of those facts and all documents evidencing any such incidents.

**ANSWER TO INTERROGATORY NO. 12:**

Parsons had many generalized concerns about health and safety, and reasonably feared the following:

- hearing loss;

- effects of dust and dirt in the air on breathing;

- asbestos contamination;

- diseases from vermin and mold;

- physical trauma from falling construction debris;

- slipping and falling on puddles of water;

- headaches;

- asthma; and

- inhalation of fumes.

On May 14th, for example, following the evacuation of the bank due to fumes, one employee was transported to the hospital by ambulance after fainting and another employee suffered from a severe headache. Both missed two days of work. On other occasions, various employees have suffered from headaches, coughing or congestion. To date, Parsons has not experienced any effects on his health that have warranted a doctor's visit.

For further information, please see Answers to Interrogatory Numbers 1, 3-6. In addition, pursuant to Rule 33(d) of the

Superior Court Rules of Civil Procedure, to the extent that non-privileged, responsive documents exist and are in Parsons' possession, custody or control, they will be produced at a mutually agreeable time and place.

**INTERROGATORY NO. 13:** State all facts and identify all witnesses and documents supporting your contention that 1225 has breached the Lease.

**ANSWER TO INTERROGATORY NO. 13:**

Please see Answers to Interrogatory Numbers 1-8, 10-12. In addition, pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, to the extent that non-privileged, responsive documents exist and are in Parsons' possession, custody or control, they will be produced at a mutually agreeable time and place.

**INTERROGATORY NO. 14:** Detail all ways in which you claim that Defendants have failed to take proper precautions to ensure against risks to you and identify all documents and witnesses supporting that claim.

**ANSWER TO INTERROGATORY NO. 14:**

Please see Answers to Interrogatory Numbers 1-8, 10-12.

**INTERROGATORY NO. 15:** State all facts and identify all witnesses and documents supporting your contention that the parties to the Lease intended to benefit IFSB employees and customers.

**ANSWER TO INTERROGATORY NO. 15:**

The Agreement of Lease contains several provisions intended to benefit third parties, including employees and customers. The provisions include:

- reference to the use of the premises to "operat[e] a savings bank;"

- "water for lavatory and drinking and office cleaning purposes;"

- "hot and chilled water for heating and cooling;"

- rules and regulations that are "universally applied to and enforced against the tenants of the Building;" and

- indemnity for the tenant for the landlord's "wilful misconduct or gross negligence."

In addition, pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, to the extent that non-privileged, responsive documents exist and are in IFSB's possession, custody or control, they will be produced at a mutually agreeable time and place. For further information, please see Answers to Interrogatory Numbers 1, 2.

**INTERROGATORY NO. 16:** State all facts and identify all witnesses and documents supporting your contention that 1225 and its general contractor are interfering with your implied covenant of quiet enjoyment and have caused you to suffer harm and include the basis upon which you believe you have standing to assert a claim for interference with such covenant.

**ANSWER TO INTERROGATORY NO. 16:**

Please see Answers to Interrogatory Numbers 1-8, 10-15.

**INTERROGATORY NO. 17:**  State all facts and identify all witnesses and documents supporting your contention that the actions of 1225 and its general contractor constitute a nuisance and have caused you injury.

**ANSWER TO INTERROGATORY NO. 17:**

Please see Answers to Interrogatory Numbers 1-8, 10-15.

**INTERROGATORY NO. 18:**  State all facts and identify all witnesses and documents supporting your contention that Defendants are carrying out and undertaking the Repositioning Project in a negligent manner and that you have suffered injury as a result thereof.

**ANSWER TO INTERROGATORY NO. 18:**

Please see Answers to Interrogatory Numbers 1-8, 10-12.

**INTERROGATORY NO. 19:**  If you intend to rely upon any documents or other tangible things not already identified herein to support a position that you have taken or intend to take in the action, provide a brief description, by category and location, of all such documents and other tangible things, and identify all persons having possession, custody, or control of them.

**ANSWER TO INTERROGATORY NO. 19:**

Pursuant to Rule 33(d) of the Superior Court Rules of Civil Procedure, to the extent that non-privileged, non-confidential (pursuant to OTS or FDIC authority, or any federal law or regulation), responsive documents exist and are in Parsons' possession, custody or control, they will be produced at a mutually agreeable time and place.  Exhibits will be identified in accordance with the Pretrial Order and the Superior Court Rules.

36

The foregoing Answers are true to the best of IFSB's knowledge and information.  Executed under the penalties of perjury of the District of Columbia, on the _____ day of June, 2008.


_____

Stanley W. Parsons

FOR THE OBJECTIONS:        COOTER, MANGOLD, TOMPERT
                            & KARAS, L.L.P.


                            ___/s/ Dale A. Cooter_____
                            Dale A. Cooter, Esq. (227454)
                            5301 Wisconsin Avenue, N.W.
                            Suite 500
                            Washington, D.C.  20015
                            (202) 537-0700
                            (202) 364-3664 (Fax)
                            efiling@cootermangold.com

### CERTIFICATE OF SERVICE

I hereby certify that on this 10th day of June, 2008, a copy of the foregoing **PLAINTIFFS STANLEY W. PARSONS'S ANSWERS TO DEFENDANTS 1225 CONNECTICUT CO., LLCS' FIRST SET OF INTERROGATORIES** was served by electronic mail on:

                Richard W. Luchs, Esq.
                William C. Casano, Esq.
                Joshua M. Greenberg, Esq.
                GREENSTEIN DELORME & LUCHS, P.C.
                1620 L Street, N.W.
                Suite 900
                Washington, D.C. 20036-5605


                            _/s/ Dale A. Cooter_____
                            Dale A. Cooter

**EXHIBIT B**

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| INDEPENDENCE FEDERAL<br>  SAVINGS BANK, et al., | )<br>)<br>) | |
| Plaintiffs, | )<br>) | |
| v. | )<br>) | C.A. No. 1:08-CV-00963 |
| 1225 CONNECTICUT CO. L.L.C.,<br>  et al., | )<br>)<br>)<br>) | |
| Defendants. | )<br>) | |

## SUPPLEMENTAL DECLARATION OF DONNA S. MANGOLD

I, Donna S. Mangold, declare and state as follows:

1. I am over the age of 18 and am competent to testify to the matters contained herein.

2. I am counsel of record for the Plaintiffs Independence Federal Savings Bank and Stanley W. Parsons in this litigation.

3. As a result of the removal of this action to the United States District Court for the District of Columbia, the Plaintiffs incurred a total of $14,574.00 in fees in seeking remand of this case back to the Superior Court for the District of Columbia. Included in Plaintiffs' Motion to Remand and for Costs and Attorneys Fees and Reply to Defendants' Opposition to the Motion to Remand and for Costs and Attorneys Fees is the true and correct billing information related to Plaintiff's efforts to gain remand of this case.

4. On June 26, 2008, Plaintiffs, through my firm, filed a Motion to Remand and for Costs and Attorneys Fees in this action. On July 10, 2008, Defendants filed an Opposition to Plaintiffs' Motion to Remand and for Costs and Attorneys Fees.

5. In the process of replying to Defendants' Opposition, Mr. Pignatelli and I conducted

additional research on all of the issues raised, and all of the cases cited in Defendants' Opposition. This was necessary to demonstrate inapplicability of the cases cited by Defendants.

6. The $6,412.00 in fees incurred in preparing the Reply, and set forth in the Reply, were actually billed to Plaintiffs, and were reasonable and necessary under the circumstances.

7. The hourly rates charged were appropriate based on Mr. Pignatelli's and my experience, and consistent with similar rates charged by attorneys of similar experience, which I have reviewed in other cases, in the context of requests for attorneys fees.

8. The current hourly rates reflected on the CMTK billing statements are as follows: my rate is $490.00; Mr. Pignatelli's rate is $260.00.

Executed under the penalty of perjury of the District of Columbia on the 21st day of June, 2008.

Donna S. Mangold

2